**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| STOP LONGMEADOW, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | ) |
| | ) |
| UNITED STATES DEPARTMENT OF | )   Case No. |
| TRANSPORTATION, ELAINE L. CHAO, | ) |
| Secretary, United States Department of | )   Hon. Sharon J. Coleman |
| Transportation, FEDERAL HIGHWAY | ) |
| ADMINISTRATION, WALTER C. "BUTCH" | ) |
| WAIDELICH, JR., Acting Deputy Administrator, | ) |
| Federal Highway Administration, CATHERINE K. | ) |
| BATEY, Division  Administrator, Illinois Division, | ) |
| Federal Highway Administration, and KANE | ) |
| COUNTY, a municipal corporation, | ) |
| | ) |
|     Defendants. | ) |

## MOTION TO INTERVENE PURSUANT TO F.R.C.P. 24

NOW COMES Plaintiff, STOP LONGMEADOW, by and through its undersigned

counsel, and for its Motion to Intervene Pursuant to F.R.C.P. 24, states as follows:

1.      Currently pending before this Court is the matter of *Petzel v. Kane County Dept. of*

*Trans., et al.*, 16-cv-05435. The *Petzel* matter is a *pro se* suit challenging the planned construction

of a highway and toll bridge in Kane County, Illinois ("the Longmeadow Project"). The *Petzel*

action asserts various claims against federal and local agencies supporting the Longmeadow

Project, including violations of the National Environmental Protection Act ("NEPA") and the

Land and Water Conservation Fund Act.

2.      Stop Longmeadow, the party seeking to intervene, is a not-for-profit corporation

organized and existing under the laws of the State of Illinois. Stop Longmeadow and its members

use, enjoy and work to protect and conserve the natural resources in Kane County, Illinois, specifically including the areas affected by the proposed highway and toll bridge. Like the plaintiff in *Petzel*, Stop Longmeadow also opposes the Longmeadow Project. The parties' claims overlap to a high degree (*e.g.*, NEPA claims), but not entirely (*e.g.*, Stop Longmeadow also specifically challenges portions of the project due to its impact on a rusty patched bumble bee, an endangered species present in the project area). Overall, the *Petzel* claim and the claims set forth in Stop Longmeadow's proposed complaint (attached as Ex. A) share numerous common (virtually identical) questions of law and fact, and all arise from the same challenge to the same undertaking. All but one of the defendants in Stop Longmeadow's proposed complaint are sued and have already appeared in the *Petzel* matter.

3.      In addition, Stop Longmeadow is particularly concerned with the Longmeadow Project's imminent and destructive impact on the habitat of the rusty patched bumble bee, in light of a construction project which is slated to begin on April 17, 2017. As such, upon being granted leave to intervene, should the Court decide to allow same, Stop Longmeadow intends to seek leave to file the attached Proposed Emergency Motion for Temporary Restraining Order and Preliminary Injunction on Count III of Plaintiff's Complaint for Injunctive Relief (Ex. B).

4.      Stop Longmeadow has advised the Court's office and counsel in the *Petzel* matter of its intent to seek emergency relief, and has been advised to appear for same on Monday, April 17 at 9:00 a.m. Stop Longmeadow will request that the Court grant the instant motion at that time, and for leave to file the proposed complaint and motion *instanter*.

**WHEREFORE**, petitioning Intervenor, Stop Longmeadow, respectfully requests that it be granted leave to appear before the Court, to file the attached proposed complaint and proposed

motion *instanter*, and to have same consolidated for adjudication alongside the pending *Petzel*

matter.

Respectfully submitted,

/s/ James A. Karamanis
Barney & Karamanis, LLP
Two Prudential Plaza
180 N. Stetson, Suite 3050
Chicago, IL 60601
Telephone: 312-553-5300
jbarney@jsbarney.com
Illinois ARDC No. 6203479

# EXHIBIT

# A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STOP LONGMEADOW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | Case No. |
| TRANSPORTATION, ELAINE L. CHAO, | ) | |
| Secretary, United States Department of | ) | Hon. Sharon J. Coleman |
| Transportation, FEDERAL HIGHWAY | ) | |
| ADMINISTRATION, WALTER C. "BUTCH" | ) | |
| WAIDELICH, JR., Acting Deputy Administrator, | ) | |
| Federal Highway Administration, CATHERINE K. | ) | |
| BATEY, Division Administrator, Illinois Division, | ) | |
| Federal Highway Administration, and KANE | ) | |
| COUNTY, a municipal corporation, | ) | |
| | ) | |
| Defendants. | ) | |

<span style="color:red">**PROPOSED**</span>
**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

NOW COMES Plaintiff, STOP LONGMEADOW, by and through its undersigned counsel, and hereby seeks declaratory and injunctive relief against the Defendants, United States Department of Transportation ("DOT"); Elaine L. Chao in her official capacity as Secretary of the DOT; the Federal Highway Administration ("FHWA"); Acting Deputy Administrator Walter C. "Butch" Waidelich, Jr., in his official capacity as Acting Deputy Administrator of the FHWA; and Catherine Batey in her official capacity as Division Administrator, Illinois Division of the FHWA, in connection with Defendants' approval of the November 22, 2016 Finding of No Significant Impact and the underlying Reevaluation Environmental Assessment for the Longmeadow Parkway Bridge Corridor Project in Kane County, Illinois. In support of this Complaint, Plaintiff states the following:

## INTRODUCTION

1.     This action challenges the Defendants' violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. 4321 *et seq*.; Section 4(f) of the Department of Transportation Act ("Section 4(f)"), 49 U.S.C. 303 and 23 U.S.C. 138; and the Administrative Procedure Act ("APA"), 5 U.S.C. 553-559 and 701-706, and the Endangered Species Act of 1973, 16 U.S.C. 1531 *et seq*. ("ESA") in connection with Defendant FHWA's approval of a Finding of No Significant Impact ("FONSI") and the underlying Reevaluation Environmental Assessment ("EA") for the Longmeadow Parkway Bridge Corridor Project ("Longmeadow" or "the Longmeadow Project") in Kane County, Illinois. Plaintiff is a citizens' groups whose members live in Kane County, enjoy recreational activities in the parklands that will be adversely affected by the Longmeadow Project, and support environmentally and fiscally responsible transportation solutions in Kane County.

2.     The Longmeadow Project is a proposed highway corridor between Huntley Road and Illinois Route 62, passing through Algonquin, Carpentersville, Barrington Hills, and portions of unincorporated Kane County.  The proposed route is approximately 5.6 miles long, and will entail constructing an additional 3.7 miles of intersecting and "feeder" roadways as well as a new four-lane toll bridge spanning the Fox River in Kane County, Illinois. Defendants currently estimate that the project will cost approximately $115,000,000 to complete. $14,500,000 of those funds are federal funds, provided through the federal Defendants.

3.     The Longmeadow Project was conceived in 1990. Despite almost 30 years of demographic, environmental and social changes in the affected region, Defendants and the project's other backers have failed to properly update their underlying plans and research studies

to account for such changes, in contravention of the NEPA, Section 4(f) and their enabling regulations.

4.     The proposed highway will pass through the heart of the Brunner Family Forest Preserve, a public forest described as among the highest quality habitats of its kind in the United States. It is home to a local population of bald eagles, as well as twelve "priority species" which represent certain globally rare ecosystems found in the region, including but not limited to, the blue-spotted salamander and various butterflies, bees, turtles and snakes. The preserve also provides habitat for birds (including the willow flycatcher, sedge wren and the Illinois-endangered American bittern) and the federally-threatened northern long-eared bat, as well as fragile wetlands and rare plants, all of which are critical to the makeup of the area's unique ecology. The proposed four-lane toll bridge portion of the highway will cross the Fox River, home to rare, native species of aquatic life, and will entail the construction of a massive bridge pier and a large detention pond for polluted runoff. Construction of the project will require cutting down over 5,765 trees in the Brunner Family Forest Preserve, the nearby Fox River Shores Forest Preserve, other local forest preserves and along the proposed route.

5.     Significantly, the Brunner Family Forest Preserve is also home to the rusty patched bumblebee, a species on the brink of extinction, and the first bee of any kind in the continental United States to be declared endangered. The U.S. Fish and Wildlife Service formally listed the species (*Bombus affinis*) as endangered on March 21, 2017.  (*See* Ex. 1).

6.     While the Longmeadow Project, in one form or another, has been contemplated and discussed for decades, recent activity showing that the Defendants intend to move forward on the proposed highway has caused the project to become the subject of a fierce and organized opposition in Kane County. Plaintiff and its members, like members of the community at large,

recognize it as ecologically devastating and fiscally unsound, as well as unnecessary, given the current and anticipated traffic patterns in the area. In addition to opposition from Plaintiff and members of the general public in the immediately affected area, the project is opposed by the Sierra Club and other national and regional environmental advocacy groups. It is also formally opposed by the Village of Barrington Hills and Dundee Township (where it was overwhelmingly rejected (over 72% of voters opposed), in a March 2016 advisory referendum). In addition, the National Park Service has rescinded its approval of the Hickory Hill Park conversion portion of the project, as of January 31, 2017.

7.     FHWA issued a final Environmental Impact Statement ("EIS") (Ex. 2) in November 2001 and a Record of Decision ("ROD") in May 2002.  In June 2015, the Regional FHWA Administrator for Illinois determined that a Reevaluation Environmental Assessment ("Reevaluation EA") was necessary. On July 26, 2016, FHWA approved the Reevaluation EA. (Ex. 3). On November 22, 2016 FHWA issued its finding that the changes to the project from 2002 to 2016 were of no significant impact; and approved the FONSI (Ex. 4). Plaintiff asserts that both the FONSI and the Reevaluation EA failed to take into account numerous critical changes, described in detail below.

8.     As also discussed in detail below, Defendants violated NEPA and Section 4(f) because they acted unreasonably, arbitrarily and capriciously, abused their discretion, and acted contrary to law when they relied upon inflated population and employment forecasts in the Longmeadow Parkway study area. These inflated forecasts, in turn, became the basis for inflated traffic projections used to establish the purpose of and need for the new toll bridge. Defendants also failed to conduct a rigorous exploration and objective evaluation of the alternatives, as require by the NEPA. See also, 42 U.S.C. 4332(2)(C); 5 U.S.C. 702.

9.     Defendants' approval of the project, the FONSI and the Reevaluation EA should be reversed and remanded to avoid the irreparable harm the Longmeadow Project will inflict upon local natural resources; the quality of the human environment; Plaintiff's and its members' use and enjoyment of Hickory Hill Park, Buffalo Park Forest Preserve, Brunner Family Forest Preserve, Fox Shores River Preserve, and eleven wetlands; and the public at large. Plaintiff respectfully requests that the Court enter and Order: (1) declaring that Defendants violated the NEPA, Section 4(f), and the APA when they approved the FONSI for the Longmeadow Project; (2) declaring that Defendants' approval of the FONSI was unreasonable, arbitrary and capricious, an abuse of discretion, and contrary to law; (3) vacating, setting aside, and remanding the Reevaluation EA and FONSI; (4) enjoining Defendants and their agents from any and all construction activity for the Longmeadow Project, unless and until Defendants fully comply with the NEPA, Section 4(f), and the APA; (5) directing that the Plaintiff be allowed to recover its costs, including reasonable attorneys' fees, incurred in connection with this action, under the Equal Access to Justice Act, 28 U.S.C. 2412(d), and other applicable laws; and (6) providing such other and further relief as the Court deems just, proper, and in the public interest.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. 1331 (federal question), § 2201 (declaratory relief), and § 2202 (injunctive relief), because this action is one of cases and controversies under the National Environmental Policy Act, Department of Transportation Act, Endangered Species Act and Administrative Procedure Act.

11.     Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) and (e), because the proposed Project lies entirely within the Northern District of Illinois, and the Plaintiff and its members, as well as Defendants, are present in and do business in the Northern District.

Furthermore, a substantial portion of the events or omissions giving rise to the claims stated herein occurred in the Northern District. FHWA, in consultation with the Illinois Department of Transportation ("IDOT") prepared the unlawful Reevaluation EA and FONSI and violated the laws at issue in this Complaint.

12.     Plaintiff has no adequate remedy at law. The relief Plaintiff seeks will redress the injuries to its members, and, unless this Court grants the requested relief, the Defendants' actions will cause irreparable harm to the environment and natural resources, to Plaintiff and its members' interests, including its members' use and enjoyment of the affected land and natural resources, and to the general public. No monetary damages or other legal remedy could adequately compensate Plaintiff, its members, or the public for these harms. Considering the balance of hardships between the Plaintiff and Defendants, a remedy in equity is warranted.

13.     Plaintiff and its members are persons adversely affected or aggrieved by federal agency action within the meaning of Section 702 of the Administrative Procedure Act. 5 U.S.C. 702.

14.      On January 13, 2017, pursuant to 23 U.S.C. 139(l)(1), Defendant FHWA published a notice in the Federal Register stating that the Reevaluation EA and FONSI constitute the Final Federal Agency Action on the Longmeadow Project, and that any claim seeking judicial review of the agency action would be barred unless the claim is filed on or before June 12, 2017. This Complaint is filed on April 17, 2017 and therefore is not time-barred under 23 U.S.C. 139(l)(1).

## PARTIES

15.     Plaintiff Stop Longmeadow is a not-for-profit corporation organized and existing under the laws of the State of Illinois. Stop Longmeadow and its members use, enjoy and work to protect and conserve the natural resources in Kane County, Illinois, specifically including the areas

affected by the proposed highway and toll bridge: the Perry-Lathrop Property, Buffalo Park Forest Preserve, Brunner Family Forest Preserve, Fox Shores River Preserve, the Fox River and eleven local wetlands. Stop Longmeadow was organized to protect these natural wildlife habitats, to enrich the lives of the citizens of Kane County with open space and clean air, and to maintain opportunities for recreation on the Fox River for the use of all Illinoisans. Stop Longmeadow has approximately 200 members, who live in Kane County and/or use and enjoy the land and natural areas that would be affected and degraded by the proposed new highway and toll bridge's construction and operation, related car and truck traffic and induced development. Specifically, Stop Longmeadow members enjoy activities such as hiking, paddling, boating, birdwatching, cycling, gardening, restoring and volunteering in the parkland that will be affected by the Longmeadow Project. The Defendants' actions --adopting the Reevaluation EA and FONSI, along with their related actions and omissions, as set forth in this Complaint --will irreparably harm Stop Longmeadow and its members. Stop Longmeadow's members have and continue to participate in and comment in administrative and municipal proceedings related to the Longmeadow Project and the Defendants' attendant violations of federal laws.

16.     Defendant United States Department of Transportation ("DOT") is an executive department of the United States Government. Its duties include ensuring the coordinated and effective administration of the transportation programs of the United States Government and encouraging cooperation of Federal, State and local governments to achieve transportation objectives. 49 U.S.C. 101(b).

17.     Defendant Elaine L. Chao is the Secretary of the DOT. Secretary Chao oversees the activities of the DOT and its agencies, including the Federal Highway Administration. Secretary Chao is sued in her official capacity.

18.     Defendant Federal Highway Administration ("FHWA") is an agency within the DOT. Among other things, FHWA is required to ensure compliance with NEPA before approving transportation projects such as Longmeadow. FHWA is also responsible for overseeing the preparation of Environmental Impact Statements; reviewing Environmental Impact Statements to determine their compliance with NEPA and other federal laws; approving or denying Environmental Impact Statements in the form of written Records of Decision; conducting reevaluations of environmental impacts of transportation projects; and approving Reevaluation Environmental Assessments and findings of the impacts of changes made to projects as they progress to assess what, if any, impact those modifications will have on the environment. FHWA's Regional Office in Springfield, Illinois, approved the Reevaluation EA and FONSI at issue in this case.

19.     Walter C. "Butch" Waidelich, Jr., Acting Deputy Administrator, in his official capacity as Acting Deputy Administrator of the FHWA (and in lieu of the Administrator of the FHWA, as that role is currently vacant and awaiting appointment). As such, the Acting Deputy Administrator oversees the activities of FHWA and its various divisions.

20.     Defendant Catherine Batey, Division Administrator of FHWA, is the director of FHWA's Illinois Division. Administrator Batey oversees the activities of the Illinois Division, including the preparation and approval of Environmental Impact Statements, Records of Decision, Environmental Assessment Reevaluations, and FONSIs. Administrator Batey is sued in her official capacity.

21.     Defendant Kane County is a municipal corporation in Illinois, located entirely within this federal district.

## APPLICABLE LAW

The National Environmental Policy Act ("NEPA"), 42 U.S.C. 4321 *et seq*.

22.     NEPA is the "basic national charter for protection of the environment." 40 CFR 1500.1(a). NEPA seeks to protect the environment by ensuring that public officials "make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 CFR 1500.1(c).

23.     NEPA requires all federal agencies to prepare a detailed Environmental Impact Statement ("EIS") on every proposal for a major federal action which will or may significantly affect the quality of the human environment. 42 U.S.C. 4332(2)(C). NEPA defines the required elements of an EIS, which must include a detailed discussion of:

(i)     the environmental impact of the proposed action;

(ii)    any adverse environmental effects which cannot be avoided should the proposal be implemented;

(iii)   alternatives to the proposed action;

(iv)    the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

(v)     any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

24.     NEPA requires federal agencies to study, develop and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. 42 U.S.C. 4332(2)(E).

25.     NEPA regulations further require that an agency must identify the purpose and need of the proposed action in its EIS; must "rigorously explore and objectively evaluate all reasonable alternatives" for achieving the general goals of the proposed action; and must thoroughly analyze the environmental impacts of the proposed action and alternatives. 40 CFR 1502.

26.     The environmental impacts that an EIS must consider include "indirect" impacts, including growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems and "cumulative" impacts which result from incremental impact of the proposed action when combined with other past, present, and reasonably foreseeable future actions. 40 CFR 1508.7.

27.     An EIS also must evaluate "[p]ossible conflicts between the proposed action and the objectives of Federal, regional, State, and local ... land use plans, policies and controls for the area concerned." 40 CFR. 1502.16(c). "Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law." 40 CFR 1506.2(d).

28.     FHWA's NEPA regulations provide that an NEPA study may, when appropriate, proceed in "tiers." At the first tier of study, FHWA is to consider "broad issues such as general location, mode choice, and area wide air quality and land use implications of the major alternatives." 23 CFR. 771.111(g). FHWA is then to address "site-specific details" at the second tier. *Id.*

Section 4(f) of the Transportation Act , U.S.C. 303 and 23 U.S.C. 138

29.     Section 4(f) of the Transportation Act establishes as a national policy that "special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites." 49 U.S.C. 303(a); 23 U.S.C. 138(a). In order to achieve this national policy, Section 4(f) prohibits the Secretary of Transportation from approving any "transportation program or project . . . requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national,

10

State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site)" unless "(l) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use." 49 U.S.C. 303(c); *see also* 23 U.S.C. 138.

30.     FHWA regulations implementing Section 4(f) define "use" to include both actual use and "constructive" use. 23 C.F.R. 774.17. Actual use occurs when "land is permanently incorporated into a transportation facility." "Constructive" use occurs when "the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify a resource for protection under section 4(f) are substantially impaired." 23 CFR. 774.15.

The Administrative Procedure Act ("APA"), 5 U.S.C. 553-559, 701-706

31.     The APA provides for judicial review of final agency actions, such as those at issue here. A reviewing court shall hold unlawful and set aside agency actions, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. 706(2)(A).

The Endangered Species Act, 16 U.S.C. 1531 *et seq.*

32.     The purpose of the ESA is to protect and recover imperiled species and the ecosystems upon which they depend.

33.     Under the ESA, species may be listed as either endangered or threatened. "Endangered" means a species is in danger of extinction throughout all or a significant portion of its range. "Threatened" means a species is likely to become endangered within the foreseeable future.

34.     The law's ultimate goal is to "recover" species so they no longer need protection under the ESA. Recovery plans describe the steps needed to restore a species to ecological health. U.S. Fish & Wildlife Service ("FWS") biologists write and implement these plans with the assistance of species experts; other federal, state, and local agencies; tribes; nongovernmental organizations; academia; and other stakeholders.

35.     Section 7 of the ESA requires federal agencies to use their legal authorities to promote the conservation purposes of the ESA and to consult with the FWS to ensure that effects of actions they authorize, fund, or carry out are not likely to jeopardize the continued existence of listed species. During consultation the "action" agency receives a "biological opinion" or concurrence letter addressing the proposed action.

## BACKGROUND

36.     The proposed highway, first conceived in 1990, would be built through a corridor at the exurban edge of the Chicago metropolitan area that is now almost entirely agricultural lands, low-density residential homes, open and natural spaces and public forest preserves. Construction of the proposed the four-lane highway and its toll bridge would impact hundreds of acres of farmland and forest, and change population growth and traffic patterns in a manner that would also threaten the long-term viability of the forest preserves and the area wetlands. The following timeline summarizes the development of the Longmeadow Project:

Timeline

a.      1990 - Formation of the Fox River Bridge Advisory Committee consisting of representatives from townships, municipalities and counties near the Fox River.

b.      May 14, 1991 - Kane County Board Resolution #91-104 authorizes the County Superintendent to enter into an agreement with the State of Illinois Department of Transportation for a feasibility study.

c. September 10, 1991 - Kane County Board Resolution #91-227 authorizes county to enter into an agreement for engineering services with a consultant.

d. May 11, 1993 - Kane County Board Resolution #93-151 seeks an Environmental Impact Statement for various new roadways and bridges over the Fox River in Kane County.

e. June 9, 1998 - Congress adopts "Transportation Equity Act for the 21st Century," which includes $9,375,000 "to construct crossings over Fox River in Kane County."

f. July 28, 1998 - Public Hearing held to discuss a draft EIS.

g. November 1, 2001 - Final EIS and Section 4(f) Evaluation approved.

h. May 13, 2002 – FHWA issues ROD.

i. October 12, 2004 - Kane County Board Resolution #04-375 adopts 2030 Transportation & 2030 Land Resource Management Plans.

j. August 10, 2005 – Congress adopts "Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users" or SAFETEA–LU. Includes $4,000,000 for "land acquisition, engineering, and construction for the initial 2-lane segments of the [Longmeadow Parkway Bridge] Corridor between IL 31 and IL 25 and other segments of the Corridor as appropriate."

k. April 8, 2008 - Kane County Board Resolution #08-107 authorizes a traffic projection and financial feasibility study agreement by Wilbur Smith Associates.

l. June 23, 2010 - Longmeadow Parkway Tollway Bridge Task Force accepts and adopts the traffic projections and financial feasibility study.

m. May 13, 2003 - Kane County Board Resolution #03- 176 authorizes acquisition of right of way.

n. June 9, 2009 - Kane County Board Resolution #09-222 and #09-223 authorize acquisition of  right of way.

o. November 20, 2009 - FHWA issues a statement that the modification of the original plan, to make the non-toll bridge over Fox River into a toll bridge, did not require the FHWA to prepare a Supplemental EIS.

p. March 9, 2010 - Kane County Board Resolution #10-89 authorizes acquisition of right of way.

q.      August, 10, 2010 - Kane County Board Resolution #10-238 recommends proceeding to construct of a toll bridge across the Fox River in Dundee Township.

r.      December 13, 2011 - Kane County Board Resolution #11-415 authorizes acquisition of  right of way.

s.      January 10, 2012 - Kane County Board Resolution #12-18 amends certain right of way authorizations.

t.      June 2015 - Regional FHWA Administrator for Illinois determines that an Environmental Assessment Reevaluation ("Reevaluation EA") is necessary.

u.      July 26, 2016 – FHWA approved the Reevaluation EA.

v.      September 22, 2016 – FWS publishes notice in the Federal Register of proposed rule to classify the rusty patched bumble bee as "endangered."

w.      November 22, 2016 - FHWA issued its finding that the changes to the project from 2002 to 2016 were of no significant impact and approved the FONSI.

x.      January 13, 2017 - pursuant to 23 U.S.C. 139(l)(1), FHWA publishes a notice in the Federal Register stating that the Reevaluation EA and FONSI constitute the Final Federal Agency Action on the Longmeadow Project.

y.      March 21, 2017 – rusty patched bumble bee officially classified as "endangered" by FWS.

z.      April 11, 2017 – Kane County Department of Transportation announces plans to begin construction --on April 17, 2017 –on land within the "action area" of the rusty patched bumble bee.

37.     During this development process, and in furtherance of the project described above, the Defendants have made numerous, critical omissions in their methodologies and conclusions, and particularly in their adoption of the Reevaluation EA and resultant FONSI, which amount to violations of the NEPA, APA and Section 4(f):

Critical Omissions in Defendants' Methodologies and Conclusions

a.      Failure to adequately take into account, consider or otherwise address the existence of at-risk species, specifically including but not limited to, the rusty patched bumblebee, a federally recognized endangered species found in and near the Brunner Family Forest Preserve, or to study or evaluate the impact of the

14

highway project on its population, which is recognized as being on the verge of extinction.

b.      Failing to consult with FWS, failing to receive a conference report and failing to document or make any kind of record of consideration regarding the rusty patched bumble bee and the impact of the project upon it, in contravention of Section 7 of the ESA.

c.      Making the unsupported, conclusory, arbitrary and capricious finding that the highway and toll bridge project would, for purposes of Section 4(f), constitute a *de minimis* use of the Fox River Shores Forest Preserve when, in fact, the use would include the construction of a massive bridge pier and large detention pond for polluted runoff, as well as four lanes of traffic passing over the subject forest canopy.

d.      Failure of the Reevaluation EA to describe the impact of the following construction activities on the environment or recreational activities:

- construction of bridge piers in the Fox River;
- construction of mechanically stabilized earth walls; and
- permanent detour of the Fox River Trail

e.      Failure to consider the effect of a proposed "haul road" under Section 4(f), and failure to evaluate the proposed "haul road" for exemption for Section 4(f) status, as required by 23 CFR 774.13(d).

f.      Failure of the Reevaluation EA to discuss alternatives to the highway and toll bridge, as required by 40 CFR 1508.9(b).

g.      Failure of the EIS and Reevaluation EA, in contravention of 23 U.S.C. 138(a) to rule out "feasible and prudent alternative[s]" prior to the use of land covered by Section 4(f).

h.      Failure to account for current traffic and population data and forecasts that show that the significant growth predicted for the project area at the time of the EIS has not developed, in contravention of 40 CFR 1502.9(c) and 23 CFR 771.130(a). In other words, the traffic and population figures used to evaluate, support and ultimately justify and authorize the project are simply inflated.

i.      Basing traffic assessments on a non-toll bridge, when the proposed bridge is now actually intended to charge a toll, in contravention of 40 CFR 1502.9(c) and 23 CFR 771.130(a).

j.      Failure, in contravention of 40 CFR 1502.9(c) and 23 CFR 771.130(a), to account for the reduction in traffic congestion caused by the expansion of I-90 at the Fox River to eight lanes.

k.    Failure to update the 1996 bird species count used in the EIS, in contravention of 40 CFR 1502.9(c) and 23 CFR 771.130(a)

l.    Failure to consider modern studies, conducted since the 1996 bird species count, regarding the effects of traffic noise and light pollution, *inter alia*, on the species present in the affected forests.

## CLAIMS FOR RELIEF

## COUNT I

## VIOLATIONS OF THE NATIONAL ENVIRONMENTAL POLICY ACT AND THE ADMINISTRATIVE PROCEDURE ACT

38.    Plaintiffs reassert and incorporate herein Paragraphs 1 through 37.

39.    The NEPA requires federal agencies, including the Defendants herein, to analyze the environmental impacts of a proposed action before proceeding with that action. *See* 42 U.S.C. 4332(2)(C). Under the NEPA and its enabling regulations, Defendants were required to prepare and circulate to the public a comprehensive EIS so that the environmental impacts of the Longmeadow Project could be meaningfully considered and disclosed to the public during the decision-making process. *See* 40 CFR 1501.2, 1502.5.

40.    In contravention of these requirements, the EIS, the Reevaluation EA and resulting FONSI failed to identify direct, indirect, and cumulative impacts of the proposed action, failed to consider alternative actions (including the alternative of taking no action) and their impacts, and failed to identify all irreversible and irretrievable commitments of resources associated with the action, as set forth above in Paragraph 37(a)-(l). *See* 42 U.S.C. § 4332(2); 40 C.F.R. § 1502.14(d).

41.    Accordingly, the Defendants violated the NEPA and its implementing regulations and the Administrative Procedure Act in approving the EIS, the Reevaluation EA and resulting FONSI for the proposed Longmeadow Project by conducting a flawed analysis of the need for the proposed highway and toll bridge, based on inflated, outdated and misleading population,

employment and traffic forecasts; and failing to take a "hard look" at the area-wide environmental impacts of the Longmeadow Project, as described above.

42.     The Defendants' failure to comply with the NEPA and its implementing regulations and their approval of the EIS, the Reevaluation EA and resulting FONSI was arbitrary and capricious, an abuse of discretion, and not in accordance with law, and thus violates the Administrative Procedure Act, 5 U.S.C. 706.

## COUNT II

### VIOLATIONS OF SECTION 4(f) OF THE DEPARTMENT OF TRANSPORTATION ACT AND THE ADMINISTRATIVE PROCEDURE ACT

43.     Plaintiffs reassert and incorporate herein Paragraphs 1 through 42.

44.     The Defendants violated Section 4(f) and its implementing regulations and the Administrative Procedure Act in approving the EIS, the Reevaluation EA and resulting FONSI for the proposed Longmeadow Project by failing to reasonably and adequately address alternatives to the use of lands protected by Section 4(f), and in failing to adequately consider reasonable, prudent and feasible alternatives to avoid harmful impacts to these protected lands, as set forth above in Paragraph 37(a)-(l).

45.     Accordingly, the Defendants' failure to comply with Section 4(f) and its implementing regulations, as set forth above, was arbitrary and capricious, an abuse of discretion, and not in accordance with law, and thus violates the Administrative Procedure Act.

## COUNT III

### ADMINISTRATIVE PROCEDURE ACT
### DEFENDANTS' FAILURE TO PERFORM DUTIES UNDER
### SECTION 7 OF THE ENDANGERED SPECIES ACT

46.     Plaintiffs reassert and incorporate herein Paragraphs 1 through 45.

47.     This Count is brought pursuant to the Administrative Procedure Act, U.S.C. § 701 *et seq*., ("APA") and challenges the Defendants' failure to perform their duties under the ESA.

48.     The 60-day notice provision found under 16 U.S.C. § 1540(g) is inapplicable to claims brought under the APA, challenging an agency's failure to perform a discretionary duty under the ESA. *Bennett v. Spear*, 520 U.S. 154, 176-178 (1997). *See also Western Watersheds Project v. United States Forest Serv*., 535 F. Supp. 2d 1173, 1183 (D.C. Idaho, 2007) (citing *Bennett*). However, such a claim brought under the APA may not be eligible for attorneys' fees under 16 U.S.C. § 1540(g)(4). *Bennet* at 162-63. When an ESA claim is pled under the APA, the standard of analysis is whether the challenged agency's action was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." *Id*. at 177.

49.     Under 16 USCS § 1536(a)(4) an agency has discretion to decide whether its actions are "likely" jeopardize the continued existence of any species proposed to be listed as endangered.

50.     The rusty patched bumble bee was proposed for listing as endangered on September 22, 2016, and has been formally recognized as such since March 21, 2017.

51.      The rusty patched bumble bee is present in the areas affected by the Longmeadow Project, including but not limited to, the Brunner Family Forest Preserve.

52.     Nevertheless, and notwithstanding that the proposed highway would be constructed in the heart of the bee's natural habitat, the Defendants concluded that the project would not jeopardize that habitat and the bee's continued existence there. This decision was unreasonable, arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.

53.     Moreover, pursuant to Sec. 7 of the ESA, federal agencies (including the federal Defendants here) shall, in consultation with FWS, insure that any action authorized, funded, or carried out by the agency (including the federally-funded Longmeadow Project) is not likely to

jeopardize the continued existence of any endangered species or threatened species or its habitat. 16 USC § 1536(a)(2). "In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available." *Id.*

54.     Pursuant to Sec. 7, the Defendants are required to obtain a written opinion from FWS and "a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." 16 USC § 1536(b)(3)(A).

55.     Pursuant to Sec. 7, the Defendants were required to seek from FWS information regarding whether any endangered species (or species proposed to be listed as endangered, as the rusty patched bumble bee had been since Sept. 22, 2016) may be present in the vicinity of the Longmeadow Project, and were required to "conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such [construction]." 16 USC § 1536(c)(1).

56.     The Defendants have failed to meet their obligation to assess the impact of their actions on the rusty patched bumble bee, a federally-recognized endangered species: The EIS, Reevaluation EA and FONSI are entirely devoid of any discussion, consideration or mention of the presence of the rusty patched bumble bee in the vicinity of the Longmeadow Project. In addition, Defendants failed to seek, let alone obtain,  the requisite written report from FWS regarding the endangered rusty patched bumble bee. Such omission is unreasonable, arbitrary and capricious, and an abuse of discretion, and in contravention of the statutory provisions set forth above.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment in favor of

Plaintiff and against Defendants and enter an Order:

a. Declaring that the EIS, the Reevaluation EA and resulting FONSI failed to identify direct, indirect, and cumulative impacts of the proposed action, failed to consider alternative actions (including the alternative of taking no action) and their impacts, and failed to identify all irreversible and irretrievable commitments of resources associated with the action;

b. Declaring that the Defendants violated the NEPA and its implementing regulations and the Administrative Procedure Act in approving the EIS, the Reevaluation EA and resulting FONSI for the proposed Longmeadow Project, by conducting a flawed analysis of the need for the proposed highway and toll bridge, based on inflated, outdated and misleading population, employment and traffic forecasts; and failing to take a "hard look" at the area-wide environmental impacts of the Longmeadow Project;

c. Declaring that the Defendants violated Section 4(f) and its implementing regulations and the Administrative Procedure Act in approving the EIS, the Reevaluation EA and resulting FONSI for the proposed Longmeadow Project, by failing to reasonably and adequately address alternatives to the use of lands protected by Section 4(f), and in failing to adequately consider reasonable, prudent and feasible alternatives to avoid harmful impacts to these protected lands;

d. Declaring that the that the Defendants' actions were arbitrary and capricious, an abuse of discretion and contrary to law, and thus violated the APA;

e. Vacating, setting aside, reversing and remanding the the EIS, the Reevaluation EA and resulting FONSI;

f. Enjoining Defendants from using the EIS, the Reevaluation EA and resulting FONSI in subsequent proceedings, including decisions whether to grant licenses, permits, and approvals for the proposed Longmeadow Project, unless and until the Defendants fully and fairly comply with the requirements of NEPA and Section 4(f);

g. Requiring the Defendants to undertake the biological assessment and other evaluations set forth in Sec. 7 of the ESA, and enjoining them from proceeding with the Longmeadow Project or receiving or disbursing federal funding in furtherance of it, until such assessment and evaluation is completed;

     h.      Allowing Plaintiff to recover its costs, including reasonable attorneys' fees incurred in connection with this action, as provided for under the Equal Access to Justice Act, 28 USC. 2412(d), the Endangered Species Act, and other applicable laws; and

     i.      Grant any such other and further relief as the Court may deem just and proper and in the public interest.

Respectfully submitted,

/s/ James A. Karamanis
 Barney & Karamanis, LLP
Two Prudential Plaza
180 N. Stetson, Suite 3050
Chicago, IL 60601
Telephone:  312-553-5300
jbarney@jsbarney.com
Illinois ARDC No. 6203479

/s/ Joshua Barney
Joshua Barney
Barney & Karamanis, LLP
Two Prudential Plaza
180 N. Stetson, Suite 3050
Chicago, IL 60601
Telephone:  312-553-5300
jbarney@barneykaramanis.com
Illinois ARDC No. 6210534
*Attorneys for Stop Longmeadow*

# EXHIBIT

# 1

## §1627.5 Applicability of restrictions, recordkeeping, and recipient priorities; private attorney involvement subgrants.

(a) *Applicability of restrictions.* The prohibitions and requirements set forth in 45 CFR part 1610 apply both to the subgrant and to the subrecipient's non-LSC funds, except as modified by paragraphs (b), (c), and (d) of this section.

(b) *Priorities.* Subrecipients must either:

(1) Use the subgrant consistent with the recipient's priorities; or

(2) Establish their own priorities for the use of the subgrant consistent with 45 CFR part 1620.

(c) *Recordkeeping.* A recipient must be able to account for how its subrecipients spend LSC funds or use property or services funded in whole or in part with LSC funds. A subrecipient must provide to the recipient records as described in paragraphs (c)(1) and (2) of this section.

(1) A subrecipient that handles matters as defined at 45 CFR 1635.2(b) must maintain adequate records to demonstrate that its attorneys and paralegals used the LSC funds or property or services funded in whole or in part with LSC funds:

(i) To carry out the activities described in the subgrant agreement; and

(ii) Consistent with the restrictions set forth at 45 CFR part 1610.

(2) A subrecipient that handles cases as defined at 45 CFR 1635.2(a):

(i) Must require its attorneys and paralegals to maintain records for each case that show the amount of time spent on the case and the activity conducted by date, and a unique client name or case number; and

(ii) Either the subrecipient or the recipient must maintain records for each case that show the problem type and the closing code for the case.

(iii) This requirement does not apply to subrecipients described in paragraph (d)(2)(ii) of this section.

(3) A subrecipient who handles both cases and matters must maintain the types of records described in paragraphs (c)(1) and (2).

(d) *Subgrants for engaging private attorneys*—(1) *Subgrants of funds.* The prohibitions and requirements set forth in 45 CFR part 1610 apply *only* to the subgranted funds when the subrecipient is a bar association, *pro bono* program, private attorney or law firm, or other entity that receives a subgrant for the sole purpose of funding private attorney involvement activities (PAI) pursuant to 45 CFR part 1614.

(2) *In-kind subgrants.* The prohibitions and requirements set forth in 45 CFR part 1610 apply *only* to the subgranted property or services acquired in whole or in part with LSC funds when the subrecipient is a bar association, *pro bono* program, private attorney or law firm, or other entity that receives a subgrant for the sole purpose of:

(i) Conducting private attorney involvement activities (PAI) pursuant to 45 CFR part 1614; or

(ii) Providing legal information or legal assistance on a *pro bono* or reduced fee basis to individuals who have been screened and found eligible to receive legal assistance from an LSC recipient.

(3) *Treatment of non-LSC funds.* Any funds or property or services acquired in whole or in part with LSC funds and used by a recipient as payment for a PAI subgrant are deemed LSC funds for purposes of this paragraph (d).

(4) *Recordkeeping exception.* The recordkeeping requirement in paragraph (c) of this section does not apply to private attorneys providing legal assistance on a pro bono or reduced fee basis.

## §1627.6 Transfers to other recipients.

(a) The requirements of this part apply to all subgrants from one recipient to another recipient.

(b) The subrecipient must audit any funds or property or services acquired in whole or in part with LSC funds provided by the recipient under a subgrant in its annual audit and supply a copy of this audit to the recipient. The recipient must either submit the relevant part of this audit with its next annual audit or, if an audit has been recently submitted, submit it as an addendum to that recently submitted audit.

(c) In addition to the provisions of §1627.4(c)(3), LSC may hold the recipient responsible for any disallowed expenditures of subgrant funds. Thus, LSC may recover all of the disallowed costs from either the recipient or the subrecipient or may divide the recovery between the two. LSC's total recovery may not exceed the amount of expenditures disallowed.

## §1627.7 Recipient policies, procedures and recordkeeping.

Each recipient must adopt written policies and procedures to guide its staff in complying with this part and must maintain records sufficient to document the recipient's compliance with this part.

## PART 1630—COST STANDARDS AND PROCEDURES

■ 11. In newly transferred and redesignated § 1630.16, revise the section heading to read as follows:

## § 1630.16   Tax sheltered annuities, retirement accounts, and pensions.

\*    \*    \*    \*    \*

Dated: February 6, 2017.

**Stefanie K. Davis,**
*Assistant General Counsel.*

[FR Doc. 2017–02718 Filed 2–9–17; 8:45 am]

**BILLING CODE 7050–01–P**

## DEPARTMENT OF THE INTERIOR

## Fish and Wildlife Service

## 50 CFR Part 17

[Docket No. FWS–R3–ES–2015–0112; 4500030113]

RIN 1018–BB66

## Endangered and Threatened Wildlife and Plants; Endangered Species Status for Rusty Patched Bumble Bee

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule; delay of effective date.

**SUMMARY:** In accordance with a January 20, 2017, memo from the White House, we, the U.S. Fish and Wildlife Service, are delaying the effective date of a rule we published on January 11, 2017.

**DATES:** The effective date of the rule that published on January 11, 2017, at 82 FR 3186, is delayed from February 10, 2017, to March 21, 2017.

**FOR FURTHER INFORMATION CONTACT:** Peter Fasbender, Field Supervisor, U.S. Fish and Wildlife Service, Twin Cities Ecological Services Field Office, 4101 American Blvd. E., Bloomington, MN 55425; by telephone 952–252–0092, extension 210. Persons who use a telecommunications device for the deaf (TDD) may call the Federal Relay Service at 800–877–8339.

**SUPPLEMENTARY INFORMATION:** On January 11, 2017, we published a rule to list the rusty patched bumble bee (*Bombus affinis*), a species that occurs in the eastern and Midwestern United States and Ontario, Canada, as an endangered species under the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*). The rule was to be effective on February 10, 2017.

On January 20, 2017, the White House issued a memo instructing Federal

agencies to temporarily postpone the effective date for 60 days after January 20, 2017, of any regulations that have published in the **Federal Register** but not yet taken effect, for the purpose of "reviewing questions of fact, law, and policy they raise." We are, therefore, delaying the effective date of our rule published on January 11, 2017, at 82 FR 3186 (see **DATES**, above).

## Administrative Procedure Act

To the extent that 5 U.S.C. 553 applies to this action, it is exempt from notice and comment because it constitutes a rule of procedure under 5 U.S.C. 553(b)(A). Alternatively, our implementation of this action without opportunity for public comment, effective immediately upon publication in the **Federal Register** is based on the good cause exceptions in 5 U.S.C. 553(b)(B) and 553(d)(3). Pursuant to 5 U.S.C. 553(b)(B), we have determined that good cause exists to forgo the requirement to provide prior notice and an opportunity for public comment thereon for this rule as such procedures would be impracticable, unnecessary, and contrary to the public interest. We are temporarily postponing for 60 days after January 20, 2017, the effective date of this regulation pursuant to the previously noted memorandum from the White House. As a result, seeking public comment on this delay is unnecessary and contrary to the public interest. For these same reasons, we find good cause to waive the 30-day delay in effective date provided for in 5 U.S.C. 553(d).

**Authority:** 16 U.S.C. 1361–1407; 1531–1544; and 4201–4245, unless otherwise noted.

Dated: February 7, 2017.

**James W. Kurth,**

*Acting Director, U.S. Fish and Wildlife Service.*

[FR Doc. 2017–02865 Filed 2–9–17; 8:45 am]

**BILLING CODE 4333–15–P**

---

# DEPARTMENT OF COMMERCE

## National Oceanic and Atmospheric Administration

### 50 CFR Part 217

**[Docket No. 160405311–6999–02]**

**RIN 0648–BF95**

## Taking and Importing Marine Mammals; Taking Marine Mammals Incidental to Rehabilitation of the Jetty System at the Mouth of the Columbia River: Jetty A, North Jetty, and South Jetty, in Washington and Oregon

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Final rule.

**SUMMARY:** NMFS, upon request of the U.S. Army Corps of Engineers (Corps), hereby issues a regulation to govern the unintentional taking of marine mammals incidental to the rehabilitation of the Jetty System at the Mouth of the Columbia River (MCR), over the course of five years. This regulation, which allows for the issuance of a Letter of Authorization (LOA) for the incidental take of marine mammals during the described activities and specified timeframes, prescribes the permissible methods of taking and other means of effecting the least practicable adverse impact on marine mammal species or stocks and their habitat, as well as requirements pertaining to the monitoring and reporting of such taking.

**DATES:** Effective May 1, 2017, through April 30, 2022.

**ADDRESSES:** An electronic copy of the application, containing a list of references used in this document, and the associated Environmental Assessment (EA) and Finding of No Significant Impact (FONSI) may be obtained by telephoning the contact listed below (see **FOR FURTHER INFORMATION CONTACT**), or visiting the internet at: *http://www.nmfs.noaa.gov/pr/permits/incidental.htm.*

**FOR FURTHER INFORMATION CONTACT:** Rob Pauline, Office of Protected Resources, NMFS, (301) 427–8401.

**SUPPLEMENTARY INFORMATION:**

## Executive Summary

This regulation, issued under the Marine Mammal Protection Act (MMPA) (16 U.S.C. 1361 *et seq.*), establishes a framework for authorizing the take of marine mammals incidental to the Corps' rehabilitation of the Jetty System, including Jetty A, North Jetty and South Jetty at the Mouth of the Columbia River in Washington and Oregon.

*Purpose and Need for This Regulatory Action*

NMFS received an application from the Corps requesting five-year regulations and authorization to take multiple species of marine mammals. We anticipate take to occur in the vicinity of the MCR Jetty System by Level B harassment incidental to the use of vibratory pile driving and pedestrian surveys of the jetties. This regulation is valid for five years from the date of issuance. Please see "Background" later in this document for definitions of harassment.

Section 101(a)(5)(A) of the MMPA (16 U.S.C. 1361 *et seq.*) directs the Secretary of Commerce to allow, upon request, the incidental, but not intentional taking of small numbers of marine mammals by U.S. citizens who engage in a specified activity (other than commercial fishing) within a specified geographical region if, after notice and public comment, the agency makes certain findings and issues regulations. This regulation contains mitigation, monitoring, and reporting requirements.

*Legal Authority for the Regulatory Action*

Section 101(a)(5)(A) of the MMPA and the implementing regulations at 50 CFR part 216, subpart I provide the legal basis for issuing the five-year regulations and any subsequent Letters of Authorization.

*Summary of Major Provisions Within the Final Regulation*

The following provides a summary of some of the major provisions within this regulation for the MCR Jetty System rehabilitation project. We have determined that the Corps' adherence to the mitigation, monitoring, and reporting measures listed later in this regulation would achieve the least practicable adverse impact on the affected marine mammals. They include:

• Establishment and monitoring of shutdown zones to reduce likelihood of injury to marine mammals;

• Establishment and monitoring of Level B harassment zones or zones of influence (ZOI) to record instances of behavioral harassment;

• Implementation of hydroacoustic monitoring plan to ensure that shutdown zones and ZOIs have been delineated appropriately; and

• Shutdown between May 1 and July 1 when killer whales are sighted within the ZOIs to avoid take of Southern Resident killer whales which are listed

# EXHIBIT

# 2

**The Environmental Impact State (EIS) is voluminous (749 pages, 52 MB digitized). Plaintiff's counsel is providing a flash drive containing the entire EIS (text-searchable) to the Court, and will upload the contents of the EIS to an online repository accessible to the Court and counsel.**

# EXHIBIT

# 3

 **Illinois Department of Transportation**

**Environmental Reevaluation**

Longmeadow Parkway, Huntley Road to Illinois Route 62, County of Kane, Illinois

REEVALUATION
ENVIRONMENTAL ASSESSMENT

Submitted Pursuant to 42 USC 4332 (2)(c)
by the

U.S. Department of Transportation
Federal Highway Administration (FHWA)

and

Illinois Department of Transportation (IDOT)

| | |
|---|---|
| _July 26, 2016_ | _[signature]_ |
| Date of Approval | For IDOT |
| _July 26, 2016_ | _[signature]_ |
| Date of Approval | For FHWA |

The following persons may be contacted for additional information concerning this document:

Catherine A. Batey
Federal Highway Administration
Division Administrator
3250 Executive Park Drive
Springfield, Illinois 62703
Telephone: 217-492-4640

John Fortmann, P.E.
D-1 Regional Engineer
Illinois Department of Transportation
201 West Central Court
Schaumburg, IL 60196-1096
Telephone: 847-705-4000

The proposed action consists of the construction of a new highway between Huntley Road and Illinois Route 62 and a new bridge crossing over the Fox River in Kane County. The length of this improvement from western terminus to eastern terminus is approximately 5.6 miles, with another 3.7 miles of intersecting road improvements. Longmeadow Parkway will impact eleven wetlands for a total acreage of 4.16 acres. The total number of trees impacted by this project (including dead trees) is approximately 5,765 trees.

**Table of Contents**

**SECTION I:  INTRODUCTION & PURPOSE AND NEED** _____ **7**

  **1.   Introduction** _____ **7**

  **2.   Purpose and Need** _____ **8**
    Purpose _____ 8
    Need _____ 9

**SECTION II:  AFFECTED ENVIRONMENT TABLE** _____ **11**

**SECTION III:  ALTERNATIVES** _____ **16**

**SECTION IV:  IMPACTS, DOCUMENTATION AND MITIGATION** _____ **16**

  **Part I.  Socio-economic** _____ **16**
    1.   Community Cohesion _____ 16
    2.   Title VI and Environmental Justice _____ 16
    3.   Public Facilities and Services _____ 17
    4.   Changes in Travel Pattern and Access _____ 17
    5.   Relocations (Business and Residential) _____ 17
    6.   Economic Impacts _____ 18
    7.   Land Use _____ 18
    8.   Growth and Economic Development _____ 18
    9.   Pedestrian and Bicycle Facilities _____ 18

  **Part II.  Agricultural** _____ **19**
    1.   Farms and Farmland Conversion _____ 19
    2.   Prime and Important Soils _____ 19
    3.   Severed/Landlocked Parcels _____ 19
    4.   Adverse Travel _____ 19

  **Part III.  Cultural Resources** _____ **19**
    1.   Archaeological Properties _____ 20
    2.   Historic Bridges _____ 20
    3.   Historic District _____ 20
    4. Historic Buildings _____ 20

  **Part IV.  Air Quality** _____ **20**
    1.   CO Microscale Analysis _____ 21
    2.   Air Quality Conformity _____ 21
    3.   $PM_{2.5}$ and $PM_{10.0}$ Nonattainment and Maintenance Areas _____ 22
    4.   Construction-Related Particulate-Matter _____ 23
    5.   Mobile Source Air Toxics (MSAT) _____ 23

  **Part V.  Noise** _____ **26**

  **Part VI.  Natural Resources** _____ **32**
    1. Upland Plant Communities _____ 33
    2. Wildlife Resources _____ 33
    3. Threatened and Endangered Species _____ 34

  **Part VII.  Water Quality/Resources/Aquatic Habitats** _____ **37**

  **Part VIII.  Groundwater Resources** _____ **43**

  **Part IX.  Floodplains** _____ **43**

 

**Part X.  Wetlands** _____ **43**

**Part XI.  Special Waste** _____ **47**

**Part XII. Special Lands** _____ **48**

    1.   Section 4(f) _____ 49

    2.   Section 6(f) _____ 53

    3.   Open Space Lands Acquisition and Development (OSLAD) Act Lands _____ 53

    4.   Illinois Natural Area (INAI) Sites _____ 53

    5.   Nature Preserves _____ 53

    6.   Land & Water Reserves _____ 53

**Environmental Commitments** _____ **53**

**Permits/Certifications Required** _____ **56**

**Public Involvement** _____ **56**

**Agency Coordination** _____ **57**

**SECTION V. COMMENTS** _____ **58**

**SECTION VI. FIGURES AND APPENDICES** _____ **59**

**Figures** _____ **59**

**Appendices** _____ **59**

## List of Tables

Table 1 – Level of Service for Intersections................................................................22

Table 2 – Absolute Noise Level Consideration................................................................25

Table 3 – Increase in Noise Level Consideration................................................................26

Table 4 – New Alignment / Construction Data Consideration ............................................26

Table 5 – Noise Modeling Results Section A-1 ................................................................27

Table 6 – Noise Modeling Results Section A2-B1 to Section D ..........................................28

Table 7 – Adjusted Allowable Cost Per Benefited Receptor Summary ..............................29

Table 8 – Noise Wall Cost Reasonableness Evaluation ................................................29

Table 9 – Waterway Summary ................................................................36

Table 10 – Total Waterway Impacts and Mitigation Summary ..........................................41

Table 11 – Wetland Summary ................................................................43

Table 12 – Total Wetland Mitigation Summary ................................................................45

# GLOSSARY

| | |
|---|---|
| ADID | Advanced Identification |
| ADT | Average Daily Traffic |
| BMPs | Best Management Practices |
| CFR | Code of Federal Regulation |
| CMAP | Chicago Metropolitan Agency for Planning |
| CNE | Common Noise Environment |
| CERCLIS | Comprehensive Environmental Response, Compensation and Liability Information System |
| D&E | Design and Environmental |
| EIS | Environmental Impact Statement |
| FHWA | Federal Highway Administration |
| FPDKC | Forest Preserve District of Kane County |
| FTA | Federal Transit Administration |
| FQI | Floristic Quality Index |
| GPS | Global Positioning Systems |
| HEI | Health Effects Institute |
| HFV | High Functional Values |
| HHV | High Habitat Values |
| HQAR | High Quality Aquatic Resource |
| IDNR | Illinois Department of Natural Resources |
| IDOT | Illinois Department of Transportation |
| IEPA | Illinois Environmental Protection Agency |
| IGA | Intergovernmental Agreement |
| INAI | Illinois Natural Area |
| INHS | Illinois Natural History Survey |
| IRIS | Integrated Risk Information System |
| ISGS | Illinois State Geological Survey |
| IWPA | Interagency Wetland Policy Act |
| KDOT | Kane County Division of Transportation |
| LOS | Level of Service |
| MSE | Manufactured Structural Earth |
| MSAT | Mobile Source Air Toxics |

| | |
|---|---|
| NAC | Noise Abatement Criteria |
| NEPA | National Environmental Policy Act |
| NPDES | National Pollutant Discharge Elimination System |
| NIPC | Northeastern Illinois Planning Commission |
| OSLAD | Open Space Lands Acquisition |
| OWR | Office of Water Resource |
| OMS | Operational Management Strategies |
| PESA | Preliminary Environmental Site Assessment |
| PSI | Preliminary Site Investigation |
| RECs | Recognized Environmental Conditions |
| ROD | Record of Decision |
| RCRA | Resource Conservation and Recovery Act |
| ROW | Right-of-Way |
| SHPO | State Historic Preservation Office |
| SIP | State Implementation Plan |
| TNM | Traffic Noise Model |
| TIP | Transportation Improvement Program |
| TDR | Travel Demand Reduction |
| USACE | United States Army Corps of Engineers |
| USEPA | United States Environmental Protection Agency |
| USFWS | United States Fish and Wildlife Service |
| USGS | United States Geological Survey |
| VPH | Vehicles Per Hour |
| VMT | Vehicle Miles Traveled |
| WOUS | Waters of the United States |


**Illinois Department
of Transportation**

## SECTION I:  INTRODUCTION & PURPOSE AND NEED

### 1.  Introduction

This document has been prepared to present updated information regarding the environmental studies that have been completed since the Environmental Impact Statement (EIS).  The EIS was dated November 2001 and the signature date of the Record of Decision (ROD) was May 13, 2002.  In the EIS, this project was referred to as the Bolz Road Corridor, but is now known as the Longmeadow Parkway.  As the project moved through the design process the required right-of-way (ROW) was refined.  The final ROW footprint of this project is shown on Figure 1.  A reevaluation dated November 10, 2009 was completed for the change to toll the bridge which led to the determination that a supplemental EIS was not needed.  Other actions that have occurred subsequent to the ROD include Design Report approval received on December 3, 2013.  There are no alignment changes in the reevaluation from the alignment selected in the ROD.

Pursuant to 23 Code of Federal Regulations (CFR) 771.130(c), this Environmental Reevaluation is being prepared to assess the impacts of the new information and circumstances that have occurred with the project. Figure 1 shows the project area and new resources being discussed in this document.  The new information and circumstances include the following:

a.  The construction of neighborhoods adjacent to the project corridor.
b.  Air quality including the designation of Kane County as a non-attainment area for $PM_{2.5}$, and addition of construction-related particulate-matter and mobile source air toxics National Environmental Policy Act (NEPA) compliance language
c.  Reassessing noise impacts based on the most recent IDOT noise policy and procedures
d.  Federal listing of the Northern long eared bat as a threatened species under the Endangered Species Act.
e.  Results of the Bald eagle nest survey
f.  A wetland delineation was conducted and wetland impacts were reevaluated
g.  Section 4(f) Coordination related to Buffalo Park Forest Preserve
h.  Section 4(f) Coordination related to Fox River Shores Forest Preserve
i.  Section 4(f) Coordination related to Brunner Family Forest Preserve
j.  A commitment change from providing clay lined ditches to providing current Best Management Practices (BMPs) that allow for infiltration.
k.  A change from no piers in the Fox River to including piers in the Fox River
l.  An increase in the acreage of trees impacted (from 2.7 acres to 28.7 acres)
m.  A change in acreage of wetland impacted (from 0 to 4.16)
n.  Visual impact resulting from taking a strip of land in front of the Perry Lathrop house which is an historic property.
o.  Inclusion of the Starhead topminnow which has recently been State-listed as a threatened species.
p.  The large presence of Smallmouth bass in the Fox River within the project limits.

This reevaluation also will evaluate each resource area to determine if there are any other changes in impacts with the project. This reevaluation will be made available for public review and comment. Following the public review and comment opportunity, Federal Highway Administration (FHWA) will either determine a Supplemental EIS is required based on new significant impacts; or FHWA will issue a "Finding of No Significant Impact" if no new significant impacts are identified.

The proposed action consists of the construction of a new highway between Huntley Road and Illinois Route 62 and a new bridge crossing over the Fox River in Kane County. The proposed project corridor is located in the Villages of Algonquin, Carpentersville, Barrington Hills, and in unincorporated Kane County. The Algonquin section of the improvement is on the west side of the Fox River between Randall Road and White Chapel Road, unincorporated sections of Kane County are mainly between White Chapel Lane and the east side of the Fox River, the Carpentersville section is on the east side of the Fox River, and the Barrington Hills section is east of the Village of Carpentersville between Illinois Route 25 and Illinois Route 62. The existing section of Longmeadow Parkway is located between Randall Road and White Chapel Road. The proposed Longmeadow Parkway typical cross section consists of two 11-foot lanes in each direction separated by a landscaped barrier median. Signalized intersection improvements would be provided at Huntley/Boyer Road, Randall Road, Sleepy Hollow Road, Illinois Route 31, Bolz Road Connector, Illinois Route 25 and Illinois Route 62 (Algonquin Road). Sandbloom Road would pass under the new bridge over the Fox River and intersect with Bolz Road. The existing T-intersection of Huntley Road and Boyer Road would be reconstructed as a four-legged intersection. The proposed roadway would transition into Huntley Road on the west terminus into a two-lane cross section. The length of this improvement from western terminus to eastern terminus is approximately 5.6 miles, with another 3.7 miles of intersecting road improvements.

## 2. Purpose and Need

The Purpose and Need of the Longmeadow Parkway project is consistent with and a reiteration of the Purpose and Need stated in the EIS and in the Design Report. The needs that existed at the time the EIS was developed still exist and the deficiencies that the project meant to address are still relevant.

### Purpose

The purpose of the Longmeadow Parkway is to provide a transportation corridor that increases access across the Fox River in the north region of Kane County. The Fox River represents a physical barrier, which limits east-west access in this region. The purpose recognizes this barrier and refines the objectives to address it more precisely in terms of land use and transportation issues. The three objectives are:

- Enhance the transportation network by reducing congestion and providing alternate and more direct routes;
- Serve existing land use in the region through efficient access to central business districts, public services, and employment and commercial centers; and
- Serve proposed land use in conformance to local and county land use and resource management plans, which encourage compact, contiguous growth for the eastern portion of the region and preserve the rural qualities of the western portion of the region.

**Need**

**Enhance the Transportation Network –** There are no major river crossings within the 5.1 mile stretch between the Illinois Route 72/Main Street Bridge, in the Villages of East and West Dundee, and the Illinois Route 62/Algonquin Road Bridge, in the Village of Algonquin. The Illinois Route 72/Main Street Bridge in East and West Dundee facilitates both local and regional traffic. Illinois Route 72/Main Street is congested through East and West Dundee with numerous driveways and businesses fronting the road. The Illinois Route 62/Algonquin Road Bridge through Algonquin is consistently congested, due to lack of capacity through the intersection of Algonquin Road and Illinois Route 31 on the west side of the Fox River. The Huntley Road/Main Street Bridge, in Village of Carpentersville, is a two-lane bridge that primarily serves local traffic and terminates at Lord Avenue, four blocks east of the Fox River. Providing highway improvements within this area will enhance travel by reducing travel times and providing safer traveling conditions.

**Capacity –** The proposed Longmeadow Parkway corridor would provide access across the Fox River, reduce congestion and provide an alternate and more direct east-west route within this northern region of Kane County. As documented in the EIS, the need is for more than relief to an existing roadway or bridge; the traffic demands for crossings of the Fox River, in the immediate project area, currently exceed the effective capacity available. Therefore, the benefit of adding an additional bridge crossing over the Fox River will improve the entire roadway network within this region. Instead, network modeling by the Chicago Metropolitan Agency for Planning (CMAP) indicate the network will be more efficient since trips will be more direct on a less congested network. Furthermore, east-west through traffic will be diverted from the downtowns of Carpentersville, Algonquin and East and West Dundee. Traffic modeling has indicated traffic volumes will continue to grow, with or without a new bridge crossing, resulting in higher levels of congestion within the subject roadway network. The increase in traffic volumes is due to continued growth in population, employment, and automobile usage within the region.

The need for the proposed improvement is evident from an examination of the existing and projected traffic volumes within the project corridor. With projected traffic volumes ranging from 8,000 to 33,000 vehicles per day in 2040, motorists will benefit from a more direct regional corridor that allows crossing of the Fox River with minimal delays. Figure 2 in the Appendix shows the range in the Average Daily Traffic (ADT) values for the existing and 2040 design year. The ROD was based on 2020 traffic projections. The 2013 Design Report and this reevaluation utilize 2040 traffic projections. Differences in traffic volume projections between 2020 and 2040 vary depending on locations within the corridor. West of the Fox River, there are generally minimal projected increases in traffic volumes. The only increase, west of the Fox River, is west of Boyer Road on Huntley Road where volumes are expected to increase 65% from 2020 to 2040. East of the Fox River, there is an anticipated decrease in volumes between 2020 projections and 2040 projections, ranging anywhere from 21% to 55%. Though the 2040 projections show wide variances from the 2020 projections, the increase between the existing volumes and the 2040 projections still support the need for the proposed improvement. The projected increases on existing Longmeadow Parkway range from 106% along existing Huntley Road to 1,418% east of Sleepy Hollow Road.

**Land Use Development and Community Cohesion** – The Villages of Carpentersville and Algonquin, as well as unincorporated Kane County, are experiencing rapid growth in residential developments west of the Fox River. As documented in the EIS, CMAP formerly known as the Northeastern Illinois Planning Commission (NIPC), projects a growth trend in housing and jobs to continue into the year 2020, when Kane County's population is projected to reach 552,944, a 74% increase over the 1990 population. East of the Fox River, the Villages of Carpentersville and Algonquin have seen residential developments occur north of Bolz Road from the Fox River to Illinois Route 25. The proposed Longmeadow Parkway corridor will support and complement existing developments and the expected continuation of growth within the region.

The 2010 population for Kane County was 508,482 per the U.S. Census Bureau. Kane County's population is projected to reach 789,295 by 2040, an increase of 55.2% over the 2010 population. This is an increase of 149% over the 1990 population.

The original EIS analyzed present day land uses at the time, which included one new subdivision (Silverstone Lake Subdivision) located along the north side of proposed Longmeadow Parkway between Amarillo Drive and Alameda Drive. Figure 3 shows the land use changes that have occurred since 1999.

**Roadway Deficiencies and Safety** – An existing three-leg intersection is located at Huntley Road and Boyer Road. When Longmeadow Parkway is constructed, the fourth leg of the intersection will be built. Between 2009 and 2012, there were four rear-end crashes, three fixed-object crashes, five side-swipe crashes, and one overturned vehicle for a total of thirteen crashes. Twelve of the crashes were property damage only; one crash (NB rear-end) resulted in an injury. Capacity improvements at the intersection will likely reduce rear-end collisions and the center barrier median to be added on Huntley Road will likely reduce opposite direction side-swipe collisions. The Huntley-Boyer Road intersection will be reconstructed and remain a signalized intersection in accordance with current roadway standards.

There also is an existing three-leg intersection at Randall Road and Longmeadow Parkway, which is currently an unsignalized T-intersection. There were eighteen crashes at the intersection during the 5-year period between 2008 and 2012. The predominant type of crash is rear-end, with 7 reported during the 5-year period. The remaining crash types are sideswipe-same direction (3), left-turning (3), animal (3) and fixed object (2). Three of the crashes resulted in an injury. This intersection will be reconstructed as a four-leg signalized intersection in accordance with current roadway standards.

There is no existing intersection along the proposed Longmeadow Parkway alignment which intersects with Illinois Route 31, Illinois Route 25, or Illinois Route 62. Therefore, no crash data was analyzed at these locations.

## SECTION II:  AFFECTED ENVIRONMENT TABLE

| Environmental Resources/Conditions | Resource/Condition Present? | | | |
|---|---|---|---|---|
| | Impacts Identified in the EIS | | Impacts Identified During the Reevaluation | |
| | Yes | No | Yes | No |
| **I. Social/Economic** | | | | |
| 1.  Community Cohesion | | X | | X |
| 2.  Environmental Justice and Title VI | | X | | X |
| 3.  Public Facilities and Services | X | | X | |
| 4.  Changes in Travel Patterns and Access | X | | X | |
| 5.  Relocations (Business and Residential) | X | | X | |
| 6.  Economic Impacts | X | | X | |
| 7.  Land Use | X | | X | |
| 8.  Growth and Economic Development | X | | X | |
| 9.  Pedestrian and Bicycle Facilities | X | | X | |
| **II. Agricultural** | | | | |
| 1.  Farms and Farmland Conversion | X | | X | |
| 2.  Prime and Important Soils | X | | X | |
| 3.  Severed/Landlocked Parcels | | X | | X |
| 4.  Adverse Travel | | X | | X |
| **III. Cultural Resources (Historic Properties)** | | | | |
| 1.  Archaeological Sites | | X | | X |
| 2.  Historic Bridges | | X | | X |
| 3.  Historic Districts | | X | | X |
| 4.  Historic Buildings | X | | | X |

| Environmental Resources/Conditions | Resource/Condition Present? | | | |
|---|---|---|---|---|
| | Impacts Identified in the EIS | | Impacts Identified During the Reevaluation | |
| | **Yes** | **No** | **Yes** | **No** |
| **IV. Air Quality** | | | | |
| 1. Microscale Analysis | | X | | X |
|   a. Does project add through lanes or auxiliary turning lanes? | X | | X | |
|   b. Has COSIM 4.0 been used? | NA | NA | NA | NA |
| 2. Air Quality Conformity | X | | | X |
|   a. Is project in a non-attainment or maintenance area? | X | | X | |
| 3. Is project located in a PM 2.5 or PM 10 non-attainment or maintenance area | X | | X | |
| 4. Construction-Related Particulate Matter | NA | NA | | X |
| 5. Mobile Source Air Toxics | NA | NA | | X |
| **V. Noise** | | | | |
| 1. Is this a Type I project? | X | | X | |
|   a. Noise impacts | X | | X | |
|   b. Does abatement meet feasibility and reasonableness criteria? | | X | | X |
| 2. Is this a Type III project? | | X | | X |
| **VI. Natural Resources** | | | | |
| 1. Upland Plant Communities | X | | X | |
|   a. Does the project impact wooded areas (Trees)? | X | | X | |
|   b. Does the project impact Prairie? | | X | | X |
|   c. Does the project occur within an Illinois Department of Agriculture quarantine area for an invasive species? | NA | NA | X | |
| 2. Wildlife Resources | X | | X | |
|   a. Does the project area contain Wildlife Habitat? | X | | X | |
|   b. Does the project area contain breeding habitat for neotropical migrant species of birds? | | X | | X |
|   c. Does the project area contain nesting Bald eagles? | | X | X | |
| 3. Threatened and Endangered Species | X | | X | |
|   a. Does habitat exist for Federally-listed species in the project area? | | X | X | |
|   b. Did the EcoCAT response from IDNR indicate the presence of State-Listed Species in the project area? | X | | X | |

| Environmental Resources/Conditions | Resource/Condition Present? | | | |
|---|---|---|---|---|
| | Impacts Identified in the EIS | | Impacts Identified During the Reevaluation | |
| | Yes | No | Yes | No |
| **VII.  Water Quality/Resources/Aquatic Habits** | | | | |
| 1.   Does the project involve a waterbody? | X | | X | |
| 2.   Does the project affect the physical features of a stream? | | X | X | |
| 3.   Does the project affect the fish and/or mussels within the stream? | | X | X | |
| 4.   Does the project affect either the narrative or numeric water quality standards? | | X | | X |
| 5.   Does the project occur within an area listed as a navigable stream, nationwide river inventory, ADID stream, or have a rating under the Biological Stream rating system? | X | | X | |
| 6.   Do the project impacts require mitigation? | X | | X | |
| **VIII.  Groundwater Resources** | | | | |
| 1.   Is groundwater the primary source of potable water in the area? | | X | | X |
| 2.   Does the project occur within an area of karst topography? | | X | | X |
| 3.   Does the project occur within a watershed that has been designated by the IEPA as vital for a particularly sensitive ecological system? | | X | | X |
| 4.   Does the project impact a Wellhead Protection Area? | | X | | X |
| 5.   Does the project occur within an area where potable water supply wells are present? | | X | | X |
| 6.   Does the project contribute to degradation of the area's groundwater quality? | | X | | X |
| 7.   Does the project occur within an area designated as a special resources groundwater? | | X | | X |

| Environmental Resources/Conditions | Resource/Condition Present? | | | |
| --- | --- | --- | --- | --- |
| | Impacts Identified in the EIS | | Impacts Identified During the Reevaluation | |
| | Yes | No | Yes | No |
| **IX. Floodplains** | | | | |
| 1. Does the project occur within a 100-year floodplain? | X | | X | |
| 2. Does the project occur within the Regulated Floodway? | X | | X | |
| 3. Is a Floodplain Finding required? | | X | | X |
| **X. Wetlands** | | | | |
| 1. Does the project impact Wetlands? | | X | X | |
| 2. Do the wetlands have an FQI of 20 or greater? | | X | | X |
| 3. Are the wetlands listed as an ADID Site? | NA | NA | X | |
| 4. Wetlands Finding | X | | X | |
| **XI. Special Waste** | | | | |
| 1. Did project pass Level I screening? | NA | NA | | X |
| 2. Did project pass Level II screening? | NA | NA | | X |
| 3. Was a Preliminary Environmental Site Assessment (PESA) required? | X | | X | |
|    a. Is All Appropriate Inquiry (AAI) required? | NA | NA | | X |
|    b. Were REC(s) identified in the PESA? | NA | NA | X | |
| 4. Was a Preliminary Site Investigation (PSI) required? | NA | NA | X | |
| **XII. Special Lands** | | | | |
| 1. Section 4(f) | X | | X | |
|    a. *DeMinimis*, Programmatic, or Individual | X | | X | |
| 2. Section 6(f) | | X | | X |
| 3. Open Space Lands Acquisition and Development (OSLAD) Act Lands | | X | | X |
| 4. INAI Sites | | X | | X |
| 5. Nature Preserves | | X | | X |
| 6. Land & Water Reserves | | X | | X |

| Environmental Resources/Conditions | Resource/Condition Present? | | | |
|---|---|---|---|---|
| | Impacts Identified in the EIS | | Impacts Identified During the Reevaluation | |
| | Yes | No | Yes | No |
| **XIV.  Environmental Commitments Permits/Certifications Required** | | | | |
| 1.  Does the project require Section 404 Permit(s)? | X | | X | |
| 2.  Will an individual Water Quality Certification from IEPA be required? | X | | X | |
| 3.  Will a Coast Guard Bridge Permit be required? | | X | | X |
| **XV.  Public Involvement** | X | | X | |
| **XVI.  Agency Coordination** | X | | X | |

## SECTION III:  ALTERNATIVES

In this reevaluation, the two alternatives under consideration are the No-Build and the Build alternative, which was selected in the ROD. The ROD dismissed the No-Build alternative because it would not meet the purpose and need for the project; however, it is included in this re-evaluation for comparison with the Build Alternative. The original EIS evaluated several alignments for the Bolz Road Corridor (Longmeadow Parkway), and the ROD selected the alternative with the least environmental impacts. The selected alternative from the ROD is the subject of this re-evaluation to determine if there are any new significant impacts. If new significant impacts are identified, then a Supplemental EIS is required.

The No-Build alternative is the current roads in their existing configuration with no improvements other than routine maintenance and minor rehabilitation.  It is the future base condition against which the effects of the Build alternative will be measured.  Selection of the No-Build alternative will result in longer travel times and increased congestion due to the lack of major river crossings within the 5.1 mile stretch between IL Route 72 and IL Route 62.  This selection will be detrimental to the roadway network support of current and future land use development within the region.  Within this re-evaluation, the No-Build alternative still does not meet the purpose and need for the project.

## SECTION IV:  IMPACTS, DOCUMENTATION AND MITIGATION

### Part I.  Socio-economic

In the EIS, there were no impacts under Community Cohesion and Title VI and Environmental Justice and there are no new impacts as a result of this reevaluation.  Effects to Public Facilities and Services, Changes in Travel Patterns and Access, Economic Impacts, Land Use and Growth and Economic Development, and Pedestrian and Bicycle Facilities were described in the EIS and summarized in this reevaluation. The EIS identified 11 single family residential displacements necessary to build the proposed bridge and roadway improvements.   This impact has been reduced to 3 single family residential structures being displaced.

#### 1.   Community Cohesion

**Description**

The proposed bridge crossing would connect neighborhoods on both the east and west side of the Fox River reducing congestion.  Dundee School District #300 will benefit from improved bus access within its service area as a result of the bridge and roadway improvement as District #300 serves both sides of the Fox River.  There have been no changes in community cohesion impacts from the EIS.

#### 2.   Title VI and Environmental Justice

**Title VI**

Groups of ethnic, racial or religious minorities or elderly or disabled people are not present within the project area. No groups of individuals have been or will be excluded from participation in public involvement activities, denied the benefit of the project or

subjected to discrimination in any way on the basis of race, color, age, national origin, disability, or religion.

**Environmental Justice**

Upon reviewing and evaluating available data regarding the census tracts within the project limits, there are no disproportionate impacts on the low-income and minority population. At the time of the EIS, the project limits were included in one census tract 8501.00. The project limits did not change; however, the original census tract has been since subdivided into three census tracts, 8501.01, 8501.05, and 8501.06. The data for the 2010 census from each of these census tracts was reviewed and there are no disproportionate impacts on the low income or minority population. The census tracts within the project limits had a lower level of minority and low income population than Kane County as a whole. This reevaluation found that this determination from the EIS is still valid.

**3. Public Facilities and Services**

**Description**

The Algonquin and Carpentersville Police and Fire Departments serve both the west and east sides of the Fox River and would benefit from improved response times as a result of implementing the bridge and roadway improvements. There also are many park and recreational facilities located on both the east and west sides of the Fox River. Providing an alternative bridge crossing between the two existing crossings in Algonquin and Carpentersville will improve access for many residents in both of these communities, adjacent communities, and unincorporated Kane County. There have been no changes in impacts to public facilities and services from the EIS.

**4. Changes in Travel Pattern and Access**

**Description**

The primary future growth areas of both Algonquin and Carpentersville are west of the Fox River. As congestion increases on the existing bridges in the downtown areas of these communities, automobile and pedestrian movements will be impeded, affecting the viability of these commercial areas. The proposed improvements will provide a major transportation link from residences to employment, shopping and recreational opportunities. There have been no changes in impacts to travel patterns and access from the EIS.

**5. Relocations (Business and Residential)**

**Estimation and Description**

The EIS had 11 single family residential displacements to accommodate the proposed bridge and roadway improvements. This impact has been reduced to 3 single family residential structures being displaced. One residence in the area of Karen Drive was purchased at least five years ago and was demolished. One residence is in negotiation along Route 31. One residence at the northwest corner of Randall/Longmeadow was purchased and has been demolished.

The number of relocations have been reduced from eleven (EIS) to three (reevaluation).

**6.  Economic Impacts**

**Description**

The proposed bridge and roadway improvements will help focus new employment opportunities within Kane County and the local municipalities.  Businesses that are currently located in this developed corridor also will benefit from the improved access to major transportation routes, business districts, customer bases, and public services. There have been no changes in economic impacts from the EIS.

**7.  Land Use**

**Description**

The land use along the Longmeadow Corridor is predominantly residential with forest preserve and open lands also present.  There have been no changes in land use from the EIS.

**8.  Growth and Economic Development**

**Description**

Improved accessibility across the Fox River will enhance the planned development potential of the undeveloped parcels along the corridor as traffic is projected to increase. Growth in these areas is consistent with the policies of local governmental units as reflected in Comprehensive Plans and Zoning Ordinances.  There have been no changes in impacts to growth and economic development from the EIS.

**9.  Pedestrian and Bicycle Facilities**

☑ Project will cause disruption or permanent changes in pedestrian or bicycle acess

☐ Project will not cause disruption or permanent changes in pedestrian or bicycle acess

**Description**

This project will include the construction of a new bike path and will make connections to existing bike paths, which are considered positive changes (i.e. improvements) for the Forest Preserve District of Kane County (FPDKC).  There will not be any permanent interruption of the existing bicycle or pedestrian paths.  The proposed improvements will provide permanent changes in pedestrian or bicycle access, as a multi-use path will be constructed along the entire Longmeadow Parkway corridor.  There could be some short term closures or detours at the existing bicycle path during construction.  There have been no changes in impacts to pedestrian and bicycle facilities from the EIS.

**Part II.  Agricultural**

The project will have impacts to Farms and Farmland Conversion and Prime and Important Soils; however, there have been no changes in impacts from the EIS.

>    **1.  Farms and Farmland Conversion**
>
>    There are 28.5 acres of land to be acquired from farm parcels.  There are no farm houses or buildings being displaced.  There is no change in impacts from the EIS.
>
>    **2.  Prime and Important Soils**
>
>    According to the EIS and reevaluation, there are 28.5 acres of prime soils within the Longmeadow Parkway corridor and there are no impacts to statewide important soils.  There is no change in impacts from the EIS.
>
>    **3.  Severed/Landlocked Parcels**
>
>    **Identify**
>
>    There are no severed or landlocked parcels resulting from the Longmeadow Parkway project. There are no changes in impacts from the EIS.
>
>    **4.  Adverse Travel**
>
>    According to the EIS and reevaluation, there is no adverse travel resulting from the Longmeadow Parkway project.  There are no changes in impacts from the EIS.

**Part III.  Cultural Resources**

There are no impacts under Archeological Sites, Historic Bridges and Historic Districts in the EIS or reevaluation. There was an impact under Historic Buildings resulting from taking approximately 0.23 acres of frontage from the Perry-Lathrop property located along the east side of Illinois Route 31 at 19N045.  This property was determined eligible for inclusion on the National Register of Historic Places.  An approximately 40 feet wide strip of land will be taken in front of the Perry Lathrop House.  The only impact will be visual and a landscape plan will be developed and submitted for State Historic Preservation Office (SHPO) approval for the area adjacent to the Perry Lathrop property prior to construction.  The parcel to the south and east of the Perry Lathrop property, known as the Melva property, will be acquired by the County and transferred to the FPDKC.  The Melva property will be transferred to the FPDKC and will be maintained in perpetuity as greenspace upon request by FPDKC.  The Intergovernmental Agreement (IGA) between Kane County Division of Transportation (KDOT) and the FPDKC is included in Appendix A, Page A-7.

☐ No Historic Properties Affected - See letter from SHPO

☑ Historic Properties Affected - See below

IDOT coordinated with the Illinois State Historic Preservation Officer (SHPO) and the SHPO concurred with a "Conditional No Adverse Effect" finding (Appendix A, Page A-2) for the

Perry Lathrop House provided that SHPO reviews and approves the landscape plan for the Perry Lathrop House (See Appendix A, Page A-1).

On April 8, 2016, IDOT coordinated with the SHPO in regards to the acreage around the Perry-Lathrop House (known as the Melva property) and the SHPO concurred with a "Conditional No Adverse Effect" finding (Appendix A, Page A-4) for this property provided that SHPO reviews and approves the landscape plan (See Appendix A, Page A-3).

**1. Archaeological Properties**

☑ Project will not affect Archeological Properties

☐ Project will affect Archeological Properties

**2. Historic Bridges**

☑ Project will not affect a Historic District

☐ Project will affect a Historic District

**3. Historic District**

☑ Project will not affect a Historic District

☐ Project will affect a Historic District

**4. Historic Buildings**

☑ Project will not affect any Historic Buildings

☐ Project will affect Historic Buildings

**Impacts**

A 40 foot strip of right-of-way will be acquired from the Perry-Lathrop property. A landscaping plan will be developed and submitted to the Illinois SHPO for review and concurrence and an adjacent property, the Melva property, will be preserved in perpetuity as greenspace upon request of the FPDKC.

**Coordination**

A landscape plan will be developed and submitted for the area adjacent to the Perry-Lathrop house that fronts the proposed Longmeadow Parkway, and this plan must be reviewed and approved in writing by the SHPO prior to construction.

No new historic properties have been identified after the EIS was issued. There is a "no adverse effect" to historic properties.

**Part IV. Air Quality**

In the EIS, there were no impacts under Air Quality.

Since the EIS was prepared, there have been new regulatory requirements established for $PM_{2.5}$ and $PM_{10}$ Nonattainment and Maintenance Areas. Additionally, Construction-Related Particulate Matter, and Mobile Source Air Toxics (MSAT) are analyzed during the NEPA process. The air quality analysis has been updated to address these new requirements. As a result of the analysis, there are no new impacts to air quality.

1. **CO Microscale Analysis**

   **Project Type:**

   This project does not meet any of the below listed project types.

   ☐ Project does not add Through Lanes or Auxillary Turning Lanes

   ☐ Project does not involve any sensitive receptors and is not suitable for using COSIM 4.0

   ☐ Project is subject to COSIM Pre-screen

   ☐ Project is subject COSIM screening analysis

   In accordance with the IDOT-Illinois Environmental Protection Agency (IEPA) "Agreement on Microscale Air Quality Assessments for IDOT Sponsored Transportation Projects," projects are exempt from project-level carbon monoxide air quality analysis if the highest design-year approach-volume on the busiest leg of the intersection is less than 5,000 vehicles per hour (vph) or 62,500 ADT. This project does not have traffic that would exceed this threshold, and therefore a CO analysis is not required.

2. **Air Quality Conformity**

   **Project Type:**

   ☐ Project is outside of Nonattainment or Maintenance Area

   ☐ Exempt Project in Nonattainment or Maintenance Area

   ☑ Project is within a portion of a Nonattainment or Maintenance Area where CMAP is the MPO

   ☐ Project is within a Nonattainment or Maintenance area served by an MPO other than CMAP

   ☐ Project is within a Nonattainment or Maintenance area not served by an MPO

   ☐ Regionally Significant Non-Federal project within a Nonattainment or Maintenance Area.

This project is included in the FY 2014-2019 Transportation Improvement Program (TIP) endorsed by the Metropolitan Planning Organization Policy Committee of the Chicago Metropolitan Agency for Planning (CMAP) for the region in which the project is located. Projects in the TIP are considered to be consistent with the regional transportation plan endorsed by CMAP. The project is within the fiscally constrained portion of the plan.

On June 5, 2015, the Federal Highway Administration (FHWA) and the Federal Transit Administration (FTA) determined that the GO TO 2040 Comprehensive Regional Plan and

the Transportation Improvement Plan conforms to the State Implementation Plan (SIP) and the transportation-related requirements of the 1990 Clean Air Act Amendments. These findings were in accordance with 40 CFR Part 93, "Determining Conformity of Federal Actions to State or Federal Implementation Plans."

The project's design concept and scope are consistent with the project information used for the TIP conformity analysis. Therefore, this project conforms to the existing State Implementation Plan and the transportation-related requirements of the 1990 Clean Air Act Amendments.  The TIP number for this project is 09-96-0017.

### 3.  PM$_{2.5}$ and PM$_{10.0}$ Nonattainment and Maintenance Areas

**Project-Type**

☐ Exempt Project

☑ Nonexempt project that is not an Air Quality Concern

☐ Nonexempt project that is an Air Quality Concern

Pursuant to 40 CFR 93.123(b)(1) this is not a project of air quality concern and therefore a quantitative hot spot analysis is not required. The highest projected ADT along Longmeadow Parkway is 33,300 with 4% trucks, for a total of 1,332 diesel trucks. The regulations provide examples of projects that are of air quality concern, such as a project that adds 10,000 new diesel trucks; however, this project adds substantially less than 10,000 trucks. Also, the regulations describe projects affecting intersections with a Level of Service (LOS) of D, E, or F as projects of air quality concern. This project will not affect any intersection with a LOS of D, E, or F with additional diesel trucks.  Due to the fact that the ADT is 33,300 which is well below the 125,000 ADT threshold and truck traffic is less than 8%, this project will not cause or contribute to any new localized PM$_{2.5}$ violations or increase the frequency or severity of any PM$_{2.5}$ violations. United States Environmental Protection Agency (USEPA) has determined that such projects meet the Clean Air Act's requirements without any further Hot-Spot analysis.   The LOS for intersections is shown in Table 1.

**Table 1
Level of Service for Intersections**

|  | AM Intersection Level of Service (2040) | | | | | | |
|---|---|---|---|---|---|---|---|
|  | Boyer Road | Randall Road | Sleepy Hollow Road | Illinois Route 31 Connector | Bolz Road Connector | Illinois Route 25 | Illinois Route 62 |
| Longmeadow Parkway | C | C | C | B | C | C | B |

| | PM Intersection Level of Service (2040) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Boyer Road | Randall Road | Sleepy Hollow Road | Illinois Route 31 Connector | Bolz Road Connector | Illinois Route 25 | Illinois Route 62 |
| Longmeadow Parkway | C | D | C | B | C | C | B |

## 4. Construction-Related Particulate-Matter

Demolition and construction activities can result in short-term increases in fugitive dust and equipment-related particulate emissions in and around the project area. (Equipment-related particulate emissions can be minimized if the equipment is well maintained.) The potential air quality impacts will be short-term, occurring only while demolition and construction work is in progress and local conditions are appropriate. The potential for fugitive dust emissions typically is associated with building demolition, ground clearing, site preparation, grading, stockpiling of materials, on-site movement of equipment, and transportation of materials. The potential is greatest during dry periods, periods of intense construction activity, and during high wind conditions. IDOT's Standard Specifications for Road and Bridge Construction include provisions on dust control. Under these provisions, dust and airborne dirt generated by construction activities will be controlled through dust control procedures or a specific dust control plan, when warranted. The contractor and IDOT will meet to review the nature and extent of dust-generating activities and will cooperatively develop specific types of control techniques appropriate to the specific situation. Techniques that may warrant consideration include measures such as minimizing track-out of soil onto nearby publicly-traveled roads, reducing speed on unpaved roads, covering haul vehicles, and applying chemical dust suppressants or water to exposed surfaces, particularly those on which construction vehicles travel. With the application of appropriate measures to limit dust emissions during construction, this project will not cause any significant, short-term particulate matter air quality impacts.

## 5. Mobile Source Air Toxics (MSAT)

**Project-Type:**

☐ Project is exempt

☐ Project has no meaningful potential MSAT effects

☑ Project has low meaning potential MSAT effects and is one of the following types below:

　　☐ A minor widening project

　　☑ A new interchange connecting an existing roadway with a new roadway

　　☐ A new interchange connecting new roadways

☐ Minor improvements or expansions to intermodal centers or other projects that affect truck traffic

☐ Project has high potential MSAT effects

This project has a low potential for MSAT effects because design year traffic is projected to be less than 140,000 to 150,000 annual average daily traffic AADT. As a project with low potential for MSAT effects, a qualitative analysis was completed.

For the build alternative, the amount of MSAT emitted would be proportional to the vehicle miles traveled (VMT). Because the VMT estimated for the No Build Alternative is higher than for the Build Alternative, higher levels of regional MSAT are not expected from the Build Alternative compared to the No Build Alternative. Also, emissions will likely be lower than present levels in the design year as a result of USEPA's national control programs that are projected to reduce MSAT emissions by 72 percent from 1999 to 2050. Local conditions may differ from these national projections in terms of fleet mix and turnover, VMT growth rates, and local control measures. However, the magnitude of the USEPA-projected reductions is so great, even after accounting for VMT growth, emissions in the study area are likely to be lower in the future in virtually all locations. There may be localized areas where VMT would increase, and other areas where VMT would decrease. Therefore, it is possible that localized increases and decreases in MSAT emissions may occur. The localized increases in MSAT emissions would likely be most pronounced along the new roadway sections that would be built over and adjacent to the Fox River under the Build Alternative Longmeadow Parkway. However, even if these increases do occur, they too will be substantially reduced in the future due to implementation of USEPA's vehicle and fuel regulations.

In summary, under the Build Alternative in the design year, it is expected there would be reduced MSAT emissions in the immediate area of the project, relative to the No Build Alternative, due to the reduced VMT associated with more direct routing, and due to USEPA's MSAT reduction programs.

INCOMPLETE OR UNAVAILABLE INFORMATION FOR PROJECT-SPECIFIC MSAT HEALTH IMPACTS ANALYSIS

In FHWA's view, information is incomplete or unavailable to credibly predict the project-specific health impacts due to changes in MSAT emissions associated with a proposed set of highway alternatives. The outcome of such an assessment, adverse or not, would be influenced more by the uncertainty introduced into the process through assumption and speculation rather than any genuine insight into the actual health impacts directly attributable to MSAT exposure associated with a proposed action.

**USEPA Role**

The USEPA is responsible for protecting the public health and welfare from any known or anticipated effect of an air pollutant. It is the lead authority for administering the Clean Air Act and its amendments and has specific statutory obligations with respect to hazardous air pollutants and MSAT. USEPA is in the continual process of assessing human health effects, exposures, and risks posed by air pollutants. It maintains the Integrated Risk Information System (IRIS), which is "a compilation of electronic reports on specific substances found in the environment and their potential to cause human

health effects." IRIS can be accessed through the USEPA website. Each report contains assessments of non-cancerous and cancerous effects for individual compounds and quantitative estimates of risk levels from lifetime oral and inhalation exposures with uncertainty spanning perhaps an order of magnitude.

### Role of Other Organizations

Other organizations are also active in the research and analyses of the human health effects of MSAT, including the Health Effects Institute (HEI). Two HEI studies are summarized in Appendix D of FHWA's "Interim Guidance Update on Mobile Source Air Toxic Analysis in NEPA Documents." Among the adverse health effects linked to MSAT compounds at high exposures are cancer in humans in occupational settings; cancer in animals; and irritation to the respiratory tract, including the exacerbation of asthma. Less obvious is the adverse human health effects of MSAT compounds at current environmental concentrations or in the future as vehicle emissions substantially decrease. See research reports available through the HEI website.

### Problems with Modeling Methodologies

The methodologies for forecasting health impacts include emissions modeling, dispersion modeling, exposure modeling, and then final determination of health impacts, each step in the process building on the model predictions obtained in the previous step. All are encumbered by technical shortcomings or uncertain science that prevents a more complete differentiation of the MSAT health impacts among a set of project alternatives. These difficulties are magnified for lifetime (i.e., 70 year) assessments, particularly because unsupportable assumptions would have to be made regarding changes in travel patterns and vehicle technology, which affects emissions rates over that time frame, because such information is unavailable.

It is particularly difficult to reliably forecast MSAT exposure near roadways, and to determine the portion of time that people are actually exposed at a specific location. It is particularly difficult to reliably forecast 70-year lifetime MSAT concentrations and exposures near roadways; to determine the portion of time that people are actually exposed at a specific location; and to establish the extent attributable to a proposed action, especially given that some of the information needed is unavailable.

### MSAT Toxicity Estimates

There are considerable uncertainties associated with the existing estimates of toxicity of the various MSAT, because of factors such as low-dose extrapolation and translation of occupational exposure data to the general population, a concern expressed by HEI. As a result, there is no national consensus on air dose-response values assumed to protect the public health and welfare for MSAT compounds, and in particular for diesel PM. USEPA and the HEI have not established a basis for quantitative risk assessment of diesel PM in ambient settings.

### Level of Risk

There is also the lack of a national consensus on an acceptable level of risk. The current context is the process used by USEPA, as provided by the Clean Air Act, to determine whether more stringent controls are required in order to provide an ample margin of safety to protect public health or to prevent an adverse environmental effect for industrial sources subject to the maximum achievable control technology standards (e.g., benzene

emissions from refineries). The decision framework is a two-step process. The first step requires USEPA to determine an "acceptable" level of risk due to emissions from a source, which is generally no greater than approximately 100 in a million. Additional factors are considered in the second step, the goal of which is to maximize the number of people with risks less than 1 in a million due to emissions from a source. The results of this statutory two-step process do not guarantee that cancer risks from exposure to air toxics are less than 1 in a million; in some cases, the residual risk determination could result in maximum individual cancer risks that are as high as approximately 100 in a million. In a June 2008 decision, the US Court of Appeals for the District of Columbia Circuit upheld USEPA's approach to addressing risk in its two-step decision framework. Information is incomplete or unavailable to establish that even the largest of highway projects would result in levels of risk greater than safe or acceptable.

<u>Conclusions</u>

Because of the limitations in the methodologies for forecasting the health impacts described, any predicted difference in health impacts between alternatives is likely to be much smaller than the uncertainties associated with predicting the impacts. Consequently, the results of such assessments would not be useful to decision makers, who would need to weigh this information against project benefits (e.g., reducing traffic congestion, crash rates, and fatalities plus improved access for emergency response) that are better suited for quantitative analysis.

**Part V.  Noise**

In the EIS, noise impacts were evaluated using the STAMINA noise model software.  The noise analysis for the Longmeadow Parkway has been reevaluated based on the current IDOT Noise Policy and the current FHWA Traffic Noise Model (TNM) model software was used.  Since the original noise study was completed, a few scattered residences have been constructed near the proposed roadway and a new subdivision, located along the north side of the proposed Longmeadow Parkway and west of Illinois Route 25, has been completed.

The noise analysis was conducted for two sections: Section A-1 and Section A2-B1 to Section D. The proposed action for Section A-1, located between Huntley Road from approximately 2,300 feet west of Boyer Road to just west of Randall Road, is a new alignment from the eastern extent of the east/west leg of Huntley Road to just short of the current Longmeadow Parkway/Randall Road three-way intersection. The proposed actions for Section A2-B1 to Section D, located between Randall Road and Illinois Route 62 (Algonquin Road), are additional lanes between Randall Road and White Chapel Lane, a new alignment east from the Longmeadow Parkway/White Chapel Lane intersection to Algonquin Road, and a new alignment north of existing Bolz Road.  Appendix B contains both the A-1 and the A2-B1 to Section D Noise Study Summary Memoranda.

☑ Type I Project

☐ Type III Project

An analysis of noise abatement measures (noise barriers) was conducted in conformance with FHWA requirements contained in Title 23 *Code of Federal Regulations* Part 772 for each of the impacted receptors.  In order for a noise abatement measure to be constructed, it must meet both the feasibility and reasonableness criteria, described below.

**Feasibility**

The feasibility evaluation is a combination of acoustical and engineering factors considered in the evaluation of a noise abatement measure. The acoustical portion of the IDOT policy, as required by FHWA regulations, considers noise abatement to be feasible if it achieves at least a 5 dB(A) traffic noise reduction at an impacted receptor. Factors including, but not limited to, safety, barrier height, topography, drainage, utilities, maintenance, and access issues are also considered.

**Reasonableness**

As per FHWA regulations, a noise abatement measure is determined to be reasonable when all three of the following reasonableness evaluation factors are met:

- cost effectiveness of the highway traffic noise abatement measure;
- achievement of IDOT's noise reduction design goal; and,
- consideration of the viewpoints of the benefited receptors (property owners and residents), if all other criterion are achieved.

A noise abatement measure is considered cost-effective to construct if the noise wall construction cost per benefited receptor is less than the allowable cost per benefited receptor. A benefited receptor is any receptor that is afforded at least a 5 dB(A) traffic noise reduction from the proposed noise abatement measure. The FHWA regulations allow each State Highway Authority to establish cost criteria for determining cost effectiveness.

IDOT policy provides that the actual cost per benefited receptor shall be based on a noise wall cost of $25 per square foot, which includes engineering, materials, and construction. The base value allowable cost is $24,000 per benefited receptor, which can be increased based on three factors as summarized below:

- the absolute noise level of the benefited receptors in the design year build scenario before noise abatement;

- the incremental increase in noise level between the existing noise level at the benefited receptor and the predicted build noise level before noise abatement; and

- the date of development compared to the construction date of the highway. These factors are considered for all benefited receptors.

**Table 2**
**Absolute Noise Level Consideration**

| Predicted Build Noise Level Before Noise Abatement | Dollars Added to Base Value Cost per Benefited Receptor |
|---|---|
| Less than 70 dB(A) | $0 |
| 70 to 74 dB(A) | $1,000 |
| 75 to 79 dB(A) | $2,000 |
| 80 dB(A) or greater | $4,000 |

**Source:** IDOT Highway Traffic Noise Assessment Manua

**Table 3**
**Increase in Noise Level Consideration**

| Incremental Increase in Noise Level Between the Existing Noise Level and the Predicted Build Noise Level Before Noise Abatement | Dollars Added to Base Value Cost per Benefited Receptor |
|---|---|
| Less than 5 dB(A) | $0 |
| 5 to 9 dB(A) | $1,000 |
| 10 to 14 dB(A) | $2,000 |
| 15 dB(A) or greater | $4,000 |

**Source:** IDOT Highway Traffic Noise Assessment Manual

**Table 4**
**New Alignment / Construction Date Consideration**

| Project is on new alignment OR the receptor existed prior to the original construction of the highway | Dollars Added to Base Value Cost per Benefited Receptor |
|---|---|
| No for both | $0 |
| Yes for either | $5,000 |

**Note**: No single optional reasonableness factor shall be used to determine that a noise abatement measure is unreasonable.
**Source:** IDOT Highway Traffic Noise Assessment Manual

The IDOT noise reduction design goal is to achieve an 8 dB(A) traffic noise reduction at a minimum of one benefited receptor. If a noise abatement measure is feasible, achieves the cost-effective criterion, and achieves the IDOT noise reduction design goal, then the viewpoints of benefited receptors are solicited on the construction of the noise wall.

The third component of reasonableness is obtaining the viewpoints of those who would be benefitted by a feasible and cost-effective noise barrier that meets the IDOT noise reduction design goal. The viewpoints solicitation process will be completed with the property owners and tenants of the receptors that would benefit from the proposed walls. The received votes will be tallied by noise wall per IDOT policy. If greater than fifty percent of a wall's votes are in support of wall construction, the wall will be recommended for construction and will likely be included in final design plans for the project. Conversely, walls that do not receive fifty percent or more votes in favor of the wall will not be recommended for construction as part of the project.

**Impacts**
In the EIS, twelve sites were selected as receptors for analysis along the entire preferred Longmeadow alignment. Future traffic noise levels were predicted for the design year 2020 for both the Build Alternative and No-Build Alternative. For the No-Build Alternative, noise levels typically increased by 1 dB(A) or less within the project corridor. Traffic noise levels under the Build Alternative ranged from 44 dB(A) to 69 dB(A). The increase from Existing to Build noise levels ranged from 2 dB(A) to 13 dB(A) with one receptor, R4, having a 24 dB(A) increase from the Existing to Build condition. Four receptors were determined to have a noise impact, R3, R4, R9 and R12.

Section A-1
For the reevaluation noise analysis in Section A-1, four receptors (R1 through R4) have been selected to represent the study area in Section A-1. Existing (2015) and future (2040) Build and No-Build traffic noise levels were predicted for the receptor sites utilizing TNM. The results are shown in Table 5.

**Table 5**
**NOISE MODELING RESULTS SECTION A-1**

| Receptor Number | Land Use Category / NAC in dB(A) | Existing 2015 Noise Level, dB(A) | No-Build 2040 Noise Level, dB(A) | Build 2040 Noise Level, dB(A) | Build Increase Over Existing |
|---|---|---|---|---|---|
| R1 | B / 67 | 57 | 58 | 60 | 3 |
| R2 | B / 67 | 61 | 62 | 64 | 3 |
| R3 | B / 67 | 59 | 60 | 63 | 4 |
| R4 | B / 67 | 73 | 74 | ==**77**== | 4 |

**Boldface and highlighted** indicates whether the noise levels approach, meet or exceed the Noise Abatement Criteria (NAC) in the Build scenario.

The Existing 2015 noise levels range from 57 dB(A) at R1 to 73 dB(A) at R4. The projected No-Build 2040 traffic noise levels range from 58 dB(A) at R1 to 74 dB(A) at R4. Receptor noise levels increased 1 dB(A) from the Existing scenario to the No-Build scenario. Any increase in traffic noise levels are due to an increase in traffic volumes.

The 2040 traffic noise levels for the Build scenario as predicted by TNM range from 60 dB(A) at R1 to 77 dB(A) at R4. Traffic noise levels increased 3 dB(A) or 4 dB(A) from the Existing scenario to the Build scenario due to the increase in the traffic volumes and the proposed geometry. One of the four receptor locations exceeded the FHWA NAC criteria. Based on the 2040 traffic noise levels, noise abatement was evaluated for the impacted receptor.

Section A2-B1 to Section D
For the reevaluation noise analysis for Section A2-B1 to Section D, thirty receptors have been selected to represent the study area in Section A2-B1 to Section D. The results are shown in Table 6.

**Table 6**
**NOISE MODELING RESULTS SECTION A2-B1 TO SECTION D**

| Receptor / CNE No. | Existing Noise Level, dB(A) | No-Build 2040 Noise Level, dB(A) | No-Toll Build 2040 Noise Level, dB(A) | Change from Existing to Build, dB(A) |
|---|---|---|---|---|
| R5 | 73 | 74 | **75** | 2 |
| R6 | 46 | 48 | 59 | 13 |
| R7 | 50 | 51 | 61 | 11 |
| R8 | 49 | 51 | 63 | 14 |
| R9 | 51 | 53 | 64 | 13 |
| R10 | 52 | 53 | 56 | 4 |
| R11 | 60 | 61 | 63 | 3 |
| R12 | 59 | 60 | 64 | 5 |
| R13 | 48 | 50 | 62 | 14 |
| R14 | 46 | 48 | 60 | 14 |
| R15 | 48 | 50 | 62 | 14 |
| R16 | 45* | 45* | 59 | 14 |
| R17 | 60 | 61 | N/A | N/A |
| R18 | 45* | 45* | 49 | 4 |
| R19 | 51 | 52 | 64 | 13 |
| R20 | 49 | 50 | 57 | 8 |
| R21 | 44 | 45 | 55 | 11 |
| R22 | 61 | 61 | 62 | 1 |
| R23 | 47* | 47* | 54 | 7 |
| R24 | 61 | 62 | 62 | 1 |
| R25 | 67 | 68 | **69** | 2 |
| R26 | 71 | 72 | **73** | 2 |
| R26A | 70 | 71 | **72** | 2 |
| R27 | 60 | 61 | 64 | 4 |
| R28 | 52 | 53 | 58 | 6 |
| R29 | 44* | 44* | 53 | 9 |
| R30 | 55 | 56 | 60 | 5 |
| R31 | 60 | 62 | 62 | 2 |
| R32 | 62 | 63 | 65 | 3 |
| R33 | 62 | 63 | 64 | 2 |

**Bold, highlighted** data represent Build Condition noise levels that approach, meet, or exceed the appropriate NAC.
* - Noise levels taken from monitoring results as receptors are greater than 500 feet from modeled roadways and therefore beyond TNM's effective range.
Receptor 17 is directly in the path of Longmeadow Parkway new alignment and therefore not modeled in the Build Condition.

The Existing 2015 noise levels range from 44 dB(A) at R21 and R29 to 73 dB(A) at R5. The projected No-Build 2040 traffic noise levels range from 44 dB(A) at R29 to 74 dB(A) at R5. Receptor noise levels remained the same or increased by either 1 dB(A) or 2 dB(A) from the Existing scenario to the No-Build scenario. Any increase in traffic noise levels are due to an increase in traffic volumes.

The 2040 traffic noise levels for the Build scenario, as predicted by TNM range from 49

dB(A) at R18 to 75 dB(A) at R5. Traffic noise levels increased from 1 dB(A) to 14 dB(A) from the Existing scenario to the Build scenario due to the increase in the traffic volumes and the proposed geometry. Four of the 30 receptor locations exceed the NAC and are considered traffic noise impacts. These four receptor locations also approach or exceed the NAC in the existing condition. None of the receptors are considered an impact due to a substantial increase (greater than 14 dB(A)) in noise. Traffic noise abatement measures were considered for impacted receptors that approach, meet, or exceed the appropriate FHWA NAC.

**Abatement Evaluation**

In the EIS, four out of the twelve sites had a noise impact and were evaluated for noise abatement. Three of the four barriers could not substantially reduce noise levels, and therefore were not considered feasible. The fourth barrier could substantially reduce noise, but this wall was not economically reasonable based on the cost of the wall per benefited receptor. Therefore, no abatement was proposed in the EIS noise analysis, and this was documented in the ROD.

Section A-1

For the reevaluation in Section A-1, TNM was used to perform the noise wall feasibility and reasonableness check for the one impacted receptor (R4). The noise wall met IDOT's feasibility criterion. The noise barrier also achieved IDOT's noise reduction design goal of at least an 8 dB(A) traffic noise reduction at one or more benefited receptor locations. The wall was then checked for economic reasonableness. Based on the evaluation, the noise wall would not be economically reasonable, as the actual cost per benefited receptor exceeds the adjusted allowable cost per benefited receptor, see Table 7 and 8 below. Therefore, noise abatement will not be implemented as part of this project within Section A-1.

Section A2-B1 to Section D

For Section A2-B1 to Section D, TNM was used to perform the noise wall feasibility and reasonableness check for the four impacted receptors: R5, R25, R26, and R26A. This includes two variants of a shared noise wall in the area of R26 and R26A. Noise Wall B2A, a shared noise wall spanning the length of adjacent CNEs R26 and R26A, was evaluated separately from Noise Wall B2 in the event that the church (R26A) would prefer to maintain visibility over noise abatement. When determining if an abatement measure is feasible and reasonable, the noise reductions achieved, number of residences benefited, total cost, and total cost per residence benefited are considered. All noise walls were modeled along the proposed right-of-way.

All four of the noise walls could feasibly be built and achieve at least a 5 dB(A) reduction at an impacted receptor. Three (B1/R25, B2/R26, and B2A/R26 & R26A) of the four noise barrier considered feasible would be considered acoustically reasonable, as they achieve the IDOT noise reduction design goal of at least an 8 dB(A) traffic noise reduction at one or more benefited receptor locations. A noise wall at R5 would not achieve the noise reduction design goal, as the gap in the wall (needed to maintain driveway access) limited the effectiveness of the noise wall.

The three feasible and noise reduction design goal-achieving noise walls, at CNEs R25, R26, and R26A, were then evaluated for cost-effectiveness. Based on the adjusted cost evaluation, none of noise reduction design goal-achieving noise walls (Noise Walls B1, B2 and B2A) would be economically reasonable, as the actual cost per benefited receptor

exceeds the adjusted allowable cost per benefited receptor. Therefore, noise abatement will not be implemented as part of this project within Section A2-B1 to Section D.

**Table 7**
**ADJUSTED ALLOWABLE COST PER BENEFITED RECEPTOR SUMMARY**

| Barrier / CNE | Benefited Receptors | Adjustment Factor [1] | Adjusted Allowable Cost per Benefited Receptors |
|---|---|---|---|
| B1 / R4 | 1 | $7,000[3] | $31,000 |
| B0 / R5 | Does not meet IDOT Noise Reduction Design Goal | | |
| B1 / R25 | 5 | $0 | $24,000 |
| B2 / R26 | 4 | $0 to $1,000[2] | $24,250 |
| B2A / R26 & R26A | 5 | $ 0 to $1,000[2] | $24,400 |

[1] The Adjustment factor is analyzed individually for each benefited receptor; therefore, a range may be presented for the Adjustment Factor.
[2] Include $1,000 for the Absolute Noise Level Consideration.
[3] Includes $2,000 for the Absolute Noise Level Consideration and $5,000 for New Alignment Consideration.

**Table 8**
**NOISE WALL COST REASONABLENESS EVALUATION**

| Barrier / CNE | Benefited Receptors[1] | Total Noise Wall Cost[2] | Actual Cost per Benefited Receptor | Adjusted Allowable Cost per Benefited Receptor |
|---|---|---|---|---|
| B1/R4 | 1 | $57,250 | $57,250 | $31,000 |
| B0 / R5 | Does not meet IDOT Noise Reduction Design Goal | | | |
| B1 / R25 | 5 | $158,850 | $31,770 | $24,000 |
| B2 / R26 | 4 | $263,450[3] | $65,863 | $24,250 |
| B2A / R26 & R26A | 5 | $300,250[3] | $60,050 | $24,400 |

[1] Includes the anticipated outdoor use areas anticipated to receive at least a 5 dB(A) reduction
[2] Based on the IDOT policy value of $25 per square foot
[3] Includes estimated cost of utility relocation required to construct wall ($197,850)

**Construction Noise**
Trucks and machinery used for construction produce noise that may affect some land uses and activities during the construction period. Residents along the alignment will, at some time, experience perceptible construction noise from implementation of the project. To minimize or eliminate the effect of construction noise on these receptors, mitigation measures have been incorporated into the IDOT Standard Specifications for Road and Bridge Construction as Article 107.35.

**Part VI. Natural Resources**

The EIS quantified an impact of forested areas of 2.7 acres adjacent to the Fox River, but did not quantify a number of trees. As part of the reevaluation, it was determined that the total number of trees impacted by this project is about 5,765. The acreage associated with the tree impacts adjacent to the Fox River is approximately 2.4 acres with a total tree acreage impact throughout the corridor of 28.7 acres. This includes all land covered by trees within the corridor, i.e. floodplain, upland and wetland forested areas, as well as tree lines. At the time of the EIS

there were several open fields which had converted into forested areas over the last decade when the most recent calculation of tree coverage was completed. In addition, the right-of-way necessary for construction of Longmeadow Parkway and detention requirements was refined through the design process, resulting in additional tree impacts. Impacts from side street improvements were not considered in the EIS.

## 1. Upland Plant Communities

### Impacts

The total number of trees within the Longmeadow Corridor is estimated at 7,485. The total number of trees impacted by this project (including dead trees) is about 5,765 trees. The number of dead trees is 232 based on Addendum A to the Tree Survey Report for Longmeadow Parkway dated September 2015. The dead trees do provide habitat for wildlife, specifically bats, and as a voluntary conservation measure were included as an impact and mitigated for. This number also includes the trees to be removed at Raging Buffalo Snowboard Ski Park. About 235 trees will be impacted at Raging Buffalo Snowboard Ski Park. Improvements to Raging Buffalo Snowboard Ski Park are discussed in Section XII, Special Lands.

Both the EIS and the reevaluation determined that the project area does not impact prairie. The project does occur within an Illinois Department of Agriculture quarantine area for an invasive species of the Emerald ash borer. This was not previously evaluated in the EIS because the Emerald ash borer was not an issue at the time the EIS was completed.

Both the EIS and reevaluation have identified tree impacts. Additional tree impacts were identified during the reevaluation process.

### Proposed Mitigation

Tree replacement based on the IDOT Design and Environment (D&E) -18 departmental policy requires the replacement of trees within the project right-of-way to the extent practical. Where it is not practical to provide replacement plantings within the right-of-way, opportunities for plantings should be considered outside of the right-of-way or on other projects to achieve a long-term goal of providing at least as many replacement trees as the number removed. According to IDOT policy, if bare root or balled and burlapped trees are used for replacement plantings, a minimum ratio of 1:1 is recommended for the number of trees removed to the number of trees intended to be established. If seedlings are used, a minimum ratio of 3:1 is recommended. The mitigation ratio proposed for this project is 2:1, due to response to public comments, for a total of 11,530 trees. This exceeds D&E-18 and demonstrates environmental stewardship. A Tree Mitigation Plan has been prepared and can be found in Appendix C, Page C-12. Kane County plans to plant approximately 4,050 trees within the right-of-way of the Longmeadow Parkway and 7,500 trees on the west side of the Fox River within the Brunner Family Forest Preserve. Sizes, types and densities will be coordinated with the FPDKC.

## 2. Wildlife Resources

Both the EIS and reevaluation states that the project area contains wildlife that will be impacted; however, the project area does not contain breeding habitat for neotropical migrant species of birds. The EIS did not address the presence of nesting Bald eagles;

however, nesting Bald eagles have subsequently been observed in the project area. One confirmed Bald eagle nest is located approximately 1,330 feet southwest of the closest project limit. Since there is adequate distance between the project and this nest there will be no impact to this Bald eagle nest. One potential Bald eagle nest is located approximately 800 feet southwest of Karen Drive and Forest Drive. In April 2016, Great horned owls were documented using this nest. Per the US Fish and Wildlife Service (USFWS), since there is no information indicating that Bald eagles have ever utilized the nest but a Great horned owl was documented using the nest, a Bald eagle permit is not necessary. A memorandum prepared to summarize the Bald eagle survey is located in Appendix C, Page C-17. The Great horned owl is protected by the Migratory Bird Treaty Act.

Smallmouth bass was not evaluated during the EIS since there were no concerns regarding its populations at that time. Since that time, IDNR has conducted recent surveys and this information has been included in the reevaluation document. Per the Illinois Department of Natural Resources (IDNR), a 2015 fish survey was conducted in the project area and 250 Smallmouth bass were captured per hour. In 2014, an IDNR fish survey caught 358 Smallmouth bass per hour approximately one mile downstream. In comparison the largest amount caught on any other area within the Fox River basin was 154 per hour in 2012 (Fox River Basin Survey). The next highest catch was 95 per hour and the average for the Fox River was 38 per hour. Based on this comparison, the project area has a higher Smallmouth bass population than other areas in the Fox River Basin.

**Impacts**

There are no impacts anticipated to the Bald eagle, Great horned owl or Smallmouth bass.

**Proposed Mitigation**

Although, there are no impacts anticipated to Bald eagle, Great horned owl or Smallmouth bass commitments have been made to ensure their protection. Great horned owls were documented using the nest that is located approximately 800 feet southwest of Karen Drive and Forest Drive. Since the Great horned owl is protected by the Migratory Bird Treaty Act, the tree with the nest shall not be cleared until the young have fledged and the nest is not being used. Per the INHS, the Great horned owl nests between January 1 and May 31.

No in stream work will occur between April 1 and June 30. The in stream work restriction that is being implemented for listed threatened and endangered species will also protect the Smallmouth bass since no in stream work will occur while the Smallmouth bass is spawning.

**3. Threatened and Endangered Species**

In the EIS, no federally listed species were observed in the project area; however, the state listed Brown creeper was observed in the project area but no impacts were proposed. The Brown creeper was delisted in 2004.

On April 2, 2015, the USFWS listed the Northern long-eared bat as a threatened species, affording it protection under the Endangered Species Act. The project is within the range of the Northern long-eared bat; IDOT with concurrence from USFWS, has determined there is suitable habitat for the Northern long-eared bat in the project area.

State-listed species that occur within the vicinity of the project area include the state-listed threatened Blanding's turtle, threatened Starhead topminnow, and threatened Slippershell mussel. None of these species were State-listed threatened species, so none were listed in the EIS. The Starhead topminnow can be identified by its light olive tan back and upper sides with the lower sides and belly lighter to yellowish in color. There is a prominent dark blotch of color (similar to a teardrop) beneath its eye. The adult length is approximately two inches.

### a. Federally-listed Species/Habitat

**Identify listed species or habitat in project area**

The federally listed species that occur in Kane and Cook Counties were compared to the habitat in the project area. IDOT, with concurrence from USFWS, determined that there may be suitable habitat for only the Northern long-eared bat in the project area. The following conservation measures will be implemented as part of this project:

- Trees will not be cleared from April 1 through September 30, consistent with tree clearing dates noted on the permits; and
- Impacts to trees will be mitigated at a 2:1 mitigation ratio per the tree Mitigation Plan, providing potential habitat for the Northern Long-eared bat.

The project is not likely to adversely affect the Northern long-eared bat. See Appendix C for documentation of the coordination between USFWS and IDOT.

**Impacts**

☐ No Effect

☑ May Effect

    ☑ Informal Consultation

    ☐ Formal Consultation

### b. State-Listed Species

**Identify listed species or habitat in project area**

The in stream work restriction commitment listed in the 2002 ROD regarding the Greater redhorse and River redhorse is out of date. No record of the Greater redhorse exists in the project vicinity. A record of the River redhorse occurs approximately 2 miles downstream from the project. A record of the Starhead topminnow occurs approximately 2,000 feet downstream of the project and is not discussed in the 2002 ROD. Due to the potential presence of the River redhorse and the Starhead topminnow no in stream work in the Fox River shall occur between April 1 and June 30. In addition, a fish survey will be conducted during the summer of 2016 to document the existing habitat in the project area. Results of the survey will be incorporated into the FONSI. If any listed fish species are found, IDOT will implement commitments to protect the listed fish in consultation with IDNR.

In 2007, the Illinois Natural History Survey (INHS) conducted a mussel survey and found seven native species. No threatened or endangered species were collected. INHS stated that they "believe that the presence of listed mussel species is unlikely in the Fox River in the vicinity of the proposed Bolz Rd/Longmeadow Parkway. No listed species were found alive in the area during this visit or have been found alive in the last 50 years in a reach of the river from upstream of the Carpentersville dam to downstream of the Algonquin dam (INHS Mollusk Collection). Because of unsuitable habitat, only the most tolerant unionid mussel species, if any, typically are found in the impounded areas of the Fox River, and re-colonization from downstream sources is unlikely because dams block the upstream dispersal of glochidia-bearing fishes."

A shoreline mussel survey was conducted at the Fox River Bridge crossing by Huff & Huff (consultant) on June 11, 2014. Eighteen state threatened Spike mussel shells were found. Seventeen were considered dead more than 5 years. One was considered dead less than five years (ligament attached). A shell of the Slippershell mussel and a shell of the Purple wartyback mussel were found and considered dead for more than 5 years. The Illinois Natural Heritage Database does not have any records of listed mussels in the project vicinity.

The commitment regarding mussels in the 2002 ROD states "Prior to the start of construction, a population survey of live, non-invasive mussel species will be conducted in streams to be crossed. In the event that any live specimens of the Elktoe mussel or other non-invasive species are found, a mussel relocation program will be developed in consultation with the IDNR".

This commitment was written prior to the understanding of IDNR's Incidental Take Authorization process which became effective July 17, 2001. Thus, the commitment shall be changed to "A mussel survey will be conducted in the summer of 2016 to determine if any live threatened or endangered mussels exist in the project corridor. If a state listed mussel is found, an Incidental Take Authorization will be required before any in stream work in the Fox River will occur." Results of the survey will be incorporated into the EA Errata.

The Illinois Natural History Database contains a record of the State-listed threatened Blanding's turtle (*Emydoidea blandgii*) approximately 1,000 feet south of Longmeadow Parkway. The project was coordinated with the IDNR via an EcoCAT submittal dated March 24, 2015. IDNR responded via email dated March 25, 2015 and requested several commitments which will be implemented into the project plans along the area where there is high potential for Blanding's turtle.

The commitments listed regarding the Blanding's turtle are as follows:

- In order to assist in ease of movement for the Blanding's turtle, and decrease the likelihood of entrapment in the roadway, the proposed plan has been revised to demonstrate mountable curb and gutter along the entire south leg of the proposed construction limits.

- KDOT will educate and inform construction crews and all on-site personnel about the Blanding's turtle before work begins. The local agency will distribute photos (adult and juvenile) of the species and discuss the site management plan for responding to encounters in a training session and at the preconstruction site meeting. If a turtle is encountered on site, crews will be informed to immediately stop construction in the

surrounding area and contact the appropriate staff at IDNR as listed in the contractor's documents; keeping in mind it is a criminal act to handle a listed species. Personnel on site should watch the turtle until the proper authority arrives to alleviate the situation, keeping at a respectable distance. If the turtle moves, crews should mark the spot it was seen.

- The project area near Sleepy Hollow Road and Highmeadow Lane intersection (south of Longmeadow Parkway) may contain the route to a nesting site. Therefore, potential harm to transiting turtles is a concern. IDNR recommends limiting work at Sleepy Hollow Road and Highmeadow Lane intersection to between late October and late March, when this species is hibernating, to prevent construction activities from crushing or injuring juvenile or adult turtles.

- If construction cannot be limited to between late October and late March, exclusionary fencing should be installed along the construction limits of the intersection of Sleepy Hollow Road and Highmeadow Lane. The fencing should be in place from the end of March through October to prevent turtles from entering the construction areas. Daily inspections should occur for the first two weeks and then be maintained weekly throughout the construction period to ensure the exclusionary fencing has been properly installed (dug into the ground) and to check if any turtles are present on either side of the fence.

- Trenches along the construction limits of the intersection of Sleepy Hollow Road and Highmeadow Lane should be covered at the end of each work day. Before starting each work day, trenches and excavations should be routinely inspected to ensure no turtles (or other amphibians and reptiles) have become trapped within.

**IDNR Consultation results**

☑ Closed
   Date (04-24-2015)

☐ Open

Incidental Take Authorization

☐ Yes

☑ No

**Part VII.  Water Quality/Resources/Aquatic Habitats**

The EIS states that the project involves a waterbody, the Fox River, but would not affect the physical features of the stream and would not result in impacts that require mitigation. The EIS also states that other drainage ways crossed are intermittent and generally have watersheds that are less than one square mile. Culverts of various sizes will be used for these crossings. The EIS does not discuss impacts to the waterways under the Clean Water Act. In the EIS, the proposed bridge over the Fox River was designed to span the entire floodway with no piers

placed in the river. Due to the value engineering process, it was determined to be more economical to redesign the bridge crossing to allow piers in the river. Preliminary bridge designs indicate two piers located at the eastern and western edge of the river bank. One pier is also planned in the floodplain forest on the west bank of the Fox River. This placement minimizes any direct impact on the Fox River's water quality and related biological resources or recreational activities. Removal of a portion of the floodplain forest on the west bank during construction will be mitigated by erosion control practices and revegetation. Therefore, the crossing of the Fox River includes placement of piers in the river, and in the reevaluation, the project will affect the physical features of the stream and will result in impacts that require mitigation. The placement of piers in the Fox River will result in temporary increases of sedimentation and turbidity and impacts to boating and fishing.

The study area is located in two watersheds. The majority of the study area is located within the Fox River Watershed (Hydrologic Code [HUC] 07120006) and the very western portion of the project area is located in the Kishwaukee River Watershed (HUC 07090006).

The Biological Stream Characterization (BSC) that was discussed in the EIS is outdated. The BSC has since been updated and has become the Integrated Multiple Taxa in a Biological Stream Rating System. The following updates this section of the EIS. The portions of the rivers and creeks in the study area are not listed as Biologically Significant Streams in the IDNR Biological Stream Rating Report, "*Integrating Multiple Taxa in a Biological Stream Rating System*" (2008). The segment of the Fox River that passes through the study area has a "C" rating for diversity and a "C" rating for integrity. The diversity and integrity ratings are based on a score calculated from a dataset of similar samplings. The ratings are grouped into grades, from A (high) to E (low), for different ranges of scores.

The Illinois Environmental Protection Agency (IEPA) use supports (IEPA, 2000) were updated with the following information. The IEPA Integrated Water Quality Report and Section 303(d) List (February 2016) was reviewed to determine the "Use Support" of each of the assessed rivers and creeks that are located within the limits of the proposed improvements. The Fox River is not supporting aquatic life and fish consumption. Causes include alteration in stream-side or littoral vegetative covers, other flow regime alterations, dissolved oxygen, and polychlorinated biphenyls. Sources include habitat modification, impacts from hydrostructure flow regulation/modification, and unknown sources.

Wetlands were delineated in 2013 and surface waters located within the study area. Their locations are depicted on the Environmental Resources Exhibit (Figure 1). The surface waters (i.e. rivers and creeks) are described below. Wetlands are discussed in Part X.

There were ten waterways identified within the project limits and summarized in Table 9.

**Table 9**
**Waterway Summary**

| Site # | Waterway Type** | Function** | Dominant Vegetation (all strata) | FQI/ C-Value | Mapped Soil Type | NWI Classification | Kane County ADID Classification |
|--------|-----------------|-----------|----------------------------------|--------------|------------------|--------------------|-------------------------------|
| 5 | Intermittent tributary/WOUS | F, C, WH | Tatarian honeysuckle | 8.0/4.0 | Senachwine silt loam (618E) | Hydrology line | Unrated stream |

| Site # | Waterway Type* | Function** | Dominant Vegetation (all strata) | FQI/ C-Value | Mapped Soil Type | NWI Classification | Kane County ADID Classification |
|---|---|---|---|---|---|---|---|
| 6 | Intermittent tributary/WOUS | F, C, WH | Black walnut, white mulberry, Siberian elm, clearweed, motherwort, stickseed, pinkweed, pokeweed, crowned beggarticks, black raspberry | 9.3/2.8 | Senachwine silt loam (618E) | None | None |
| 8 | Unnamed tributary/WOUS/ Forested wetland/ Wet meadow | F, C, T, S, E,WH | Silver maple, slippery elm, Norway maple, Amur honeysuckle, Tatarian honeysuckle, tall morning glory, reed canary grass, calico aster, orange jewelweed | 18.8/2.7 | Peotone silty clay loam (330A), Harpster silty clay loam (67A), Drummer silty clay loam (152A) | Hydrology line/ PEMA | NRCS Farmed Wetland |
| 10 | Fox River/WOUS | F, C, WH, M | None | -- | Water (W), Casco-Roadman Complex (969F) | R2UBH | High Quality River/Natural Open Water Wetland #100011 |
| 12 | Tributary/WOUS and associated wetlands | F, C, T, S, E,WH | Green ash, American elm, Tatarian honeysuckle, common buckthorn, stickseed, common reed | 11.7/2.5 | Casco-Rodman Complex (969E2) | None | None |
| 13 | Tributary/WOUS/ Wet meadow/ Open water pond/ Forested | F, C, T, S, E,WH | Box elder, common buckthorn, American elm, sugar maple, Missouri gooseberry, Tatarian honeysuckle, green ash, multiflora rose, curly dock, reed canary grass, orange jewelweed, fowl mannagrass, bittersweet nightshade | 16.1/2.5 | Casco-Rodman Complex (969E2) | PUBHh, | Artificial Pond #904 |
| 26 | Open Water Channel | F,C, WH | Black cherry, silver maple, | -- | Kidder loam (361E2) | None | None |

| Site # | Waterway Type* | Function** | Dominant Vegetation (all strata) | FQI/ C-Value | Mapped Soil Type | NWI Classification | Kane County ADID Classification |
|---|---|---|---|---|---|---|---|
| | | | common buckthorn, Tatarian honeysuckle | | | | |
| 27 | Open Water Channel | F,C, WH | Black locust, box elder | -- | Kidder loam (361B) | None | None |
| 28 | Open Water Channel | F, C, WH | Box elder, bur oak, Virginia creeper, multiflora rose | -- | Kidder loam (361B) | None | None |
| 29 | Intermittent tributary/WOUS | F, C, WH | Sugar maple, eastern cottonwood, Tatarian honeysuckle, jumpseed | 2.1/1.5 | Senachwine silt loam (618E) | None | None |

*Wetland type is listed by IDOT classification on WIE forms.
** F = flood control, C = conveyance, T = treatment of surface runoff, S = sediment and nutrient uptake, E = erosion control, WH = wildlife habitat, M = moderation of temperature within the microclimate.
*Isolated is based on professional judgment in the field. The COE makes all final jurisdictional determinations. Isolated applies to the lack of hydrological connection to a "Waters of the U.S.

## Impacts

Impacts to waterways are summarized in Table 10. The existing waterway acreage is 4.50 acres. Impacts to the waterways total 0.652 acres.

Construction impacts to water resources in this corridor occur at the bridge crossing of the Fox River and at intermittent waterways within the corridor. The proposed bridge over the Fox River will impact the Fox River and associated floodway and floodplain due to placement of piers in the river. The proposed impact resulting from the piers in the river is 0.06 acres (see Site 10 in Table 10). Preliminary bridge designs indicate two piers located at the eastern and western edge of the river bank. One pier is also planned in the floodplain forest on the west bank of the Fox River. The placement of piers in the Fox River will result in temporary increases of sedimentation and turbidity and impacts to boating and fishing. The Fox River is not a continuously navigable waterway; there are dams at regular intervals with the nearest north in Algonquin and south in Carpentersville. All other drainage ways crossed are intermittent and generally have watersheds that are less than one square mile. The EIS did not specify impacts to other drainage ways besides the Fox River. Impacts to these drainage ways would involve culvert improvements. Impacts to waterways and the required mitigation for these impacts under the Clean Water Act is listed in Table 10.

Due to the size of the proposed Fox River crossing, a variety of construction practices may be utilized. Construction will be staged as much as possible from adjacent upland areas in order to minimize temporary impacts to wetlands and waterways. The width of the river at the proposed crossing likely precludes the ability to construct the bridge from the banks. As a result, it is anticipated that temporary causeways will be required. The size of the causeway would be limited to less than one-half the width of the river at any time during any construction stage. The causeway will be utilized to construct the bridge as needed.

A construction staging area is typically required at the base of a bridge to construct piers and erect beams. The staging area must be graded level adjacent to the piers to allow for the safe operation of cranes and drill rigs. Based on the crane size needed for this project, the staging area would occupy the entire proposed alignment area. Additional space would also be needed to create a level platform for crane operations. The area needed to create a level platform for crane operations would be located within the project corridor. Beam erection will be accomplished by conducting all crane operations from within the Fox River or from adjacent upland areas along the banks of the Fox River.

The temporary features within the Fox River are anticipated to be in place as long as 2 years during the construction of the Fox River Bridge. It is anticipated that the bridge construction will extend over two construction seasons.

**Proposed Mitigation**

The Clean Water Act requires mitigation for impacts to waterways. Proposed mitigation for the waterways are summarized in Table 10. The total mitigation required is 0.998 acres.

Removal of a portion of the floodplain forest area on the west bank during construction will be mitigated by erosion control practices and revegetation. The banks will be revegetated following construction. Vegetated ditches will be constructed for the majority of the corridor located on the west side of the Fox River. Curb and gutter with storm sewers will be used in the more urban areas east of the river. Outfalls will be protected with erosion protection measures such as rip rap or energy dissipaters.

The table below summarizes all the waterways delineated for this project, including type, watershed, jurisdictional status, Floristic Quality Index (FQI), impact, and mitigation ratios.

**Table 10**
**Total Waterway Impacts and Mitigation Summary**

| Site # | Watershed | JD Status | HQAR (Y/N) | Existing Waterway Acreage | Permanent Waterway Impact (Acres) | USACE Mitigation Ratio[1] | Kane County Mitigation Ratio[3] | Total Mitigation (Acres) |
|--------|-----------|-----------|------------|---------------------------|-----------------------------------|---------------------------|--------------------------------|--------------------------|
| 5 | Fox | USACE | N | 0.22 | 0.14 | 1.5:1 | N/A | 0.21 |
| 6 | Fox | USACE | N | 0.023 | 0.13 | 1.5:1 | N/A | 0.20 |
| 8 | Fox | USACE | N | 0.47 | 0.27 | 1.5:1 | N/A | 0.405 |
| 10 | Fox | USACE | N | 2.44 | 0.06 | 1.5:1 | N/A | 0.09 |
| 12 | Fox | USACE | N | 0.06 | 0.02 | 1.5:1 | N/A | 0.03 |
| 13 | Fox | USACE | N | 1.15 | 0.01 | 1.5:1 | N/A | 0.02 |
| 26 | Fox | Isolated | N | 0.10 | 0.01 | N/A | 2:1 | 0.02 |
| 27 | Fox | Isolated | N | 0.01 | 0.01 | N/A | 2:1 | 0.02 |
| 29 | Fox | USACE | N | 0.03 | 0.002 | 1.5:1 | 1.5:1 | 0.003 |
| | | | | 4.50 | 0.652 | | | 0.998 |

N/A Not applicable
High Quality Aquatic Resources (HQARs) include Advanced Identification (ADID) High Habitat Values (HHV) and High

Functional Value (HFV) sites, bogs, ephemeral pools, fens, forested wetlands, sedge meadows, wet meadows, seeps, streams rated Class A or B in the Illinois Biological Stream Characterization Study, streamside marshes, wet prairies, wetland supporting Federal or Illinois endangered or threatened species, and wetlands with a floristic quality index of 20 or greater or mean-C value of 3.5 or greater.

[1] Per the US Army Corps of Engineers (USACE), for non-HQARs the minimum mitigation ratio is 1.5:1, for HQARs the minimum is 5.5:1

[2] Per the IWPA, permanent impacts that are <0.5 acre are to be mitigated at either 2:1 (in-basin) or 3:1 (out-of-basin) and impacts >0.5 acre are to be mitigated at either 4:1 (in-basin) or 5.5:1 (out-of-basin).  In-basin mitigation will occur in the Fox River watershed.

[3] Per the Kane County Ordinance, Floristic Quality Index (FQI)<7=1:1 ratio, FQI>7 but <16= 2:1 ratio, FQI>16 but < 25 = 3:1 ration, FQI>25 is unmitigable.  However, mitigation for isolated wetland impacts upon more than one wetland within a site shall meet the standards of highest quality isolated wetland.

## Operational Impacts

Salt splash and spray impacts were discussed during the EIS.  The following additional information was not included in the EIS.  Specific calculations were completed for this project to assess potential chloride concentrations in the streams of the project area.  These calculations were completed using the U.S. Geological Survey (USGS) methodology, which is a standard estimating procedure.  The USGS methodology does not consider the effects of BMPs or detention basins in estimating water quality concentrations.  The results of these calculations indicate the chloride General Use Water Quality Standard of 500 mg/L would be achieved with one exception.  The daily maximum chloride concentration of the tributary to the West Branch of the South Tributary to the Fox River was estimated at 513 mg/L prior to any BMP or storm water treatment.  The upstream drainage area tributary to this location results in 0.14 square miles with intermittent flow.  Stormwater runoff from this area is directed to a stormwater detention basin prior to discharge.  This basin is anticipated to provide mixing and reduce chloride concentration peaks to below 500 mg/L.  This would require only a three percent reduction from estimated peak levels, which is achievable with such equalization.

Typically, detention basins do not show chloride removals when the concentrations vary from 16 to 200 mg/L; however, two studies did indicate 11 to 13 percent lower concentrations during winter events.  Primarily, the detention basins provide equalization of concentrations, which lowers the peak or maximum concentration discharged.   To achieve the water quality standard would only require a 3 percent reduction, which is anticipated to be achieved and maintain water quality in that tributary.

KDOT has been proactive in reducing the impacts of salt.  Through the use of computerized/calibrated salt spreaders and Global Positioning Systems (GPS), drivers can more accurately spread the correct amount of salt and better pinpoint the application of salt on its roads.  In addition, drivers cannot control the applications which are pre-programmed into the computers.  The trucks are regularly calibrated and spot checked.  Drivers also receive regular training on de-icing procedures.  KDOT continues to evaluate alternate deicers and is constantly monitoring and following the latest industry trends.  Currently, KDOT is utilizing Cargill ClearLane, an enhanced deicer/salt product that contains a pre-wetting agent.  The product adheres to the road surface more effectively than dry salt, minimizing loss of deicer from wind and traffic scatter, thereby reducing distribution to adjacent areas.

Potential impacts from increased roadway runoff due to this project are expected to involve minor short-term water quality degradation with no chronic effects.

**Part VIII. Groundwater Resources**

The EIS states that the upper sand and gravel aquifer is a public water supply aquifer within the project corridor. In the east half of the corridor, the shallow sand and gravel aquifer is known as the Valparaiso Aquifer. Two of the public supply wells in the City of Carpentersville, south of the proposed corridor, draw water from the Valparaiso Aquifer at a depth of 180 feet. Most of the private wells on both sides of the Fox River extract water from the Valparaiso Aquifer. The public wells reported in the project vicinity are 2,000 to 3,000 feet from the project corridor. These wells are confined to the Valparaiso aquifer. There are no changes to groundwater resources in the reevaluation.

**Impacts**

According to the EIS and reevaluation, roadway excavation will not penetrate either of the aquifers above bedrock that are supplying water in the vicinity of the corridor. No impedance to the groundwater flow toward the Fox River is anticipated considering the roadway section and alignment proposed.

Eleven private wells are located within 500 feet of the corridor and two within the ROW will need to be properly abandoned and capped. One well is located on the northwest corner of Longmeadow Parkway and Randall Road and the other is located on Angelina Place, just east of the Fox River. Since the EIS was approved, three wells along Angelina Place have been abandoned and capped. No public wells were noted within 1,500 feet of the corridor.

As a result of the analysis, there are no new impacts to groundwater resources.

**Part IX. Floodplains**

According to the EIS, the Fox River has an identified floodplain at the crossing location. The streambanks are undeveloped and include a floodplain forest on the western bank. The EIS stated that impacts to the floodplain would include the installation of one bridge pier but no acreage of impact was provided. The EIS further states that the proposed Bolz Road corridor has a transverse crossing of the Fox River floodplain and that the proposed bridge will span the entire designated floodway of the Fox River with no piers in the floodway and no construction below the 100 year flood elevation. Therefore, there will be no significant impact to flood elevations or flood flow velocities. Since the EIS, the design adjacent to the Fox River has been refined. Floodplain fill is estimated at 0.57 acre-feet from fill generated from piers and walls. Mitigation for fill in the floodplain will include providing sufficient compensatory storage.

**Part X. Wetlands**

According to the EIS, there were six wetlands delineated in 1995 by the Illinois Natural History Service (INHS) along the Longmeadow Parkway. Only one of those wetlands (Wetland No. 5) would be directly affected by construction of the Build Alternative but this wetland was later converted to a detention pond during the EIS process and therefore was no longer considered a wetland. Further information as to who converted the wetland to a detention basin was not provided in the EIS. Therefore, no wetland impacts were proposed.

During subsequent Phase 1 studies, the INHS re-delineated the entire corridor and four additional wetlands in 2005 and 2007.  This was done due to changes that were made to the shape of the proposed corridor between 1995 and 2005.  The four additional sites were new project areas not included in the 1995 study.   As part of the reevaluation, a wetland delineation was conducted in October 2013, utilizing the Regional Supplement to the Corps of Engineers Wetland Delineation Manual Midwest Region, and there were twenty wetlands delineated that are summarized in Table 11.   Additional wetlands delineated between the EIS and reevaluation can be attributed to refined right-of-way necessary for construction of Longmeadow Parkway and detention requirements, which increased from when the EIS was prepared resulting in additional wetland impacts. Furthermore, impacts from side street improvements were not considered in the EIS.   Adjacent development can also affect overland flow, drainage resulting in additional wetland areas over the past decade.   In addition, the original wetland delineation followed procedures outlined in the "Corps of Engineers Delineation Manual (Technical Report Y087-1) which was the methodology used at that time.  The current methodology used is the Regional Supplement to the Corps of Engineers Wetland Delineation Manual Midwest Region, this methodology is more inclusive as it uses specific regional indicators that were not considered as part of the older methodology used at the time of the EIS.  It also appears that farmed wetlands were not delineated for the EIS, which accounts for an additional five wetlands that are described in the reevaluation that are not included in the EIS. At the time the EIS was prepared, farmed wetland delineations were not typically completed.

Site 1, 9, and 11 are classified as Advanced identification (ADID) wetlands on the Kane County wetland mapping high habitat and/or high function wetland value.

## Table 11
## Wetland Summary

| Site # | Wetland Type | Function** | Dominant Vegetation (all strata) | FQI/ C- Value | NWI Classification | Kane County ADID Classification |
|---|---|---|---|---|---|---|
| 1 | Wet meadow/ Marsh | F,T, S, E, WH | Sandbar willow, eastern cottonwood,  black willow, reed canary grass, Canada thistle, cinnamon willow herb, narrow-leaved cattail | 16.7/3.1 | PEMC | HHV #917 |
| 1A | Wet meadow | F,T, S, E,WH | Barnyard grass, pinkweed, narrow-leaved cattail, sedge sp. | 13.1/2.7 | PEMC | None |
| 1B | Farmed | F,T, S, E,WH | Sandbar willow, river bulrush, giant ragweed Canada thistle, riverbank grape | 4.2/1.3 | None | None |
| 1C | Farmed | F,T, S, E,WH | Narrow-leaved cattail, corn, deer tongue grass | 12.7/2.3 | PEMCf | Wetland #650 and Wetland #651 |
| 2 | Farmed | F,T, S, E,WH | Box elder, elderberry, reed canary grass | 10.7/2.3 | None | NRCS Farmed Wetland |
| 3 | Wet meadow | F,T, S, E,WH | Box elder, silver maple, reed canary grass, riverbank grape | 9.4/2.0 | PEMF | Wetland #655 |
| 4 | Wet meadow | F,T, S, E,WH | Eastern cottonwood, red osier dogwood, reed canary grass, common reed | 12.2/2.5 | None | None |

| Site # | Wetland Type | Function** | Dominant Vegetation (all strata) | FQI/ C-Value | NWI Classification | Kane County ADID Classification |
|---|---|---|---|---|---|---|
| 7 | Forested | F, T, S, E,WH | Black cherry, common buckthorn, Tatarian honeysuckle, European high bush cranberry, green ash, moneywort, riverbank grape | 12.8/2.3 | None | HFV #643 |
| 8 | Unnamed tributary/WOUS/ Forested wetland/ Wet meadow | F, C, T, S, E,WH | Silver maple, slippery elm, Norway maple, Amur honeysuckle, Tatarian honeysuckle, tall morning glory, reed canary grass, calico aster, orange jewelweed | 18.8/2.7 | Hydrology line/ PEMA | NRCS Farmed Wetland |
| 9 | Forested | F, T, S, E,WH | Green ash, box elder, creeping Charlie, garlic mustard | 14.0/2.5 | PFO1A | HFV #643 |
| 11 | Forested | F, T, S, E,WH | Green ash, American elm, common buckthorn, riverbank grape | 16.9/2.5 | None | HFV #643 |
| 12 | Tributary/WOUS and associated wetlands | F, C, T, S, E,WH | Green ash, American elm, Tatarian honeysuckle, common buckthorn, stickseed, common reed | 11.7/2.5 | None | None |
| 13 | Tributary/WOUS/ Wet meadow/ Open water pond/ Forested | F, C, T, S, E,WH | Box elder, common buckthorn, American elm, sugar maple, Missouri gooseberry, Tatarian honeysuckle, green ash, multiflora rose, curly dock, reed canary grass, orange jewelweed, fowl mannagrass, bittersweet nightshade | 16.1/2.5 | PUBHh, | Artificial Pond #904 |
| 16 | Wet meadow | F, T, S, E, WH | Silver maple, common horsetail, giant ragweed, prairie cord grass | 4.4/1.4 | None | None |
| 18 | Marsh | F,T, S, E, WH | Narrow-leaved cattail | 7.7/2.6 | None | None |
| 19 | Farmed | F, T, S, E | Corn, barnyard grass | 0.0/0.0 | None | None |
| 20 | Farmed | F, T, S, E | Soybean | 0.0/0.0 | None | None |
| 23 | Wet meadow | F,T, S, E, WH | Box elder, common buckthorn, Tatarian honeysuckle, reed canary grass, common reed | 2.9/1.7 | None | None |
| 25 | Forested wetland/wet meadow | F, WH | Silver maple, American elm common buckthorn, reed canary grass, riverbank grape | 4.1/1.7 | None | None |
| 31 | Forested | F, C, T, S, E,WH | Shagbark hickory, common buckthorn, Tatarian honeysuckle, high bush cranberry | 4.9/3.5 | None | None |

\* F = flood control, C = conveyance, T = treatment of surface runoff, S = sediment and nutrient uptake, E = erosion control, WH = wildlife habitat, M = moderation of temperature within the microclimate.
ᵃIsolated is based on professional judgment in the field. The USACE makes all final jurisdictional determinations. Isolated applies to the lack of hydrological connection to a "Waters of the U.S".

**Impacts**

Longmeadow Parkway will impact eleven wetlands for a total acreage of 4.16 acres (2.37 acres jurisdictional and 1.79 acres isolated) that are summarized in Table 12. The Wetland Impact Evaluation is included in Appendix C.

**Proposed Mitigation**

☐ On-site

☐ Off-site

☑ Wetland Bank

**Description**

Considering USACE, Interagency Wetland Policy Act (IWPA), and Kane County mitigation ratios, the total required wetland mitigation is 17.13 acres. Mitigation credits will be purchased from a wetland bank site in Fox River Basin.

The table below summarizes all the wetlands delineated for this project, including type, watershed, jurisdictional status, Floristic Quality Index (FQI), impact, and mitigation ratios. There are three mitigation ratios based on the Clean Water Act, Interagency Wetlands Policy Act and the Kane County ordinance. The highest mitigation ratio out of the three will be used. The highest mitigation ratio has been bolded in Table 12. The total mitigation required is 17.13 acres. The USACE has made final jurisdictional status determinations on all wetlands in Table 12 below per a letter dated June 2, 2014 to KDOT.

**Table 12**
**Total Wetland Mitigation Summary**

| Site # | Watershed | JD Status | HQAR (Y/N) | Existing Wetland Acreage | Permanent Wetland Impact (Acres) | USACE Mitigation Ratio[1] | IWPA Mitigation Ratio[2] | Kane County Mitigation Ratio[3] | Total Mitigation (Acres) |
|--------|-----------|-----------|------------|--------------------------|----------------------------------|---------------------------|--------------------------|---------------------------------|--------------------------|
| 1B | Kishwaukee | Isolated | N | 0.08 | 0.08 | N/A | **3:1** | 2:1 | 0.24 |
| 1C | Fox | USACE | N | 2.34 | 0.26 | 1.5:1 | **2:1** | N/A | 0.52 |
| 2 | Fox | Isolated | N | 1.69 | 1.15 | N/A | **4:1** | 2:1 | 4.60 |
| 3 | Fox | Isolated | N | 0.30 | 0.19 | N/A | **2:1** | 2:1 | 0.38 |
| 4 | Fox | Isolated | N | 0.17 | 0.17 | N/A | **2:1** | 2:1 | 0.34 |
| 7 | Fox | USACE | Y | 0.56 | 0.40 | **5.5:1** | 2:1 | N/A | 2.20 |
| 8 | Fox | USACE | N | 1.35 | 0.68 | 1.5:1 | **4:1** | N/A | 2.72 |
| 11 | Fox | USACE | Y | 1.36 | 1.03 | **5.5:1** | 4:1 | N/A | 5.67 |
| 16 | Kishwaukee | Isolated | N | 0.35 | 0.06 | N/A | **3:1** | 2:1 | 0.18 |
| 20 | Fox | Isolated | N | 0.48 | 0.13 | N/A | **2:1** | 2:1 | 0.26 |
| 31 | Fox | Isolated | N | 0.03 | 0.01 | N/A | **2:1** | 2:1 | 0.02 |

| Site # | Watershed | JD Status | HQAR (Y/N) | Existing Wetland Acreage | Permanent Wetland Impact (Acres) | USACE Mitigation Ratio[1] | IWPA Mitigation Ratio[2] | Kane County Mitigation Ratio[3] | Total Mitigation (Acres) |
|--------|-----------|-----------|------------|--------------------------|----------------------------------|---------------------------|--------------------------|---------------------------------|--------------------------|
|        |           |           |            | 8.71 | 4.16 |  |  |  | 17.13 |

N/A Not applicable

High Quality Aquatic Resources (HQARs) include Advanced Identification (ADID) High Habitat Values (HHV) and High Functional Value (HFV) sites, bogs, ephemeral pools, fens, forested wetlands, sedge meadows, wet meadows, seeps, streams rated Class A or B in the Illinois Biological Stream Characterization Study, streamside marshes, wet prairies, wetland supporting Federal or Illinois endangered or threatened species, and wetlands with a floristic quality index of 20 or greater or mean-C value of 3.5 or greater.

[1] Per the USACE, for non-HQARs the minimum mitigation ratio is 1.5:1, for HQARs the minimum is 5.5:1

[2] Per the IWPA, permanent impacts that are <0.5 acre are to be mitigated at either 2:1 (in-basin) or 3:1 (out-of-basin) and impacts >0.5 acre are to be mitigated at either 4:1 (in-basin) or 5.5:1 (out-of-basin).  In-basin mitigation will occur in the Fox River watershed.

[3] Per the Kane County Ordinance, FQI<7=1:1 ratio, FQI>7 but <16= 2:1 ratio, FQI>16 but < 25 = 3:1 ration, FQI>25 is unmitigable.  However, mitigation for isolated wetland impacts upon more than one wetland within a site shall meet the standards of highest quality isolated wetland.


## Wetland Finding

A wetland finding is required by Executive Order 11990.

Various methods of avoidance and minimization were analyzed for the project, including reducing the typical roadway cross section by reducing lane and median widths.  Lane widths were minimized from the standard 12 foot wide lanes to 11 foot wide lanes which minimize impervious surfaces and reduce environmental impact.  On the east side of the Fox River, wetland impacts are being reduced through the use of retaining walls or Manufactured Structural Earth (MSE) walls at the bridge abutments and bridge approaches.  These walls reduce the footprint of the bridge approach by eliminating the need for bridge cone grading.  In addition, culverts at stream crossings are proposed to have natural bottoms or be sumped in cobblestone to maintain a natural substrate.  Because of the proximity of the wetlands and WOUS to the proposed corridor alignment, impacts to wetlands and WOUS are unavoidable.

The proposed corridor alignment was shifted to avoid impacts to wetland Sites 1, 1A, 9, 25 and 33.  Perimeter erosion control fencing will be placed adjacent to all wetland sites to prevent intrusion beyond the construction limits**.**  Construction will be staged as much as possible from upland areas to eliminate mass grading and reduce potential for erosion and sedimentation.

Based on the above considerations, the determination is that there is no practicable alternative to the proposed construction and impact to wetlands and that the proposed action includes all practicable measures to minimize harm to wetlands that may result from such use.

## Part XI.  Special Waste

The proposed project will not require any right-of-way or easement from any Comprehensive Environmental Response, Compensation and Liability Information System (CERCLIS) site.  The only Resource Conservation and Recovery Act (RCRA) generator in the project vicinity is Meyer Material Company but there were no violations on file and the area groundwater gradient is parallel to the proposed corridor.  Just west of the Meyer Material Company is the

Fox Valley Gun Club with a small arms shooting range located within the proposed corridor. There is a potential for lead contamination at this location.

A Preliminary Environmental Site Assessment (PESA) was conducted as part of the reevaluation. According to the PESA review dated December 18, 2014 prepared by the Illinois State Geological Survey (ISGS), there were five Recognized Environmental Conditions (RECs) and *de minimus* conditions at 34 sites along the project corridor. The Special Waste Review is attached as Appendix D, Page D-2. A Preliminary Site Investigation (PSI) will need to be completed to determine if any of the sites or Right-of-Way (ROW) adjacent to the sites will be impacted with the proposed work and/or if any ROW will be required at any of the locations.

## Part XII. Special Lands

Special lands for the north region included the Fox River Trail, FPDKC properties of Algonquin Shores and Fox River Shores, and the Dundee Township Park District Hickory Hills site. The Algonquin Shores Forest Preserve is north of Bolz Road between the Fox River and Williams Street. The Fox River Shores Forest Preserve is south of Bolz Road along both banks of the Fox River to about Lake Marian Road. The Hickory Hills site is located north of Bolz Road between Illinois Route 62 (Algonquin Road) and Illinois Route 25 in unincorporated Kane County. The EIS stated that 2.12 acres of Algonquin Shores/Fox River Shores and 6.64 acres of Hickory Hills would be impacted by the Longmeadow Parkway. Since the EIS, Algonquin Shores has been incorporated into Fox River Shores; it is no longer a separate forest preserve property. The impacts to Hickory Hills remain at 6.64 acres in the reevaluation while the impacts to Fox River Shores increased to 2.96 acres. The IGA between KDOT and Dundee Park District is included in Appendix A, Page A-17. A timeline of the coordination between KDOT and Dundee Park District is included in Appendix A, Page A-45.

New work is proposed at the Buffalo Park Forest Preserve and the Fox River Shores Forest Preserve.

After the ROD was issued, the Brunner Family Forest Preserve was established by the FPDKC. FPDKC worked with the KDOT to jointly plan the Brunner Family Forest Preserve to reserve a corridor within it for the Longmeadow Parkway. Additional temporary work is now proposed within the Brunner Family Forest Preserve.

A letter from KDOT to the Federal Highway Administration detailing the history of the Brunner property is attached as Appendix E and the following exhibits to this letter also are attached and summarized below.

- Exhibit I includes reference to the Final EIS and Section 4(f) Evaluation.
- Exhibit II includes an excerpt from the ROD.
- Exhibit III includes an email regarding the Brunner parcel acquisition.
- Exhibit IV includes an article on the Brunner Farm site.
- Exhibit V includes a letter between KDOT and the FPDKC regarding Algonquin Shores FPDKC and the Brunner parcel.
- Exhibit VI includes an intergovernmental agreement between the County and the FPDKC.
- Exhibit VII includes a letter from the County to Fred Brunner regarding impacts to the Brunner parcel.

- Exhibit VIII includes an affidavit from John Hoscheit (Commissioner and President of the FPDKC) regarding the coordination efforts of the FPDKC with the Longmeadow Parkway project.
- Exhibit IX is the 2030 Land Resource Management Plan and map showing the Longmeadow Parkway alignment.
- Exhibit X is an amendment to the intergovernmental agreement between the County and the FPDKC extending the termination date from January 1, 2005 to January 1, 2010.
- Exhibit XI and Exhibit XII include letters from the County to Suburban Trust and Savings Bank regarding property acquisition.
- Exhibit XIII includes the FPDKC Executive Committee Meeting Minutes.
- Exhibit XIV includes an article regarding the purchase of the Brunner property by the FPDKC.
- Exhibit XV is the resolution establishing the intent of the intergovernmental agreement between the County and the FPDKC.
- Exhibit XVI is the resolution authorizing the execution of an intergovernmental agreement with Kane County
- Exhibit XVII is the warranty deed
- Exhibit XVIII is the Transportation Committee Meeting Minutes dated June 16, 2015.
- Exhibit XIX is the restatement of agreements between KDOT and the FPDKC regarding the Longmeadow Parkway Extended.
- Letters from FHWA to homeowners regarding Section 4(f) concerns
- Buffalo Park Temporary Occupancy Letter

Additional information regarding each of these forest preserves, proposed improvements and impacts are described below.

**1.  Section 4(f)**

**Perry-Lathrop property**

The Perry-Lathrop property is located along the east side of Illinois Route 31 at 19N045. The project will take approximately 0.23 acres of frontage from the Perry-Lathrop property. This property is considered eligible for inclusion on the National Register of Historic Places and is therefore protected under Section 4(f).

An approximately 40 feet wide strip of land will be taken in front of the Perry Lathrop House. The only impact will be visual and a landscape plan will be developed and submitted for State Historic Preservation Office (SHPO) approval for the area adjacent to the Perry Lathrop property prior to construction.  The parcel to the south and east of the Perry Lathrop property, known as the Melva property, will be acquired by the County and transferred to the FPDKC. The Melva property will be transferred to the Forest Preserve District of Kane County and will be maintained in perpetuity as greenspace.

The Illinois SHPO was notified that FHWA intended to make a *de minimis* determination based upon their concurrence with the "no adverse effect" finding. The Illinois SHPO concurred in a letter dated July 7, 2016 (located on Page A-60 in Appendix A).

The FHWA has determined that the use of the Perry-Lathrop property, including the measures to minimize harm described above, will have a *de minimis* impact, as defined in 23 CFR 771.17, on the property.

**Buffalo Park Forest Preserve**

There is no Section 4(f) use of the Buffalo Park Forest Preserve.

Buffalo Park Forest Preserve, which is owned by the FPDKC, is located just north of the Longmeadow Parkway project limits and is considered a Section 4(f) resource. Buffalo Park Forest Preserve was acquired in the 1980's and is approximately 29 acres. Features, attributes and activities at this preserve that qualify it for protection under Section 4(f) include picnic areas, a loop trail for walking and biking, access to fishing, several parking areas and restrooms. Within the Buffalo Park Forest Preserve is the Raging Buffalo Snowboard Ski Park, woodlands and the Fox River shoreline. The FPDKC is planning to expand the Raging Buffalo Snowboard Ski Park, including additional parking, a new building and a larger snowboarding hill.

Excavation for the Longmeadow Parkway project will create approximately 524,000 cubic yards of excess material that requires disposal. KDOT and FPDKC have worked together on a plan to use the excess material to improve the snowboarding hill within the Raging Buffalo Snowboard Ski Park. In order to move the material to the Raging Buffalo Snowboard Ski Park, a temporary haul road will be constructed in both the Buffalo Park Forest Preserve and the Brunner Family Forest Preserve. This road will be used solely to haul material to the snowboarding hill. A concept plan showing the proposed improvements is located in Appendix E, Page E-100.

The construction activities within the Buffalo Park Forest Preserve are considered a temporary occupancy because it is so minimal that it does not constitute a use within the meaning of Section 4(f). Pursuant to 23 C.F.R. 774.13(d), the following conditions will be satisfied:

(1) Duration will be temporary, i.e., less than the time needed for construction of the project and there will be no change in ownership of the land.
(2) The scope of the work is minor and the magnitude of changes to the Section 4(f) property are minimal.
(3) There are no anticipated permanent adverse physical impacts, nor will there be interference with the protected activities, features, or attributes of the property, on either a temporary or permanent basis.
(4) The land will be fully restored and the property will be returned to a condition which is at least as good as that which existed prior to the project; and
(5) There is a documented agreement with the official with jurisdiction over Buffalo Park Forest Preserve. (See Appendix E, Page E-117)

**Brunner Family Forest Preserve**

There is no Section 4(f) use of the Brunner Family Forest Preserve.

The Brunner Family Forest Preserve is approximately 741 acres and is located adjacent to the Longmeadow Parkway north and south of the corridor, west of the Fox River. This forest preserve was established in October 2008, after the ROD for this project was issued. Features, attributes and activities at this preserve that qualify it for protection under Section 4(f) include a picnic shelter, informational kiosk, fishing access, interpretive signs, parking lot, restrooms and five miles of trails.

A corridor within the Brunner Family Forest Preserve was formally reserved for the Longmeadow Parkway before the forest preserve was established, based on the alignment established in the ROD. The Longmeadow Parkway was a jointly planned transportation facility between FPDKC and KDOT prior to the FPDKC acquiring this land from the Brunner family. The FPDKC closed on the property on October 1, 2008 and right-of-way was transferred to KDOT on April 14, 2009 for the Longmeadow Parkway project. A map showing the location of Longmeadow Parkway within Brunner Family Forest Preserve is included in Appendix E, Page E-28. A complete history of the Brunner Family Forest Preserve acquisition process is attached as Appendix E, Page E-1 through E-78.

Pursuant to 23 CFR 774.11(i), when a property is formally reserved for a future transportation facility before or at the same time a park, recreation area, or wildlife and waterfowl refuge is established and concurrent or joint planning or development of the transportation facility and the Section 4(f) resource occurs, then any resulting impacts of the transportation facility will not be considered a use. Because the Longmeadow Parkway was a concurrent and jointly planned facility with the Brunner Family Forest Preserve, there is not a Section 4(f) use of the Brunner Family Forest Preserve.

A temporary haul road will also be constructed in the Brunner Family Forest Preserve, which was not identified in the EIS. This haul road is outside of the original footprint of what was in the joint agreement and will be used solely to haul material to the snowboarding hill at the Buffalo Park Forest Preserve. The construction activities within the Brunner Family Forest Preserve for the hauling of material to the snowboarding hill are considered a temporary occupancy because it is so minimal that it does not constitute a use within the meaning of Section 4(f). Pursuant to 23 C.F.R. 774.15(d), the following conditions will be satisfied:

(1) Duration will be temporary, i.e., less than the time needed for construction of the project and there will be no change in ownership of the land.
(2) The scope of the work is minor and the magnitude of the changes to Section 4(f) property are minimal.
(3) There are no anticipated permanent adverse physical impacts, nor will there be interference with the protected activities, features, or attributes of the property, on either a temporary or permanent basis.
(4) The land will be fully restored and the property will be returned to a condition which is at least as good as that which existed prior to the project; and
(5) There is documented agreement with the official with jurisdiction over Brunner Family Forest Preserve. (See Appendix E, Page E-117)

KDOT plans to plant approximately 7,500 trees on the west side of the Fox River within the Brunner Family Forest Preserve. Sizes, types and densities will be coordinated with the FPDKC.

**Fox River Shores Forest Preserve**

There is a Section 4(f) use of the Fox River Shores Forest Preserve; however, it qualifies as a *de minimis* impact.

Fox River Shores Forest Preserve, which is owned by the FPDKC, is an approximately 393 acre site located within the Longmeadow Parkway project limits on the east and west sides of the Fox River. It is bordered by the Brunner Family Forest Preserve to the north and the Raceway Woods Forest Preserve to the southwest. Within the Fox River Shores Forest Preserve is the Fox River Trail, woodlands and the Fox River shoreline. There are several features, attributes and activities at this preserve that qualify it for protection under Section 4(f). The Fox River Shores Forest Preserve includes the Fox River Trail bike path running the length of the preserve. There also is a picnic area, shelter, restrooms, fishing and boat launch along the Fox River near the south end of the preserve.

Included as part of the Longmeadow Parkway project are several improvements to the Fox River Trail. A new connection to the Fox River Trail will be provided from Longmeadow Parkway, which will provide a connection across the Fox River, and a connection between both Forest Preserves. This will require 0.9 acres of temporary easement to re-align the trail. A detention pond will be constructed under the proposed Fox River Bridge and just west of the realigned bike path to provide storage for storm water runoff from Longmeadow Parkway. This will enhance water quality within the area. A MSE wall will be constructed where the current Fox River Trail crosses under the proposed Longmeadow Parkway alignment, requiring the trail to be realigned. This will require 2.06 acres of permanent right-of-way from the Forest Preserve property.

This project will result in the use of the Fox River Shores Forest Preserve, a Section 4(f) resource. On May 3, 2015, KDOT published a notice to offer the opportunity for the public to comment on the effects of the project on the protected activities, features, or attributes. The majority of the comments received during this public notice did not pertain to the impacts of the Fox River Shores Forest Preserve improvements. The most prevalent comment relevant to this notice was that the Fox River Shores impacts were adverse enough that this work should not be considered for *de minimis* processing. Other comments included displeasure at the loss of right-of-way at Fox River Shores and the additional disruption of a third forest preserve. In a letter dated May 24, 2016, the FPDKC was notified that FHWA intended to make a *de minimis* impact finding and on June 17, 2016 the FPDKC concurred in writing that the project will not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection. These letters can be found in Appendix E on Page E-124 and Page E-125. The agreement between the KDOT and FDPKC about the right-of-way acquisition in the Fox River Shores Forest Preserve can be found in Appendix E on Page E-79.

FHWA hereby makes a *de minimis* impact finding for this use as it will not adversely affect this resource's features, attributes, or activities that qualify the property for protection under Section 4(f). The *de minimis* impact finding is based upon the impact avoidance, minimization, and mitigation or enhancement measures detailed in the documentation submitted and included in at the end of this document.

## 2.   Section 6(f)

### Description

The Hickory Hills site is a Section 6(f) and 4(f) property and is located north of Bolz Road between Illinois Route 62 (Algonquin Road) and Illinois Route 25 in unincorporated Kane County.  The EIS stated that 6.64 acres of Hickory Hills would be impacted by the Longmeadow Parkway and determined there were no feasible and prudent alternatives and documented all possible planning to minimize harm to the Section 4(f) resource.  The impacts to Hickory Hills remain at 6.64 acres in the reevaluation.  The total mitigation for the 6.64 acres is 19.5 acres.  The Park District received 4.132 acres in 2006 and 10 acres in 2016.  There is currently 5.414 acres pending to be transferred to the Park District.  The IGA between KDOT and FPDKC is included in Appendix A, Page A-7.

## 3.   Open Space Lands Acquisition and Development (OSLAD) Act Lands

### Description

There are no Open Space Lands Acquisition and Development (OSLAD) lands identified in the EIS and this remains unchanged in the reevaluation.

## 4.   Illinois Natural Area (INAI) Sites

### Description

There were no INAI sites identified in the EIS and this remains unchanged in the reevaluation.

## 5.   Nature Preserves

### Description

There were no nature preserves identified in the EIS and this remains unchanged in the reevaluation.

## 6.   Land & Water Reserves

### Description

There were no land and water reserves identified in the EIS and this remains unchanged in the reevaluation.

### Environmental Commitments

Commitments listed in the EIS included the following:

1. As part of the Congestion Management Study, Pace requested the right to review any proposed plans to ensure compatibility with existing or proposed bus service. When Phase 1 plans are developed, Pace will be provided copies of the relevant portion for their input.

2. For all corridors in areas of near surface granular materials, drainage ditch lining shall be used, if drainage ditches are used, to reduce potential for infiltration of spills and other runoff contaminants.

3. Due to the potential presence of River redhorse and the Starhead topminnow, no in stream work in the Fox River shall occur between April 1 and June 30. In addition, a fish survey will be conducted in the summer of 2016 to document the existing habitat in the project area. If any listed fish species are found, IDOT will implement commitments to protect the listed fish in consultation with IDNR.

4. The commitment in the 2002 ROD which states "Prior to the start of construction, a population survey of live, non-invasive mussel species will be conducted in streams to be crossed. In the event that any live specimens of the Elktoe mussel or other non-invasive species are found, a mussel relocation program will be developed in consultation with the IDNR" was written prior to the understanding of the Incidental Take Authorization process which became effective July 17, 2001. Thus, the commitment shall be changed to "A mussel survey will be conducted in the summer of 2016 to determine if any live threatened or endangered mussels exist in the project corridor. If a state listed mussel is found, an Incidental Take Authorization will be required before any in stream work in the Fox River will occur."

5. As plans for the corridor are developed, ongoing coordination will take place with Pace and Metra to ensure the maximum practical inclusion of Travel Demand Reduction (TDR), Operational Management Strategies (OMS), and mass transit extensions and improvements in the project.

6. A system of Stormwater Management ponds will be built to comply with, as a minimum, the Kane County Stormwater Management ordinance and, where feasible, to extend residence time to promote sediment removal and dilute the release of the accumulated deicing agencies. Ponds will be lined to diminish interaction with groundwater.

7. Wetland mitigation for direct impacts will be provided in accordance with the more stringent of the USACE, IDNR and Kane County requirements and policies. Credits from a wetland bank site from the same wetland basin will be purchased before the project is included on a letting.

8. Erosion and Sediment Control during construction shall comply with the requirements of the Kane County Stormwater ordinance. The construction plans for each phase shall have the Erosion and Sediment control plans reviewed by the Kane County Nature Resources Department.

9. Compensatory Storage for fill within the regulatory floodplain will be provided in accordance with the more stringent requirements of the Kane County Countywide Stormwater Ordinance of IDNR-Office of Water Resource (OWR) policies.

10. Coordination will be carried out with SHPO prior to the construction of any corridor where potential archaeological sites exist to allow documentation of the site.

11. Coordination will be carried out with SHPO as plans for the Bolz Road Corridor (Longmeadow Parkway) are developed to allow coordination on minimizing the impacts to the Perry Lathrop property.

Additional commitments that KDOT has agreed to follow since the EIS include the following:

1. In order to assist in ease of movement for the Blanding's turtle, and decrease the likelihood of entrapment in the roadway, the proposed plan has been revised to demonstrate mountable curb and gutter along the entire south leg of the proposed construction limits.

2. KDOT will educate and inform construction crews and all on-site personnel about Blanding's turtle before work begins. The local agency will distribute photos (adult and juvenile) of the species and discuss the site management plan for responding to encounters in a training session and at the preconstruction site meeting. If a turtle is encountered on site, inform crews to immediately stop construction in the surrounding area and contact the appropriate staff at IDNR as listed in the contractor's documents; keeping in mind it is a criminal act to handle a listed species. Personnel on site should watch the turtle until the proper authority arrives to alleviate the situation, keeping at a respectable distance. If the turtle moves, crews should mark the spot it was seen.

3. The project area at Sleepy Hollow Road and Highmeadow Lane (south of Longmeadow Parkway) may contain the route to a nesting site. Therefore, potential harm to transiting turtles is a concern. IDNR recommends limiting work at Sleepy Hollow Road and Highmeadow Lane to between late October and late March, when this species is hibernating, to prevent construction activities from crushing or injuring juvenile or adult turtles.

4. If construction cannot be limited to between late October and late March, exclusionary fencing should be installed along the construction limits at the intersection of Sleepy Hollow Road and Highmeadow Lane. The fencing should be in place from the end of March through October to prevent turtles from entering the construction areas. Daily inspections should occur for the first two weeks and then be maintained weekly throughout the construction period to ensure the exclusionary fencing has been properly installed (dug into the ground) and to check if any turtles are present on either side of the fence.

5. Trenches along the construction limits at the intersection of Sleepy Hollow Road and Highmeadow Lane should be covered at the end of each work day. Before starting each work day, trenches and excavations should be routinely inspected to ensure no turtles (or other amphibians and reptiles) have become trapped within.

6. Trees shall not be cleared from April 1 through September 30 to protect the Northern long-eared bat.

7. Impacts to trees shall be mitigated in accordance with the Tree Mitigation Plan developed for the Longmeadow Parkway project.

8. Instead of providing clay lined ditches as described in Item 2 of the EIS commitments, current BMP's will be provided that allow for infiltration. See Appendix G, Page G-165 for the Errata Sheet to the ROD.

9. Water wells that are within 200-feet of the project will be properly capped and abandoned unless they can be demonstrated that the well is deep, properly cased, and not hydraulically connected to the surface. If the dwelling associated with the water well will remain after construction is completed, the water well will be replaced or another suitable alternative will be provided. The water well will be constructed such that susceptibility to surficial contamination is minimized, for example, by constructing the well in a deeper aquifer.

10. A PSI shall be completed before the project is included on a letting to determine if any of the sites or ROW adjacent to the sites will be impacted with the proposed work and/or if any ROW will be required at any of the locations identified in the PESA.

11. Great horned owls were documented using the nest that is located approximately 800 feet southwest of Karen Drive and Forest Drive. Since the Great horned owl is protected by the Migratory Bird Treaty Act, the tree with the nest shall not be cleared until the young have fledged and the nest is not being used. Per the INHS, the Great horned owl nests between January 1 and May 31.

**Permits/Certifications Required**

There were no permitting requirements stated in the EIS. The following permits will be required for the Longmeadow Parkway project:

- An Individual Section 404 permit from the USACE including separate Water Quality Certification from the IEPA will be required due to impacts to wetlands and WOUS. This will require review and approval of the soil erosion and sediment control plans from the Kane DuPage Soil and Water Conservation District
- Construction permits from IDNR  Office of Water Resources (OWR) will be required for fill placed in the floodway
- A National Pollutant Discharge Elimination System (NPDES) Permit will be required from the IEPA for construction disturbance greater than 1 acre.

**Public Involvement**

Public involvement occurred during the original EIS.  According to the EIS, in May and June of 1993, public meetings were held in the South, Central, and Northern regions of the project area. The purpose of these meetings was to introduce the public and officials to the project and solicit their opinions and insights into the potential corridors.  General concerns were expressed about whether the project or any of the corridors are warranted and questions were raised whether there were less intrusive options than building new roads.  More specific concerns focused upon intrusion into parklands and impacts to wetlands as well as displacements.  The second public meeting was held on February 16, 1994.  This meeting was held when consideration was being given to dropping corridors from further study.  The purpose of this meeting was to present the corridors with their known impacts so the public could comment before finalizing the recommendations of the draft *Corridor Analysis Document*.  In general, a recommendation to discontinue further study of a corridor evoked no negative response.  The third series of public meetings were held in May 1995.  Separate meetings were held in the North, Central and South

Regions.  At these meetings only five corridors that were being advanced for further study were presented.  The Bolz Road (Longmeadow Parkway) corridor did not evoke much response.  A series of public hearings were held in July 1998 at four locations with Kane County.  The North Region hearing was held at the Randall Oaks Golf Club in West Dundee.  Much of the commentary at this hearing focused on the Bolz Road Corridor (Longmeadow Parkway), with the majority of comments in opposition to the corridor for a variety of reasons.  All public involvement prior to the signing of the ROD is documented in the EIS (Record of Public Hearings, Comments to the Release of the Draft EIS and Responses).

After approval of the EIS and ROD, a Public Hearing was held on March 26, 2009.  The purpose of this hearing was to present Longmeadow Parkway as a toll highway facility, thereby using tolls to fund construction of the facility.  The toll facility would be an electronic collection and there would be no changes to the geometry as previously proposed.  The documentation of this Public Hearing is contained in the "Technical Memorandum for the Fox River Bridge Crossings Final Environmental Impact Statement and Section 4(f) Evaluation" dated November 2009.  Other public involvement activities have occurred to clarifying the impacts to individual property owners.

Several public meetings since 1990 have occurred at a variety of locations including municipalities, park districts, schools, libraries, golf clubs and community centers.  A summary of public involvement meetings is provided in Appendix F including dates, venues, and topics.

## Agency Coordination

Agency coordination occurred during the original EIS.  As documented in the EIS, in conformance with the NEPA/404 Process outside coordination was handled within the framework of meetings on the following concurrence points: 1) Purpose and Need, 2) Alternatives Carried Forward, and 3) Selected Alternative.  The first scoping meeting was held May 26, 1993.  At this meeting the scope of the project with probable range of proposed alternatives and schedule were presented.  The second scoping meeting was held on December 1, 1993.  The purpose of this meeting was to develop a consensus on the dropping from further evaluation corridors that did not satisfy the purpose and need or those corridors that had unacceptable impacts.  Since the USACE was not represented a follow up meeting was held on January 19, 1994.  The culmination of these efforts was the final Corridor Analysis Document which reduced the number of corridors under study to five.  The corridors to be advanced were reduced to Bolz Road (Longmeadow Parkway), CC&P/Stearns Road, Red Gate, C&NW/Dean Street, and Mooseheart/Illinois Route 56.  On March 2, 1995 a meeting was held to seek concurrence on the Purpose and Need statement and to prepare for Concurrence Point 2 by a limited presentation of the corridors still under study.  On April 18, 1995 a meeting was held on Concurrence Point 2.  The alternatives presented included the No-Build, Congestion Management System (CMS), and each of the proposed build alternative corridors.  On April 27, 1995 a follow-up meeting was held with the USACE and USEPA to request a formal response.  On July 19, 1995 another meeting was held to attempt to secure closure on Concurrence Points 1 and 2.  Concurrence was received from USEPA, USACE, and USFWS with a caveat that it could be rescinded because of new relevant data.  The Concurrence Point 3 was held on May 17, 2001.  After a presentation on the three remaining corridors (Bolz Road [Longmeadow Parkway], CC&P/Stearns Road, and Illinois 56/Oak Street), the impacts and the proposed mitigation, USFWS, USEPA and USACE agreed that these three could be the selected alternatives.

Since the ROD was signed, agency coordination has continued between Kane County, IDOT, and agencies interested in the proposed project have involved issues regarding sensitive environmental resources and coordination has been on-going with the following agencies:

- Illinois Historic Preservation Agency
  - Coordination included review of impacts resulting from Perry Lathrop House and the Melva property.
- U.S. Army Corps of Engineers
  - Coordination included WOUS and wetland impacts as well as Northern long-eared bat coordination
    - Original Individual Permit (IP)          Pre-Application Meeting: 1/7/2014
    - Original IP Submittal: 7/11/2014
    - USACE Public Notice #1: 9/3/2014
    - IP Addendum Meeting: 10/30/2014
    - IP Addendum Submittal: 11/18/2014
    - Joint USACE/USFWS Meeting: 9/22/2015
    - USACE/IEPA Joint Public Notice #2: 12/9/2015
    - Permit currently pending review
- U.S. Environmental Protection Agency
- U.S. Fish and Wildlife Service
  - Coordination included review and approval of Tree Mitigation Plan, Northern long-eared bat and Bald eagle concerns.
    - Joint USACE/USFWS Meeting: 9/22/2015
- Illinois Department of Natural Resources
  - Coordination included protection of Smallmouth bass, Blanding's turtle, Starhead topminnow, Slippershell and Spike mussel, Greater and River redhorse
- Illinois Department of Natural Resources – Office of Water Resources
  - Coordination regarding floodway and floodplain impacts
    - Original Submittal: 2/13/2015
    - Public Responses Submitted: 2/15/2016
    - Permit currently pending review
- Illinois Environmental Protection Agency
  - Submittal: 3/27/2015
  - IEPA Public Notice #1:4/17/2015
  - USACE/IEPA Joint Public Notice #2: 12/9/2015
  - Certification currently pending review

A major coordination effort in the reevaluation was devoted to potential Section 4(f) issues involving the FPDKC and the IDNR with regards to the Buffalo Park Forest Preserve, Fox River Shores Forest Preserve, and Brunner Family Forest Preserve.   On-going coordination has been provided with the FPDKC and they have been an active participant in the process, including attending internal status meetings.  Continued involvement will be required for ROW acquisition.

Besides Kane County, the proposed improvement involves the Villages of Algonquin, Barrington Hills, and Carpentersville.  These communities along with the Villages of West Dundee, East Dundee, Gilberts, Huntley, Lake in the Hills, Sleepy Hollow, and McHenry County have been involved in the project throughout its duration.

## SECTION V. COMMENTS

Several comments from Section 4(f) and USACE public notices have been received and formal responses are included in Appendix G.

**SECTION VI. FIGURES AND APPENDICES**

The following figures and appendices are incorporated as part of this Environmental Assessment Reevaluation:

Section 4(f) *De Minimis* for Fox River Shores Forest Preserve

**Figures**
Figure 1 – Environmental Resource Map
Figure 2 – Range in ADT Values
Figure 3 – Aerial Photographs Comparing Land Use

**Appendices**
Appendix A – Cultural Resources
Appendix B – Noise Analysis
Appendix C – Natural Resources
Appendix D – PESA Review
Appendix E – Section 4(f) Documentation
Appendix F – Significant Milestones and Public Meeting Summary
Appendix G – Public Comments and Reponses

# EXHIBIT

# 4

**Federal Highway Administration**

**FINDING OF NO SIGNIFICANT IMPACT**

**Longmeadow Parkway**
**Huntley Road to IL Route 62**
**Kane County, Illinois**

## PROJECT BACKGROUND

The Federal Highway Administration (FHWA) issued a Final Environmental Impact Statement (FEIS) in November 2001 and a Record of Decision (ROD) in May 2002 for the Fox River Bridge Crossings in Kane County. In the ROD, three build corridors were identified as build alternatives and each of the corridors were identified as having independent utility, meaning that a decision to build or not build any one of the three corridors would not affect the decision on the other corridors. One of the corridors identified to be built was the "Bolz Road Corridor", which has subsequently been renamed the "Longmeadow Parkway" by the project sponsor, the Kane County Division of Transportation (KDOT). Within this document, the project will be referred to only as the Longmeadow Parkway.

After the issuance of the ROD, KDOT and the Illinois Department of Transportation (IDOT) continued to work to advance the project, including purchasing right-of-way, conducting public meetings, and preparing final design plans. Using local funds, KDOT began construction of a portion of the project, between Huntley Road and Randall Road, in April 2016.

In March 2009, KDOT held a public hearing to seek comments on the KDOT proposal to convert the Longmeadow Parkway Bridge to a tolled bridge to help fund construction. KDOT prepared a document titled "Technical Memorandum for the Fox River Bridge Crossings Final Environmental Impact Statement and Section 4(f) Evaluation" to document the effects of tolling the bridge. In a November 20, 2009 letter from FHWA to IDOT, FHWA concluded that the re-evaluation demonstrated that a supplemental Environmental Impact Statement (EIS) was not required based on the change from a non-tolled bridge to a tolled bridge.

In 2015, as KDOT prepared to begin construction on the project, FHWA determined a re-evaluation was necessary, due to new information and circumstances in the project area. FHWA was uncertain of the significance of the new impacts, and therefore required that an Environmental Assessment (EA) Reevaluation be prepared to assess the impacts of the changes, new information, or new circumstances (23 CFR 771.130(b)(2)). The purpose of the EA Reevaluation was to document the changes in impacts, in comparison to the impacts disclosed in the FEIS/ROD and 2009 Reevaluation, to assist FHWA in assessing the significance of the new impacts.

Per 23 CFR 771.130(a), an EIS must be supplemented, when:

(1) Changes to the proposed action would result in significant environmental impacts that were not evaluated in the EIS; or

(2) New information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS.

This document describes FHWA's decision with regard to the applicability of these two criteria for the Longmeadow Parkway project. The "context and intensity" of the impact was evaluated to determine if the impact was "significant". The criteria in 40 CFR 1508.27 were used to evaluate the context and intensity, and therefore the significance, in the changes to the impacts.

If the change, new information or new circumstance resulted in (1) no new impact to the environment, (2) a lessening of environmental impact, or (3) it resulted in a negligible change in environmental impact (e.g., *de minimis*), then the change was not considered a significant impact.

**PURPOSE AND NEED FOR THE PROJECT**

This section describes and summarizes the needs that were identified for the project in the original NEPA decision, describes changes in conditions that have occurred after the FEIS and ROD were issued, and evaluates if the purpose and need remains valid.

<u>FEIS and ROD</u>

The purpose and need for the Longmeadow Parkway was fully documented in the FEIS and ROD.

The need for the project was driven by the few number of bridge crossings of the Fox River, the existing bridge crossings experiencing congestion, and the existing crossings expected to exceed their capacity by the year 2010 due to increasing population in the area of the proposed project. There are four crossings in the project area, and their capacities were noted in the EIS. The crossings included, from north to south:

- IL Route 62/Algonquin Road Bridge (Village of Algonquin)
  - 30,000 vehicles per day (vpd)
- Huntley Road/Main Street Bridge (Carpentersville)
  - 16,000 vpd
- IL Route 72/Main Street Bridge (villages of East and West Dundee)
  - 24,000 vpd
- Interstate 90 (Northwest Tollway)
  - 99,000 vpd

In the 5.1 mile distance between the IL Route 62/Algonquin Road Bridge (within the Village of Algonquin) and the IL Route 72/Main Street Bridge (within the villages of East and West Dundee), there are no major river crossings. The Huntley Road/Main Street Bridge in Carpentersville within this area is a two-lane bridge that serves local, not regional traffic, and terminates at Lord Avenue, four blocks east of the Fox River.

The three objectives of the project were identified to be:

- Enhance the transportation network by reducing congestion and providing alternate and more direct routes;

- Serve existing land use in the region through efficient access to central business districts, public services, and employment and commercial centers; and

- Serve proposed land use in conformance to local and county land use and resource management plans, which encourage compact, contiguous growth for the eastern portion of the region and preserve the rural qualities of the western portion of the region.

Current conditions in the project area

**Transportation Network.** According to the U.S. Census, the population of Kane County has increased from about 208,000 people in 1960 to 515,269 people in 2010.

Northern Kane County continues to be one of the fastest growing areas in the Chicago region, as evidenced by 2014 projections from the Chicago Metropolitan Agency for Planning (CMAP). Kane County's population is projected to reach 789,295 by 2040, an increase of 53.2% over the 2010 population. CMAP expects a population increase of about 146,000 additional residents by the year 2040, within the four townships that are part of the Longmeadow Parkway corridor area. This population increase will add demand for an improved transportation network in the area.

There have been several roadway improvements in the project area after the completion of the EIS, including the following:

- Algonquin Bypass – this project includes a new roadway on new alignment to direct through traffic around downtown Algonquin on IL Route 31. The intent of the project was to alleviate congestion at the IL Route 31 and IL Route 62 intersection.
- I-90 Add Lanes – this project included reconstructing and expanding to six lanes from Randall Road to I-39 and reconstructing and expanding to eight lanes from I-294 to Randall Road. This project was intended to add capacity to the roadway and decrease travel times throughout the corridor. I-90 serves long distance and regional travel and is not intended to address local traffic.

- Main Street Bridge in Carpentersville – this bridge was reconstructed to replace the structurally deficient bridge over the Fox River. No capacity was added to the roadway.

The CMAP April 7, 2016 traffic projections below, show the traffic growth on the other crossings in this area, assuming the Longmeadow Parkway project is not built. This average daily traffic (ADT) projection, measured in vehicles per day (vpd), includes the recently completed Algonquin Bypass and I-90 widening in its model. The documentation from CMAP is included in the Errata document.

| Bridge Location | Roadway Capacity (vpd) | Current ADT (vpd) | No Build 2040 ADT (vpd) |
|---|---|---|---|
| IL Route 62/Algonquin Road Bridge | 30,000 | 37,000 | 47,000 |
| Huntley Road/Main Street Bridge | 16,000 | 26,000 | 31,300 |
| IL Route 72/Main Street Bridge | 32,000 | 32,000 | 42,600 |
| Interstate 90 | 132,000* | 110,000 | 146,400 |

* This value is an estimate for the additional lanes based on the capacity of I-90 before the improvements.

With the exception of I-90, additional capacity has not been added to the other three crossings listed above. Both current and projected traffic on these three crossings show that without any additional crossings, the bridges will continue to experience congestion and ADT in excess of the effective available capacity.

IL Route 72/Main Street is congested through East and West Dundee with numerous driveways and businesses fronting the road. The IL Route 62/Algonquin Road Bridge through Algonquin is consistently congested, due to lack of capacity through the intersection of Algonquin Road and IL Route 31 on the west side of the Fox River. Currently, the existing ADT is 37,000 while the capacity of the roadway for a 24-hour period is 30,000. The Huntley Road/Main Street Bridge, in Village of Carpentersville, is a two-lane bridge that primarily serves local traffic and terminates at Lord Avenue, four blocks east of the Fox River.

**Existing Land Use.** The existing bridges across the Fox River pass through the Central Business Districts (CBD) of Algonquin, Carpentersville and West Dundee. These routes are currently congested. Vehicles traveling through the CBD are disruptive to locally-oriented pedestrian and vehicular movement. The provision of an alternate east-west route will better serve the existing land use, reducing congestion by reducing the through traffic on these routes. This will also protect the historic integrity of the downtown areas by providing a more direct alternate route for some trips.

The area along Randall Road from Big Timber Road to IL Route 72 has continued to undergo commercial/warehouse/industrial development. In 2010, Dundee Township had 25,727 jobs. By 2040, this figure is expected to grow to 53,539. Immediately to the west in Rutland Township, employment is expected to grow from 2,707 to 18,681 (*Source: CMAP Population Summary, October 10, 2014)*. This projected growth continues to support the original purpose and need for the project.

**Proposed Land Use.** This project continues to support the purpose to provide access to proposed land uses in the northern region of Kane County. Kane County's 2040 Transportation Plan was developed in concert with the ongoing Land Resource Management Plan update and supports local land use plans. The area west of the Fox River, including the Randall Road/I-90 corridor, continues to be a focus of growth in the northern region of Kane County. The communities of Algonquin and Carpentersville are continuing to develop the land in this area.

EA Reevaluation

The conditions and deficiencies in the roadway network that were identified in the 2002 ROD are still relevant today, and thus the essential elements of the purpose and need for this project are still valid. Population is projected to continue to grow, as well as traffic on the local roadway network, supporting the need for improving access across the Fox River.

The 2013 Design Report and EA Reevaluation utilize the 2040 traffic projections for engineering the roadway and assessing impacts.

**PROPOSED ACTION**

The proposed action is to construct a new highway (Longmeadow Parkway) between Huntley Road and IL Route 62, including a new bridge crossing over the Fox River in Kane County, Illinois. The proposed project corridor is located in the Villages of Algonquin, Carpentersville, Barrington Hills, and in unincorporated Kane County. The length of the project is approximately 5.6 miles, with another 3.7 miles of intersecting roadway improvements. In 2009, KDOT determined that the bridge over the Fox River will be tolled to assist in funding the project.

The location of the Longmeadow Parkway, as described in the FEIS and ROD, has not materially changed. During final design and preparation of engineering plans, refinements have been made including development of intersecting roadway improvements necessary for the Longmeadow Parkway project to be built.

The proposed Longmeadow Parkway typical section consists of two 11-foot lanes in each direction separated by an 18-foot landscaped barrier median. Intersection improvements along the Longmeadow Parkway would also be made. Signalized intersection improvements would be provided at Huntley/Boyer Road, Randall Road, Sleepy Hollow Road, IL Route 31, Bolz Road Connector, IL Route 25 and IL Route 62 (Algonquin Road). Sandbloom Road would pass under the new bridge over the Fox River and intersect with Bolz Road. The existing T-intersection of Huntley Road and Boyer Road would be reconstructed as a four-legged intersection. The proposed roadway would transition into Huntley Road on the west terminus into a two-lane cross section.

The construction of the Longmeadow Parkway should result in the following 2040 reduction in congestion on bridge crossings in the project area, and the resulting traffic on the Longmeadow Parkway Bridge.

| Bridge Segment | Current ADT (vpd) | No Build 2040 ADT (vpd) (1) | Toll Build 2040 ADT (vpd) | Build/No Build 2040 %Change |
|---|---|---|---|---|
| IL Route 62/Algonquin Road Bridge | 37,000 | 47,000 | 37,600 | -25% |
| Huntley Road/Main Street Bridge | 26,000 | 31,300 | 28,400 | -10% |
| IL Route 72/Main Street Bridge | 32,000 | 42,600 | 37,500 | -14% |
| Interstate 90 | 110,000 | 146,400 | 144,800 | -1% |
| Longmeadow Parkway over Fox River | - | - | 26,700 | - |

(1) Updated CMAP projections from April 7, 2016

The following sections, "Changes to the Action" and "New Information and Circumstances", describe and assess the change in impacts that resulted from design changes to the project, implementation of new policies and regulations, listing of new threatened or endangered species, or other new information or circumstances that were discovered after the ROD was issued. The effects of tolling the bridge were previously evaluated and addressed in the 2009 reevaluation and a decision issued by FHWA; therefore, those effects are not evaluated in this document.

**CHANGES TO THE ACTION**

- **PIER IN THE FOX RIVER**

    In the FEIS and ROD, it was decided that there would be no piers in the Fox River for the Longmeadow Parkway (Bolz Road). The original design did not have any piers in the river but did have seven piers in the floodplain.

    During the design and the value engineering process, KDOT determined that placing a pier in the river would result in a more economical bridge structure. The current design includes one pier in the Fox River and four piers located in the floodplain. The impact will be minimized as the proposed pier in the Fox River will be located near the west shore and will leave the majority of the river open for recreational use. Attached are the plans showing the placement of piers in the original design and the placement of piers in the current design, as well as renderings of what the bridge would look like based on the original design and also based on

the current design. A boat launch is located at Fox River Shores Forest Preserve and this launch will be open during construction.

The current design has two less piers than the original design. Impacts to Waters of the US (WOUS) will be mitigated. The total WOUS impact from the pier in the river is 0.06 acres and mitigation required is 0.09 acres. Credits have already been purchased from wetland banks within the Fox River basin to mitigate for Waters of the US (WOUS) impacts. Compensatory storage is being provided in the basins adjacent to the Fox River to mitigate for floodway and floodplain impacts.

This change to the project resulted in a new impact not evaluated in the EIS and was evaluated for context and intensity.

CONTEXT ANALYSIS

There are three roadway crossings of the Fox River within 5 miles upstream and downstream of the proposed Longmeadow Parkway crossing including Algonquin Road to the north and West Main Street in Carpentersville and East Main Street in West Dundee to the south. All three of these crossings have piers in the water, two on Algonquin Road and three each on the Main Street bridges. In addition, there are two multi-use paths crossing over the Fox River which also have between four to five piers in the Fox River.

INTENSITY ANALYSIS

As defined in 40 CFR 1508.27(b), intensity is evaluated by examining the following 10 criteria.

1. *Impacts that may be both beneficial and adverse. A significant impact may exist even if the Federal agency believes that on balance the effect will be beneficial.*

   The beneficial effect of placing a pier in the Fox River is that the project costs are lowered in comparison to not placing one pier in the Fox River. The total permanent WOUS impact from the one pier in the Fox River is 0.06 acres and mitigation required is 0.09 acres. This WOUS impact will be mitigated at a 1.5:1 mitigation ratio based on the USACE's mitigation ratio that states that for non-high quality aquatic resources the minimum mitigation ratio is 1.5:1. The pier is being placed on the shoreline to minimize effects to recreational boating on the Fox River.

2. *The degree to which the action affects public health or safety.*

Including a pier in the river will not affect public health or safety. During construction a cofferdam will be erected around the pier to prevent sediment from leaving the project site and limit boaters from entering the immediate area where construction is occurring.

3. *Unique characteristics of the geographic area such as proximity to historic or cultural resources, parklands, prime farmlands, wild and scenic rivers or ecologically critical areas.*

There are no historic or cultural resources, parklands, prime farmlands, or ecologically critical areas where the pier will be placed. The Fox River is not designated as a wild or scenic river. There is a population of Smallmouth bass within the project area. The cofferdam and causeway will not be installed between April 1st and June 30th to avoid spawning season. No in stream work will occur in the Fox River between April 1 and June 30th. The causeway and cofferdam will be constructed outside of this period between April 1 and June 30th but will remain in place during these dates. To minimize effects to wildlife in the Fox River, the causeway will consist of clean large stone with no fine material.

4. *The degree to which the effects on the quality of the human environment are likely to be highly controversial.*

In NEPA terms, effects are considered to be "controversial" when technical and scientific experts in the field disagree on the effects of the impact on the human environment. Installation of piers in rivers and other waterways are common and the effects on the environment are well understood. The impact of one pier in the river is typical for a new bridge over a river and an impact of 0.06 acre is minimal for a new river crossing. The effects on the human environment of constructing and permanent placement of one pier in the Fox River for the Longmeadow Parkway Bridge are not controversial. Recreational activities such as boating and fishing may still occur with the pier located in the Fox River.

5. *Degree to which possible effects on the quality of the human environment are highly uncertain or involve unique or unknown risks.*

Possible effects are highly certain and do not involve unique or unknown risks. It is common for bridges to be built with piers in the river. The WOUS impact of 0.06 acres from the one pier in the river is a definitive, highly certain, impact with no unknown risks.

6. *The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principal about a future consideration.*

All bridges over the Fox River within a five mile radius have piers in the river, with the majority having three or more piers in the river. Installing one pier in the Fox River is not setting a precedent for any future actions.

7. *Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.*

The construction of the Longmeadow Parkway project will not force improvements on other roadways. The action will not result in cumulatively significant impacts on the Fox River.

8. *The degree to which the action may adversely affect items listed or eligible for listing in the National Register of Historic Places, or other significant scientific, cultural or historic resources.*

The installation of the pier will not adversely impact any sites listed in or eligible for listing in the National Register of Historic Places or cause loss or destruction of significant scientific, cultural or historical resources.

9. *The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.*

Fish and mussel survey were conducted in Summer of 2016 and no threatened or endangered fish or mussels are located in the location of the pier. The pier in the river will not have an adverse effect on federally listed endangered or threatened species or critical habitat.

10. *Whether the action threatens a violation of Federal, State or local law or requirements imposed for the protection of the environment.*

The installation of the pier will not threaten a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

<u>CONCLUSION</u>

Based on the context and intensity of the impact, and considering the mitigation that will be implemented as part of this action, there is no significant impact resulting from the placement or long term inclusion of one pier in the Fox River.

- **ROADWAY CROSS-SECTION**

The ROD approved a typical cross-section of two 12 foot lanes in each direction separated by an 18 foot median.

During final design, the typical cross-section was changed to two eleven foot lanes in each direction separated by an 18 foot landscaped barrier median.

This change in the project resulted in a lessening of the roadway footprint; therefore, there is no significant impact on the environment as a result of this change.

- **CLAY LINED DITCHES**

In the ROD, a commitment was made to provide clay-lined ditches for all of the corridors selected, including Longmeadow Parkway.

During the coordination for the Section 404 permit for the Longmeadow Parkway, the US Army Corps of Engineers (USACE) identified that this commitment in the ROD would not meet their current permit program requirements. In coordination with the resource and regulatory agencies, including the USEPA, USACE, US Fish and Wildlife Service (USFWS), Illinois EPA, Illinois Department of Natural Resources (IDNR), IDOT, KDOT and FHWA, this commitment was changed to providing clay-lined ditches near IL Route 31 to meet the permitting requirements of the USACE. The change in commitment will result in better protection of WOUS. This coordination is documented in a July 9, 2015 e-mail from FHWA to IDOT, KDOT, and the resource and regulatory agencies.

The change in the commitment from the ROD was necessary to meet the USACE permitting requirements to provide the best protection to WOUS. This results in a lessening of the environmental impact and therefore there is no significant impact on the environment.

**NEW INFORMATION OR CIRCUMSTANCES**

- **RESIDENTIAL RELOCATIONS**

The FEIS identified eleven single family residential displacements required by the project. The number of relocations has been reduced to ten single family residential displacements. Seven of the ten single family relocations have already occurred. There are only three remaining single family relocations that will be required and there is sufficient replacement housing in the project area to relocate them.

Because the number of relocations has been reduced, this change is not a significant impact on the environment.

- **BALD EAGLE NEST SURVEY**

A bald eagle nest survey was completed because nesting bald eagles were observed in the project area. There was one confirmed bald eagle nest approximately 1,330 feet from the nearest project limit. Because there is adequate distance, defined as a minimum distance of 300 feet, between the project and the nest, there is no impact on the nest.

The project will not have an impact on bald eagles and therefore there is not a significant impact.

- **AIR QUALITY DESIGNATION AS A $PM_{2.5}$ NONATTAINMENT AREA**

The project is within a nonattainment area for $PM_{2.5}$ hot spot analysis. Requirements for $PM_{2.5}$ were first established in March 2006 and later modified in November 2013. The Longmeadow Parkway project is not considered a "project of air quality concern" and therefore a quantitative hot spot analysis is not required. The project will accommodate 1,332 diesel trucks on the new roadway, which is much less than 10,000 diesel trucks, the threshold at which a quantitative analysis would be considered. Therefore, this project will not cause or contribute to any new localized $PM_{2.5}$ violations or increase the frequency or severity of any $PM_{2.5}$ violations.

The project will not have new impacts on air quality ($PM_{2.5}$) and therefore there is no significant impact on $PM_{2.5}$ as result of the project.

- **IDOT NOISE POLICY AND PROCEDURES**

On July 13, 2010, FHWA published a final rule updating its noise regulations (23 CFR 772). Subsequently, IDOT revised its noise policy and procedures to be consistent with the updated regulations. A traffic noise impact occurs when the future build noise levels approach, meet,

or exceed the appropriate Noise Abatement Criteria, or when future build noise levels substantially exceed (greater than 14 dB(A)) existing noise levels.

In the FEIS, the analysis for the Longmeadow Parkway corridor demonstrated that noise impacts occurred in four locations. Noise abatement was considered at each of those locations; however, no noise abatement was proposed because either the abatement would not provide substantial noise reduction or it was not economically reasonable based on cost compared to benefit (FEIS page #4-75).

A new noise analysis was completed for the Longmeadow Parkway corridor as part of the current EA Reevaluation using IDOT's updated noise policy and procedures. Several scattered new residences and a new subdivision, located along the north side of the proposed Longmeadow Parkway and west of IL Route 25, have been included in the noise analyses. There were additional receptors chosen for the updated study based upon IDOT's updated noise policy and current land use. There were no noise impacts due to a "substantial increase" of future build noise levels over existing noise levels.

Out of the four receptors impacted by noise in the FEIS, only one of those receptors was identified as impacted in the updated noise analysis. The updated noise analysis identified four additional receptors that would be impacted by noise, for a total of five impacted receptors. Noise walls were found to not be economically reasonable as the actual cost per benefited receptor exceeded the adjusted allowable cost per benefited receptor.

This change to the project resulted in a new impact not evaluated in the FEIS and was evaluated for context and intensity.

CONTEXT ANALYSIS

The noise sensitive receptors located within Kane County are predominantly single family residential. For the Longmeadow Parkway the sensitive receptor locations included predominantly single family residential with a few multi-family residential receptors, a place of worship and soccer field and trail heads. Both the existing and proposed noise levels are evaluated and noise measurements are calculated for locations where outdoor activity is likely to occur. Impacted receptors were all located along the side roads, i.e. Randall Road and IL Route 25, and not directly adjacent to the proposed Longmeadow Parkway. In the proposed condition with increased traffic it would be likely that impacts would occur to these receptor locations with or without the construction of the proposed Longmeadow Parkway.

Per IDOT's noise policy, if the future build noise level approaches or exceeds the noise abatement criteria (NAC), then the project is considered to have a noise impact. For residential properties, the NAC is 67 dB(A). A 3 dB(A) change in noise level is considered barely

perceptible by the human ear, and a 5 dB(A) change in noise level is considered readily perceptible.

<u>INTENSITY ANALYSIS</u>

As defined in 40 CFR 1508.27(b), intensity is evaluated by examining the following 10 criteria.

1.  *Impacts that may be both beneficial and adverse. A significant impact may exist even if the Federal agency believes that on balance the effect will be beneficial.*

    There are five sensitive receptors that were determined to have noise impacts because the future build noise level at those locations exceeded the NAC of 67 dB(A)(R4, R5, R25, R26 and R26A).

    Receptor R4 is a single family residence located at the northwest corner of Longmeadow Parkway and Randall Road. The single family residence is immediately adjacent to Randall Road (approximately 40 feet from edge of pavement to the residence), a four-lane roadway with 23,560 ADT in 2015. The existing noise level at R4 is 73 dB(A) and the build noise level in 2040 is 77 dB(A). This results in a 4 dB(A) increase over the 20 year life of the project. Changes from 3 to 5 dB(A) are barely to readily perceptible by the human ear.

    Receptor R5 is a single family residence located at the southeast corner of Longmeadow Parkway and Randall Road. The single family residence is immediately adjacent to Randall Road (approximately 80 feet from edge of pavement to the residence), a four-lane roadway with 23,140 ADT in 2015. The existing noise level at R5 is 73 dB(A) and the build noise level in 2040 is 75 dB(A). This results in a 2 dB(A) increase over the 20 year life of the project. Changes less than 3 dB(A) are considered not perceptible by the human ear.

    Receptor R25 is a single family residence located along the west side of IL Route 25, south of Bolz Road. The single family residence is immediately adjacent to IL Route 25/Kennedy Drive (approximately 70 feet from edge of pavement to the residence), a four-lane roadway with 10,460 ADT in 2015. The existing noise level at R25 is 67 dB(A) and the build noise level in 2040 is 69 dB(A). This results in a 2 dB(A) increase over the 20 year life of the project. Changes less than 3 dB(A) are considered not perceptible by the human ear.

    Receptor R26 is a single family residence located along the east side of IL Route 25, south of Bolz Road. The single family residence is immediately adjacent to IL Route 25/Kennedy Drive (approximately 45 feet from edge of pavement to the residence), a four-lane roadway with 10,460 ADT in 2015. The existing noise level at R26 is 71 dB(A) and the build noise level in 2040 is 73 dB(A). This results in a 2 dB(A) increase over the 20 year life of the project. Changes less than 3 dB(A) are considered not perceptible by the human ear.

Receptor R26A is a place of worship located along the east side of IL Route 25, south of Bolz Road.  The place of worship is immediately adjacent to IL Route 25/Kennedy Drive (approximately 70 feet from edge of pavement to the residence), a four-lane roadway with 10,460 ADT in 2015. The existing noise level at R26A is 70 dB(A) and the build noise level in 2040 is 72 dB(A). This results in a 2 dB(A) increase over the 20 year life of the project. Changes less than 3 dB(A) are considered not perceptible by the human ear.

All of these impacted receptors are along the side roads (i.e., Randall Road and IL Route 25) and not directly adjacent to the proposed Longmeadow Parkway.

2. *The degree to which the action affects public health or safety.*

Four of the five receptors impacted would have an increase in noise levels that would not be perceptible to the human ear (< 3 dB(A)). One of the five receptors would have a 4 dB(A) increase over the existing condition which may be perceived by the human ear. The highest noise level at an impacted receptor is 77 dB(A).

Generally, 120 dB(A) is recognized as the threshold of pain and considered a dangerous noise level. Noise levels less than 120 dB(A) can damage hearing if the listener is exposed to the noise for an extended period of time.  The Occupational Safety and Health Administration (OSHA) standard for hearing protection is an 8-hour time-weighted average sound level of 85 dB(A).  The noise levels for this project do not approach 85 dB(A).

Typically, traffic noise levels in areas of frequent human use do not approach these noise levels. A 90 dB(A) traffic noise level would occur if a person stood 10 to 20 feet from a roadway carrying approximately 1,000 trucks per hour. It is unlikely that residents would be exposed to this level of noise, and therefore it is unlikely that residents experience hearing damage due to traffic noise.

3. *Unique characteristics of the geographic area such as proximity to historic or cultural resources, parklands, prime farmlands, wetlands, wild and scenic rivers or ecologically critical areas.*

There are no historic or cultural resources, parklands, prime farmlands, or ecologically critical areas where noise impacts have been identified.  The Fox River is not designated as a wild or scenic river.

4. *The degree to which the effects on the quality of the human environment are likely to be highly controversial*

The noise impacts will not have effects on the human environment that are likely to be controversial. In NEPA terms, effects are considered to be "controversial" when technical and scientific experts in the field disagree on the effects of the impact on the human environment. Increases in noise levels are common for transportation projects especially with new road construction and the effects on the environment are well understood. The effects on the human environment relating to the impacted receptors are not controversial.

5. *Degree to which possible effects on the quality of the human environment are highly uncertain or involve unique or unknown risks.*

Possible effects are highly certain and do not involve unique or unknown risks. It is common for transportation projects that involve new road construction result in increases in noise levels and potential impacts for sensitive receptors that are located adjacent to the project. The noise levels as summarized in the Traffic Noise Technical Report are definitive and demonstrate a highly certain impact with no unknown risks.

6. *The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principal about a future consideration.*

Most transportation projects that involve new road construction result in increases in noise levels and potential impacts for sensitive receptors that are located adjacent to the project. This does not set a precedent for any future actions.

7. *Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.*

The construction of the Longmeadow Parkway project will not force improvements on other roadways. The action will not result in cumulatively significant impacts due to noise.

8. *The degree to which the action may adversely affect items listed or eligible for listing in the National Register of Historic Places, or other significant scientific, cultural or historic resources.*

Noise impacts will not adversely impact any sites listed in or eligible for listing in the National Register of Historic Places or cause loss or destruction of significant scientific, cultural or historical resources.

9. *The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.*

Noise impacts will not adversely affect an endangered or threatened species or its habitat that has been determined critical under the Endangered Species Act of 1973.

10. *Whether the action threatens a violation of Federal, State or local law or requirements imposed for the protection of the environment.*

Noise impacts will not threaten a violation of Federal, State, or local law or requirements imposed for the protection of the environment. FHWA Noise Abatement Criteria and impact levels along with IDOT Noise Policy and Procedures have been followed and are documented in the Traffic Noise Technical Report.

CONCLUSION

Based on the context and intensity of the impact there is not significant impact on residences due to noise impacts.

- **STATE LISTED SPECIES**

Three species have been listed by the State of Illinois after the ROD was issued, including the Blanding's turtle (threatened), Starhead topminnow (threatened), and Slippershell mussel (threatened).

Blanding's turtle

The Illinois Natural Heritage Database contains a record from 2006 of the Blanding's turtle approximately 1,000 feet south of the Longmeadow Parkway corridor. The project was coordinated with the IDNR who responded on March 25, 2015 recommending commitments be incorporated into the project in the location of the Blanding's turtle record. Those commitments are included in the EA Reevaluation and will be incorporated into the project plans.

Starhead topminnow

A fish survey was conducted in the project area and no state-listed species, including the Starhead topminnow, were found. A record of a Starhead topminnow exists at a location approximately 2,000 feet downstream of the project. Due to the potential presence of the Starhead topminnow, and the River redhorse (a previously state listed species), no in stream

will occur between April 1 and June 30. IDNR concurs with the in-stream work restriction dates per letter dated October 12, 2016.  During this time period no work will affect the moving waterway outside of the cofferdam and causeway.  Work can still occur within an already constructed cofferdam and causeway.

Slippershell mussel

The Illinois Natural Heritage Database does not have any records of listed mussels in the project vicinity.  A mussel survey was conducted in the project area of the Fox River on July 14, 2016. Thirteen species of mussels were collected, no Slippershell mussels were found. A relict shell for Spike (state-listed, threatened) was found in the survey. The commitment in the 2002 ROD states that:

> Prior to the start of construction, a population survey of live, non-invasive mussel species will be conducted in streams to be crossed.  In the event that any live specimens of the elktoe mussel or other non-invasive species are found, a mussel relocation program will be developed in consultation with the IDNR.

This commitment was written prior to the understanding of the Incidental Take Authorization process which became effective July 17, 2001.  Thus, the commitment was changed in the EA Reevaluation to:

> A mussel survey will be conducted in the summer of 2016 to determine if any live threatened or endangered mussels exist in the project corridor.  If a state listed mussel is found an Incidental Take Authorization will be required before any in stream work in the Fox River will occur.

This commitment was met.  IDNR accepted the results of the survey per the October 12, 2016 IDNR letter.  Thus, there is no longer a need for a commitment regarding mussels.

The project will have no new impact to the state-listed species and will incorporate measures to ensure state-listed species are protected; therefore, there is no significant impact on state-listed species.

- **NORTHERN LONG-EARED BAT**

The Northern Long-Eared Bat (NLEB) was listed as a threatened species by the USFWS on April 2, 2015. IDOT completed the "Northern Long-Eared Bat 4(d) Rule Streamlined Consultation Form" and submitted it to US Fish and Wildlife Service on July 14, 2016. The determination was made that the project may affect the NLEB, but that any resulting incidental take of the NLEB is not prohibited by the final 4(d) rule. The USFWS did not respond within 30-days of the notification and therefore this determination is informed by the best

available information and FHWA's project responsibilities under Section 7(a)(2) with respect to the NLEB are fulfilled through the USFWS January 5, 2016 Programmatic Biological Opinion (BO).

The following conservation measures will be implemented as part of this project:

- o Trees will not be cleared from April 1 through September 30, consistent with tree clearing dates noted on permits;
- o Impacts to trees will be mitigated at a 2:1 mitigation ratio per the tree mitigation plan, providing potential habitat for NLEB.

The project may affect the NLEB, but any resulting incidental take is not prohibited by the final 4(d) rule. Conservation measures will be implemented to minimize the potential for incidental take. Because the conservation measures will be implemented and any incidental take of the NLEB is not prohibited, there is no significant impact on the NLEB as a result of the project.

- **SMALLMOUTH BASS**

  The project area has a higher Smallmouth bass population than other areas in the Fox River Basin. No in stream work will occur between April 1 and June 30 to protect state listed species and the in stream work restriction will benefit the Smallmouth bass since no in stream work will occur while the Smallmouth bass is spawning. Once the cofferdam is in place, all work in the Fox River including installation of the causeway, will be contained within the cofferdam.

  There is no significant impact on the Smallmouth bass.

- **HISTORIC PROPERTY IMPACTS**

  A forty foot strip of right-of-way will be acquired from the Perry-Lathrop property, which is considered eligible for the National Register of Historic Places. The Illinois State Historic Preservation Officer (SHPO) concurred with a conditional "no adverse effect" finding for the impact. The condition is that the landscaping plan near the Perry-Lathrop property will be submitted to the Illinois SHPO for review and approval.

  Based on the commitment to submit the landscaping plan to the Illinois SHPO for review and approval, the "no adverse effect" finding, and concurrence by the Illinois SHPO, there is no significant impact to historic properties.

- **SECTION 4(f) PROPERTIES**

  After completion of the ROD, there have been changes regarding Section 4(f) properties in the project area. Those properties include the Perry Lathrop house, Brunner Family Forest Preserve, the Fox River Shores Forest Preserve, and the Buffalo Park Forest Preserve.

  Perry Lathrop property

  The Perry-Lathrop property is located along the east side of IL Route 31 at 19N045. The Perry Lathrop property is considered eligible for the National Register of Historic Places and is therefore protected by Section 4(f) as a historic property. The Official with Jurisdiction (OWJ) for historic properties is the Illinois State Historic Preservation Officer (SHPO).

  A forty foot strip of right-of-way (approximately 0.23 acres) will be acquired from the Perry Lathrop House, resulting in a Section 4(f) use. There is not a direct impact to the house. In coordination with the SHPO, a landscape plan will be developed and submitted to the SHPO for review and approval.

  In a letter dated July 7, 2016, IDOT notified the SHPO that FHWA intended to make a Section 4(f) *de minimis* determination based on their concurrence with a conditional "no adverse effect" finding. The SHPO concurred with the no adverse effect finding on July 14, 2016 (Appendix E-60, EA Reevaluation).

  The FHWA has determined that the Section 4(f) use of the Perry-Lathrop property, including the measures to minimize harm described in the EA Reevaluation, will have a Section 4(f) *de minimis* impact.

  There is no significant impact on the Perry Lathrop property.

  Buffalo Park Forest Preserve

  FHWA considers the Buffalo Park Forest Preserve a resource protected by Section 4(f). The Forest Preserve District of Kane County (FPDKC) is the OWJ. Within the Buffalo Park Forest Preserve is the Raging Buffalo Snowboard Ski Park. The FPDKC is planning to expand the ski park, including additional parking, a new building, and a larger snowboarding hill.

  Excavation of material will occur during construction of Longmeadow Parkway, resulting in approximately 524,000 cubic yards of excess material. Working together, KDOT and FPDKC reached agreement to use the excess material to improve the snowboarding hill within the Buffalo Park Forest Preserve. The improved snowboarding hill will use material excavated from the Longmeadow Parkway project to construct the improved snowboarding hill, for

recreational purposes. Approximately 25% of the work on the hill will occur within the Buffalo Park Forest Preserve with the remaining 75% of the work on the hill to occur within the adjacent Brunner Family Forest Preserve. The construction of the ski hill is not a Section 4(f) use because it is being done at the request of the KCFPD. Section 4(f) land is not being converted to a transportation use, it is being improved for recreational purposes planned for by the KCFPD.

To facilitate the transfer of fill material from the Longmeadow Parkway project site to the Forest Preserve snowboarding hill site, a temporary haul road, partially located on the Buffalo Park Forest Preserve, will be constructed.

As documented in the EA Reevaluation, the temporary haul road meets the temporary occupancy exception described in 23 CFR 774.13(d). Additionally, there is written agreement with FPDKC that the temporary occupancy exception criteria have been met (Appendix E-117 through E-119, EA Reevaluation).

Placement of fill on the Buffalo Park Forest Preserve is a benefit to the Section 4(f) resource as it helps the OWJ achieve its plans and objectives for the Section 4(f) property. Because the temporary occupancy exception is applicable for the construction of the haul road on the Buffalo Park Forest Preserve property, there is no section 4(f) use of this resource.

There is no significant impact on the Buffalo Park Forest Preserve.

<u>Brunner Family Forest Preserve</u>

The Brunner Family Forest Preserve was purchased in October 2008 by the FPDKC. FHWA considers the Brunner Family Forest Preserve a resource protected by Section 4(f), with the exception of the transportation corridor within the Brunner Family Forest Preserve, which was jointly planned by FPDKC and KDOT as a transportation corridor for Longmeadow Parkway. The OWJ for Brunner Family Forest Preserve is the FPDKC.

As documented in the EA Reevaluation, property was formally reserved for the Longmeadow Parkway before, or at the same time, the Brunner Family Forest Preserve was established (Appendix E-1 through E-5, EA Reevaluation). Pursuant to 23 CFR 771.11(i), when a property is formally reserved for a future transportation facility before or at the same time a park, recreation area, or wildlife and waterfowl refuge is established and concurrent or joint planning or development of the transportation facility and the Section 4(f) resource occurs, then any resulting impacts of the transportation facility will not be considered a use as defined in 23 CFR 774.17. Per FHWA's Section 4(f) Policy Paper (July 20, 2012), the land that will be used by the transportation project was reserved from and, therefore, has never been

part of the protected Section 4(f) property. Further, it is not possible to have a constructive use of the Section 4(f) property because it was jointly planned with the transportation project.

The only proposed work that will be outside of the reserved corridor within the Brunner Family Forest Preserve is a temporary haul road to be used to move fill material to the site where the snowboarding hill will be improved, per the request of the FPDKC. Approximately 25% of the work on the hill will occur within the Buffalo Park Forest Preserve with the remaining 75% of the work on the hill to occur within the adjacent Brunner Family Forest Preserve. The construction of the ski hill is not a Section 4(f) use because it is being done at the request of the KCFPD.  Section 4(f) land is not being converted to a transportation use, it is being improved for recreational purposes planned for by the KCFPD. The temporary haul road will be constructed along the far western boundary and a farmed portion of the Brunner Family Forest Preserve.

As documented in the EA Reevaluation, the temporary haul road meets the temporary occupancy exception described in 23 CFR 774.13(d). Additionally, there is written agreement with FPDKC that the temporary occupancy exception criteria have been met (Appendix E-117 through E-119, EA Reevaluation).

Because the temporary occupancy exception is applicable for the construction of the haul road on the Buffalo Park Forest Preserve property, there is no Section 4(f) use of Brunner Family Forest Preserve caused by the temporary haul road construction and removal.

There is no Section 4(f) use of the Brunner Family Forest Preserve, and therefore there is no significant impact.

Fox River Shores Forest Preserve

FHWA considers the Fox River Shores Forest Preserve a resource protected by Section 4(f). The FPDKC is the OWJ.

In 2006, FPDKC combined the Algonquin Shores Forest Preserve with the Fox River Shores Forest Preserve. After combining the two adjacent resources, FPDKC retained the Fox River Shores Forest Preserve name. In the ROD, it was found that the Algonquin Shores Forest Preserve, owned by FPDKC, would be impacted by the Longmeadow Parkway project and there were no feasible and prudent alternatives to crossing in this location. The ROD states that the Fox River Shores Forest Preserve was directly south of the Algonquin Forest Preserve and that the Longmeadow Parkway (Bolz Road) crossing is in the area where the Algonquin Shores and Fox River Shores Forest Preserves are joined by a common property line. The ROD explains that the roadway will be on a bridge to minimize land used and to maintain access across the property. Two piers (with footings and piles) will be constructed on the Algonquin

Shores Forest Preserve Property. The total area used by the Longmeadow Parkway was identified as 2.12 acres. It was noted that the Fox River Trail would not be impeded by the roadway because it would be on structure.

The location of the Longmeadow Parkway near the Fox River Shores Forest Preserve has not materially changed since the ROD; the impacts identified are now within the Fox River Shores Forest Preserve because the Algonquin Shores Forest Preserve was incorporated into it.

There have been changes in impacts as a result of refined design of the Longmeadow Parkway in this section. The total permanent right-of-way required by the project has been reduced to 2.06 acres for construction of a detention pond, one bridge pier, mechanically stabilized earth walls, and providing additional length to the existing multi-use trail. An additional 0.9 acres of temporary right-of-way will be necessary to re-align the Fox River Trail. A new connection to the Fox River Trail will be provided from Longmeadow Parkway, which will provide a connection across the Fox River, and a connection between Brunner Family and Fox River Shores Forest Preserves.

The changes in impacts, as a result of the refined design, were disclosed to the public on May 3, 2015 and there was a 30-day opportunity to provide comments on the effects the project would have to the protected activities, features, and attributes that qualify the Fox River Shores Forest Preserve for Section 4(f) protection. Most comments received were general objections to advancing the project and expressed disagreement with applying the *de minimis* determination to the Forest Preserves that would be impacted by the project. Response letters were sent explaining the *de minimis* requirements and explaining that the impacts to the Fox River Shores Forest Preserve would not adversely affect the activities, features, or attributes that make the Fox River Shores Forest Preserve eligible for Section 4(f) protection. Subsequently, on May 24, 2016, KDOT sought concurrence with FPDKC that the project would not adversely affect the activities, features, or attributes that make the Fox River Shores Forest Preserve eligible for Section 4(f) protection and noted that FHWA intended to make a *de minimis* finding based on the FPDKC concurrence. The FPDKC concurred that the scope of work on the Longmeadow Parkway project would not adversely affect the activities, features, or attributes that make the Fox River Shores Forest Preserve eligible for Section 4(f) protection.

The FHWA has determined that the Section 4(f) use of the Fox River Shores Forest Preserve, including the measures to minimize harm described in the EA Reevaluation, will have a Section 4(f) *de minimis* impact.

There is a Section 4(f) *de minimis* use of the Fox River Shores Forest Preserve, and therefore there is no significant impact.

- **WETLAND IMPACTS**

The FEIS did not identify any wetland impacts resulting from the Longmeadow Parkway. After the ROD the right-of-way requirements were refined to include detention requirements and the improvements necessary on side roads that would intersect with Longmeadow Parkway. The US Army Corps of Engineers also updated their wetland delineation manual after the ROD was issued, which takes a more inclusive approach for identifying wetlands.

The Longmeadow Parkway corridor was delineated to take into account all of these changes that occurred. There are a total of eleven wetlands impacted, for a total acreage of 4.16 acres. Of the 4.16 acres impacted, 2.37 acres are considered jurisdictional under the USACE and will require an individual Section 404 permit, while the remaining 1.79 acres are considered non jurisdictional and will be permitted under Kane County requirements. A total of 17.13 acres of wetland mitigation is required. Mitigation credits have been purchased from a wetland bank site in Fox River Basin and some impacts to non-jurisdictional wetlands are being provided through a cooperative project between KDOT and FPDKC.

CONTEXT ANALYSIS

The Northeastern Morainal Natural Division, where Longmeadow Parkway is located, contains a landscape of the most recently glaciated portion of Illinois within the counties of Boone, DeKalb, DuPage, Kane Lake, McHenry, Will and Winnebago. Approximately 72,000 acres of wetlands currently exist in the Northeastern Morainal Natural Division (http://www.dnr.illinois.gov/conservation/IWAP/Documents/NaturalDivisions/Northeastern Morainal.pdf). About 8,891 acres of wetlands currently exist in Kane County (IDNR – Land Cover Summary Data by Counties – http://www.dnr.state.il.us/orep/ctap/map/counties.htm).

Twenty wetlands were identified within the project limits, (see Table 11 in the EA Reevaluation). None of the wetlands identified had a Floristic Quality Index (FQI) of 19 or greater. The FQI is an indication of native vegetative quality for an area. Generally a value of under 19 indicates low vegetative quality. Four sites were classified as Advanced Identification (ADID) sites indicating high habitat value or function.

INTENSITY ANALYSIS

As defined in 40 CFR 1508.27(b), intensity is evaluated by examining the following 10 criteria.

1. *Impacts that may be both beneficial and adverse. A significant impact may exist even if the Federal agency believes that on balance the effect will be beneficial.*

   The project will require filling 4.16 acres of wetlands, constituting less than 0.05% of the wetlands in Kane County and all of the wetlands impacted are considered to have low vegetative quality. The 4.16 acres of wetland impact will be mitigated with a total of 17.13 acres of wetlands, resulting in a net increase in wetlands. Approximately 13 acres of additional wetland will be created and could be considered a benefit.

2. *The degree to which the action affects public health or safety.*

   The impact to wetlands will not affect public health or safety.

3. *Unique characteristics of the geographic area such as proximity to historic or cultural resources, parklands, prime farmlands, wetlands, wild and scenic rivers or ecologically critical areas.*

   There are no historic or cultural resources, parklands, prime farmlands, or ecologically critical areas at any locations where wetlands will be impacted. The Fox River is not designated as a wild or scenic river. Wetlands that will be impacted are considered to have low vegetative quality. The average size of wetlands to be impacted is around 1 acre. Typically larger wetlands provide greater function and habitat value.

4. *The degree to which the effects on the quality of the human environment are likely to be highly controversial*

   In NEPA terms, effects are considered to be "controversial" when technical and scientific experts in the field disagree on the effects of the impact on the human environment. Filling of wetlands for highway projects, and other purposes, is common and the effects on the environment are well understood. The effects on the human environment of filling 4.16 acres of wetland are not highly controversial. Wetland impacts will not have effects on the human environment that are likely to be highly controversial. Because of the linear nature of transportation projects, it is common to impact wetlands; however, impacts have been minimized to the extent practicable, and the quality of wetlands to be impacted is considered low. Through the permitting process, mitigation will replace the wetlands impacted.

5. *Degree to which possible effects on the quality of the human environment are highly uncertain or involve unique or unknown risks.*

   The wetland impact of 4.16 acres is a definitive, highly certain impact with no unknown risks. It is common for transportation projects, especially of this size, to have these types of wetland impacts. The wetlands impacted are considered to have low vegetative quality and will be replaced with 17.13 acres of wetlands.

6. *The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principal about a future consideration.*

   Wetland impacts were minimized to the greatest extent possible in accordance with USACE permit guidance. The 4.16 acres of impacts to wetlands is not setting a precedent for any future actions. Regulatory requirements include avoiding impacts to wetlands. If this is not possible, the requirements include minimizing impacts to the greatest extent practical. On Longmeadow Parkway, construction limits were reduced to minimize impacts to wetlands and other resources.

7. *Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.*

   The construction of the Longmeadow Parkway project will not force improvements on other roadways. The action will not result in cumulatively significant impacts on wetlands.

8. *The degree to which the action may adversely affect items listed or eligible for listing in the National Register of Historic Places, or other significant scientific, cultural or historic resources.*

   Impacts to wetlands will not adversely impact any sites listed in or eligible for listing in the National Register of Historic Places or cause loss or destruction of significant scientific, cultural or historical resources.

9. *The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.*

   Impacts to wetlands will not affect any threatened or endangered species or habitat. NLEB, fish and mussel species will not be affected by wetland impacts.

10. *Whether the action threatens a violation of Federal, State or local law or requirements imposed for the protection of the environment.*

Impacts to wetlands will not threaten a violation of Federal, State, or local law or requirements imposed for the protection of the environment. All required permits from the USACE will be obtained prior to construction and conditions stipulated in the permit will be followed including compliance with the Interagency Wetlands Policy Act.

<u>CONCLUSION</u>

Based on the context and intensity of the impact, and considering the mitigation that will be implemented as part of this action, there is no significant impact on wetlands.

- **TREE IMPACTS**

In the FEIS, there were 2.7 acres of trees that were identified to be impacted by the Longmeadow Parkway. After the ROD was issued, and KDOT completed detailed design, the right-of-way requirements were refined to include detention requirements and the improvements necessary on side roads that would intersect with Longmeadow Parkway.

The tree impacts were reassessed as part of the 2016 EA Reevaluation. The identification and evaluation of trees, in and adjacent to the right-of-way of the proposed Longmeadow Parkway was performed in accordance with the IDOT Design and Environment-18 (D&E-18) Preservation and Replacement Trees policy. A total of approximately 28.7 acres (or 5,765 trees) are anticipated to be impacted within the Longmeadow Parkway corridor.

According to IDOT policy, if balled and burlapped trees are used for replacement plantings, a minimum of 1:1 is recommended for the number of trees removed to the number of trees intended to be established. KDOT has proposed to mitigate the tree impacts at a 2:1 ratio, for a total of 11,530 balled and burlapped replacement trees. This exceeds D&E-18 minimum requirements for tree replacement and demonstrates environmental stewardship. KDOT plans to plant approximately 4,050 trees within the right-of-way of the Longmeadow Parkway and 7,500 trees on the west side of the Fox River within the Brunner Family Forest Preserve. Sizes, types and densities will be coordinated with the Forest Preserve District of Kane County (FPDKC). This mitigation is within the Northeastern Morainal Natural Division and will be held in conservation in perpetuity.

<u>CONTEXT ANALYSIS</u>

The Northeastern Morainal Natural Division, where Longmeadow Parkway is located, contains a landscape of the most recently glaciated portion of Illinois within the counties of Boone,

DeKalb, DuPage, Kane Lake, McHenry, Will and Winnebago. The pre-settlement plant communities within this division would have been comprised of approximately 60 percent prairie, in addition to upland oak forests, mesic sugar maple forests, marshes, sedge meadows, bogs and fens. Approximately 270,000 acres of forested areas currently exist within the Northeastern Morainal Natural Division (http://www.dnr.illinois.gov/conservation/IWAP/Documents/NaturalDivisions/Northeastern Morainal.pdf). About 24,660 acres of forest currently exists in Kane County. (IDNR – Land Cover Summary Data by Counties - http://www.dnr.state.il.us/orep/ctap/map/counties.htm). The Longmeadow tree survey indicates that the health of the trees within the project corridor as : 9% dead, 41.3% poor, 38% fair, 11.5% good and 0.2% excellent (*Tree Survey Report for Longmeadow Parkway*, August 2014).

<u>INTENSITY ANALYSIS</u>

As defined in 40 CFR 1508.27(b), intensity is evaluated by examining the following 10 criteria.

1. *Impacts that may be both beneficial and adverse. A significant impact may exist even if the Federal agency believes that on balance the effect will be beneficial.*

   The project will result in the removal of 28.7 acres of trees, constituting less than 0.5% of the forested area in Kane County. Within the 28.7 acres of forest, there are approximately 5,765 trees which will be replaced at a 2:1 ratio with 11,530 trees. The trees will be planted within the Longmeadow Parkway right-of-way and other public land. Mitigated at a 2:1 mitigation ratio doubles the amount of trees to be planted which can be considered a benefit. The new tree plantings will supplement existing forested resources as the older trees naturally progress, mature and die.

2. *The degree to which the action affects public health or safety.*

   The impact to trees will not affect public health or safety.

3. *Unique characteristics of the geographic area such as proximity to historic or cultural resources, parklands, prime farmlands, wild and scenic rivers or ecologically critical areas.*

   There are no prime farmlands, wetlands or ecologically critical areas at any locations where trees will be impacted. The Fox River is not designated as a wild or scenic river.

   The 28.7 acres that will be removed involves over 50 percent edge habitat but does include some interior forested areas.

   There will be some trees removed adjacent to the Perry Lathrop property which is considered eligible for inclusion in the National Register of Historic Places. A landscape

plan will be developed and submitted for SHPO approval prior to construction. This is included in the commitments and is not a new impact from the EIS. The SHPO concurred with a "no adverse effect" finding on the Perry Lathrop property.

In addition, there will be some trees impacts on FPDKC property in areas adjacent to the Fox River. Approximately 235 trees will be impacted at Raging Buffalo Snowboard Ski Park, a FPDKC property. These impacts result from improvements planned by the FPDKC and in coordination with them.

The majority of trees to be impacted include dead and poor quality trees and a 2:1 mitigation ratio will be applied to replace the impacted trees. The majority of the mitigation, approximately 7,500 trees, will be planted within the Brunner Family Forest Preserve where currently no trees exist. This will provide additional habitat along the Fox River and enhance the riparian buffer in this area. It will take some time for the balled and burlapped trees to grow and reach maturity and to provide the same function as the trees to be removed.

4. *The degree to which the effects on the quality of the human environment are likely to be highly controversial.*

In NEPA terms, effects are considered to be "controversial" when technical and scientific experts in the field disagree on the effects of the impact on the human environment. The removal of trees in the project area will not have effects on the human environment that are likely to be highly controversial. Tree removal for new transportation projects is common and the effects on the environment are well understood.

The effects on the human environment of removing 28.7 acres of trees are not highly controversial. The tree removal will not occur from April 1 through September 30 to minimize potential impacts to the Northern Long Eared Bat, a federally listed threatened species. Additionally, the trees will be replaced at a 2:1 ratio as a conservation measure.

5. *Degree to which possible effects on the quality of the human environment are highly uncertain or involve unique or unknown risks.*

Possible effects to the human environment as a result of the tree removal are highly certain and do not involve unique or unknown risks. It is common for transportation projects on new location to have impacts on trees and therefore these impacts are well understood.

6. *The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principal about a future consideration.*

The 28.7 acres of impacts to trees is not setting a precedent for any future actions. It is common for transportation projects, especially new bridge projects, to have these types of tree impacts.

7. *Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.*

When considered with other reasonably foreseeable past, present and future projects, cumulative impacts are expected to be minor. No cumulatively significant impacts are anticipated from impacting trees.

8. *The degree to which the action may adversely affect items listed or eligible for listing in the National Register of Historic Places, or other significant scientific, cultural or historic resources.*

Impacts to trees will not adversely impact any sites listed in or eligible for listing in the National Register of Historic Places or cause loss or destruction of significant scientific, cultural or historical resources. There will be some trees removed adjacent to the Perry Lathrop property which is considered eligible for inclusion on the National Register of Historic Places. A landscape plan will be developed and submitted for SHPO approval prior to construction. This is included in the commitments and is not a new impact from the EIS. The SHPO concurred with a "no adverse effect" determination on the Perry Lathrop property.

9. *The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.*

Impacts to trees will not affect any threatened or endangered species or habitat. The NLEB is a threatened species. Trees will not be cleared from April 1st through September 30 to avoid impacting the NLEB and impacts to trees will be mitigated at a 2:1 mitigation ratio providing potential additional habitat for the NLEB. Any incidental take of the NLEB is not prohibited.

10. *Whether the action threatens a violation of Federal, State or local law or requirements imposed for the protection of the environment.*

Impacts to trees will not threaten a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

<u>CONCLUSION</u>

Based on the context and intensity of the impact, and considering the mitigation that will be implemented as part of this action, there is no significant impact on trees.

**ENVIRONMENTAL COMMITMENTS**

Below is a list of all commitments. These commitments are specific to Longmeadow Parkway. The commitments in the FEIS applied to all corridors evaluated and were not necessarily specific to Longmeadow Parkway. This document supersedes any previous commitments made, and if there is a conflict with other documentation, then this FONSI takes precedence.

1. As part of the Congestion Management Study, Pace (the suburban bus division of the Regional Transportation Authority) requested the right to review any proposed plans to ensure compatibility with existing or proposed bus service.

2. As plans for the corridor are developed, ongoing coordination will take place with Pace to ensure the maximum practical inclusion of Travel Demand Reduction (TDR), Operational Management Strategies (OMS), and mass transit extensions and improvements in the project.

3. Clay lined ditches will only be provided near IL Route 31 to reduce the amount of chlorides reaching the shallow groundwater associated with seeps and wetlands west of the Fox River. In all other locations, stormwater runoff will be directed to permeable vegetative swales to continue to allow infiltration to groundwater.

4. Ponds in the area of IL Route 31 will be constructed in a clay/loam formation, similar to the ditches near IL Route 31, which provides protection for shallow ground water resources in this area.

5. Although the cofferdam and causeway may remain in the stream for as long as 2 years, no in stream work in the Fox River outside of the cofferdam and causeway shall occur between April 1 and June 30 due to the potential presence of River redhorse and the Starhead topminnow. The in stream work restriction will benefit the high concentration of Smallmouth bass since no in stream work will occur while the Smallmouth bass is spawning.

6. Of the 4.16 acres of wetlands impacted, 2.37 acres are considered jurisdictional under the USACE and will require an individual Section 404 permit, while the remaining 1.79 acres are considered non jurisdictional and will be permitted under Kane County requirements. A total of 17.13 acres of wetland mitigation is required. Mitigation credits have been purchased from a wetland bank site in Fox River Basin and some impacts to non-jurisdictional wetlands are being provided through a cooperative project between KDOT and FPDKC. Wetland mitigation for direct impacts will be provided in accordance with the more stringent of the USACE, IDNR and Kane County requirements and policies. Wetland mitigation credits from a wetland bank site from the same watershed basin.

7. Erosion and sediment control during construction shall comply with the requirements of the Kane County Stormwater Ordinance. The construction plans for each phase shall have the erosion and sediment control plans reviewed by KDOT.

8. Compensatory storage for fill within the regulatory floodplain will be provided in accordance with the more stringent requirements of the Kane County Countywide Stormwater Ordinance or IDNR-Office of Water Resource (OWR) policies.

9. All archaeological sites will be avoided, no further coordination is necessary.

10. Coordination, regarding review of landscaping plans, will be carried out with SHPO as plans for the Longmeadow Parkway are developed.

11. Blanding's turtle commitments:

   a. In order to assist in ease of movement for the Blanding's turtle, and decrease the likelihood of entrapment in the roadway, the proposed plan has been revised to demonstrate mountable curb and gutter in the area of Sleepy Hollow Road.

   b. KDOT will educate and inform construction crews and all on-site personnel about Blanding's turtle before work begins. The local agency will distribute photos (adult and juvenile) of the species and discuss the site management plan for responding to encounters in a training session and at the preconstruction site meeting. If a turtle is encountered on site, inform crews to immediately stop construction in the surrounding area and contact the appropriate staff at IDNR as listed in the contractor's documents, keeping in mind it is a criminal act to handle a listed species. Personnel on site should watch the turtle until the proper authority arrives to alleviate the situation, keeping at a respectable distance. If the turtle moves, crews should mark the spot where it was seen.

   c. The project area at Sleepy Hollow Road and Highmeadow Lane (south of Longmeadow Parkway) may contain the route to a nesting site. Therefore, potential harm to

transiting turtles is a concern. Work will be limited at Sleepy Hollow Road and Highmeadow Lane to between late October and late March, when this species is hibernating, to prevent construction activities from crushing or injuring juvenile or adult turtles.

d.  If construction cannot be limited to between late October and late March, exclusionary fencing should be installed along the construction limits at the intersection of Sleepy Hollow Road and Highmeadow Lane. The fencing should be in place from the end of March through October to prevent turtles from entering the construction areas. Daily inspections should occur for the first two weeks and then be maintained weekly throughout the construction period to ensure the exclusionary fencing has been properly installed (dug into the ground) and to check if any turtles are present on either side of the fence.

e.  Trenches along the construction limits at the intersection of Sleepy Hollow Road and Highmeadow Lane shall be covered at the end of each work day. Before starting each work day, trenches and excavations shall be routinely inspected to ensure no turtles (or other amphibians and reptiles) have become trapped within.

12. Trees shall not be cleared from April 1 through September 30 to protect the NLEB.

Within the 28.7 acres of forest, there are approximately 5,765 trees which will be replaced at a 2:1 ratio with 11,530 trees. The trees will be planted within the Longmeadow Parkway right-of-way and other public land.

13. Water wells that are within 200-feet of the project will be properly capped and abandoned unless they can be demonstrated that the well is deep, properly cased, and not hydraulically connected to the surface. If the dwelling associated with the water well will remain after construction is completed, the water well will be replaced or another suitable alternative will be provided. The water well will be constructed such that susceptibility to surficial contamination is minimized, for example, by constructing the well in a deeper aquifer.

14. A Preliminary Site Inspection (PSI) shall be completed before the project is included on a letting to determine if any of the sites or ROW adjacent to the sites will be impacted with the proposed work and/or if any ROW will be required at any of the locations identified in the Preliminary Environmental Site Assessment (PESA).

15. Great horned owls were documented using the nest that is located approximately 800 feet southwest of Karen Drive and Forest Drive. Since the Great horned owl is protected by the Migratory Bird Treaty Act, the tree with the nest shall not be cleared until the young have fledged and the nest is not being used. Per the Illinois Natural History Survey (INHS), the

Great horned owl nests between January 1 and May 31.  The tree will be marked on the construction plans and it will not be cleared between January 1 and May 31.

16. Existing natural wetlands or forested tracts will not be used as a pollution prevention device.  Natural wetlands will not to be used as primary detention facilities and any treated stormwater discharged to natural wetlands are not anticipated to change the existing use of wetlands.

## AGENCY FINDINGS

The following findings establish the project's adherence to applicable laws intended to protect sensitive environmental and socioeconomic resources.

### Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations

The project does not result in disproportionately high or adverse human health or environmental effects on minority or low-income populations (Executive Order 12898).  The number of relocations is ten single family residential displacements, none are considered low income or minority populations.

### Section 106 of the National Historic Preservation Act of 1966 (NHPA)

The FHWA issued a conditional "no adverse effect" finding for this project related to the effects on the Perry Lathrop property. The SHPO concurred with this finding.

### Executive Order 11988, Floodplain Management

The Fox River has an identified floodplain at the crossing location.  The streambanks are undeveloped and include a floodplain forest on the western bank.  Floodplain fill is estimated at 0.57 acre-feet from fill generated from piers and walls. There is one floodplain within the project study area.

There will be no significant encroachment within any of the 100-year floodplains and regulatory floodways as part of the proposed improvements.

### Section 176(c) of the Clean Air Amendments of 1990

The project's design concept and scope are consistent with the project information used for the TIP conformity analysis.  Therefore, this project conforms to the existing State Implementation Plan and the transportation-related requirements of the 1990 Clean Air Act Amendments.

This project is within a portion of a Nonattainment or Maintenance Area where CMAP is the MPO.

This project is included in the FY 2014-2019 Transportation Improvement Program (TIP) endorsed by the Metropolitan Planning Organization Policy Committee of the Chicago Metropolitan Agency for Planning

(CMAP) for the region in which the project is located. Projects in the TIP are considered to be consistent with the regional transportation plan endorsed by CMAP. The project is within the fiscally constrained portion of the plan.

On June 5, 2015, the Federal Highway Administration (FHWA) and the Federal Transit Administration (FTA) determined that the GO TO 2040 Comprehensive Regional Plan and the Transportation Improvement Plan conforms to the State Implementation Plan (SIP) and the transportation-related requirements of the 1990 Clean Air Act Amendments. These findings were in accordance with 40 CFR Part 93, "Determining Conformity of Federal Actions to State or Federal Implementation Plans."

**Executive Order 11990, Protection of Wetlands**

It is anticipated that the proposed action will result in 4.16 acres of wetland impacts. Executive Order (EO) 11990 requires federal agencies to avoid (to the extent practical) long- and short-term adverse impacts associated with the destruction or modification of wetlands. More specifically, EO 11990 directs federal agencies to avoid new construction in wetlands (if practicable avoidance alternatives exist). Where wetlands cannot be avoided, the proposed action must include all practicable measures to minimize harm to wetlands.

Wetland impacts have been avoided where practicable. Wetland impacts result from constructing the new road and bridge on new alignment, widening the existing Longmeadow Parkway and associated side streets to meet current safety and capacity requirements, ditch re-grading and detention requirements.

The determination is that there is no practicable alternative to the proposed construction and impact to wetlands and that the proposed action includes all practicable measures to minimize harm to wetlands that may result from such use.

**Section 7 of the Endangered Species Act**

FHWA determined that the project may affect the NLEB, but that any resulting incidental take of the NLEB is not prohibited by the final 4(d) rule. This determination is informed by the best available information and FHWA's project responsibilities under Section 7(a)(2) with respect to the NLEB are fulfilled through the USFWS January 5, 2016 Programmatic BO.

**Section 4(f) of the U.S. DOT Act of 1966**

FHWA has made the following determinations with respect to Section 4(f) properties:

> Perry Lathrop property – Section 4(f) *de minimis* determination.

> Buffalo Park Forest Preserve – No Section 4(f) use, temporary occupancy exception is applicable (23 CFR 774.13(d)).

Brunner Family Forest Preserve – Longmeadow Parkway corridor was jointly planned and thus the transportation corridor does not have a Section 4(f) use of this property (23 CFR 774.11(i)). The construction of temporary haul road outside of the reserve transportation corridor is not a Section 4(f) use because the temporary occupancy exception is applicable (23 CFR 774.13(d)).

Fox River Shores Forest Preserve – Section 4(f) *de minimis* determination.

## PUBLIC INVOLVEMENT

The EA Reevaluation was made available to the public on July 29, 2016 for public review and comment through September 6, 2016 at www.co.kane.il.us/dot/foxBridges/longmeadowPkwy.aspx as well as at select local libraries, Villages located within the study area, and the KDOT office. A complete listing of these locations was posted on the project website. Comments received through September 6, 2016 were made part of the official public hearing record.

An invitation postcard was sent to approximately 548 stakeholders on August 9, 2016. Advertisements for the public hearing were published in local newspapers, including the Northwest Herald (July 29 and August 23), Daily Herald (July 29 and August 23), and Reflejos (July 31 and August 21). An email with a web advertisement attached was sent to local municipalities and chambers of commerce the week of August 15th requesting that they distribute information about the public hearing to residents and businesses. Stacks of postcards and posters were also sent to the local municipalities.

 A public hearing was held on Tuesday, August 30, 2016, at the Holiday Inn – Chicago Northwest /Elgin at 495 Airport Road, Elgin, Illinois from 4:00 p.m. to 8:00 p.m. Representatives from the KDOT, IDOT, and consultant team were available to discuss the project and answer questions. Representatives from IDOT's Bureau of Land Acquisition were also present to answer questions regarding the land acquisition process.

The public hearing was in an open house format and also offered a public forum where participants were offered an opportunity to give public comment. There was also a continuous audio-visual presentation, exhibit boards for review, large scale aerials of the project area, and a comment area for attendees to provide comments, questions, and concerns. Two court reporters were available to take comments verbally. Two Spanish speaking interpreters were present throughout the hearing.

The meeting was attended by over 323 people and five media representatives. Forty-five (45) comments via comment form or letter were submitted by attendees. Thirty-six (36) people provided statements during the public forum. The comments submitted via comment form or letter indicated both opposition and support for the project, and covered a variety of topics, including benefits, capacity, environmental impacts, funding, impacts on wildlife and need for project.

All comments received through the end of the public comment period have been addressed and are attached to the Errata.

**CONCLUSION**

The FHWA has determined that the changes to the proposed action will not result in significant environmental impacts that were not evaluated in the EIS. Additionally, the new information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts will not result in a significant environmental impact that was not evaluated in the EIS. There are therefore no new significant impacts on the human environment.

This finding of no new significant impacts is based on the attached EA Reevaluation, Errata, and response to public comments on the EA Reevaluation, which has been independently evaluated by the FHWA and determined to adequately and accurately assess the need, environmental issues, and impacts of the proposed project and appropriate mitigation measures. It provides sufficient evidence and analysis for determining that a Supplemental EIS is not required. The FHWA takes full responsibility for the accuracy, scope and content of the attached EA Reevaluation and Errata.


November 22, 2016
_____
Date

_____
Catherine A. Batey, Division Administrator

# EXHIBIT

# B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| STOP LONGMEADOW,              ) | |
|           ) | |
|       Plaintiff,           ) | |
|           ) | |
|       v.           ) | |
|           ) | |
| UNITED STATES DEPARTMENT OF    ) | Case No._____ |
| TRANSPORTATION, ELAINE L. CHAO,    ) | |
| Secretary, United States Department of    ) | Hon. Sharon J. Coleman |
| Transportation, FEDERAL HIGHWAY    ) | |
| ADMINISTRATION, WALTER C. "BUTCH"    ) | |
| WAIDELICH, JR., Acting Deputy Administrator,    ) | |
| Federal Highway Administration, CATHERINE K. ) | |
| BATEY, Division  Administrator, Illinois Division, ) | |
| Federal Highway Administration, and KANE    ) | |
| COUNTY, a municipal corporation,    ) | |
|           ) | |
|       Defendants.           ) | |

<p style="text-align:center;color:red;"><strong>PROPOSED</strong></p>

**EMERGENCY MOTION AND MEMORANDUM IN SUPPORT**
**OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**
**<ins>ON COUNT III OF PLAINTIFF'S COMPLAINT FOR INJUNCTIVE  RELIEF</ins>**

NOW COMES Plaintiff, STOP LONGMEADOW, by and through its undersigned counsel, and for its Emergency Motion for Temporary Restraining Order and Preliminary Injunction on Count III of Plaintiff's Complaint for Injunctive Relief, states as follows:

**INTRODUCTION AND FACTUAL BACKGROUND**

1.     Plaintiff has filed a Complaint for Injunctive and Declaratory Relief, arising from the proposed construction of a four-lane highway and accompanying toll bridge ("the Longmeadow Project") in Kane County, Illinois. As discussed in detail in the Complaint, the Longmeadow Project will pass through or over the Fox River and various public forest preserves, wetlands and agricultural lands. The affected areas are home to numerous species of rare,

threatened or endangered wildlife, and the natural habitat through which the highway is proposed to be routed has been described as the among the highest quality of its kind in the United States.

2.      While the Complaint asserts numerous violations of federal statutes and their implementing regulations, the instant motion is concerned solely with the rusty patched bumblebee, a species on the brink of extinction found within the area comprising the Longmeadow Project, and the first bee of any kind in the continental United States to be declared endangered. The U.S. Fish and Wildlife Service ("FWS") formally listed the species (*Bombus affinis*) as endangered on March 21, 2017. (*see* Ex. 1, Federal Register notice) Nevertheless, on April 11, 2017, Defendant Kane County issued a press release (*see* Ex. 3)stating that construction of a portion of the Longmeadow Project which would impact the endangered bumblebee's habitat would commence on April 17, 2017.

3.      Section 7 of the Endangered Species Act, 16 U.S.C. 1531 *et seq*. ("ESA" and "Section 7", respectively) requires federal agencies, including the federal Defendants herein, to use their legal authorities to promote the conservation purposes of the ESA and to consult with the FWS to ensure that actions they authorize, fund, or carry out (such as the instant Longmeadow Project, which received $14.5 million in funding through the federal Defendants) are not likely to jeopardize the continued existence of species listed as endangered. During this consultation process the "action" agency receives a "biological opinion" or concurrence letter addressing the proposed action, and FWS works with the funding agency in order to ensure that any negative impact on endangered species found within the project area is eliminated or minimized. The consultation process is mandatory, and once initiated, proceeds rapidly (*see, e.g*., 16 U.S.C § 1536(b) and (c) (setting forth time periods for prompt resolution).

4.      Notwithstanding the interagency cooperation and environmental assessment requirements set forth in Section 7, and despite Defendants' knowledge of the presence of the endangered species in the area affected by the Longmeadow Project, Defendants have taken absolutely no action with respect to assessing the project's impact on the bee or its habitat.

5.      Accordingly, Plaintiff brings this emergency motion to compel Defendants to comply with the environmental consultation and assessment mandates set forth in Section 7 of the ESA. Doing so will allow FWS and Defendants to properly assess the Longmeadow Project's impact on the bee, and to devise an action plan that avoids or minimizes any impact to its habitat. Failure to do so will likely result in irreparable harm to the species, which is already on the verge of extinction, and which has seen its numbers decline by nearly 90% since the late 1990's. The bee's Kane County habitat represents one of only a handful of locations in the United States where the bee is currently found. As such, the Longmeadow Project has significant and permanent ramifications to not only the local population of the bee, but on the nationwide survival of the species itself.

**STANDARD OF REVIEW**

**I.      General Standard of Review for Temporary Restraining Orders and Preliminary Injunctions**

The standards for issuing temporary restraining orders are identical to the standards for preliminary injunctions. *Long v. Bd. of Educ.*, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001). To obtain a preliminary injunction or TRO, the moving party must show (1) "some likelihood of success on the merits"; (2) that it has "no adequate remedy at law"; and (3) that it "will suffer irreparable harm if a preliminary injunction is denied." *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F. 3d 676, 698 (7th Cir. 2012); *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011). If the moving party meets these threshold requirements, the district court weighs the balance of the harms,

assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied. *Ezell*, 651 F.3d at 694; *see also Stuller*, 695 F.3d at 698. In balancing the harms, the court applies a "sliding scale" analysis: "the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

## II.     Review Factors Unique to Environmental Cases

The Supreme Court has held that, in cases seeking injunctive relief under the ESA, the traditional standards of analysis must be construed to "prioritize" the protection of the species that would benefit from such relief. The Court has held that "the legislative history undergirding Section 7 reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species. The statutory mandate is unequivocal and pointed omission of the type of qualifying language previously included in endangered species legislation reveals a conscious decision by Congress to give endangered species priority over the "primary missions" of federal agencies." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 185 (1978).

The ESA provides greater statutory protection to a moving party than other environmental statutes. *See, e.g., Wisconsin v. Weinberger*, 745 F.2d 412, 426 (7th Cir. 1984) (comparing ESA and National Environmental Protection Act ("NEPA") and noting that "the Endangered Species Act contained an ***unequivocal ban on the destruction of critical habitats for endangered species***. Because the proposed dam [in *Hill, supra*] would have eliminated such a critical habitat, refusal to enjoin the construction of the dam would have ignored the explicit provisions of the Act.") (emphasis added).

4

**ARGUMENT**

The factors to be analyzed in determining whether a moving party is entitled to preliminary injunctive relief all weigh heavily in favor of Plaintiff, as discussed below:

**I.      Plaintiff is Likely to Succeed on the Merits**

**A.      Federal Law Requires the Assessment of a Federal Project's Impact on Endangered Species in the Vicinity of the Project**

The rusty patched bumble bee is a federally recognized endangered species. *See* Ex. 1 (FWS designation). As set forth in the declaration of environmentalist Susanne Masi, this species is present in the area in which defendant Kane County is scheduled to begin a two-week long construction project on April 17, 2017. *See* Ex. 2 (declaration) and Ex. 3 (Kane County press release announcing construction). Additional, related work will continue through November 2017 (*Id.* at Ex. 3)

The substantive law at issue in Count III of Plaintiff's complaint (alleging violations of Section 7 of the ESA) is very straightforward and requires that federal agencies (including the federal Defendants here) shall, in consultation with FWS, insure that any action authorized, funded, or carried out by the agency (including the federally-funded Longmeadow Project) is not likely to jeopardize the continued existence of any endangered species or threatened species or its habitat. 16 USC § 1536(a)(2). In order to fulfill that mandate, the Defendants were required to obtain a written statement from FWS, as well as "a summary of the information on which the opinion [of FWS] is based, detailing how the agency action affects the species or its critical habitat." 16 USC § 1536(b)(3)(A). In addition, the Defendants were required to seek from FWS information regarding whether any endangered species (or species proposed to be listed as endangered, as the rusty patched bumble bee had been since Sept. 22, 2016) was present in the vicinity of the Longmeadow Project, and were required to "conduct a biological assessment for

5

the purpose of identifying any endangered species or threatened species which is likely to be affected by such [construction]." 16 USC § 1536(c)(1).

**B.**      **None of These Mandatory Inquiries Were Undertaken by the Defendants**

Federal agencies are required to prepare a detailed Environmental Impact Statement ("EIS") on every proposal for a major federal action which may significantly affect the environment. 42 U.S.C. 4332(2)(C). The EIS must include a detailed discussion of the environmental impact of the proposed action. 42 U.S.C. 4332(2)(C)(i). The Longmeadow Project's EIS is attached as Ex. 4. The findings in the EIS were updated and approved in a Reevaluation Environmental Assessment ("EA") and resultant Finding of No Significant Impact ("FONSI") which are attached as Exs. 5 and 6, respectively.

With respect to the bee species at issue here, none of these mandatory inquiries were undertaken by the Defendants. If they *had* been undertaken, that fact, along with the conclusion of the inquiries, would have been reflected in the EIS, the EA and/or the FONSI. However, these documents are silent as to the expected impact of the Longmeadow Project on the bee. It is clear from a review of these documents that, notwithstanding the discussion of other wildlife, the rusty patched bumble bee is not even mentioned.

The Supreme Court has made emphatically clear that Section 7 "compels agencies not only to ***consider*** the effect of their projects on endangered species, but to take such actions as are necessary to ***insure*** that species are not extirpated as a result of federal activities." *Hill*, 437 U.S. 153 at n. 34 (emphasis in original). It is clear from the dispositive documents at issue here –the EIS, the EA and the FONSI –that this baseline, mandatory inquiry was never conducted. Accordingly, Plaintiff is likely to succeed on the merits of Count III.

## II.     Plaintiff Has No Adequate Remedy at Law

The Supreme Court has held that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Accordingly, it is well-settled that in environmental cases such as this one, this factor is presumed to weigh in favor of the moving party.

## III.    Irreparable Harm is Presumed

As set forth in *Amoco*, there is an *ab initio* suggestion in any environmental cases that the injury is irreparable. *Id*. at 545. While that suggestion may not arise to the level of fact every case, it certainly does in this one: There is no dispute that the rusty patched bumble bee is an endangered species, that its numbers have declined in recent years by almost 90%, and that it is on the brink of extinction. *See* Ex. 7 (FWS press release). While once a common summertime sight across the United States, it is now found in only in "small, scattered populations in 13 states and one province." *Id*. Loss of habitat is the first-listed cause of the decline of the bee's population. *Id.* The area that is the subject of this motion is one the bee's last remaining habitats. Extinction is, by nature, irreparable.

## IV.    Balance of Harms and Maintaining the Status Quo Weigh Heavily in Favor of Plaintiff

In a typical preliminary injunction case, a court weighs the balance of the harms, "assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied. *Ezell*, 651 F.3d at 694. However, in environmental cases, this factor is presumed to weigh in favor of the moving party. *See Amoco*, 480 U.S. 531, 545 ("if such injury is sufficiently likely, therefore, the balance of harms

will usually favor the issuance of an injunction to protect the environment."). Moreover, in cases brought pursuant to the ESA, this factor *universally* weighs in favor of the moving party. As the Ninth Circuit recently stated, in summarizing Supreme Court precedent on the issue:

> There is no question, as firmly recognized by the Supreme Court, that the ESA strips courts of at least some of their equitable discretion in determining whether injunctive relief is warranted. *Amoco*, 480 U.S. at 543 n.9 (explaining that the ESA "foreclose[s] the traditional discretion possessed by an equity court"). *Hill* held that courts do not have discretion to balance the parties' competing interests in ESA cases because Congress "afford[ed] first priority to the declared national policy of saving endangered species." 437 U.S. at 185.

*Cottonwood Envtl. Law Ctr. v. United States Forest Serv.*, 789 F.3d 1075, 1090 (9th Cir. 2015) (discussing *Amoco*, 480 U.S. 531 and *Hill*, 437 U.S. 153).

Finally, the purpose of a preliminary injunction is to simply preserve the status quo until the merits of the dispute are resolved. *Indiana Civil Liberties Union v. O'Bannon*, 259 F. 3d 766, 770 (7th Cir. 2001). The instant motion is not asking that the Longmeadow Project be entirely scrapped –that argument is for another day. The instant motion merely requests that the status quo be maintained for a short period of time, while the Defendants go through the "prompt" evaluation process set forth in Section 7 of the ESA. Doing so will allow all relevant parties to assess the impact of the project upon the endangered rusty patched bumble bee, and take appropriate steps to minimize or eliminate that impact.

<p align="center">**CONCLUSION AND REQUEST FOR RELIEF**</p>

For the reasons set forth above, Plaintiff respectfully requests that this Court enter a Temporary Restraining Order and/or Preliminary Injunction:

   a.  Enjoining the Defendants from proceeding with the construction project described in Ex. 3;

   b.  Requiring the Defendants to undertake the biological assessment and other evaluations set forth in Sec. 7 of the ESA, and enjoining them from receiving or disbursing federal funding in furtherance of the Longmeadow Project, until such assessment and evaluation is completed;

<p align="center">8</p>

    c.      Allowing Plaintiff to recover its costs, including reasonable attorneys' fees incurred in connection with this action, as provided for under the Equal Access to Justice Act, 28 USC. 2412(d), the Endangered Species Act, and/or other applicable laws; and

    d.      Granting any such other and further relief as the Court may deem just and proper and in the public interest.

Respectfully submitted,

/s/ James A. Karamanis
Barney & Karamanis, LLP
Two Prudential Plaza
180 N. Stetson, Suite 3050
Chicago, IL 60601
Telephone:  312-553-5300
jbarney@jsbarney.com
Illinois ARDC No. 6203479
*Attorney for Stop Longmeadow*

/s/ Joshua Barney
Joshua Barney
Barney & Karamanis, LLP
Two Prudential Plaza
180 N. Stetson, Suite 3050
Chicago, IL 60601
Telephone:  312-553-5300
jbarney@barneykaramanis.com
Illinois ARDC No. 6210534
*Attorney for Stop Longmeadow*

John R. Bowley
Law Office of John R. Bowley
Two Prudential Plaza
180 N. Stetson, Suite 3050
Chicago, IL 60601
Telephone:  312-702-1337
john@jrb-ftw.com
Illinois ARDC No. 6273759
*of counsel on the brief*

# EXHIBIT

# 1

## § 1627.5 Applicability of restrictions, recordkeeping, and recipient priorities; private attorney involvement subgrants.

(a) *Applicability of restrictions.* The prohibitions and requirements set forth in 45 CFR part 1610 apply both to the subgrant and to the subrecipient's non-LSC funds, except as modified by paragraphs (b), (c), and (d) of this section.

(b) *Priorities.* Subrecipients must either:

(1) Use the subgrant consistent with the recipient's priorities; or

(2) Establish their own priorities for the use of the subgrant consistent with 45 CFR part 1620.

(c) *Recordkeeping.* A recipient must be able to account for how its subrecipients spend LSC funds or use property or services funded in whole or in part with LSC funds. A subrecipient must provide to the recipient records as described in paragraphs (c)(1) and (2) of this section.

(1) A subrecipient that handles matters as defined at 45 CFR 1635.2(b) must maintain adequate records to demonstrate that its attorneys and paralegals used the LSC funds or property or services funded in whole or in part with LSC funds:

(i) To carry out the activities described in the subgrant agreement; and

(ii) Consistent with the restrictions set forth at 45 CFR part 1610.

(2) A subrecipient that handles cases as defined at 45 CFR 1635.2(a):

(i) Must require its attorneys and paralegals to maintain records for each case that show the amount of time spent on the case and the activity conducted by date, and a unique client name or case number; and

(ii) Either the subrecipient or the recipient must maintain records for each case that show the problem type and the closing code for the case.

(iii) This requirement does not apply to subrecipients described in paragraph (d)(2)(ii) of this section.

(3) A subrecipient who handles both cases and matters must maintain the types of records described in paragraphs (c)(1) and (2).

(d) *Subgrants for engaging private attorneys*—(1) *Subgrants of funds.* The prohibitions and requirements set forth in 45 CFR part 1610 apply *only* to the subgranted funds when the subrecipient is a bar association, *pro bono* program, private attorney or law firm, or other entity that receives a subgrant for the sole purpose of funding private attorney involvement activities (PAI) pursuant to 45 CFR part 1614.

(2) *In-kind subgrants.* The prohibitions and requirements set forth in 45 CFR part 1610 apply *only* to the subgranted property or services acquired in whole or in part with LSC funds when the subrecipient is a bar association, *pro bono* program, private attorney or law firm, or other entity that receives a subgrant for the sole purpose of:

(i) Conducting private attorney involvement activities (PAI) pursuant to 45 CFR part 1614; or

(ii) Providing legal information or legal assistance on a *pro bono* or reduced fee basis to individuals who have been screened and found eligible to receive legal assistance from an LSC recipient.

(3) *Treatment of non-LSC funds.* Any funds or property or services acquired in whole or in part with LSC funds and used by a recipient as payment for a PAI subgrant are deemed LSC funds for purposes of this paragraph (d).

(4) *Recordkeeping exception.* The recordkeeping requirement in paragraph (c) of this section does not apply to private attorneys providing legal assistance on a pro bono or reduced fee basis.

## § 1627.6 Transfers to other recipients.

(a) The requirements of this part apply to all subgrants from one recipient to another recipient.

(b) The subrecipient must audit any funds or property or services acquired in whole or in part with LSC funds provided by the recipient under a subgrant in its annual audit and supply a copy of this audit to the recipient. The recipient must either submit the relevant part of this audit with its next annual audit or, if an audit has been recently submitted, submit it as an addendum to that recently submitted audit.

(c) In addition to the provisions of § 1627.4(c)(3), LSC may hold the recipient responsible for any disallowed expenditures of subgrant funds. Thus, LSC may recover all of the disallowed costs from either the recipient or the subrecipient or may divide the recovery between the two. LSC's total recovery may not exceed the amount of expenditures disallowed.

## § 1627.7 Recipient policies, procedures and recordkeeping.

Each recipient must adopt written policies and procedures to guide its staff in complying with this part and must maintain records sufficient to document the recipient's compliance with this part.

## PART 1630—COST STANDARDS AND PROCEDURES

■ 11. In newly transferred and redesignated § 1630.16, revise the section heading to read as follows:

### § 1630.16 Tax sheltered annuities, retirement accounts, and pensions.

\* \* \* \* \*

Dated: February 6, 2017.

**Stefanie K. Davis,**
*Assistant General Counsel.*

[FR Doc. 2017–02718 Filed 2–9–17; 8:45 am]

**BILLING CODE 7050–01–P**

---

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

### 50 CFR Part 17

[Docket No. FWS–R3–ES–2015–0112; 4500030113]

**RIN 1018–BB66**

## Endangered and Threatened Wildlife and Plants; Endangered Species Status for Rusty Patched Bumble Bee

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule; delay of effective date.

**SUMMARY:** In accordance with a January 20, 2017, memo from the White House, we, the U.S. Fish and Wildlife Service, are delaying the effective date of a rule we published on January 11, 2017.

**DATES:** The effective date of the rule that published on January 11, 2017, at 82 FR 3186, is delayed from February 10, 2017, to March 21, 2017.

**FOR FURTHER INFORMATION CONTACT:** Peter Fasbender, Field Supervisor, U.S. Fish and Wildlife Service, Twin Cities Ecological Services Field Office, 4101 American Blvd. E., Bloomington, MN 55425; by telephone 952–252–0092, extension 210. Persons who use a telecommunications device for the deaf (TDD) may call the Federal Relay Service at 800–877–8339.

**SUPPLEMENTARY INFORMATION:** On January 11, 2017, we published a rule to list the rusty patched bumble bee (*Bombus affinis*), a species that occurs in the eastern and Midwestern United States and Ontario, Canada, as an endangered species under the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*). The rule was to be effective on February 10, 2017.

On January 20, 2017, the White House issued a memo instructing Federal

agencies to temporarily postpone the effective date for 60 days after January 20, 2017, of any regulations that have published in the **Federal Register** but not yet taken effect, for the purpose of "reviewing questions of fact, law, and policy they raise." We are, therefore, delaying the effective date of our rule published on January 11, 2017, at 82 FR 3186 (see **DATES**, above).

#### Administrative Procedure Act

To the extent that 5 U.S.C. 553 applies to this action, it is exempt from notice and comment because it constitutes a rule of procedure under 5 U.S.C. 553(b)(A). Alternatively, our implementation of this action without opportunity for public comment, effective immediately upon publication in the **Federal Register** is based on the good cause exceptions in 5 U.S.C. 553(b)(B) and 553(d)(3). Pursuant to 5 U.S.C. 553(b)(B), we have determined that good cause exists to forgo the requirement to provide prior notice and an opportunity for public comment thereon for this rule as such procedures would be impracticable, unnecessary, and contrary to the public interest. We are temporarily postponing for 60 days after January 20, 2017, the effective date of this regulation pursuant to the previously noted memorandum from the White House. As a result, seeking public comment on this delay is unnecessary and contrary to the public interest. For these same reasons, we find good cause to waive the 30-day delay in effective date provided for in 5 U.S.C. 553(d).

**Authority:** 16 U.S.C. 1361–1407; 1531–1544; and 4201–4245, unless otherwise noted.

Dated: February 7, 2017.

**James W. Kurth,**

*Acting Director, U.S. Fish and Wildlife Service.*

[FR Doc. 2017–02865 Filed 2–9–17; 8:45 am]

**BILLING CODE 4333–15–P**

---

## DEPARTMENT OF COMMERCE

**National Oceanic and Atmospheric Administration**

**50 CFR Part 217**

**[Docket No. 160405311–6999–02]**

**RIN 0648–BF95**

**Taking and Importing Marine Mammals; Taking Marine Mammals Incidental to Rehabilitation of the Jetty System at the Mouth of the Columbia River: Jetty A, North Jetty, and South Jetty, in Washington and Oregon**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Final rule.

**SUMMARY:** NMFS, upon request of the U.S. Army Corps of Engineers (Corps), hereby issues a regulation to govern the unintentional taking of marine mammals incidental to the rehabilitation of the Jetty System at the Mouth of the Columbia River (MCR), over the course of five years. This regulation, which allows for the issuance of a Letter of Authorization (LOA) for the incidental take of marine mammals during the described activities and specified timeframes, prescribes the permissible methods of taking and other means of effecting the least practicable adverse impact on marine mammal species or stocks and their habitat, as well as requirements pertaining to the monitoring and reporting of such taking.

**DATES:** Effective May 1, 2017, through April 30, 2022.

**ADDRESSES:** An electronic copy of the application, containing a list of references used in this document, and the associated Environmental Assessment (EA) and Finding of No Significant Impact (FONSI) may be obtained by telephoning the contact listed below (see **FOR FURTHER INFORMATION CONTACT**), or visiting the internet at: *http://www.nmfs.noaa.gov/ pr/permits/incidental.htm.*

**FOR FURTHER INFORMATION CONTACT:** Rob Pauline, Office of Protected Resources, NMFS, (301) 427–8401.

**SUPPLEMENTARY INFORMATION:**

### Executive Summary

This regulation, issued under the Marine Mammal Protection Act (MMPA) (16 U.S.C. 1361 *et seq.*), establishes a framework for authorizing the take of marine mammals incidental to the Corps' rehabilitation of the Jetty System, including Jetty A, North Jetty and South Jetty at the Mouth of the

Columbia River in Washington and Oregon.

*Purpose and Need for This Regulatory Action*

NMFS received an application from the Corps requesting five-year regulations and authorization to take multiple species of marine mammals. We anticipate take to occur in the vicinity of the MCR Jetty System by Level B harassment incidental to the use of vibratory pile driving and pedestrian surveys of the jetties. This regulation is valid for five years from the date of issuance. Please see "Background" later in this document for definitions of harassment.

Section 101(a)(5)(A) of the MMPA (16 U.S.C. 1361 *et seq.*) directs the Secretary of Commerce to allow, upon request, the incidental, but not intentional taking of small numbers of marine mammals by U.S. citizens who engage in a specified activity (other than commercial fishing) within a specified geographical region if, after notice and public comment, the agency makes certain findings and issues regulations. This regulation contains mitigation, monitoring, and reporting requirements.

*Legal Authority for the Regulatory Action*

Section 101(a)(5)(A) of the MMPA and the implementing regulations at 50 CFR part 216, subpart I provide the legal basis for issuing the five-year regulations and any subsequent Letters of Authorization.

*Summary of Major Provisions Within the Final Regulation*

The following provides a summary of some of the major provisions within this regulation for the MCR Jetty System rehabilitation project. We have determined that the Corps' adherence to the mitigation, monitoring, and reporting measures listed later in this regulation would achieve the least practicable adverse impact on the affected marine mammals. They include:

• Establishment and monitoring of shutdown zones to reduce likelihood of injury to marine mammals;

• Establishment and monitoring of Level B harassment zones or zones of influence (ZOI) to record instances of behavioral harassment;

• Implementation of hydroacoustic monitoring plan to ensure that shutdown zones and ZOIs have been delineated appropriately; and

• Shutdown between May 1 and July 1 when killer whales are sighted within the ZOIs to avoid take of Southern Resident killer whales which are listed

# EXHIBIT

# 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

STOP LONGMEADOW,                                )
                                                )
    Plaintiff,                                  )
                                                )
    v.                                          )
                                                )
UNITED STATES DEPARTMENT OF                      )    Case No.
TRANSPORTATION, ELAINE L. CHAO,                  )
Secretary, United States Department of           )
Transportation, FEDERAL HIGHWAY                  )
ADMINISTRATION, WALTER C. "BUTCH"                )
WAIDELICH, JR., Acting Deputy Administrator,      )
Federal Highway Administration, CATHERINE K.     )
BATEY, Division Administrator, Illinois Division, )
Federal Highway Administration, and KANE         )
COUNTY, a municipal corporation,                 )
                                                )
    Defendants.                                 )

DECLARATION OF SUSANNE MASI

    I, Susanne Masi, declare as follows in support of Plaintiff Stop Longmeadow's Motion for a

Temporary Restraining Order and Preliminary Injunction:

    1.      I am a resident of Algonquin, Illinois in the Fox Valley for 16 years and I worked as a

botanist at the Chicago Botanic Garden for 22 years, particularly with endangered and threatened

species. I have an MA in Geography and Environmental Studies.

    2.      I have first-hand knowledge of the facts stated herein, except where such facts are

stated on information and believe, and in those instances, I believe them to be true. If called upon to

testify to the veracity of this information, I could and would do so.

    3.      The rusty patched bumble bee (Bombus affinis), now on the Federal Endangered Species

List, was formally proposed for such status on September 22, 2016, and was formally declared

Endangered January, 11, 2017 by the US Fish and Wildlife Service.

4.     The bee is found in Kane County, in the fen of the Brunner Family Forest Preserve, and specifically in the areas listed on the April 11, 2107 press release from KDOT.

5.     I have concern that construction activity in that area is **likely** to negatively affect the bee population in that area because of potential changes to its fen habitat in hydrology and salt spray and road runoff.  These effects must be studied specifically in relation to the Brunner fen.

6.     This harm, if demonstrated, would be irreparable (i.e., the local bee population would unlikely rebound from it, due to degradation of habitat and hydrology).

7.     This bee begins colony formation in the springtime (i.e., right now).

8.     This bee has seen its population decrease across its range by over almost 90% since the late-1990s, according to research conducted.

9.     The bee is on the verge of extinction. As a federally endangered species, by definition, it is one "in danger of extinction throughout all or a significant portion of its range." (Endangered Species Act of 1973)

10.     The affected area is among one of its few remaining habitats in the U.S.

11.     The bee is a pollinator; pollinators are essential to the survival of the human species, due to their critical and irreplaceable role in agriculture.

12.     The disappearance of this pollinating species would be a great loss to Kane County and the State of Illinois.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.

This declaration was executed on the _13_ th day of April, 2017 at _ALGONQUIN_, Illinois.

_Susanne Masi_
Susanne Masi

# EXHIBIT

# 3

# KANE COUNTY
## DIVISION of TRANSPORTATION



Carl Schoedel, P.E.
Director of Transportation
County Engineer

41W011 Burlington Road
St. Charles, IL 60175
Phone: (630) 584-1170
Fax: (630) 584-5265

April 11, 2017

### <u>Press Release</u>

### Longmeadow Parkway – Randall Road to Karen Drive
### New Construction
### Kane County Section No. 13-00215-10-PV

Starting the week of April 17, 2017, pavement removal and pavement widening work will begin on the following sections:

- Randall Road from approximately 1,500 feet north and south of the intersection of Longmeadow Parkway
- Sleepy Hollow Road north and south of the intersection of Longmeadow Parkway
- Longmeadow Parkway from Randall Road to east of White Chapel Drive.

This initial work will be complete in approximately 2 weeks, weather permitting, after which pavement, storm sewer installation and all of the remaining work items of the project will take place. Construction on this portion of the Longmeadow Parkway corridor will be complete by the end of November 2017, weather permitting.

The above-mentioned roads will remain open during construction, but may be reduced to one lane or require temporary daily lane closures for the temporary pavement installation and other anticipated work. Motorist need to be prepared to reduce their speed, exercise caution, and be extra alert. Motorist must watch for construction workers, construction vehicles entering or leaving the site, and obey flaggers and other traffic control devices within the work zone. Motorists should expect delays while traveling through the work areas. Motorists may want to add additional time to their commutes and consider the use of alternate routes while this work is being completed.

A reminder – **it is illegal for drivers to talk on a cell phone while driving through a highway construction work zone.**

The Longmeadow Parkway Bridge Corridor is a planned tree-lined parkway and new Fox River bridge crossing with a landscaped median, approximately 5.6 miles in length, running from Huntley Road to IL Route 62. The proposed road passes through portions of the Villages of Algonquin, Carpentersville and Barrington Hills, as well as unincorporated areas of Kane County.

Additional information is available on **the Longmeadow Parkway page of the Kane County Division of Transportation website**.

Questions and concerns may be directed to David Boesch, Chief of Construction with the Kane County Division of Transportation, at (630) 845-7875.

For all Kane County Traffic Advisories, see http://www.co.kane.il.us/dot/trafficalerts/Default.aspx.



N. County Line Rd.

Algonquin

Huntley Rd.

30

Longmeadow

Karen Dr

New Construction

34

Randall Rd.

31

Gilberts

72

Tyrrell Rd.

Sleepy
Hollow

**Legend**

Interstates
US Roads
State Roads
County Roads
Other Roads
Rail Roads
County Boundry
Township Boundry
Fox River
Forest Preserves
Municipalities

Section Number 13-00215-10-PV
Longmeadow Parkway - Section B-1
Randall Rd to Karen Drive

N
W        E
S

KANE COUNTY
Division of Transportation

0   700  1,400    2,800      4,200      5,600
Feet
0                                    1
Miles

M:\dotserver2\USERS\Committee\2016\201609 September\Implementation\LMP Section B-1 LAA\Map Standard_ Longmeadow - Randall Rd toKaren Dr loc map.mxd

# EXHIBIT

# 4

**The Environmental Impact State (EIS) is voluminous (749 pages, 52 MB digitized). Plaintiff's counsel is providing a flash drive containing the entire EIS (text-searchable) to the Court, and will upload the contents of the EIS to an online repository accessible to the Court and counsel.**

# EXHIBIT

# 5

 **Illinois Department of Transportation**

**Environmental Reevaluation**

Longmeadow Parkway, Huntley Road to Illinois Route 62, County of Kane, Illinois

REEVALUATION
ENVIRONMENTAL ASSESSMENT

Submitted Pursuant to 42 USC 4332 (2)(c)
by the

U.S. Department of Transportation
Federal Highway Administration (FHWA)

and

Illinois Department of Transportation (IDOT)

_July 26, 2016_
Date of Approval

_For IDOT_

_July 26, 2016_
Date of Approval

_For FHWA_

The following persons may be contacted for additional information concerning this document:

Catherine A. Batey
Federal Highway Administration
Division Administrator
3250 Executive Park Drive
Springfield, Illinois 62703
Telephone: 217-492-4640

John Fortmann, P.E.
D-1 Regional Engineer
Illinois Department of Transportation
201 West Central Court
Schaumburg, IL 60196-1096
Telephone: 847-705-4000

The proposed action consists of the construction of a new highway between Huntley Road and Illinois Route 62 and a new bridge crossing over the Fox River in Kane County. The length of this improvement from western terminus to eastern terminus is approximately 5.6 miles, with another 3.7 miles of intersecting road improvements. Longmeadow Parkway will impact eleven wetlands for a total acreage of 4.16 acres. The total number of trees impacted by this project (including dead trees) is approximately 5,765 trees.

**Table of Contents**

SECTION I:  INTRODUCTION & PURPOSE AND NEED _____ 7

  **1.  Introduction** _____ 7

  **2.  Purpose and Need** _____ 8

    Purpose _____ 8

    Need _____ 9

**SECTION II:  AFFECTED ENVIRONMENT TABLE** _____ 11

**SECTION III:  ALTERNATIVES** _____ 16

**SECTION IV:  IMPACTS, DOCUMENTATION AND MITIGATION** _____ 16

  **Part I.  Socio-economic** _____ 16

    1.  Community Cohesion _____ 16

    2.  Title VI and Environmental Justice _____ 16

    3.  Public Facilities and Services _____ 17

    4.  Changes in Travel Pattern and Access _____ 17

    5.  Relocations (Business and Residential) _____ 17

    6.  Economic Impacts _____ 18

    7.  Land Use _____ 18

    8.  Growth and Economic Development _____ 18

    9.  Pedestrian and Bicycle Facilities _____ 18

  **Part II.  Agricultural** _____ 19

    1.  Farms and Farmland Conversion _____ 19

    2.  Prime and Important Soils _____ 19

    3.  Severed/Landlocked Parcels _____ 19

    4.  Adverse Travel _____ 19

  **Part III.  Cultural Resources** _____ 19

    1.  Archaeological Properties _____ 20

    2.  Historic Bridges _____ 20

    3.  Historic District _____ 20

    4. Historic Buildings _____ 20

  **Part IV.  Air Quality** _____ 20

    1.  CO Microscale Analysis _____ 21

    2.  Air Quality Conformity _____ 21

    3.  $PM_{2.5}$ and $PM_{10.0}$ Nonattainment and Maintenance Areas _____ 22

    4.  Construction-Related Particulate-Matter _____ 23

    5.  Mobile Source Air Toxics (MSAT) _____ 23

  **Part V.  Noise** _____ 26

  **Part VI.  Natural Resources** _____ 32

    1. Upland Plant Communities _____ 33

    2. Wildlife Resources _____ 33

    3. Threatened and Endangered Species _____ 34

  **Part VII.  Water Quality/Resources/Aquatic Habitats** _____ 37

  **Part VIII.  Groundwater Resources** _____ 43

  **Part IX.  Floodplains** _____ 43

**Part X.  Wetlands** _____ **43**

**Part XI.  Special Waste** _____ **47**

**Part XII. Special Lands** _____ **48**

   1.   Section 4(f) _____ 49

   2.   Section 6(f) _____ 53

   3.   Open Space Lands Acquisition and Development (OSLAD) Act Lands _____ 53

   4.   Illinois Natural Area (INAI) Sites _____ 53

   5.   Nature Preserves _____ 53

   6.   Land & Water Reserves _____ 53

**Environmental Commitments** _____ **53**

**Permits/Certifications Required** _____ **56**

**Public Involvement** _____ **56**

**Agency Coordination** _____ **57**

**SECTION V. COMMENTS** _____ **58**

**SECTION VI. FIGURES AND APPENDICES** _____ **59**

**Figures** _____ **59**

**Appendices** _____ **59**

## List of Tables

Table 1 – Level of Service for Intersections.................................................................22

Table 2 – Absolute Noise Level Consideration..............................................................25

Table 3 – Increase in Noise Level Consideration...........................................................26

Table 4 – New Alignment / Construction Data Consideration ........................................26

Table 5 – Noise Modeling Results Section A-1 .............................................................27

Table 6 – Noise Modeling Results Section A2-B1 to Section D ......................................28

Table 7 – Adjusted Allowable Cost Per Benefited Receptor Summary ............................29

Table 8 – Noise Wall Cost Reasonableness Evaluation ...............................................29

Table 9 – Waterway Summary .....................................................................................36

Table 10 – Total Waterway Impacts and Mitigation Summary ......................................41

Table 11 – Wetland Summary .....................................................................................43

Table 12 – Total Wetland Mitigation Summary ............................................................45

# GLOSSARY

| | |
|---|---|
| ADID | Advanced Identification |
| ADT | Average Daily Traffic |
| BMPs | Best Management Practices |
| CFR | Code of Federal Regulation |
| CMAP | Chicago Metropolitan Agency for Planning |
| CNE | Common Noise Environment |
| CERCLIS | Comprehensive Environmental Response, Compensation and Liability Information System |
| D&E | Design and Environmental |
| EIS | Environmental Impact Statement |
| FHWA | Federal Highway Administration |
| FPDKC | Forest Preserve District of Kane County |
| FTA | Federal Transit Administration |
| FQI | Floristic Quality Index |
| GPS | Global Positioning Systems |
| HEI | Health Effects Institute |
| HFV | High Functional Values |
| HHV | High Habitat Values |
| HQAR | High Quality Aquatic Resource |
| IDNR | Illinois Department of Natural Resources |
| IDOT | Illinois Department of Transportation |
| IEPA | Illinois Environmental Protection Agency |
| IGA | Intergovernmental Agreement |
| INAI | Illinois Natural Area |
| INHS | Illinois Natural History Survey |
| IRIS | Integrated Risk Information System |
| ISGS | Illinois State Geological Survey |
| IWPA | Interagency Wetland Policy Act |
| KDOT | Kane County Division of Transportation |
| LOS | Level of Service |
| MSE | Manufactured Structural Earth |
| MSAT | Mobile Source Air Toxics |

| | |
|---|---|
| NAC | Noise Abatement Criteria |
| NEPA | National Environmental Policy Act |
| NPDES | National Pollutant Discharge Elimination System |
| NIPC | Northeastern Illinois Planning Commission |
| OSLAD | Open Space Lands Acquisition |
| OWR | Office of Water Resource |
| OMS | Operational Management Strategies |
| PESA | Preliminary Environmental Site Assessment |
| PSI | Preliminary Site Investigation |
| RECs | Recognized Environmental Conditions |
| ROD | Record of Decision |
| RCRA | Resource Conservation and Recovery Act |
| ROW | Right-of-Way |
| SHPO | State Historic Preservation Office |
| SIP | State Implementation Plan |
| TNM | Traffic Noise Model |
| TIP | Transportation Improvement Program |
| TDR | Travel Demand Reduction |
| USACE | United States Army Corps of Engineers |
| USEPA | United States Environmental Protection Agency |
| USFWS | United States Fish and Wildlife Service |
| USGS | United States Geological Survey |
| VPH | Vehicles Per Hour |
| VMT | Vehicle Miles Traveled |
| WOUS | Waters of the United States |


**Illinois Department of Transportation**

<u>**SECTION I:  INTRODUCTION & PURPOSE AND NEED**</u>

## 1. Introduction

This document has been prepared to present updated information regarding the environmental studies that have been completed since the Environmental Impact Statement (EIS).  The EIS was dated November 2001 and the signature date of the Record of Decision (ROD) was May 13, 2002.  In the EIS, this project was referred to as the Bolz Road Corridor, but is now known as the Longmeadow Parkway.  As the project moved through the design process the required right-of-way (ROW) was refined.  The final ROW footprint of this project is shown on Figure 1.  A reevaluation dated November 10, 2009 was completed for the change to toll the bridge which led to the determination that a supplemental EIS was not needed.  Other actions that have occurred subsequent to the ROD include Design Report approval received on December 3, 2013.  There are no alignment changes in the reevaluation from the alignment selected in the ROD.

Pursuant to 23 Code of Federal Regulations (CFR) 771.130(c), this Environmental Reevaluation is being prepared to assess the impacts of the new information and circumstances that have occurred with the project. Figure 1 shows the project area and new resources being discussed in this document.   The new information and circumstances include the following:

a. The construction of neighborhoods adjacent to the project corridor.
b. Air quality including the designation of Kane County as a non-attainment area for $PM_{2.5}$., and addition of construction-related particulate-matter and mobile source air toxics National Environmental Policy Act (NEPA) compliance language
c. Reassessing noise impacts based on the most recent IDOT noise policy and procedures
d. Federal listing of the Northern long eared bat as a threatened species under the Endangered Species Act.
e. Results of the Bald eagle nest survey
f. A wetland delineation was conducted and wetland impacts were reevaluated
g. Section 4(f) Coordination related to Buffalo Park Forest Preserve
h. Section 4(f) Coordination related to Fox River Shores Forest Preserve
i. Section 4(f) Coordination related to Brunner Family Forest Preserve
j. A commitment change from providing clay lined ditches to providing current Best Management Practices (BMPs) that allow for infiltration.
k. A change from no piers in the Fox River to including piers in the Fox River
l. An increase in the acreage of trees impacted (from 2.7 acres to 28.7 acres)
m. A change in acreage of wetland impacted (from 0 to 4.16)
n. Visual impact resulting from taking a strip of land in front of the Perry Lathrop house which is an historic property.
o. Inclusion of the Starhead topminnow which has recently been State-listed as a threatened species.
p. The large presence of Smallmouth bass in the Fox River within the project limits.

This reevaluation also will evaluate each resource area to determine if there are any other changes in impacts with the project. This reevaluation will be made available for public review and comment. Following the public review and comment opportunity, Federal Highway Administration (FHWA) will either determine a Supplemental EIS is required based on new significant impacts; or FHWA will issue a "Finding of No Significant Impact" if no new significant impacts are identified.

The proposed action consists of the construction of a new highway between Huntley Road and Illinois Route 62 and a new bridge crossing over the Fox River in Kane County. The proposed project corridor is located in the Villages of Algonquin, Carpentersville, Barrington Hills, and in unincorporated Kane County. The Algonquin section of the improvement is on the west side of the Fox River between Randall Road and White Chapel Road, unincorporated sections of Kane County are mainly between White Chapel Lane and the east side of the Fox River, the Carpentersville section is on the east side of the Fox River, and the Barrington Hills section is east of the Village of Carpentersville between Illinois Route 25 and Illinois Route 62. The existing section of Longmeadow Parkway is located between Randall Road and White Chapel Road. The proposed Longmeadow Parkway typical cross section consists of two 11-foot lanes in each direction separated by a landscaped barrier median. Signalized intersection improvements would be provided at Huntley/Boyer Road, Randall Road, Sleepy Hollow Road, Illinois Route 31, Bolz Road Connector, Illinois Route 25 and Illinois Route 62 (Algonquin Road). Sandbloom Road would pass under the new bridge over the Fox River and intersect with Bolz Road. The existing T-intersection of Huntley Road and Boyer Road would be reconstructed as a four-legged intersection. The proposed roadway would transition into Huntley Road on the west terminus into a two-lane cross section. The length of this improvement from western terminus to eastern terminus is approximately 5.6 miles, with another 3.7 miles of intersecting road improvements.

## 2. Purpose and Need

The Purpose and Need of the Longmeadow Parkway project is consistent with and a reiteration of the Purpose and Need stated in the EIS and in the Design Report. The needs that existed at the time the EIS was developed still exist and the deficiencies that the project meant to address are still relevant.

### Purpose

The purpose of the Longmeadow Parkway is to provide a transportation corridor that increases access across the Fox River in the north region of Kane County. The Fox River represents a physical barrier, which limits east-west access in this region. The purpose recognizes this barrier and refines the objectives to address it more precisely in terms of land use and transportation issues. The three objectives are:

- Enhance the transportation network by reducing congestion and providing alternate and more direct routes;
- Serve existing land use in the region through efficient access to central business districts, public services, and employment and commercial centers; and
- Serve proposed land use in conformance to local and county land use and resource management plans, which encourage compact, contiguous growth for the eastern portion of the region and preserve the rural qualities of the western portion of the region.

**Need**

**Enhance the Transportation Network –** There are no major river crossings within the 5.1 mile stretch between the Illinois Route 72/Main Street Bridge, in the Villages of East and West Dundee, and the Illinois Route 62/Algonquin Road Bridge, in the Village of Algonquin. The Illinois Route 72/Main Street Bridge in East and West Dundee facilitates both local and regional traffic. Illinois Route 72/Main Street is congested through East and West Dundee with numerous driveways and businesses fronting the road. The Illinois Route 62/Algonquin Road Bridge through Algonquin is consistently congested, due to lack of capacity through the intersection of Algonquin Road and Illinois Route 31 on the west side of the Fox River. The Huntley Road/Main Street Bridge, in Village of Carpentersville, is a two-lane bridge that primarily serves local traffic and terminates at Lord Avenue, four blocks east of the Fox River. Providing highway improvements within this area will enhance travel by reducing travel times and providing safer traveling conditions.

**Capacity –** The proposed Longmeadow Parkway corridor would provide access across the Fox River, reduce congestion and provide an alternate and more direct east-west route within this northern region of Kane County. As documented in the EIS, the need is for more than relief to an existing roadway or bridge; the traffic demands for crossings of the Fox River, in the immediate project area, currently exceed the effective capacity available. Therefore, the benefit of adding an additional bridge crossing over the Fox River will improve the entire roadway network within this region. Instead, network modeling by the Chicago Metropolitan Agency for Planning (CMAP) indicate the network will be more efficient since trips will be more direct on a less congested network. Furthermore, east-west through traffic will be diverted from the downtowns of Carpentersville, Algonquin and East and West Dundee. Traffic modeling has indicated traffic volumes will continue to grow, with or without a new bridge crossing, resulting in higher levels of congestion within the subject roadway network. The increase in traffic volumes is due to continued growth in population, employment, and automobile usage within the region.

The need for the proposed improvement is evident from an examination of the existing and projected traffic volumes within the project corridor. With projected traffic volumes ranging from 8,000 to 33,000 vehicles per day in 2040, motorists will benefit from a more direct regional corridor that allows crossing of the Fox River with minimal delays. Figure 2 in the Appendix shows the range in the Average Daily Traffic (ADT) values for the existing and 2040 design year. The ROD was based on 2020 traffic projections. The 2013 Design Report and this reevaluation utilize 2040 traffic projections. Differences in traffic volume projections between 2020 and 2040 vary depending on locations within the corridor. West of the Fox River, there are generally minimal projected increases in traffic volumes. The only increase, west of the Fox River, is west of Boyer Road on Huntley Road where volumes are expected to increase 65% from 2020 to 2040. East of the Fox River, there is an anticipated decrease in volumes between 2020 projections and 2040 projections, ranging anywhere from 21% to 55%. Though the 2040 projections show wide variances from the 2020 projections, the increase between the existing volumes and the 2040 projections still support the need for the proposed improvement. The projected increases on existing Longmeadow Parkway range from 106% along existing Huntley Road to 1,418% east of Sleepy Hollow Road.

**Land Use Development and Community Cohesion** – The Villages of Carpentersville and Algonquin, as well as unincorporated Kane County, are experiencing rapid growth in residential developments west of the Fox River. As documented in the EIS, CMAP formerly known as the Northeastern Illinois Planning Commission (NIPC), projects a growth trend in housing and jobs to continue into the year 2020, when Kane County's population is projected to reach 552,944, a 74% increase over the 1990 population. East of the Fox River, the Villages of Carpentersville and Algonquin have seen residential developments occur north of Bolz Road from the Fox River to Illinois Route 25. The proposed Longmeadow Parkway corridor will support and complement existing developments and the expected continuation of growth within the region.

The 2010 population for Kane County was 508,482 per the U.S. Census Bureau. Kane County's population is projected to reach 789,295 by 2040, an increase of 55.2% over the 2010 population. This is an increase of 149% over the 1990 population.

The original EIS analyzed present day land uses at the time, which included one new subdivision (Silverstone Lake Subdivision) located along the north side of proposed Longmeadow Parkway between Amarillo Drive and Alameda Drive. Figure 3 shows the land use changes that have occurred since 1999.

**Roadway Deficiencies and Safety** – An existing three-leg intersection is located at Huntley Road and Boyer Road. When Longmeadow Parkway is constructed, the fourth leg of the intersection will be built. Between 2009 and 2012, there were four rear-end crashes, three fixed-object crashes, five side-swipe crashes, and one overturned vehicle for a total of thirteen crashes. Twelve of the crashes were property damage only; one crash (NB rear-end) resulted in an injury. Capacity improvements at the intersection will likely reduce rear-end collisions and the center barrier median to be added on Huntley Road will likely reduce opposite direction side-swipe collisions. The Huntley-Boyer Road intersection will be reconstructed and remain a signalized intersection in accordance with current roadway standards.

There also is an existing three-leg intersection at Randall Road and Longmeadow Parkway, which is currently an unsignalized T-intersection. There were eighteen crashes at the intersection during the 5-year period between 2008 and 2012. The predominant type of crash is rear-end, with 7 reported during the 5-year period. The remaining crash types are sideswipe-same direction (3), left-turning (3), animal (3) and fixed object (2). Three of the crashes resulted in an injury. This intersection will be reconstructed as a four-leg signalized intersection in accordance with current roadway standards.

There is no existing intersection along the proposed Longmeadow Parkway alignment which intersects with Illinois Route 31, Illinois Route 25, or Illinois Route 62. Therefore, no crash data was analyzed at these locations.

## SECTION II:  AFFECTED ENVIRONMENT TABLE

| Environmental Resources/Conditions | Resource/Condition Present? | | | |
| --- | --- | --- | --- | --- |
| | Impacts Identified in the EIS | | Impacts Identified During the Reevaluation | |
| | Yes | No | Yes | No |
| **I. Social/Economic** | | | | |
| 1.  Community Cohesion | | X | | X |
| 2.  Environmental Justice and Title VI | | X | | X |
| 3.  Public Facilities and Services | X | | X | |
| 4.  Changes in Travel Patterns and Access | X | | X | |
| 5.  Relocations (Business and Residential) | X | | X | |
| 6.  Economic Impacts | X | | X | |
| 7.  Land Use | X | | X | |
| 8.  Growth and Economic Development | X | | X | |
| 9.  Pedestrian and Bicycle Facilities | X | | X | |
| **II. Agricultural** | | | | |
| 1.  Farms and Farmland Conversion | X | | X | |
| 2.  Prime and Important Soils | X | | X | |
| 3.  Severed/Landlocked Parcels | | X | | X |
| 4.  Adverse Travel | | X | | X |
| **III. Cultural Resources (Historic Properties)** | | | | |
| 1.  Archaeological Sites | | X | | X |
| 2.  Historic Bridges | | X | | X |
| 3.  Historic Districts | | X | | X |
| 4.  Historic Buildings | X | | | X |

| Environmental Resources/Conditions | Resource/Condition Present? | | | |
|---|---|---|---|---|
| | Impacts Identified in the EIS | | Impacts Identified During the Reevaluation | |
| | Yes | No | Yes | No |
| **IV. Air Quality** | | | | |
| 1.  Microscale Analysis | | X | | X |
|    a. Does project add through lanes or auxiliary turning lanes? | X | | X | |
|    b. Has COSIM 4.0 been used? | NA | NA | NA | NA |
| 2.  Air Quality Conformity | X | | | X |
|    a. Is project in a non-attainment or maintenance area? | X | | X | |
| 3.  Is project located in a PM 2.5 or PM 10 non-attainment or maintenance area | X | | X | |
| 4.  Construction-Related Particulate Matter | NA | NA | | X |
| 5.  Mobile Source Air Toxics | NA | NA | | X |
| **V.  Noise** | | | | |
| 1.  Is this a Type I project? | X | | X | |
|    a. Noise impacts | X | | X | |
|    b. Does abatement meet feasibility and reasonableness criteria? | | X | | X |
| 2.  Is this a Type III project? | | X | | X |
| **VI. Natural Resources** | | | | |
| 1.  Upland Plant Communities | X | | X | |
|    a. Does the project impact wooded areas (Trees)? | X | | X | |
|    b. Does the project impact Prairie? | | X | | X |
|    c. Does the project occur within an Illinois Department of Agriculture quarantine area for an invasive species? | NA | NA | X | |
| 2.  Wildlife Resources | X | | X | |
|    a. Does the project area contain Wildlife Habitat? | X | | X | |
|    b. Does the project area contain breeding habitat for neotropical migrant species of birds? | | X | | X |
|    c. Does the project area contain nesting Bald eagles? | | X | X | |
| 3.  Threatened and Endangered Species | X | | X | |
|    a. Does habitat exist for Federally-listed species in the project area? | | X | X | |
|    b. Did the EcoCAT response from IDNR indicate the presence of State-Listed Species in the project area? | X | | X | |

| Environmental Resources/Conditions | Resource/Condition Present? | | | |
|---|---|---|---|---|
| | Impacts Identified in the EIS | | Impacts Identified During the Reevaluation | |
| | Yes | No | Yes | No |
| **VII.  Water Quality/Resources/Aquatic Habits** | | | | |
| 1.  Does the project involve a waterbody? | X | | X | |
| 2.  Does the project affect the physical features of a stream? | | X | X | |
| 3.  Does the project affect the fish and/or mussels within the stream? | | X | X | |
| 4.  Does the project affect either the narrative or numeric water quality standards? | | X | | X |
| 5.  Does the project occur within an area listed as a navigable stream, nationwide river inventory, ADID stream, or have a rating under the Biological Stream rating system? | X | | X | |
| 6.   Do the project impacts require mitigation? | X | | X | |
| **VIII.  Groundwater Resources** | | | | |
| 1.  Is groundwater the primary source of potable water in the area? | | X | | X |
| 2.  Does the project occur within an area of karst topography? | | X | | X |
| 3.  Does the project occur within a watershed that has been designated by the IEPA as vital for a particularly sensitive ecological system? | | X | | X |
| 4.  Does the project impact a Wellhead Protection Area? | | X | | X |
| 5.  Does the project occur within an area where potable water supply wells are present? | | X | | X |
| 6.  Does the project contribute to degradation of the area's groundwater quality? | | X | | X |
| 7.  Does the project occur within an area designated as a special resources groundwater? | | X | | X |

| Environmental Resources/Conditions | Resource/Condition Present? | | | |
|---|---|---|---|---|
| | Impacts Identified in the EIS | | Impacts Identified During the Reevaluation | |
| | Yes | No | Yes | No |
| **IX. Floodplains** | | | | |
| 1. Does the project occur within a 100-year floodplain? | X | | X | |
| 2. Does the project occur within the Regulated Floodway? | X | | X | |
| 3. Is a Floodplain Finding required? | | X | | X |
| **X. Wetlands** | | | | |
| 1. Does the project impact Wetlands? | | X | X | |
| 2. Do the wetlands have an FQI of 20 or greater? | | X | | X |
| 3. Are the wetlands listed as an ADID Site? | NA | NA | X | |
| 4. Wetlands Finding | X | | X | |
| **XI. Special Waste** | | | | |
| 1. Did project pass Level I screening? | NA | NA | | X |
| 2. Did project pass Level II screening? | NA | NA | | X |
| 3. Was a Preliminary Environmental Site Assessment (PESA) required? | X | | X | |
|    a. Is All Appropriate Inquiry (AAI) required? | NA | NA | | X |
|    b. Were REC(s) identified in the PESA? | NA | NA | X | |
| 4. Was a Preliminary Site Investigation (PSI) required? | NA | NA | X | |
| **XII. Special Lands** | | | | |
| 1. Section 4(f) | X | | X | |
|    a. *DeMinimis*, Programmatic, or Individual | X | | X | |
| 2. Section 6(f) | | X | | X |
| 3. Open Space Lands Acquisition and Development (OSLAD) Act Lands | | X | | X |
| 4. INAI Sites | | X | | X |
| 5. Nature Preserves | | X | | X |
| 6. Land & Water Reserves | | X | | X |

| Environmental Resources/Conditions | Resource/Condition Present? | | | |
|---|---|---|---|---|
| | Impacts Identified in the EIS | | Impacts Identified During the Reevaluation | |
| | Yes | No | Yes | No |
| **XIV.  Environmental Commitments Permits/Certifications Required** | | | | |
| 1.  Does the project require Section 404 Permit(s)? | X | | X | |
| 2.  Will an individual Water Quality Certification from IEPA be required? | X | | X | |
| 3.  Will a Coast Guard Bridge Permit be required? | | X | | X |
| **XV.  Public Involvement** | X | | X | |
| **XVI.  Agency Coordination** | X | | X | |

## SECTION III:  ALTERNATIVES

In this reevaluation, the two alternatives under consideration are the No-Build and the Build alternative, which was selected in the ROD. The ROD dismissed the No-Build alternative because it would not meet the purpose and need for the project; however, it is included in this re-evaluation for comparison with the Build Alternative. The original EIS evaluated several alignments for the Bolz Road Corridor (Longmeadow Parkway), and the ROD selected the alternative with the least environmental impacts. The selected alternative from the ROD is the subject of this re-evaluation to determine if there are any new significant impacts. If new significant impacts are identified, then a Supplemental EIS is required.

The No-Build alternative is the current roads in their existing configuration with no improvements other than routine maintenance and minor rehabilitation.  It is the future base condition against which the effects of the Build alternative will be measured.  Selection of the No-Build alternative will result in longer travel times and increased congestion due to the lack of major river crossings within the 5.1 mile stretch between IL Route 72 and IL Route 62.  This selection will be detrimental to the roadway network support of current and future land use development within the region.  Within this re-evaluation, the No-Build alternative still does not meet the purpose and need for the project.

## SECTION IV:  IMPACTS, DOCUMENTATION AND MITIGATION

### Part I.  Socio-economic

In the EIS, there were no impacts under Community Cohesion and Title VI and Environmental Justice and there are no new impacts as a result of this reevaluation.  Effects to Public Facilities and Services, Changes in Travel Patterns and Access, Economic Impacts, Land Use and Growth and Economic Development, and Pedestrian and Bicycle Facilities were described in the EIS and summarized in this reevaluation. The EIS identified 11 single family residential displacements necessary to build the proposed bridge and roadway improvements.   This impact has been reduced to 3 single family residential structures being displaced.

#### 1.  Community Cohesion

**Description**

The proposed bridge crossing would connect neighborhoods on both the east and west side of the Fox River reducing congestion.  Dundee School District #300 will benefit from improved bus access within its service area as a result of the bridge and roadway improvement as District #300 serves both sides of the Fox River.  There have been no changes in community cohesion impacts from the EIS.

#### 2.  Title VI and Environmental Justice

**Title VI**

Groups of ethnic, racial or religious minorities or elderly or disabled people are not present within the project area. No groups of individuals have been or will be excluded from participation in public involvement activities, denied the benefit of the project or

subjected to discrimination in any way on the basis of race, color, age, national origin, disability, or religion.

**Environmental Justice**

Upon reviewing and evaluating available data regarding the census tracts within the project limits, there are no disproportionate impacts on the low-income and minority population. At the time of the EIS, the project limits were included in one census tract 8501.00. The project limits did not change; however, the original census tract has been since subdivided into three census tracts, 8501.01, 8501.05, and 8501.06. The data for the 2010 census from each of these census tracts was reviewed and there are no disproportionate impacts on the low income or minority population. The census tracts within the project limits had a lower level of minority and low income population than Kane County as a whole. This reevaluation found that this determination from the EIS is still valid.

### 3.   Public Facilities and Services

**Description**

The Algonquin and Carpentersville Police and Fire Departments serve both the west and east sides of the Fox River and would benefit from improved response times as a result of implementing the bridge and roadway improvements. There also are many park and recreational facilities located on both the east and west sides of the Fox River. Providing an alternative bridge crossing between the two existing crossings in Algonquin and Carpentersville will improve access for many residents in both of these communities, adjacent communities, and unincorporated Kane County. There have been no changes in impacts to public facilities and services from the EIS.

### 4.   Changes in Travel Pattern and Access

**Description**

The primary future growth areas of both Algonquin and Carpentersville are west of the Fox River. As congestion increases on the existing bridges in the downtown areas of these communities, automobile and pedestrian movements will be impeded, affecting the viability of these commercial areas. The proposed improvements will provide a major transportation link from residences to employment, shopping and recreational opportunities. There have been no changes in impacts to travel patterns and access from the EIS.

### 5.   Relocations (Business and Residential)

**Estimation and Description**

The EIS had 11 single family residential displacements to accommodate the proposed bridge and roadway improvements. This impact has been reduced to 3 single family residential structures being displaced. One residence in the area of Karen Drive was purchased at least five years ago and was demolished. One residence is in negotiation along Route 31. One residence at the northwest corner of Randall/Longmeadow was purchased and has been demolished.

The number of relocations have been reduced from eleven (EIS) to three (reevaluation).

## 6.   Economic Impacts

**Description**

The proposed bridge and roadway improvements will help focus new employment opportunities within Kane County and the local municipalities.  Businesses that are currently located in this developed corridor also will benefit from the improved access to major transportation routes, business districts, customer bases, and public services. There have been no changes in economic impacts from the EIS.

## 7.   Land Use

**Description**

The land use along the Longmeadow Corridor is predominantly residential with forest preserve and open lands also present.  There have been no changes in land use from the EIS.

## 8.   Growth and Economic Development

**Description**

Improved accessibility across the Fox River will enhance the planned development potential of the undeveloped parcels along the corridor as traffic is projected to increase. Growth in these areas is consistent with the policies of local governmental units as reflected in Comprehensive Plans and Zoning Ordinances.  There have been no changes in impacts to growth and economic development from the EIS.

## 9.   Pedestrian and Bicycle Facilities

☑ Project will cause disruption or permanent changes in pedestrian or bicycle acess

☐ Project will not cause disruption or permanent changes in pedestrian or bicycle acess

**Description**

This project will include the construction of a new bike path and will make connections to existing bike paths, which are considered positive changes (i.e. improvements) for the Forest Preserve District of Kane County (FPDKC).  There will not be any permanent interruption of the existing bicycle or pedestrian paths.  The proposed improvements will provide permanent changes in pedestrian or bicycle access, as a multi-use path will be constructed along the entire Longmeadow Parkway corridor.  There could be some short term closures or detours at the existing bicycle path during construction.  There have been no changes in impacts to pedestrian and bicycle facilities from the EIS.

**Part II.  Agricultural**

The project will have impacts to Farms and Farmland Conversion and Prime and Important Soils; however, there have been no changes in impacts from the EIS.

### 1.  Farms and Farmland Conversion

There are 28.5 acres of land to be acquired from farm parcels.  There are no farm houses or buildings being displaced.  There is no change in impacts from the EIS.

### 2.  Prime and Important Soils

According to the EIS and reevaluation, there are 28.5 acres of prime soils within the Longmeadow Parkway corridor and there are no impacts to statewide important soils.  There is no change in impacts from the EIS.

### 3.  Severed/Landlocked Parcels

**Identify**

There are no severed or landlocked parcels resulting from the Longmeadow Parkway project. There are no changes in impacts from the EIS.

### 4.  Adverse Travel

According to the EIS and reevaluation, there is no adverse travel resulting from the Longmeadow Parkway project.  There are no changes in impacts from the EIS.

**Part III.  Cultural Resources**

There are no impacts under Archeological Sites, Historic Bridges and Historic Districts in the EIS or reevaluation.  There was an impact under Historic Buildings resulting from taking approximately 0.23 acres of frontage from the Perry-Lathrop property located along the east side of Illinois Route 31 at 19N045.  This property was determined eligible for inclusion on the National Register of Historic Places.  An approximately 40 feet wide strip of land will be taken in front of the Perry Lathrop House.  The only impact will be visual and a landscape plan will be developed and submitted for State Historic Preservation Office (SHPO) approval for the area adjacent to the Perry Lathrop property prior to construction.  The parcel to the south and east of the Perry Lathrop property, known as the Melva property, will be acquired by the County and transferred to the FPDKC.  The Melva property will be transferred to the FPDKC and will be maintained in perpetuity as greenspace upon request by FPDKC.  The Intergovernmental Agreement (IGA) between Kane County Division of Transportation (KDOT) and the FPDKC is included in Appendix A, Page A-7.

☐ No Historic Properties Affected - See letter from SHPO

☑ Historic Properties Affected - See below

IDOT coordinated with the Illinois State Historic Preservation Officer (SHPO) and the SHPO concurred with a "Conditional No Adverse Effect" finding (Appendix A, Page A-2) for the

Perry Lathrop House provided that SHPO reviews and approves the landscape plan for the Perry Lathrop House (See Appendix A, Page A-1).

On April 8, 2016, IDOT coordinated with the SHPO in regards to the acreage around the Perry-Lathrop House (known as the Melva property) and the SHPO concurred with a "Conditional No Adverse Effect" finding (Appendix A, Page A-4) for this property provided that SHPO reviews and approves the landscape plan (See Appendix A, Page A-3).

**1. Archaeological Properties**

☑ Project will not affect Archeological Properties

☐ Project will affect Archeological Properties

**2. Historic Bridges**

☑ Project will not affect a Historic District

☐ Project will affect a Historic District

**3. Historic District**

☑ Project will not affect a Historic District

☐ Project will affect a Historic District

**4. Historic Buildings**

☑ Project will not affect any Historic Buildings

☐ Project will affect Historic Buildings

**Impacts**

A 40 foot strip of right-of-way will be acquired from the Perry-Lathrop property. A landscaping plan will be developed and submitted to the Illinois SHPO for review and concurrence and an adjacent property, the Melva property, will be preserved in perpetuity as greenspace upon request of the FPDKC.

**Coordination**

A landscape plan will be developed and submitted for the area adjacent to the Perry-Lathrop house that fronts the proposed Longmeadow Parkway, and this plan must be reviewed and approved in writing by the SHPO prior to construction.

No new historic properties have been identified after the EIS was issued. There is a "no adverse effect" to historic properties.

**Part IV.  Air Quality**

In the EIS, there were no impacts under Air Quality.

Since the EIS was prepared, there have been new regulatory requirements established for $PM_{2.5}$ and $PM_{10}$ Nonattainment and Maintenance Areas. Additionally, Construction-Related Particulate Matter, and Mobile Source Air Toxics (MSAT) are analyzed during the NEPA process. The air quality analysis has been updated to address these new requirements. As a result of the analysis, there are no new impacts to air quality.

1. **CO Microscale Analysis**

   **Project Type:**

   This project does not meet any of the below listed project types.

   ☐ Project does not add Through Lanes or Auxillary Turning Lanes

   ☐ Project does not involve any sensitive receptors and is not suitable for using COSIM 4.0

   ☐ Project is subject to COSIM Pre-screen

   ☐ Project is subject COSIM screening analysis

   In accordance with the IDOT-Illinois Environmental Protection Agency (IEPA) "Agreement on Microscale Air Quality Assessments for IDOT Sponsored Transportation Projects," projects are exempt from project-level carbon monoxide air quality analysis if the highest design-year approach-volume on the busiest leg of the intersection is less than 5,000 vehicles per hour (vph) or 62,500 ADT. This project does not have traffic that would exceed this threshold, and therefore a CO analysis is not required.

2. **Air Quality Conformity**

   **Project Type:**

   ☐ Project is outside of Nonattainment or Maintenance Area

   ☐ Exempt Project in Nonattainment or Maintenance Area

   ☑ Project is within a portion of a Nonattainment or Maintenance Area where CMAP is the MPO

   ☐ Project is within a Nonattainment or Maintenance area served by an MPO other than CMAP

   ☐ Project is within a Nonattainment or Maintenance area not served by an MPO

   ☐ Regionally Significant Non-Federal project within a Nonattainment or Maintenance Area.

This project is included in the FY 2014-2019 Transportation Improvement Program (TIP) endorsed by the Metropolitan Planning Organization Policy Committee of the Chicago Metropolitan Agency for Planning (CMAP) for the region in which the project is located. Projects in the TIP are considered to be consistent with the regional transportation plan endorsed by CMAP. The project is within the fiscally constrained portion of the plan.

On June 5, 2015, the Federal Highway Administration (FHWA) and the Federal Transit Administration (FTA) determined that the GO TO 2040 Comprehensive Regional Plan and

the Transportation Improvement Plan conforms to the State Implementation Plan (SIP) and the transportation-related requirements of the 1990 Clean Air Act Amendments. These findings were in accordance with 40 CFR Part 93, "Determining Conformity of Federal Actions to State or Federal Implementation Plans."

The project's design concept and scope are consistent with the project information used for the TIP conformity analysis. Therefore, this project conforms to the existing State Implementation Plan and the transportation-related requirements of the 1990 Clean Air Act Amendments.  The TIP number for this project is 09-96-0017.

### 3.  <u>PM$_{2.5}$ and PM$_{10.0}$ Nonattainment and Maintenance Areas</u>

**Project-Type**

☐ Exempt Project

☑ Nonexempt project that is not an Air Quality Concern

☐ Nonexempt project that is an Air Quality Concern

Pursuant to 40 CFR 93.123(b)(1) this is not a project of air quality concern and therefore a quantitative hot spot analysis is not required. The highest projected ADT along Longmeadow Parkway is 33,300 with 4% trucks, for a total of 1,332 diesel trucks. The regulations provide examples of projects that are of air quality concern, such as a project that adds 10,000 new diesel trucks; however, this project adds substantially less than 10,000 trucks. Also, the regulations describe projects affecting intersections with a Level of Service (LOS) of D, E, or F as projects of air quality concern. This project will not affect any intersection with a LOS of D, E, or F with additional diesel trucks.  Due to the fact that the ADT is 33,300 which is well below the 125,000 ADT threshold and truck traffic is less than 8%, this project will not cause or contribute to any new localized PM$_{2.5}$ violations or increase the frequency or severity of any PM$_{2.5}$ violations. United States Environmental Protection Agency (USEPA) has determined that such projects meet the Clean Air Act's requirements without any further Hot-Spot analysis.   The LOS for intersections is shown in Table 1.

**Table 1**
**Level of Service for Intersections**

|  | AM Intersection Level of Service (2040) | | | | | | |
|---|---|---|---|---|---|---|---|
|  | Boyer Road | Randall Road | Sleepy Hollow Road | Illinois Route 31 Connector | Bolz Road Connector | Illinois Route 25 | Illinois Route 62 |
| Longmeadow Parkway | C | C | C | B | C | C | B |

| | PM Intersection Level of Service (2040) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Boyer Road | Randall Road | Sleepy Hollow Road | Illinois Route 31 Connector | Bolz Road Connector | Illinois Route 25 | Illinois Route 62 |
| Longmeadow Parkway | C | D | C | B | C | C | B |

## 4.  Construction-Related Particulate-Matter

Demolition and construction activities can result in short-term increases in fugitive dust and equipment-related particulate emissions in and around the project area. (Equipment-related particulate emissions can be minimized if the equipment is well maintained.) The potential air quality impacts will be short-term, occurring only while demolition and construction work is in progress and local conditions are appropriate. The potential for fugitive dust emissions typically is associated with building demolition, ground clearing, site preparation, grading, stockpiling of materials, on-site movement of equipment, and transportation of materials. The potential is greatest during dry periods, periods of intense construction activity, and during high wind conditions. IDOT's Standard Specifications for Road and Bridge Construction include provisions on dust control. Under these provisions, dust and airborne dirt generated by construction activities will be controlled through dust control procedures or a specific dust control plan, when warranted. The contractor and IDOT will meet to review the nature and extent of dust-generating activities and will cooperatively develop specific types of control techniques appropriate to the specific situation. Techniques that may warrant consideration include measures such as minimizing track-out of soil onto nearby publicly-traveled roads, reducing speed on unpaved roads, covering haul vehicles, and applying chemical dust suppressants or water to exposed surfaces, particularly those on which construction vehicles travel. With the application of appropriate measures to limit dust emissions during construction, this project will not cause any significant, short-term particulate matter air quality impacts.

## 5.  Mobile Source Air Toxics (MSAT)

**Project-Type:**

☐ Project is exempt

☐ Project has no meaningful potential MSAT effects

☑ Project has low meaning potential MSAT effects and is one of the following types below:

    ☐ A minor widening project

    ☑ A new interchange connecting an existing roadway with a new roadway

    ☐ A new interchange connecting new roadways

☐ Minor improvements or expansions to intermodal centers or other projects that affect truck traffic

☐ Project has high potential MSAT effects

This project has a low potential for MSAT effects because design year traffic is projected to be less than 140,000 to 150,000 annual average daily traffic AADT. As a project with low potential for MSAT effects, a qualitative analysis was completed.

For the build alternative, the amount of MSAT emitted would be proportional to the vehicle miles traveled (VMT). Because the VMT estimated for the No Build Alternative is higher than for the Build Alternative, higher levels of regional MSAT are not expected from the Build Alternative compared to the No Build Alternative. Also, emissions will likely be lower than present levels in the design year as a result of USEPA's national control programs that are projected to reduce MSAT emissions by 72 percent from 1999 to 2050. Local conditions may differ from these national projections in terms of fleet mix and turnover, VMT growth rates, and local control measures. However, the magnitude of the USEPA-projected reductions is so great, even after accounting for VMT growth, emissions in the study area are likely to be lower in the future in virtually all locations. There may be localized areas where VMT would increase, and other areas where VMT would decrease. Therefore, it is possible that localized increases and decreases in MSAT emissions may occur. The localized increases in MSAT emissions would likely be most pronounced along the new roadway sections that would be built over and adjacent to the Fox River under the Build Alternative Longmeadow Parkway. However, even if these increases do occur, they too will be substantially reduced in the future due to implementation of USEPA's vehicle and fuel regulations.

In summary, under the Build Alternative in the design year, it is expected there would be reduced MSAT emissions in the immediate area of the project, relative to the No Build Alternative, due to the reduced VMT associated with more direct routing, and due to USEPA's MSAT reduction programs.

INCOMPLETE OR UNAVAILABLE INFORMATION FOR PROJECT-SPECIFIC MSAT HEALTH IMPACTS ANALYSIS

In FHWA's view, information is incomplete or unavailable to credibly predict the project-specific health impacts due to changes in MSAT emissions associated with a proposed set of highway alternatives. The outcome of such an assessment, adverse or not, would be influenced more by the uncertainty introduced into the process through assumption and speculation rather than any genuine insight into the actual health impacts directly attributable to MSAT exposure associated with a proposed action.

## **USEPA Role**

The USEPA is responsible for protecting the public health and welfare from any known or anticipated effect of an air pollutant. It is the lead authority for administering the Clean Air Act and its amendments and has specific statutory obligations with respect to hazardous air pollutants and MSAT. USEPA is in the continual process of assessing human health effects, exposures, and risks posed by air pollutants. It maintains the Integrated Risk Information System (IRIS), which is "a compilation of electronic reports on specific substances found in the environment and their potential to cause human

health effects." IRIS can be accessed through the USEPA website. Each report contains assessments of non-cancerous and cancerous effects for individual compounds and quantitative estimates of risk levels from lifetime oral and inhalation exposures with uncertainty spanning perhaps an order of magnitude.

## Role of Other Organizations

Other organizations are also active in the research and analyses of the human health effects of MSAT, including the Health Effects Institute (HEI). Two HEI studies are summarized in Appendix D of FHWA's "Interim Guidance Update on Mobile Source Air Toxic Analysis in NEPA Documents." Among the adverse health effects linked to MSAT compounds at high exposures are cancer in humans in occupational settings; cancer in animals; and irritation to the respiratory tract, including the exacerbation of asthma. Less obvious is the adverse human health effects of MSAT compounds at current environmental concentrations or in the future as vehicle emissions substantially decrease. See research reports available through the HEI website.

## Problems with Modeling Methodologies

The methodologies for forecasting health impacts include emissions modeling, dispersion modeling, exposure modeling, and then final determination of health impacts, each step in the process building on the model predictions obtained in the previous step. All are encumbered by technical shortcomings or uncertain science that prevents a more complete differentiation of the MSAT health impacts among a set of project alternatives. These difficulties are magnified for lifetime (i.e., 70 year) assessments, particularly because unsupportable assumptions would have to be made regarding changes in travel patterns and vehicle technology, which affects emissions rates over that time frame, because such information is unavailable.

It is particularly difficult to reliably forecast MSAT exposure near roadways, and to determine the portion of time that people are actually exposed at a specific location. It is particularly difficult to reliably forecast 70-year lifetime MSAT concentrations and exposures near roadways; to determine the portion of time that people are actually exposed at a specific location; and to establish the extent attributable to a proposed action, especially given that some of the information needed is unavailable.

## MSAT Toxicity Estimates

There are considerable uncertainties associated with the existing estimates of toxicity of the various MSAT, because of factors such as low-dose extrapolation and translation of occupational exposure data to the general population, a concern expressed by HEI. As a result, there is no national consensus on air dose-response values assumed to protect the public health and welfare for MSAT compounds, and in particular for diesel PM. USEPA and the HEI have not established a basis for quantitative risk assessment of diesel PM in ambient settings.

## Level of Risk

There is also the lack of a national consensus on an acceptable level of risk. The current context is the process used by USEPA, as provided by the Clean Air Act, to determine whether more stringent controls are required in order to provide an ample margin of safety to protect public health or to prevent an adverse environmental effect for industrial sources subject to the maximum achievable control technology standards (e.g., benzene

emissions from refineries). The decision framework is a two-step process. The first step requires USEPA to determine an "acceptable" level of risk due to emissions from a source, which is generally no greater than approximately 100 in a million. Additional factors are considered in the second step, the goal of which is to maximize the number of people with risks less than 1 in a million due to emissions from a source. The results of this statutory two-step process do not guarantee that cancer risks from exposure to air toxics are less than 1 in a million; in some cases, the residual risk determination could result in maximum individual cancer risks that are as high as approximately 100 in a million. In a June 2008 decision, the US Court of Appeals for the District of Columbia Circuit upheld USEPA's approach to addressing risk in its two-step decision framework. Information is incomplete or unavailable to establish that even the largest of highway projects would result in levels of risk greater than safe or acceptable.

### Conclusions

Because of the limitations in the methodologies for forecasting the health impacts described, any predicted difference in health impacts between alternatives is likely to be much smaller than the uncertainties associated with predicting the impacts. Consequently, the results of such assessments would not be useful to decision makers, who would need to weigh this information against project benefits (e.g., reducing traffic congestion, crash rates, and fatalities plus improved access for emergency response) that are better suited for quantitative analysis.

**Part V.  Noise**

In the EIS, noise impacts were evaluated using the STAMINA noise model software.  The noise analysis for the Longmeadow Parkway has been reevaluated based on the current IDOT Noise Policy and the current FHWA Traffic Noise Model (TNM) model software was used.  Since the original noise study was completed, a few scattered residences have been constructed near the proposed roadway and a new subdivision, located along the north side of the proposed Longmeadow Parkway and west of Illinois Route 25, has been completed.

The noise analysis was conducted for two sections: Section A-1 and Section A2-B1 to Section D. The proposed action for Section A-1, located between Huntley Road from approximately 2,300 feet west of Boyer Road to just west of Randall Road, is a new alignment from the eastern extent of the east/west leg of Huntley Road to just short of the current Longmeadow Parkway/Randall Road three-way intersection. The proposed actions for Section A2-B1 to Section D, located between Randall Road and Illinois Route 62 (Algonquin Road), are additional lanes between Randall Road and White Chapel Lane, a new alignment east from the Longmeadow Parkway/White Chapel Lane intersection to Algonquin Road, and a new alignment north of existing Bolz Road.  Appendix B contains both the A-1 and the A2-B1 to Section D Noise Study Summary Memoranda.

☑ Type I Project

☐ Type III Project

An analysis of noise abatement measures (noise barriers) was conducted in conformance with FHWA requirements contained in Title 23 *Code of Federal Regulations* Part 772 for each of the impacted receptors.  In order for a noise abatement measure to be constructed, it must meet both the feasibility and reasonableness criteria, described below.

**Feasibility**

The feasibility evaluation is a combination of acoustical and engineering factors considered in the evaluation of a noise abatement measure. The acoustical portion of the IDOT policy, as required by FHWA regulations, considers noise abatement to be feasible if it achieves at least a 5 dB(A) traffic noise reduction at an impacted receptor. Factors including, but not limited to, safety, barrier height, topography, drainage, utilities, maintenance, and access issues are also considered.

**Reasonableness**

As per FHWA regulations, a noise abatement measure is determined to be reasonable when all three of the following reasonableness evaluation factors are met:

- cost effectiveness of the highway traffic noise abatement measure;
- achievement of IDOT's noise reduction design goal; and,
- consideration of the viewpoints of the benefited receptors (property owners and residents), if all other criterion are achieved.

A noise abatement measure is considered cost-effective to construct if the noise wall construction cost per benefited receptor is less than the allowable cost per benefited receptor. A benefited receptor is any receptor that is afforded at least a 5 dB(A) traffic noise reduction from the proposed noise abatement measure. The FHWA regulations allow each State Highway Authority to establish cost criteria for determining cost effectiveness.

IDOT policy provides that the actual cost per benefited receptor shall be based on a noise wall cost of $25 per square foot, which includes engineering, materials, and construction. The base value allowable cost is $24,000 per benefited receptor, which can be increased based on three factors as summarized below:

- the absolute noise level of the benefited receptors in the design year build scenario before noise abatement;

- the incremental increase in noise level between the existing noise level at the benefited receptor and the predicted build noise level before noise abatement; and

- the date of development compared to the construction date of the highway. These factors are considered for all benefited receptors.

**Table 2**
**Absolute Noise Level Consideration**

| Predicted Build Noise Level Before Noise Abatement | Dollars Added to Base Value Cost per Benefited Receptor |
|---|---|
| Less than 70 dB(A) | $0 |
| 70 to 74 dB(A) | $1,000 |
| 75 to 79 dB(A) | $2,000 |
| 80 dB(A) or greater | $4,000 |

**Source:** IDOT Highway Traffic Noise Assessment Manua

**Table 3**
**Increase in Noise Level Consideration**

| Incremental Increase in Noise Level Between the Existing Noise Level and the Predicted Build Noise Level Before Noise Abatement | Dollars Added to Base Value Cost per Benefited Receptor |
|---|---|
| Less than 5 dB(A) | $0 |
| 5 to 9 dB(A) | $1,000 |
| 10 to 14 dB(A) | $2,000 |
| 15 dB(A) or greater | $4,000 |

**Source:** IDOT Highway Traffic Noise Assessment Manual

**Table 4**
**New Alignment / Construction Date Consideration**

| Project is on new alignment OR the receptor existed prior to the original construction of the highway | Dollars Added to Base Value Cost per Benefited Receptor |
|---|---|
| No for both | $0 |
| Yes for either | $5,000 |

**Note**: No single optional reasonableness factor shall be used to determine that a noise abatement measure is unreasonable.
**Source:** IDOT Highway Traffic Noise Assessment Manual

The IDOT noise reduction design goal is to achieve an 8 dB(A) traffic noise reduction at a minimum of one benefited receptor. If a noise abatement measure is feasible, achieves the cost-effective criterion, and achieves the IDOT noise reduction design goal, then the viewpoints of benefited receptors are solicited on the construction of the noise wall.

The third component of reasonableness is obtaining the viewpoints of those who would be benefitted by a feasible and cost-effective noise barrier that meets the IDOT noise reduction design goal. The viewpoints solicitation process will be completed with the property owners and tenants of the receptors that would benefit from the proposed walls. The received votes will be tallied by noise wall per IDOT policy. If greater than fifty percent of a wall's votes are in support of wall construction, the wall will be recommended for construction and will likely be included in final design plans for the project. Conversely, walls that do not receive fifty percent or more votes in favor of the wall will not be recommended for construction as part of the project.

**Impacts**
In the EIS, twelve sites were selected as receptors for analysis along the entire preferred Longmeadow alignment. Future traffic noise levels were predicted for the design year 2020 for both the Build Alternative and No-Build Alternative. For the No-Build Alternative, noise levels typically increased by 1 dB(A) or less within the project corridor. Traffic noise levels under the Build Alternative ranged from 44 dB(A) to 69 dB(A). The increase from Existing to Build noise levels ranged from 2 dB(A) to 13 dB(A) with one receptor, R4, having a 24 dB(A) increase from the Existing to Build condition. Four receptors were determined to have a noise impact, R3, R4, R9 and R12.

Section A-1
For the reevaluation noise analysis in Section A-1, four receptors (R1 through R4) have been selected to represent the study area in Section A-1. Existing (2015) and future (2040) Build and No-Build traffic noise levels were predicted for the receptor sites utilizing TNM. The results are shown in Table 5.

**Table 5**
**NOISE MODELING RESULTS SECTION A-1**

| Receptor Number | Land Use Category / NAC in dB(A) | Existing 2015 Noise Level, dB(A) | No-Build 2040 Noise Level, dB(A) | Build 2040 Noise Level, dB(A) | Build Increase Over Existing |
|---|---|---|---|---|---|
| R1 | B / 67 | 57 | 58 | 60 | 3 |
| R2 | B / 67 | 61 | 62 | 64 | 3 |
| R3 | B / 67 | 59 | 60 | 63 | 4 |
| R4 | B / 67 | 73 | 74 | **77** | 4 |

**Boldface and highlighted** indicates whether the noise levels approach, meet or exceed the Noise Abatement Criteria (NAC) in the Build scenario.

The Existing 2015 noise levels range from 57 dB(A) at R1 to 73 dB(A) at R4. The projected No-Build 2040 traffic noise levels range from 58 dB(A) at R1 to 74 dB(A) at R4. Receptor noise levels increased 1 dB(A) from the Existing scenario to the No-Build scenario. Any increase in traffic noise levels are due to an increase in traffic volumes.

The 2040 traffic noise levels for the Build scenario as predicted by TNM range from 60 dB(A) at R1 to 77 dB(A) at R4. Traffic noise levels increased 3 dB(A) or 4 dB(A) from the Existing scenario to the Build scenario due to the increase in the traffic volumes and the proposed geometry. One of the four receptor locations exceeded the FHWA NAC criteria. Based on the 2040 traffic noise levels, noise abatement was evaluated for the impacted receptor.

Section A2-B1 to Section D
For the reevaluation noise analysis for Section A2-B1 to Section D, thirty receptors have been selected to represent the study area in Section A2-B1 to Section D. The results are shown in Table 6.

**Table 6**
**NOISE MODELING RESULTS SECTION A2-B1 TO SECTION D**

| Receptor / CNE No. | Existing Noise Level, dB(A) | No-Build 2040 Noise Level, dB(A) | No-Toll Build 2040 Noise Level, dB(A) | Change from Existing to Build, dB(A) |
|---|---|---|---|---|
| R5 | 73 | 74 | **75** | 2 |
| R6 | 46 | 48 | 59 | 13 |
| R7 | 50 | 51 | 61 | 11 |
| R8 | 49 | 51 | 63 | 14 |
| R9 | 51 | 53 | 64 | 13 |
| R10 | 52 | 53 | 56 | 4 |
| R11 | 60 | 61 | 63 | 3 |
| R12 | 59 | 60 | 64 | 5 |
| R13 | 48 | 50 | 62 | 14 |
| R14 | 46 | 48 | 60 | 14 |
| R15 | 48 | 50 | 62 | 14 |
| R16 | 45* | 45* | 59 | 14 |
| R17 | 60 | 61 | N/A | N/A |
| R18 | 45* | 45* | 49 | 4 |
| R19 | 51 | 52 | 64 | 13 |
| R20 | 49 | 50 | 57 | 8 |
| R21 | 44 | 45 | 55 | 11 |
| R22 | 61 | 61 | 62 | 1 |
| R23 | 47* | 47* | 54 | 7 |
| R24 | 61 | 62 | 62 | 1 |
| R25 | 67 | 68 | **69** | 2 |
| R26 | 71 | 72 | **73** | 2 |
| R26A | 70 | 71 | **72** | 2 |
| R27 | 60 | 61 | 64 | 4 |
| R28 | 52 | 53 | 58 | 6 |
| R29 | 44* | 44* | 53 | 9 |
| R30 | 55 | 56 | 60 | 5 |
| R31 | 60 | 62 | 62 | 2 |
| R32 | 62 | 63 | 65 | 3 |
| R33 | 62 | 63 | 64 | 2 |

**Bold, highlighted** data represent Build Condition noise levels that approach, meet, or exceed the appropriate NAC.
* - Noise levels taken from monitoring results as receptors are greater than 500 feet from modeled roadways and therefore beyond TNM's effective range.
Receptor 17 is directly in the path of Longmeadow Parkway new alignment and therefore not modeled in the Build Condition.

The Existing 2015 noise levels range from 44 dB(A) at R21 and R29 to 73 dB(A) at R5. The projected No-Build 2040 traffic noise levels range from 44 dB(A) at R29 to 74 dB(A) at R5. Receptor noise levels remained the same or increased by either 1 dB(A) or 2 dB(A) from the Existing scenario to the No-Build scenario. Any increase in traffic noise levels are due to an increase in traffic volumes.

The 2040 traffic noise levels for the Build scenario, as predicted by TNM range from 49

dB(A) at R18 to 75 dB(A) at R5. Traffic noise levels increased from 1 dB(A) to 14 dB(A) from the Existing scenario to the Build scenario due to the increase in the traffic volumes and the proposed geometry. Four of the 30 receptor locations exceed the NAC and are considered traffic noise impacts. These four receptor locations also approach or exceed the NAC in the existing condition. None of the receptors are considered an impact due to a substantial increase (greater than 14 dB(A)) in noise. Traffic noise abatement measures were considered for impacted receptors that approach, meet, or exceed the appropriate FHWA NAC.

**Abatement Evaluation**

In the EIS, four out of the twelve sites had a noise impact and were evaluated for noise abatement. Three of the four barriers could not substantially reduce noise levels, and therefore were not considered feasible. The fourth barrier could substantially reduce noise, but this wall was not economically reasonable based on the cost of the wall per benefited receptor. Therefore, no abatement was proposed in the EIS noise analysis, and this was documented in the ROD.

Section A-1

For the reevaluation in Section A-1, TNM was used to perform the noise wall feasibility and reasonableness check for the one impacted receptor (R4). The noise wall met IDOT's feasibility criterion. The noise barrier also achieved IDOT's noise reduction design goal of at least an 8 dB(A) traffic noise reduction at one or more benefited receptor locations. The wall was then checked for economic reasonableness. Based on the evaluation, the noise wall would not be economically reasonable, as the actual cost per benefited receptor exceeds the adjusted allowable cost per benefited receptor, see Table 7 and 8 below. Therefore, noise abatement will not be implemented as part of this project within Section A-1.

Section A2-B1 to Section D

For Section A2-B1 to Section D, TNM was used to perform the noise wall feasibility and reasonableness check for the four impacted receptors: R5, R25, R26, and R26A. This includes two variants of a shared noise wall in the area of R26 and R26A. Noise Wall B2A, a shared noise wall spanning the length of adjacent CNEs R26 and R26A, was evaluated separately from Noise Wall B2 in the event that the church (R26A) would prefer to maintain visibility over noise abatement. When determining if an abatement measure is feasible and reasonable, the noise reductions achieved, number of residences benefited, total cost, and total cost per residence benefited are considered. All noise walls were modeled along the proposed right-of-way.

All four of the noise walls could feasibly be built and achieve at least a 5 dB(A) reduction at an impacted receptor. Three (B1/R25, B2/R26, and B2A/R26 & R26A) of the four noise barrier considered feasible would be considered acoustically reasonable, as they achieve the IDOT noise reduction design goal of at least an 8 dB(A) traffic noise reduction at one or more benefited receptor locations. A noise wall at R5 would not achieve the noise reduction design goal, as the gap in the wall (needed to maintain driveway access) limited the effectiveness of the noise wall.

The three feasible and noise reduction design goal-achieving noise walls, at CNEs R25, R26, and R26A, were then evaluated for cost-effectiveness. Based on the adjusted cost evaluation, none of noise reduction design goal-achieving noise walls (Noise Walls B1, B2 and B2A) would be economically reasonable, as the actual cost per benefited receptor

exceeds the adjusted allowable cost per benefited receptor. Therefore, noise abatement will not be implemented as part of this project within Section A2-B1 to Section D.

**Table 7**
**ADJUSTED ALLOWABLE COST PER BENEFITED RECEPTOR SUMMARY**

| Barrier / CNE | Benefited Receptors | Adjustment Factor [1] | Adjusted Allowable Cost per Benefited Receptors |
|---|---|---|---|
| B1 / R4 | 1 | $7,000[3] | $31,000 |
| B0 / R5 | Does not meet IDOT Noise Reduction Design Goal | | |
| B1 / R25 | 5 | $0 | $24,000 |
| B2 / R26 | 4 | $0 to $1,000[2] | $24,250 |
| B2A / R26 & R26A | 5 | $ 0 to $1,000[2] | $24,400 |

[1] The Adjustment factor is analyzed individually for each benefited receptor; therefore, a range may be presented for the Adjustment Factor.
[2] Include $1,000 for the Absolute Noise Level Consideration.
[3] Includes $2,000 for the Absolute Noise Level Consideration and $5,000 for New Alignment Consideration.

**Table 8**
**NOISE WALL COST REASONABLENESS EVALUATION**

| Barrier / CNE | Benefited Receptors[1] | Total Noise Wall Cost[2] | Actual Cost per Benefited Receptor | Adjusted Allowable Cost per Benefited Receptor |
|---|---|---|---|---|
| B1/R4 | 1 | $57,250 | $57,250 | $31,000 |
| B0 / R5 | Does not meet IDOT Noise Reduction Design Goal | | | |
| B1 / R25 | 5 | $158,850 | $31,770 | $24,000 |
| B2 / R26 | 4 | $263,450[3] | $65,863 | $24,250 |
| B2A / R26 & R26A | 5 | $300,250[3] | $60,050 | $24,400 |

[1] Includes the anticipated outdoor use areas anticipated to receive at least a 5 dB(A) reduction
[2] Based on the IDOT policy value of $25 per square foot
[3] Includes estimated cost of utility relocation required to construct wall ($197,850)

### Construction Noise

Trucks and machinery used for construction produce noise that may affect some land uses and activities during the construction period. Residents along the alignment will, at some time, experience perceptible construction noise from implementation of the project. To minimize or eliminate the effect of construction noise on these receptors, mitigation measures have been incorporated into the IDOT Standard Specifications for Road and Bridge Construction as Article 107.35.

## Part VI. Natural Resources

The EIS quantified an impact of forested areas of 2.7 acres adjacent to the Fox River, but did not quantify a number of trees. As part of the reevaluation, it was determined that the total number of trees impacted by this project is about 5,765. The acreage associated with the tree impacts adjacent to the Fox River is approximately 2.4 acres with a total tree acreage impact throughout the corridor of 28.7 acres. This includes all land covered by trees within the corridor, i.e. floodplain, upland and wetland forested areas, as well as tree lines. At the time of the EIS

there were several open fields which had converted into forested areas over the last decade when the most recent calculation of tree coverage was completed. In addition, the right-of-way necessary for construction of Longmeadow Parkway and detention requirements was refined through the design process, resulting in additional tree impacts. Impacts from side street improvements were not considered in the EIS.

## 1. Upland Plant Communities

### Impacts

The total number of trees within the Longmeadow Corridor is estimated at 7,485. The total number of trees impacted by this project (including dead trees) is about 5,765 trees. The number of dead trees is 232 based on Addendum A to the Tree Survey Report for Longmeadow Parkway dated September 2015. The dead trees do provide habitat for wildlife, specifically bats, and as a voluntary conservation measure were included as an impact and mitigated for. This number also includes the trees to be removed at Raging Buffalo Snowboard Ski Park. About 235 trees will be impacted at Raging Buffalo Snowboard Ski Park. Improvements to Raging Buffalo Snowboard Ski Park are discussed in Section XII, Special Lands.

Both the EIS and the reevaluation determined that the project area does not impact prairie. The project does occur within an Illinois Department of Agriculture quarantine area for an invasive species of the Emerald ash borer. This was not previously evaluated in the EIS because the Emerald ash borer was not an issue at the time the EIS was completed.

Both the EIS and reevaluation have identified tree impacts. Additional tree impacts were identified during the reevaluation process.

### Proposed Mitigation

Tree replacement based on the IDOT Design and Environment (D&E) -18 departmental policy requires the replacement of trees within the project right-of-way to the extent practical. Where it is not practical to provide replacement plantings within the right-of-way, opportunities for plantings should be considered outside of the right-of-way or on other projects to achieve a long-term goal of providing at least as many replacement trees as the number removed. According to IDOT policy, if bare root or balled and burlapped trees are used for replacement plantings, a minimum ratio of 1:1 is recommended for the number of trees removed to the number of trees intended to be established. If seedlings are used, a minimum ratio of 3:1 is recommended. The mitigation ratio proposed for this project is 2:1, due to response to public comments, for a total of 11,530 trees. This exceeds D&E-18 and demonstrates environmental stewardship. A Tree Mitigation Plan has been prepared and can be found in Appendix C, Page C-12. Kane County plans to plant approximately 4,050 trees within the right-of-way of the Longmeadow Parkway and 7,500 trees on the west side of the Fox River within the Brunner Family Forest Preserve. Sizes, types and densities will be coordinated with the FPDKC.

## 2. Wildlife Resources

Both the EIS and reevaluation states that the project area contains wildlife that will be impacted; however, the project area does not contain breeding habitat for neotropical migrant species of birds. The EIS did not address the presence of nesting Bald eagles;

however, nesting Bald eagles have subsequently been observed in the project area. One confirmed Bald eagle nest is located approximately 1,330 feet southwest of the closest project limit. Since there is adequate distance between the project and this nest there will be no impact to this Bald eagle nest. One potential Bald eagle nest is located approximately 800 feet southwest of Karen Drive and Forest Drive. In April 2016, Great horned owls were documented using this nest. Per the US Fish and Wildlife Service (USFWS), since there is no information indicating that Bald eagles have ever utilized the nest but a Great horned owl was documented using the nest, a Bald eagle permit is not necessary. A memorandum prepared to summarize the Bald eagle survey is located in Appendix C, Page C-17. The Great horned owl is protected by the Migratory Bird Treaty Act.

Smallmouth bass was not evaluated during the EIS since there were no concerns regarding its populations at that time. Since that time, IDNR has conducted recent surveys and this information has been included in the reevaluation document. Per the Illinois Department of Natural Resources (IDNR), a 2015 fish survey was conducted in the project area and 250 Smallmouth bass were captured per hour. In 2014, an IDNR fish survey caught 358 Smallmouth bass per hour approximately one mile downstream. In comparison the largest amount caught on any other area within the Fox River basin was 154 per hour in 2012 (Fox River Basin Survey). The next highest catch was 95 per hour and the average for the Fox River was 38 per hour. Based on this comparison, the project area has a higher Smallmouth bass population than other areas in the Fox River Basin.

**Impacts**

There are no impacts anticipated to the Bald eagle, Great horned owl or Smallmouth bass.

**Proposed Mitigation**

Although, there are no impacts anticipated to Bald eagle, Great horned owl or Smallmouth bass commitments have been made to ensure their protection. Great horned owls were documented using the nest that is located approximately 800 feet southwest of Karen Drive and Forest Drive. Since the Great horned owl is protected by the Migratory Bird Treaty Act, the tree with the nest shall not be cleared until the young have fledged and the nest is not being used. Per the INHS, the Great horned owl nests between January 1 and May 31.

No in stream work will occur between April 1 and June 30. The in stream work restriction that is being implemented for listed threatened and endangered species will also protect the Smallmouth bass since no in stream work will occur while the Smallmouth bass is spawning.

**3. Threatened and Endangered Species**

In the EIS, no federally listed species were observed in the project area; however, the state listed Brown creeper was observed in the project area but no impacts were proposed. The Brown creeper was delisted in 2004.

On April 2, 2015, the USFWS listed the Northern long-eared bat as a threatened species, affording it protection under the Endangered Species Act. The project is within the range of the Northern long-eared bat; IDOT with concurrence from USFWS, has determined there is suitable habitat for the Northern long-eared bat in the project area.

State-listed species that occur within the vicinity of the project area include the state-listed threatened Blanding's turtle, threatened Starhead topminnow, and threatened Slippershell mussel. None of these species were State-listed threatened species, so none were listed in the EIS. The Starhead topminnow can be identified by its light olive tan back and upper sides with the lower sides and belly lighter to yellowish in color. There is a prominent dark blotch of color (similar to a teardrop) beneath its eye. The adult length is approximately two inches.

### a.  Federally-listed Species/Habitat

**Identify listed species or habitat in project area**

The federally listed species that occur in Kane and Cook Counties were compared to the habitat in the project area. IDOT, with concurrence from USFWS, determined that there may be suitable habitat for only the Northern long-eared bat in the project area. The following conservation measures will be implemented as part of this project:

- Trees will not be cleared from April 1 through September 30, consistent with tree clearing dates noted on the permits; and
- Impacts to trees will be mitigated at a 2:1 mitigation ratio per the tree Mitigation Plan, providing potential habitat for the Northern Long-eared bat.

The project is not likely to adversely affect the Northern long-eared bat. See Appendix C for documentation of the coordination between USFWS and IDOT.

**Impacts**

☐ No Effect

☑ May Effect

   ☑ Informal Consultation

   ☐ Formal Consultation

### b.  State-Listed Species

**Identify listed species or habitat in project area**

The in stream work restriction commitment listed in the 2002 ROD regarding the Greater redhorse and River redhorse is out of date. No record of the Greater redhorse exists in the project vicinity. A record of the River redhorse occurs approximately 2 miles downstream from the project. A record of the Starhead topminnow occurs approximately 2,000 feet downstream of the project and is not discussed in the 2002 ROD. Due to the potential presence of the River redhorse and the Starhead topminnow no in stream work in the Fox River shall occur between April 1 and June 30. In addition, a fish survey will be conducted during the summer of 2016 to document the existing habitat in the project area. Results of the survey will be incorporated into the FONSI. If any listed fish species are found, IDOT will implement commitments to protect the listed fish in consultation with IDNR.

In 2007, the Illinois Natural History Survey (INHS) conducted a mussel survey and found seven native species. No threatened or endangered species were collected. INHS stated that they "believe that the presence of listed mussel species is unlikely in the Fox River in the vicinity of the proposed Bolz Rd/Longmeadow Parkway. No listed species were found alive in the area during this visit or have been found alive in the last 50 years in a reach of the river from upstream of the Carpentersville dam to downstream of the Algonquin dam (INHS Mollusk Collection). Because of unsuitable habitat, only the most tolerant unionid mussel species, if any, typically are found in the impounded areas of the Fox River, and re-colonization from downstream sources is unlikely because dams block the upstream dispersal of glochidia-bearing fishes."

A shoreline mussel survey was conducted at the Fox River Bridge crossing by Huff & Huff (consultant) on June 11, 2014. Eighteen state threatened Spike mussel shells were found. Seventeen were considered dead more than 5 years. One was considered dead less than five years (ligament attached). A shell of the Slippershell mussel and a shell of the Purple wartyback mussel were found and considered dead for more than 5 years. The Illinois Natural Heritage Database does not have any records of listed mussels in the project vicinity.

The commitment regarding mussels in the 2002 ROD states "Prior to the start of construction, a population survey of live, non-invasive mussel species will be conducted in streams to be crossed. In the event that any live specimens of the Elktoe mussel or other non-invasive species are found, a mussel relocation program will be developed in consultation with the IDNR".

This commitment was written prior to the understanding of IDNR's Incidental Take Authorization process which became effective July 17, 2001. Thus, the commitment shall be changed to "A mussel survey will be conducted in the summer of 2016 to determine if any live threatened or endangered mussels exist in the project corridor. If a state listed mussel is found, an Incidental Take Authorization will be required before any in stream work in the Fox River will occur." Results of the survey will be incorporated into the EA Errata.

The Illinois Natural History Database contains a record of the State-listed threatened Blanding's turtle (*Emydoidea blandgii*) approximately 1,000 feet south of Longmeadow Parkway. The project was coordinated with the IDNR via an EcoCAT submittal dated March 24, 2015. IDNR responded via email dated March 25, 2015 and requested several commitments which will be implemented into the project plans along the area where there is high potential for Blanding's turtle.

The commitments listed regarding the Blanding's turtle are as follows:

- In order to assist in ease of movement for the Blanding's turtle, and decrease the likelihood of entrapment in the roadway, the proposed plan has been revised to demonstrate mountable curb and gutter along the entire south leg of the proposed construction limits.

- KDOT will educate and inform construction crews and all on-site personnel about the Blanding's turtle before work begins. The local agency will distribute photos (adult and juvenile) of the species and discuss the site management plan for responding to encounters in a training session and at the preconstruction site meeting. If a turtle is encountered on site, crews will be informed to immediately stop construction in the

surrounding area and contact the appropriate staff at IDNR as listed in the contractor's documents; keeping in mind it is a criminal act to handle a listed species. Personnel on site should watch the turtle until the proper authority arrives to alleviate the situation, keeping at a respectable distance. If the turtle moves, crews should mark the spot it was seen.

- The project area near Sleepy Hollow Road and Highmeadow Lane intersection (south of Longmeadow Parkway) may contain the route to a nesting site. Therefore, potential harm to transiting turtles is a concern. IDNR recommends limiting work at Sleepy Hollow Road and Highmeadow Lane intersection to between late October and late March, when this species is hibernating, to prevent construction activities from crushing or injuring juvenile or adult turtles.

- If construction cannot be limited to between late October and late March, exclusionary fencing should be installed along the construction limits of the intersection of Sleepy Hollow Road and Highmeadow Lane. The fencing should be in place from the end of March through October to prevent turtles from entering the construction areas. Daily inspections should occur for the first two weeks and then be maintained weekly throughout the construction period to ensure the exclusionary fencing has been properly installed (dug into the ground) and to check if any turtles are present on either side of the fence.

- Trenches along the construction limits of the intersection of Sleepy Hollow Road and Highmeadow Lane should be covered at the end of each work day. Before starting each work day, trenches and excavations should be routinely inspected to ensure no turtles (or other amphibians and reptiles) have become trapped within.

**IDNR Consultation results**

☑ Closed

  Date (04-24-2015)

☐ Open

Incidental Take Authorization

☐ Yes

☑ No

**Part VII.  Water Quality/Resources/Aquatic Habitats**

The EIS states that the project involves a waterbody, the Fox River, but would not affect the physical features of the stream and would not result in impacts that require mitigation. The EIS also states that other drainage ways crossed are intermittent and generally have watersheds that are less than one square mile. Culverts of various sizes will be used for these crossings. The EIS does not discuss impacts to the waterways under the Clean Water Act. In the EIS, the proposed bridge over the Fox River was designed to span the entire floodway with no piers

placed in the river. Due to the value engineering process, it was determined to be more economical to redesign the bridge crossing to allow piers in the river. Preliminary bridge designs indicate two piers located at the eastern and western edge of the river bank. One pier is also planned in the floodplain forest on the west bank of the Fox River. This placement minimizes any direct impact on the Fox River's water quality and related biological resources or recreational activities. Removal of a portion of the floodplain forest on the west bank during construction will be mitigated by erosion control practices and revegetation. Therefore, the crossing of the Fox River includes placement of piers in the river, and in the reevaluation, the project will affect the physical features of the stream and will result in impacts that require mitigation. The placement of piers in the Fox River will result in temporary increases of sedimentation and turbidity and impacts to boating and fishing.

The study area is located in two watersheds. The majority of the study area is located within the Fox River Watershed (Hydrologic Code [HUC] 07120006) and the very western portion of the project area is located in the Kishwaukee River Watershed (HUC 07090006).

The Biological Stream Characterization (BSC) that was discussed in the EIS is outdated. The BSC has since been updated and has become the Integrated Multiple Taxa in a Biological Stream Rating System. The following updates this section of the EIS. The portions of the rivers and creeks in the study area are not listed as Biologically Significant Streams in the IDNR Biological Stream Rating Report, "*Integrating Multiple Taxa in a Biological Stream Rating System*" (2008). The segment of the Fox River that passes through the study area has a "C" rating for diversity and a "C" rating for integrity. The diversity and integrity ratings are based on a score calculated from a dataset of similar samplings. The ratings are grouped into grades, from A (high) to E (low), for different ranges of scores.

The Illinois Environmental Protection Agency (IEPA) use supports (IEPA, 2000) were updated with the following information. The IEPA Integrated Water Quality Report and Section 303(d) List (February 2016) was reviewed to determine the "Use Support" of each of the assessed rivers and creeks that are located within the limits of the proposed improvements. The Fox River is not supporting aquatic life and fish consumption. Causes include alteration in stream-side or littoral vegetative covers, other flow regime alterations, dissolved oxygen, and polychlorinated biphenyls. Sources include habitat modification, impacts from hydrostructure flow regulation/modification, and unknown sources.

Wetlands were delineated in 2013 and surface waters located within the study area. Their locations are depicted on the Environmental Resources Exhibit (Figure 1). The surface waters (i.e. rivers and creeks) are described below. Wetlands are discussed in Part X.

There were ten waterways identified within the project limits and summarized in Table 9.

**Table 9**
**Waterway Summary**

| Site # | Waterway Type** | Function** | Dominant Vegetation (all strata) | FQI/ C-Value | Mapped Soil Type | NWI Classification | Kane County ADID Classification |
|--------|-----------------|------------|----------------------------------|--------------|------------------|--------------------|----------------------------------|
| 5 | Intermittent tributary/WOUS | F, C, WH | Tatarian honeysuckle | 8.0/4.0 | Senachwine silt loam (618E) | Hydrology line | Unrated stream |

| Site # | Waterway Type* | Function** | Dominant Vegetation (all strata) | FQI/ C-Value | Mapped Soil Type | NWI Classification | Kane County ADID Classification |
|---|---|---|---|---|---|---|---|
| 6 | Intermittent tributary/WOUS | F, C, WH | Black walnut, white mulberry, Siberian elm, clearweed, motherwort, stickseed, pinkweed, pokeweed, crowned beggarticks, black raspberry | 9.3/2.8 | Senachwine silt loam (618E) | None | None |
| 8 | Unnamed tributary/WOUS/ Forested wetland/ Wet meadow | F, C, T, S, E,WH | Silver maple, slippery elm, Norway maple, Amur honeysuckle, Tatarian honeysuckle, tall morning glory, reed canary grass, calico aster, orange jewelweed | 18.8/2.7 | Peotone silty clay loam (330A), Harpster silty clay loam (67A), Drummer silty clay loam (152A) | Hydrology line/ PEMA | NRCS Farmed Wetland |
| 10 | Fox River/WOUS | F, C, WH, M | None | -- | Water (W), Casco-Roadman Complex (969F) | R2UBH | High Quality River/Natural Open Water Wetland #100011 |
| 12 | Tributary/WOUS and associated wetlands | F, C, T, S, E,WH | Green ash, American elm, Tatarian honeysuckle, common buckthorn, stickseed, common reed | 11.7/2.5 | Casco-Rodman Complex (969E2) | None | None |
| 13 | Tributary/WOUS/ Wet meadow/ Open water pond/ Forested | F, C, T, S, E,WH | Box elder, common buckthorn, American elm, sugar maple, Missouri gooseberry, Tatarian honeysuckle, green ash, multiflora rose, curly dock, reed canary grass, orange jewelweed, fowl mannagrass, bittersweet nightshade | 16.1/2.5 | Casco-Rodman Complex (969E2) | PUBHh, | Artificial Pond #904 |
| 26 | Open Water Channel | F,C, WH | Black cherry, silver maple, | -- | Kidder loam (361E2) | None | None |

| Site # | Waterway Type* | Function** | Dominant Vegetation (all strata) | FQI/ C-Value | Mapped Soil Type | NWI Classification | Kane County ADID Classification |
|--------|----------------|------------|----------------------------------|--------------|------------------|--------------------|--------------------------------|
| | | | common buckthorn, Tatarian honeysuckle | | | | |
| 27 | Open Water Channel | F,C, WH | Black locust, box elder | -- | Kidder loam (361B) | None | None |
| 28 | Open Water Channel | F, C, WH | Box elder, bur oak, Virginia creeper, multiflora rose | -- | Kidder loam (361B) | None | None |
| 29 | Intermittent tributary/WOUS | F, C, WH | Sugar maple, eastern cottonwood, Tatarian honeysuckle, jumpseed | 2.1/1.5 | Senachwine silt loam (618E) | None | None |

*Wetland type is listed by IDOT classification on WIE forms.
** F = flood control, C = conveyance, T = treatment of surface runoff, S = sediment and nutrient uptake, E = erosion control, WH = wildlife habitat, M = moderation of temperature within the microclimate.
*Isolated is based on professional judgment in the field. The COE makes all final jurisdictional determinations. Isolated applies to the lack of hydrological connection to a "Waters of the U.S.

## Impacts

Impacts to waterways are summarized in Table 10. The existing waterway acreage is 4.50 acres. Impacts to the waterways total 0.652 acres.

Construction impacts to water resources in this corridor occur at the bridge crossing of the Fox River and at intermittent waterways within the corridor. The proposed bridge over the Fox River will impact the Fox River and associated floodway and floodplain due to placement of piers in the river. The proposed impact resulting from the piers in the river is 0.06 acres (see Site 10 in Table 10). Preliminary bridge designs indicate two piers located at the eastern and western edge of the river bank. One pier is also planned in the floodplain forest on the west bank of the Fox River. The placement of piers in the Fox River will result in temporary increases of sedimentation and turbidity and impacts to boating and fishing. The Fox River is not a continuously navigable waterway; there are dams at regular intervals with the nearest north in Algonquin and south in Carpentersville. All other drainage ways crossed are intermittent and generally have watersheds that are less than one square mile. The EIS did not specify impacts to other drainage ways besides the Fox River. Impacts to these drainage ways would involve culvert improvements. Impacts to waterways and the required mitigation for these impacts under the Clean Water Act is listed in Table 10.

Due to the size of the proposed Fox River crossing, a variety of construction practices may be utilized. Construction will be staged as much as possible from adjacent upland areas in order to minimize temporary impacts to wetlands and waterways. The width of the river at the proposed crossing likely precludes the ability to construct the bridge from the banks. As a result, it is anticipated that temporary causeways will be required. The size of the causeway would be limited to less than one-half the width of the river at any time during any construction stage. The causeway will be utilized to construct the bridge as needed.

A construction staging area is typically required at the base of a bridge to construct piers and erect beams. The staging area must be graded level adjacent to the piers to allow for the safe operation of cranes and drill rigs. Based on the crane size needed for this project, the staging area would occupy the entire proposed alignment area. Additional space would also be needed to create a level platform for crane operations. The area needed to create a level platform for crane operations would be located within the project corridor. Beam erection will be accomplished by conducting all crane operations from within the Fox River or from adjacent upland areas along the banks of the Fox River.

The temporary features within the Fox River are anticipated to be in place as long as 2 years during the construction of the Fox River Bridge. It is anticipated that the bridge construction will extend over two construction seasons.

**Proposed Mitigation**

The Clean Water Act requires mitigation for impacts to waterways. Proposed mitigation for the waterways are summarized in Table 10. The total mitigation required is 0.998 acres.

Removal of a portion of the floodplain forest area on the west bank during construction will be mitigated by erosion control practices and revegetation. The banks will be revegetated following construction. Vegetated ditches will be constructed for the majority of the corridor located on the west side of the Fox River. Curb and gutter with storm sewers will be used in the more urban areas east of the river. Outfalls will be protected with erosion protection measures such as rip rap or energy dissipaters.

The table below summarizes all the waterways delineated for this project, including type, watershed, jurisdictional status, Floristic Quality Index (FQI), impact, and mitigation ratios.

**Table 10**
**Total Waterway Impacts and Mitigation Summary**

| Site # | Watershed | JD Status | HQAR (Y/N) | Existing Waterway Acreage | Permanent Waterway Impact (Acres) | USACE Mitigation Ratio[1] | Kane County Mitigation Ratio[3] | Total Mitigation (Acres) |
|--------|-----------|-----------|------------|---------------------------|-----------------------------------|---------------------------|----------------------------------|---------------------------|
| 5 | Fox | USACE | N | 0.22 | 0.14 | 1.5:1 | N/A | 0.21 |
| 6 | Fox | USACE | N | 0.023 | 0.13 | 1.5:1 | N/A | 0.20 |
| 8 | Fox | USACE | N | 0.47 | 0.27 | 1.5:1 | N/A | 0.405 |
| 10 | Fox | USACE | N | 2.44 | 0.06 | 1.5:1 | N/A | 0.09 |
| 12 | Fox | USACE | N | 0.06 | 0.02 | 1.5:1 | N/A | 0.03 |
| 13 | Fox | USACE | N | 1.15 | 0.01 | 1.5:1 | N/A | 0.02 |
| 26 | Fox | Isolated | N | 0.10 | 0.01 | N/A | 2:1 | 0.02 |
| 27 | Fox | Isolated | N | 0.01 | 0.01 | N/A | 2:1 | 0.02 |
| 29 | Fox | USACE | N | 0.03 | 0.002 | 1.5:1 | 1.5:1 | 0.003 |
| | | | | 4.50 | 0.652 | | | 0.998 |

N/A Not applicable
High Quality Aquatic Resources (HQARs) include Advanced Identification (ADID) High Habitat Values (HHV) and High

Functional Value (HFV) sites, bogs, ephemeral pools, fens, forested wetlands, sedge meadows, wet meadows, seeps, streams rated Class A or B in the Illinois Biological Stream Characterization Study, streamside marshes, wet prairies, wetland supporting Federal or Illinois endangered or threatened species, and wetlands with a floristic quality index of 20 or greater or mean-C value of 3.5 or greater.

[1] Per the US Army Corps of Engineers (USACE), for non-HQARs the minimum mitigation ratio is 1.5:1, for HQARs the minimum is 5.5:1

[2] Per the IWPA, permanent impacts that are <0.5 acre are to be mitigated at either 2:1 (in-basin) or 3:1 (out-of-basin) and impacts >0.5 acre are to be mitigated at either 4:1 (in-basin) or 5.5:1 (out-of-basin).  In-basin mitigation will occur in the Fox River watershed.

[3] Per the Kane County Ordinance, Floristic Quality Index (FQI)<7=1:1 ratio, FQI>7 but <16= 2:1 ratio, FQI>16 but < 25 = 3:1 ration, FQI>25 is unmitigable.  However, mitigation for isolated wetland impacts upon more than one wetland within a site shall meet the standards of highest quality isolated wetland.

## Operational Impacts

Salt splash and spray impacts were discussed during the EIS.  The following additional information was not included in the EIS.  Specific calculations were completed for this project to assess potential chloride concentrations in the streams of the project area.  These calculations were completed using the U.S. Geological Survey (USGS) methodology, which is a standard estimating procedure.  The USGS methodology does not consider the effects of BMPs or detention basins in estimating water quality concentrations.  The results of these calculations indicate the chloride General Use Water Quality Standard of 500 mg/L would be achieved with one exception.  The daily maximum chloride concentration of the tributary to the West Branch of the South Tributary to the Fox River was estimated at 513 mg/L prior to any BMP or storm water treatment.  The upstream drainage area tributary to this location results in 0.14 square miles with intermittent flow.  Stormwater runoff from this area is directed to a stormwater detention basin prior to discharge.  This basin is anticipated to provide mixing and reduce chloride concentration peaks to below 500 mg/L.  This would require only a three percent reduction from estimated peak levels, which is achievable with such equalization.

Typically, detention basins do not show chloride removals when the concentrations vary from 16 to 200 mg/L; however, two studies did indicate 11 to 13 percent lower concentrations during winter events.  Primarily, the detention basins provide equalization of concentrations, which lowers the peak or maximum concentration discharged.  To achieve the water quality standard would only require a 3 percent reduction, which is anticipated to be achieved and maintain water quality in that tributary.

KDOT has been proactive in reducing the impacts of salt.  Through the use of computerized/calibrated salt spreaders and Global Positioning Systems (GPS), drivers can more accurately spread the correct amount of salt and better pinpoint the application of salt on its roads.  In addition, drivers cannot control the applications which are pre-programmed into the computers.  The trucks are regularly calibrated and spot checked.  Drivers also receive regular training on de-icing procedures.  KDOT continues to evaluate alternate deicers and is constantly monitoring and following the latest industry trends.  Currently, KDOT is utilizing Cargill ClearLane, an enhanced deicer/salt product that contains a pre-wetting agent.  The product adheres to the road surface more effectively than dry salt, minimizing loss of deicer from wind and traffic scatter, thereby reducing distribution to adjacent areas.

Potential impacts from increased roadway runoff due to this project are expected to involve minor short-term water quality degradation with no chronic effects.

## Part VIII.  Groundwater Resources

The EIS states that the upper sand and gravel aquifer is a public water supply aquifer within the project corridor.  In the east half of the corridor, the shallow sand and gravel aquifer is known as the Valparaiso Aquifer.  Two of the public supply wells in the City of Carpentersville, south of the proposed corridor, draw water from the Valparaiso Aquifer at a depth of 180 feet.  Most of the private wells on both sides of the Fox River extract water from the Valparaiso Aquifer.  The public wells reported in the project vicinity are 2,000 to 3,000 feet from the project corridor.  These wells are confined to the Valparaiso aquifer.  There are no changes to groundwater resources in the reevaluation.

### Impacts

According to the EIS and reevaluation, roadway excavation will not penetrate either of the aquifers above bedrock that are supplying water in the vicinity of the corridor.  No impedance to the groundwater flow toward the Fox River is anticipated considering the roadway section and alignment proposed.

Eleven private wells are located within 500 feet of the corridor and two within the ROW will need to be properly abandoned and capped.  One well is located on the northwest corner of Longmeadow Parkway and Randall Road and the other is located on Angelina Place, just east of the Fox River.  Since the EIS was approved, three wells along Angelina Place have been abandoned and capped.  No public wells were noted within 1,500 feet of the corridor.

As a result of the analysis, there are no new impacts to groundwater resources.

## Part IX.  Floodplains

According to the EIS, the Fox River has an identified floodplain at the crossing location.  The streambanks are undeveloped and include a floodplain forest on the western bank.  The EIS stated that impacts to the floodplain would include the installation of one bridge pier but no acreage of impact was provided.  The EIS further states that the proposed Bolz Road corridor has a transverse crossing of the Fox River floodplain and that the proposed bridge will span the entire designated floodway of the Fox River with no piers in the floodway and no construction below the 100 year flood elevation.  Therefore, there will be no significant impact to flood elevations or flood flow velocities.  Since the EIS, the design adjacent to the Fox River has been refined.  Floodplain fill is estimated at 0.57 acre-feet from fill generated from piers and walls.  Mitigation for fill in the floodplain will include providing sufficient compensatory storage.

## Part X.  Wetlands

According to the EIS, there were six wetlands delineated in 1995 by the Illinois Natural History Service (INHS) along the Longmeadow Parkway.  Only one of those wetlands (Wetland No. 5) would be directly affected by construction of the Build Alternative but this wetland was later converted to a detention pond during the EIS process and therefore was no longer considered a wetland.  Further information as to who converted the wetland to a detention basin was not provided in the EIS.  Therefore, no wetland impacts were proposed.

During subsequent Phase 1 studies, the INHS re-delineated the entire corridor and four additional wetlands in 2005 and 2007. This was done due to changes that were made to the shape of the proposed corridor between 1995 and 2005. The four additional sites were new project areas not included in the 1995 study. As part of the reevaluation, a wetland delineation was conducted in October 2013, utilizing the Regional Supplement to the Corps of Engineers Wetland Delineation Manual Midwest Region, and there were twenty wetlands delineated that are summarized in Table 11. Additional wetlands delineated between the EIS and reevaluation can be attributed to refined right-of-way necessary for construction of Longmeadow Parkway and detention requirements, which increased from when the EIS was prepared resulting in additional wetland impacts. Furthermore, impacts from side street improvements were not considered in the EIS. Adjacent development can also affect overland flow, drainage resulting in additional wetland areas over the past decade. In addition, the original wetland delineation followed procedures outlined in the "Corps of Engineers Delineation Manual (Technical Report Y087-1) which was the methodology used at that time. The current methodology used is the Regional Supplement to the Corps of Engineers Wetland Delineation Manual Midwest Region, this methodology is more inclusive as it uses specific regional indicators that were not considered as part of the older methodology used at the time of the EIS. It also appears that farmed wetlands were not delineated for the EIS, which accounts for an additional five wetlands that are described in the reevaluation that are not included in the EIS. At the time the EIS was prepared, farmed wetland delineations were not typically completed.

Site 1, 9, and 11 are classified as Advanced identification (ADID) wetlands on the Kane County wetland mapping high habitat and/or high function wetland value.

### Table 11
### Wetland Summary

| Site # | Wetland Type | Function** | Dominant Vegetation (all strata) | FQI/ C- Value | NWI Classification | Kane County ADID Classification |
|---|---|---|---|---|---|---|
| 1 | Wet meadow/ Marsh | F,T, S, E, WH | Sandbar willow, eastern cottonwood, black willow, reed canary grass, Canada thistle, cinnamon willow herb, narrow-leaved cattail | 16.7/3.1 | PEMC | HHV #917 |
| 1A | Wet meadow | F,T, S, E,WH | Barnyard grass, pinkweed, narrow-leaved cattail, sedge sp. | 13.1/2.7 | PEMC | None |
| 1B | Farmed | F,T, S, E,WH | Sandbar willow, river bulrush, giant ragweed Canada thistle, riverbank grape | 4.2/1.3 | None | None |
| 1C | Farmed | F,T, S, E,WH | Narrow-leaved cattail, corn, deer tongue grass | 12.7/2.3 | PEMCf | Wetland #650 and Wetland #651 |
| 2 | Farmed | F,T, S, E,WH | Box elder, elderberry, reed canary grass | 10.7/2.3 | None | NRCS Farmed Wetland |
| 3 | Wet meadow | F,T, S, E,WH | Box elder, silver maple, reed canary grass, riverbank grape | 9.4/2.0 | PEMF | Wetland #655 |
| 4 | Wet meadow | F,T, S, E,WH | Eastern cottonwood, red osier dogwood, reed canary grass, common reed | 12.2/2.5 | None | None |

| Site # | Wetland Type | Function** | Dominant Vegetation (all strata) | FQI/ C-Value | NWI Classification | Kane County ADID Classification |
|---|---|---|---|---|---|---|
| 7 | Forested | F, T, S, E,WH | Black cherry, common buckthorn, Tatarian honeysuckle, European high bush cranberry, green ash, moneywort, riverbank grape | 12.8/2.3 | None | HFV #643 |
| 8 | Unnamed tributary/WOUS/ Forested wetland/ Wet meadow | F, C, T, S, E,WH | Silver maple, slippery elm, Norway maple, Amur honeysuckle, Tatarian honeysuckle, tall morning glory, reed canary grass, calico aster, orange jewelweed | 18.8/2.7 | Hydrology line/ PEMA | NRCS Farmed Wetland |
| 9 | Forested | F, T, S, E,WH | Green ash, box elder, creeping Charlie, garlic mustard | 14.0/2.5 | PFO1A | HFV #643 |
| 11 | Forested | F, T, S, E,WH | Green ash, American elm, common buckthorn, riverbank grape | 16.9/2.5 | None | HFV #643 |
| 12 | Tributary/WOUS and associated wetlands | F, C, T, S, E,WH | Green ash, American elm, Tatarian honeysuckle, common buckthorn, stickseed, common reed | 11.7/2.5 | None | None |
| 13 | Tributary/WOUS/ Wet meadow/ Open water pond/ Forested | F, C, T, S, E,WH | Box elder, common buckthorn, American elm, sugar maple, Missouri gooseberry, Tatarian honeysuckle, green ash, multiflora rose, curly dock, reed canary grass, orange jewelweed, fowl mannagrass, bittersweet nightshade | 16.1/2.5 | PUBHh, | Artificial Pond #904 |
| 16 | Wet meadow | F, T, S, E, WH | Silver maple, common horsetail, giant ragweed, prairie cord grass | 4.4/1.4 | None | None |
| 18 | Marsh | F,T, S, E, WH | Narrow-leaved cattail | 7.7/2.6 | None | None |
| 19 | Farmed | F, T, S, E | Corn, barnyard grass | 0.0/0.0 | None | None |
| 20 | Farmed | F, T, S, E | Soybean | 0.0/0.0 | None | None |
| 23 | Wet meadow | F,T, S, E, WH | Box elder, common buckthorn, Tatarian honeysuckle, reed canary grass, common reed | 2.9/1.7 | None | None |
| 25 | Forested wetland/wet meadow | F, WH | Silver maple, American elm common buckthorn, reed canary grass, riverbank grape | 4.1/1.7 | None | None |
| 31 | Forested | F, C, T, S, E,WH | Shagbark hickory, common buckthorn, Tatarian honeysuckle, high bush cranberry | 4.9/3.5 | None | None |

* F = flood control, C = conveyance, T = treatment of surface runoff, S = sediment and nutrient uptake, E = erosion control, WH = wildlife habitat, M = moderation of temperature within the microclimate.
*Isolated is based on professional judgment in the field. The USACE makes all final jurisdictional determinations. Isolated applies to the lack of hydrological connection to a "Waters of the U.S".

## Impacts

Longmeadow Parkway will impact eleven wetlands for a total acreage of 4.16 acres (2.37 acres jurisdictional and 1.79 acres isolated) that are summarized in Table 12.  The Wetland Impact Evaluation is included in Appendix C.

## Proposed Mitigation

☐ On-site

☐ Off-site

☑ Wetland Bank

## Description

Considering USACE, Interagency Wetland Policy Act (IWPA), and Kane County mitigation ratios, the total required wetland mitigation is 17.13 acres.   Mitigation credits will be purchased from a wetland bank site in Fox River Basin.

The table below summarizes all the wetlands delineated for this project, including type, watershed, jurisdictional status, Floristic Quality Index (FQI), impact, and mitigation ratios. There are three mitigation ratios based on the Clean Water Act, Interagency Wetlands Policy Act and the Kane County ordinance.  The highest mitigation ratio out of the three will be used.  The highest mitigation ratio has been bolded in Table 12.  The total mitigation required is 17.13 acres.  The USACE has made final jurisdictional status determinations on all wetlands in Table 12 below per a letter dated June 2, 2014 to KDOT.

**Table 12**
**Total Wetland Mitigation Summary**

| Site # | Watershed | JD Status | HQAR (Y/N) | Existing Wetland Acreage | Permanent Wetland Impact (Acres) | USACE Mitigation Ratio[1] | IWPA Mitigation Ratio[2] | Kane County Mitigation Ratio[3] | Total Mitigation (Acres) |
|---|---|---|---|---|---|---|---|---|---|
| 1B | Kishwaukee | Isolated | N | 0.08 | 0.08 | N/A | **3:1** | 2:1 | 0.24 |
| 1C | Fox | USACE | N | 2.34 | 0.26 | 1.5:1 | **2:1** | N/A | 0.52 |
| 2 | Fox | Isolated | N | 1.69 | 1.15 | N/A | **4:1** | 2:1 | 4.60 |
| 3 | Fox | Isolated | N | 0.30 | 0.19 | N/A | **2:1** | 2:1 | 0.38 |
| 4 | Fox | Isolated | N | 0.17 | 0.17 | N/A | **2:1** | 2:1 | 0.34 |
| 7 | Fox | USACE | Y | 0.56 | 0.40 | **5.5:1** | 2:1 | N/A | 2.20 |
| 8 | Fox | USACE | N | 1.35 | 0.68 | 1.5:1 | **4:1** | N/A | 2.72 |
| 11 | Fox | USACE | Y | 1.36 | 1.03 | **5.5:1** | 4:1 | N/A | 5.67 |
| 16 | Kishwaukee | Isolated | N | 0.35 | 0.06 | N/A | **3:1** | 2:1 | 0.18 |
| 20 | Fox | Isolated | N | 0.48 | 0.13 | N/A | **2:1** | 2:1 | 0.26 |
| 31 | Fox | Isolated | N | 0.03 | 0.01 | N/A | **2:1** | 2:1 | 0.02 |

| Site # | Watershed | JD Status | HQAR (Y/N) | Existing Wetland Acreage | Permanent Wetland Impact (Acres) | USACE Mitigation Ratio[1] | IWPA Mitigation Ratio[2] | Kane County Mitigation Ratio[3] | Total Mitigation (Acres) |
|--------|-----------|-----------|------------|--------------------------|----------------------------------|---------------------------|--------------------------|--------------------------------|--------------------------|
|        |           |           |            | 8.71                     | 4.16                             |                           |                          |                                | 17.13                    |

N/A Not applicable

High Quality Aquatic Resources (HQARs) include Advanced Identification (ADID) High Habitat Values (HHV) and High Functional Value (HFV) sites, bogs, ephemeral pools, fens, forested wetlands, sedge meadows, wet meadows, seeps, streams rated Class A or B in the Illinois Biological Stream Characterization Study, streamside marshes, wet prairies, wetland supporting Federal or Illinois endangered or threatened species, and wetlands with a floristic quality index of 20 or greater or mean-C value of 3.5 or greater.

[1] Per the USACE, for non-HQARs the minimum mitigation ratio is 1.5:1, for HQARs the minimum is 5.5:1

[2] Per the IWPA, permanent impacts that are <0.5 acre are to be mitigated at either 2:1 (in-basin) or 3:1 (out-of-basin) and impacts >0.5 acre are to be mitigated at either 4:1 (in-basin) or 5.5:1 (out-of-basin). In-basin mitigation will occur in the Fox River watershed.

[3] Per the Kane County Ordinance, FQI<7=1:1 ratio, FQI>7 but <16= 2:1 ratio, FQI>16 but < 25 = 3:1 ration, FQI>25 is unmitigable. However, mitigation for isolated wetland impacts upon more than one wetland within a site shall meet the standards of highest quality isolated wetland.


## Wetland Finding

A wetland finding is required by Executive Order 11990.

Various methods of avoidance and minimization were analyzed for the project, including reducing the typical roadway cross section by reducing lane and median widths. Lane widths were minimized from the standard 12 foot wide lanes to 11 foot wide lanes which minimize impervious surfaces and reduce environmental impact. On the east side of the Fox River, wetland impacts are being reduced through the use of retaining walls or Manufactured Structural Earth (MSE) walls at the bridge abutments and bridge approaches. These walls reduce the footprint of the bridge approach by eliminating the need for bridge cone grading. In addition, culverts at stream crossings are proposed to have natural bottoms or be sumped in cobblestone to maintain a natural substrate. Because of the proximity of the wetlands and WOUS to the proposed corridor alignment, impacts to wetlands and WOUS are unavoidable.

The proposed corridor alignment was shifted to avoid impacts to wetland Sites 1, 1A, 9, 25 and 33. Perimeter erosion control fencing will be placed adjacent to all wetland sites to prevent intrusion beyond the construction limits. Construction will be staged as much as possible from upland areas to eliminate mass grading and reduce potential for erosion and sedimentation.

Based on the above considerations, the determination is that there is no practicable alternative to the proposed construction and impact to wetlands and that the proposed action includes all practicable measures to minimize harm to wetlands that may result from such use.

## Part XI.  Special Waste

The proposed project will not require any right-of-way or easement from any Comprehensive Environmental Response, Compensation and Liability Information System (CERCLIS) site. The only Resource Conservation and Recovery Act (RCRA) generator in the project vicinity is Meyer Material Company but there were no violations on file and the area groundwater gradient is parallel to the proposed corridor. Just west of the Meyer Material Company is the

Fox Valley Gun Club with a small arms shooting range located within the proposed corridor. There is a potential for lead contamination at this location.

A Preliminary Environmental Site Assessment (PESA) was conducted as part of the reevaluation. According to the PESA review dated December 18, 2014 prepared by the Illinois State Geological Survey (ISGS), there were five Recognized Environmental Conditions (RECs) and *de minimus* conditions at 34 sites along the project corridor. The Special Waste Review is attached as Appendix D, Page D-2. A Preliminary Site Investigation (PSI) will need to be completed to determine if any of the sites or Right-of-Way (ROW) adjacent to the sites will be impacted with the proposed work and/or if any ROW will be required at any of the locations.

## Part XII. Special Lands

Special lands for the north region included the Fox River Trail, FPDKC properties of Algonquin Shores and Fox River Shores, and the Dundee Township Park District Hickory Hills site. The Algonquin Shores Forest Preserve is north of Bolz Road between the Fox River and Williams Street. The Fox River Shores Forest Preserve is south of Bolz Road along both banks of the Fox River to about Lake Marian Road. The Hickory Hills site is located north of Bolz Road between Illinois Route 62 (Algonquin Road) and Illinois Route 25 in unincorporated Kane County. The EIS stated that 2.12 acres of Algonquin Shores/Fox River Shores and 6.64 acres of Hickory Hills would be impacted by the Longmeadow Parkway. Since the EIS, Algonquin Shores has been incorporated into Fox River Shores; it is no longer a separate forest preserve property. The impacts to Hickory Hills remain at 6.64 acres in the reevaluation while the impacts to Fox River Shores increased to 2.96 acres. The IGA between KDOT and Dundee Park District is included in Appendix A, Page A-17. A timeline of the coordination between KDOT and Dundee Park District is included in Appendix A, Page A-45.

New work is proposed at the Buffalo Park Forest Preserve and the Fox River Shores Forest Preserve.

After the ROD was issued, the Brunner Family Forest Preserve was established by the FPDKC. FPDKC worked with the KDOT to jointly plan the Brunner Family Forest Preserve to reserve a corridor within it for the Longmeadow Parkway. Additional temporary work is now proposed within the Brunner Family Forest Preserve.

A letter from KDOT to the Federal Highway Administration detailing the history of the Brunner property is attached as Appendix E and the following exhibits to this letter also are attached and summarized below.

- Exhibit I includes reference to the Final EIS and Section 4(f) Evaluation.
- Exhibit II includes an excerpt from the ROD.
- Exhibit III includes an email regarding the Brunner parcel acquisition.
- Exhibit IV includes an article on the Brunner Farm site.
- Exhibit V includes a letter between KDOT and the FPDKC regarding Algonquin Shores FPDKC and the Brunner parcel.
- Exhibit VI includes an intergovernmental agreement between the County and the FPDKC.
- Exhibit VII includes a letter from the County to Fred Brunner regarding impacts to the Brunner parcel.

- Exhibit VIII includes an affidavit from John Hoscheit (Commissioner and President of the FPDKC) regarding the coordination efforts of the FPDKC with the Longmeadow Parkway project.
- Exhibit IX is the 2030 Land Resource Management Plan and map showing the Longmeadow Parkway alignment.
- Exhibit X is an amendment to the intergovernmental agreement between the County and the FPDKC extending the termination date from January 1, 2005 to January 1, 2010.
- Exhibit XI and Exhibit XII include letters from the County to Suburban Trust and Savings Bank regarding property acquisition.
- Exhibit XIII includes the FPDKC Executive Committee Meeting Minutes.
- Exhibit XIV includes an article regarding the purchase of the Brunner property by the FPDKC.
- Exhibit XV is the resolution establishing the intent of the intergovernmental agreement between the County and the FPDKC.
- Exhibit XVI is the resolution authorizing the execution of an intergovernmental agreement with Kane County
- Exhibit XVII is the warranty deed
- Exhibit XVIII is the Transportation Committee Meeting Minutes dated June 16, 2015.
- Exhibit XIX is the restatement of agreements between KDOT and the FPDKC regarding the Longmeadow Parkway Extended.
- Letters from FHWA to homeowners regarding Section 4(f) concerns
- Buffalo Park Temporary Occupancy Letter

Additional information regarding each of these forest preserves, proposed improvements and impacts are described below.

## 1.  Section 4(f)

**Perry-Lathrop property**

The Perry-Lathrop property is located along the east side of Illinois Route 31 at 19N045. The project will take approximately 0.23 acres of frontage from the Perry-Lathrop property. This property is considered eligible for inclusion on the National Register of Historic Places and is therefore protected under Section 4(f).

An approximately 40 feet wide strip of land will be taken in front of the Perry Lathrop House. The only impact will be visual and a landscape plan will be developed and submitted for State Historic Preservation Office (SHPO) approval for the area adjacent to the Perry Lathrop property prior to construction.  The parcel to the south and east of the Perry Lathrop property, known as the Melva property, will be acquired by the County and transferred to the FPDKC. The Melva property will be transferred to the Forest Preserve District of Kane County and will be maintained in perpetuity as greenspace.

The Illinois SHPO was notified that FHWA intended to make a *de minimis* determination based upon their concurrence with the "no adverse effect" finding. The Illinois SHPO concurred in a letter dated July 7, 2016 (located on Page A-60 in Appendix A).

The FHWA has determined that the use of the Perry-Lathrop property, including the measures to minimize harm described above, will have a *de minimis* impact, as defined in 23 CFR 771.17, on the property.

**Buffalo Park Forest Preserve**

There is no Section 4(f) use of the Buffalo Park Forest Preserve.

Buffalo Park Forest Preserve, which is owned by the FPDKC, is located just north of the Longmeadow Parkway project limits and is considered a Section 4(f) resource. Buffalo Park Forest Preserve was acquired in the 1980's and is approximately 29 acres. Features, attributes and activities at this preserve that qualify it for protection under Section 4(f) include picnic areas, a loop trail for walking and biking, access to fishing, several parking areas and restrooms. Within the Buffalo Park Forest Preserve is the Raging Buffalo Snowboard Ski Park, woodlands and the Fox River shoreline. The FPDKC is planning to expand the Raging Buffalo Snowboard Ski Park, including additional parking, a new building and a larger snowboarding hill.

Excavation for the Longmeadow Parkway project will create approximately 524,000 cubic yards of excess material that requires disposal. KDOT and FPDKC have worked together on a plan to use the excess material to improve the snowboarding hill within the Raging Buffalo Snowboard Ski Park. In order to move the material to the Raging Buffalo Snowboard Ski Park, a temporary haul road will be constructed in both the Buffalo Park Forest Preserve and the Brunner Family Forest Preserve. This road will be used solely to haul material to the snowboarding hill. A concept plan showing the proposed improvements is located in Appendix E, Page E-100.

The construction activities within the Buffalo Park Forest Preserve are considered a temporary occupancy because it is so minimal that it does not constitute a use within the meaning of Section 4(f). Pursuant to 23 C.F.R. 774.13(d), the following conditions will be satisfied:

(1) Duration will be temporary, i.e., less than the time needed for construction of the project and there will be no change in ownership of the land.
(2) The scope of the work is minor and the magnitude of changes to the Section 4(f) property are minimal.
(3) There are no anticipated permanent adverse physical impacts, nor will there be interference with the protected activities, features, or attributes of the property, on either a temporary or permanent basis.
(4) The land will be fully restored and the property will be returned to a condition which is at least as good as that which existed prior to the project; and
(5) There is a documented agreement with the official with jurisdiction over Buffalo Park Forest Preserve. (See Appendix E, Page E-117)

**Brunner Family Forest Preserve**

There is no Section 4(f) use of the Brunner Family Forest Preserve.

The Brunner Family Forest Preserve is approximately 741 acres and is located adjacent to the Longmeadow Parkway north and south of the corridor, west of the Fox River. This forest preserve was established in October 2008, after the ROD for this project was issued. Features, attributes and activities at this preserve that qualify it for protection under Section 4(f) include a picnic shelter, informational kiosk, fishing access, interpretive signs, parking lot, restrooms and five miles of trails.

A corridor within the Brunner Family Forest Preserve was formally reserved for the Longmeadow Parkway before the forest preserve was established, based on the alignment established in the ROD. The Longmeadow Parkway was a jointly planned transportation facility between FPDKC and KDOT prior to the FPDKC acquiring this land from the Brunner family. The FPDKC closed on the property on October 1, 2008 and right-of-way was transferred to KDOT on April 14, 2009 for the Longmeadow Parkway project. A map showing the location of Longmeadow Parkway within Brunner Family Forest Preserve is included in Appendix E, Page E-28. A complete history of the Brunner Family Forest Preserve acquisition process is attached as Appendix E, Page E-1 through E-78.

Pursuant to 23 CFR 774.11(i), when a property is formally reserved for a future transportation facility before or at the same time a park, recreation area, or wildlife and waterfowl refuge is established and concurrent or joint planning or development of the transportation facility and the Section 4(f) resource occurs, then any resulting impacts of the transportation facility will not be considered a use. Because the Longmeadow Parkway was a concurrent and jointly planned facility with the Brunner Family Forest Preserve, there is not a Section 4(f) use of the Brunner Family Forest Preserve.

A temporary haul road will also be constructed in the Brunner Family Forest Preserve, which was not identified in the EIS. This haul road is outside of the original footprint of what was in the joint agreement and will be used solely to haul material to the snowboarding hill at the Buffalo Park Forest Preserve. The construction activities within the Brunner Family Forest Preserve for the hauling of material to the snowboarding hill are considered a temporary occupancy because it is so minimal that it does not constitute a use within the meaning of Section 4(f). Pursuant to 23 C.F.R. 774.15(d), the following conditions will be satisfied:

   (1) Duration will be temporary, i.e., less than the time needed for construction of the project and there will be no change in ownership of the land.
   (2) The scope of the work is minor and the magnitude of the changes to Section 4(f) property are minimal.
   (3) There are no anticipated permanent adverse physical impacts, nor will there be interference with the protected activities, features, or attributes of the property, on either a temporary or permanent basis.
   (4) The land will be fully restored and the property will be returned to a condition which is at least as good as that which existed prior to the project; and
   (5) There is documented agreement with the official with jurisdiction over Brunner Family Forest Preserve. (See Appendix E, Page E-117)

KDOT plans to plant approximately 7,500 trees on the west side of the Fox River within the Brunner Family Forest Preserve. Sizes, types and densities will be coordinated with the FPDKC.

**Fox River Shores Forest Preserve**

There is a Section 4(f) use of the Fox River Shores Forest Preserve; however, it qualifies as a *de minimis* impact.

Fox River Shores Forest Preserve, which is owned by the FPDKC, is an approximately 393 acre site located within the Longmeadow Parkway project limits on the east and west sides of the Fox River. It is bordered by the Brunner Family Forest Preserve to the north and the Raceway Woods Forest Preserve to the southwest. Within the Fox River Shores Forest Preserve is the Fox River Trail, woodlands and the Fox River shoreline. There are several features, attributes and activities at this preserve that qualify it for protection under Section 4(f). The Fox River Shores Forest Preserve includes the Fox River Trail bike path running the length of the preserve. There also is a picnic area, shelter, restrooms, fishing and boat launch along the Fox River near the south end of the preserve.

Included as part of the Longmeadow Parkway project are several improvements to the Fox River Trail. A new connection to the Fox River Trail will be provided from Longmeadow Parkway, which will provide a connection across the Fox River, and a connection between both Forest Preserves. This will require 0.9 acres of temporary easement to re-align the trail. A detention pond will be constructed under the proposed Fox River Bridge and just west of the realigned bike path to provide storage for storm water runoff from Longmeadow Parkway. This will enhance water quality within the area. A MSE wall will be constructed where the current Fox River Trail crosses under the proposed Longmeadow Parkway alignment, requiring the trail to be realigned. This will require 2.06 acres of permanent right-of-way from the Forest Preserve property.

This project will result in the use of the Fox River Shores Forest Preserve, a Section 4(f) resource. On May 3, 2015, KDOT published a notice to offer the opportunity for the public to comment on the effects of the project on the protected activities, features, or attributes. The majority of the comments received during this public notice did not pertain to the impacts of the Fox River Shores Forest Preserve improvements. The most prevalent comment relevant to this notice was that the Fox River Shores impacts were adverse enough that this work should not be considered for *de minimis* processing. Other comments included displeasure at the loss of right-of-way at Fox River Shores and the additional disruption of a third forest preserve. In a letter dated May 24, 2016, the FPDKC was notified that FHWA intended to make a *de minimis* impact finding and on June 17, 2016 the FPDKC concurred in writing that the project will not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection. These letters can be found in Appendix E on Page E-124 and Page E-125. The agreement between the KDOT and FDPKC about the right-of-way acquisition in the Fox River Shores Forest Preserve can be found in Appendix E on Page E-79.

FHWA hereby makes a *de minimis* impact finding for this use as it will not adversely affect this resource's features, attributes, or activities that qualify the property for protection under Section 4(f). The *de minimis* impact finding is based upon the impact avoidance, minimization, and mitigation or enhancement measures detailed in the documentation submitted and included in at the end of this document.

**2.  Section 6(f)**

Description

The Hickory Hills site is a Section 6(f) and 4(f) property and is located north of Bolz Road between Illinois Route 62 (Algonquin Road) and Illinois Route 25 in unincorporated Kane County.  The EIS stated that 6.64 acres of Hickory Hills would be impacted by the Longmeadow Parkway and determined there were no feasible and prudent alternatives and documented all possible planning to minimize harm to the Section 4(f) resource.  The impacts to Hickory Hills remain at 6.64 acres in the reevaluation.  The total mitigation for the 6.64 acres is 19.5 acres.  The Park District received 4.132 acres in 2006 and 10 acres in 2016.  There is currently 5.414 acres pending to be transferred to the Park District.  The IGA between KDOT and FPDKC is included in Appendix A, Page A-7.

**3.  Open Space Lands Acquisition and Development (OSLAD) Act Lands**

Description

There are no Open Space Lands Acquisition and Development (OSLAD) lands identified in the EIS and this remains unchanged in the reevaluation.

**4.  Illinois Natural Area (INAI) Sites**

Description

There were no INAI sites identified in the EIS and this remains unchanged in the reevaluation.

**5.  Nature Preserves**

Description

There were no nature preserves identified in the EIS and this remains unchanged in the reevaluation.

**6.  Land & Water Reserves**

Description

There were no land and water reserves identified in the EIS and this remains unchanged in the reevaluation.

**Environmental Commitments**

Commitments listed in the EIS included the following:

1. As part of the Congestion Management Study, Pace requested the right to review any proposed plans to ensure compatibility with existing or proposed bus service. When Phase 1 plans are developed, Pace will be provided copies of the relevant portion for their input.

2. For all corridors in areas of near surface granular materials, drainage ditch lining shall be used, if drainage ditches are used, to reduce potential for infiltration of spills and other runoff contaminants.

3. Due to the potential presence of River redhorse and the Starhead topminnow, no in stream work in the Fox River shall occur between April 1 and June 30. In addition, a fish survey will be conducted in the summer of 2016 to document the existing habitat in the project area. If any listed fish species are found, IDOT will implement commitments to protect the listed fish in consultation with IDNR.

4. The commitment in the 2002 ROD which states "Prior to the start of construction, a population survey of live, non-invasive mussel species will be conducted in streams to be crossed. In the event that any live specimens of the Elktoe mussel or other non-invasive species are found, a mussel relocation program will be developed in consultation with the IDNR" was written prior to the understanding of the Incidental Take Authorization process which became effective July 17, 2001. Thus, the commitment shall be changed to "A mussel survey will be conducted in the summer of 2016 to determine if any live threatened or endangered mussels exist in the project corridor. If a state listed mussel is found, an Incidental Take Authorization will be required before any in stream work in the Fox River will occur."

5. As plans for the corridor are developed, ongoing coordination will take place with Pace and Metra to ensure the maximum practical inclusion of Travel Demand Reduction (TDR), Operational Management Strategies (OMS), and mass transit extensions and improvements in the project.

6. A system of Stormwater Management ponds will be built to comply with, as a minimum, the Kane County Stormwater Management ordinance and, where feasible, to extend residence time to promote sediment removal and dilute the release of the accumulated deicing agencies. Ponds will be lined to diminish interaction with groundwater.

7. Wetland mitigation for direct impacts will be provided in accordance with the more stringent of the USACE, IDNR and Kane County requirements and policies. Credits from a wetland bank site from the same wetland basin will be purchased before the project is included on a letting.

8. Erosion and Sediment Control during construction shall comply with the requirements of the Kane County Stormwater ordinance. The construction plans for each phase shall have the Erosion and Sediment control plans reviewed by the Kane County Nature Resources Department.

9. Compensatory Storage for fill within the regulatory floodplain will be provided in accordance with the more stringent requirements of the Kane County Countywide Stormwater Ordinance of IDNR-Office of Water Resource (OWR) policies.

10. Coordination will be carried out with SHPO prior to the construction of any corridor where potential archaeological sites exist to allow documentation of the site.

11. Coordination will be carried out with SHPO as plans for the Bolz Road Corridor (Longmeadow Parkway) are developed to allow coordination on minimizing the impacts to the Perry Lathrop property.

Additional commitments that KDOT has agreed to follow since the EIS include the following:

1. In order to assist in ease of movement for the Blanding's turtle, and decrease the likelihood of entrapment in the roadway, the proposed plan has been revised to demonstrate mountable curb and gutter along the entire south leg of the proposed construction limits.

2. KDOT will educate and inform construction crews and all on-site personnel about Blanding's turtle before work begins. The local agency will distribute photos (adult and juvenile) of the species and discuss the site management plan for responding to encounters in a training session and at the preconstruction site meeting. If a turtle is encountered on site, inform crews to immediately stop construction in the surrounding area and contact the appropriate staff at IDNR as listed in the contractor's documents; keeping in mind it is a criminal act to handle a listed species. Personnel on site should watch the turtle until the proper authority arrives to alleviate the situation, keeping at a respectable distance. If the turtle moves, crews should mark the spot it was seen.

3. The project area at Sleepy Hollow Road and Highmeadow Lane (south of Longmeadow Parkway) may contain the route to a nesting site. Therefore, potential harm to transiting turtles is a concern. IDNR recommends limiting work at Sleepy Hollow Road and Highmeadow Lane to between late October and late March, when this species is hibernating, to prevent construction activities from crushing or injuring juvenile or adult turtles.

4. If construction cannot be limited to between late October and late March, exclusionary fencing should be installed along the construction limits at the intersection of Sleepy Hollow Road and Highmeadow Lane. The fencing should be in place from the end of March through October to prevent turtles from entering the construction areas. Daily inspections should occur for the first two weeks and then be maintained weekly throughout the construction period to ensure the exclusionary fencing has been properly installed (dug into the ground) and to check if any turtles are present on either side of the fence.

5. Trenches along the construction limits at the intersection of Sleepy Hollow Road and Highmeadow Lane should be covered at the end of each work day. Before starting each work day, trenches and excavations should be routinely inspected to ensure no turtles (or other amphibians and reptiles) have become trapped within.

6. Trees shall not be cleared from April 1 through September 30 to protect the Northern long-eared bat.

7. Impacts to trees shall be mitigated in accordance with the Tree Mitigation Plan developed for the Longmeadow Parkway project.

8. Instead of providing clay lined ditches as described in Item 2 of the EIS commitments, current BMP's will be provided that allow for infiltration. See Appendix G, Page G-165 for the Errata Sheet to the ROD.

9. Water wells that are within 200-feet of the project will be properly capped and abandoned unless they can be demonstrated that the well is deep, properly cased, and not hydraulically connected to the surface. If the dwelling associated with the water well will remain after construction is completed, the water well will be replaced or another suitable alternative will be provided. The water well will be constructed such that susceptibility to surficial contamination is minimized, for example, by constructing the well in a deeper aquifer.

10. A PSI shall be completed before the project is included on a letting to determine if any of the sites or ROW adjacent to the sites will be impacted with the proposed work and/or if any ROW will be required at any of the locations identified in the PESA.

11. Great horned owls were documented using the nest that is located approximately 800 feet southwest of Karen Drive and Forest Drive. Since the Great horned owl is protected by the Migratory Bird Treaty Act, the tree with the nest shall not be cleared until the young have fledged and the nest is not being used. Per the INHS, the Great horned owl nests between January 1 and May 31.

**Permits/Certifications Required**

There were no permitting requirements stated in the EIS. The following permits will be required for the Longmeadow Parkway project:

- An Individual Section 404 permit from the USACE including separate Water Quality Certification from the IEPA will be required due to impacts to wetlands and WOUS. This will require review and approval of the soil erosion and sediment control plans from the Kane DuPage Soil and Water Conservation District
- Construction permits from IDNR Office of Water Resources (OWR) will be required for fill placed in the floodway
- A National Pollutant Discharge Elimination System (NPDES) Permit will be required from the IEPA for construction disturbance greater than 1 acre.

**Public Involvement**

Public involvement occurred during the original EIS. According to the EIS, in May and June of 1993, public meetings were held in the South, Central, and Northern regions of the project area. The purpose of these meetings was to introduce the public and officials to the project and solicit their opinions and insights into the potential corridors. General concerns were expressed about whether the project or any of the corridors are warranted and questions were raised whether there were less intrusive options than building new roads. More specific concerns focused upon intrusion into parklands and impacts to wetlands as well as displacements. The second public meeting was held on February 16, 1994. This meeting was held when consideration was being given to dropping corridors from further study. The purpose of this meeting was to present the corridors with their known impacts so the public could comment before finalizing the recommendations of the draft *Corridor Analysis Document*. In general, a recommendation to discontinue further study of a corridor evoked no negative response. The third series of public meetings were held in May 1995. Separate meetings were held in the North, Central and South

Regions. At these meetings only five corridors that were being advanced for further study were presented. The Bolz Road (Longmeadow Parkway) corridor did not evoke much response. A series of public hearings were held in July 1998 at four locations with Kane County. The North Region hearing was held at the Randall Oaks Golf Club in West Dundee. Much of the commentary at this hearing focused on the Bolz Road Corridor (Longmeadow Parkway), with the majority of comments in opposition to the corridor for a variety of reasons. All public involvement prior to the signing of the ROD is documented in the EIS (Record of Public Hearings, Comments to the Release of the Draft EIS and Responses).

After approval of the EIS and ROD, a Public Hearing was held on March 26, 2009. The purpose of this hearing was to present Longmeadow Parkway as a toll highway facility, thereby using tolls to fund construction of the facility. The toll facility would be an electronic collection and there would be no changes to the geometry as previously proposed. The documentation of this Public Hearing is contained in the "Technical Memorandum for the Fox River Bridge Crossings Final Environmental Impact Statement and Section 4(f) Evaluation" dated November 2009. Other public involvement activities have occurred to clarifying the impacts to individual property owners.

Several public meetings since 1990 have occurred at a variety of locations including municipalities, park districts, schools, libraries, golf clubs and community centers. A summary of public involvement meetings is provided in Appendix F including dates, venues, and topics.

## Agency Coordination

Agency coordination occurred during the original EIS. As documented in the EIS, in conformance with the NEPA/404 Process outside coordination was handled within the framework of meetings on the following concurrence points: 1) Purpose and Need, 2) Alternatives Carried Forward, and 3) Selected Alternative. The first scoping meeting was held May 26, 1993. At this meeting the scope of the project with probable range of proposed alternatives and schedule were presented. The second scoping meeting was held on December 1, 1993. The purpose of this meeting was to develop a consensus on the dropping from further evaluation corridors that did not satisfy the purpose and need or those corridors that had unacceptable impacts. Since the USACE was not represented a follow up meeting was held on January 19, 1994. The culmination of these efforts was the final Corridor Analysis Document which reduced the number of corridors under study to five. The corridors to be advanced were reduced to Bolz Road (Longmeadow Parkway), CC&P/Stearns Road, Red Gate, C&NW/Dean Street, and Mooseheart/Illinois Route 56. On March 2, 1995 a meeting was held to seek concurrence on the Purpose and Need statement and to prepare for Concurrence Point 2 by a limited presentation of the corridors still under study. On April 18, 1995 a meeting was held on Concurrence Point 2. The alternatives presented included the No-Build, Congestion Management System (CMS), and each of the proposed build alternative corridors. On April 27, 1995 a follow-up meeting was held with the USACE and USEPA to request a formal response. On July 19, 1995 another meeting was held to attempt to secure closure on Concurrence Points 1 and 2. Concurrence was received from USEPA, USACE, and USFWS with a caveat that it could be rescinded because of new relevant data. The Concurrence Point 3 was held on May 17, 2001. After a presentation on the three remaining corridors (Bolz Road [Longmeadow Parkway], CC&P/Stearns Road, and Illinois 56/Oak Street), the impacts and the proposed mitigation, USFWS, USEPA and USACE agreed that these three could be the selected alternatives.

Since the ROD was signed, agency coordination has continued between Kane County, IDOT, and agencies interested in the proposed project have involved issues regarding sensitive environmental resources and coordination has been on-going with the following agencies:

- Illinois Historic Preservation Agency
  - o Coordination included review of impacts resulting from Perry Lathrop House and the Melva property.
- U.S. Army Corps of Engineers
  - o Coordination included WOUS and wetland impacts as well as Northern long-eared bat coordination
    - Original Individual Permit (IP)         Pre-Application Meeting: 1/7/2014
    - Original IP Submittal: 7/11/2014
    - USACE Public Notice #1: 9/3/2014
    - IP Addendum Meeting: 10/30/2014
    - IP Addendum Submittal: 11/18/2014
    - Joint USACE/USFWS Meeting: 9/22/2015
    - USACE/IEPA Joint Public Notice #2: 12/9/2015
    - Permit currently pending review
- U.S. Environmental Protection Agency
- U.S. Fish and Wildlife Service
  - o Coordination included review and approval of Tree Mitigation Plan, Northern long-eared bat and Bald eagle concerns.
    - Joint USACE/USFWS Meeting: 9/22/2015
- Illinois Department of Natural Resources
  - o Coordination included protection of Smallmouth bass, Blanding's turtle, Starhead topminnow, Slippershell and Spike mussel, Greater and River redhorse
- Illinois Department of Natural Resources – Office of Water Resources
  - o Coordination regarding floodway and floodplain impacts
    - Original Submittal: 2/13/2015
    - Public Responses Submitted: 2/15/2016
    - Permit currently pending review
- Illinois Environmental Protection Agency
  - o Submittal: 3/27/2015
  - o IEPA Public Notice #1:4/17/2015
  - o USACE/IEPA Joint Public Notice #2: 12/9/2015
  - o Certification currently pending review

A major coordination effort in the reevaluation was devoted to potential Section 4(f) issues involving the FPDKC and the IDNR with regards to the Buffalo Park Forest Preserve, Fox River Shores Forest Preserve, and Brunner Family Forest Preserve. On-going coordination has been provided with the FPDKC and they have been an active participant in the process, including attending internal status meetings. Continued involvement will be required for ROW acquisition.

Besides Kane County, the proposed improvement involves the Villages of Algonquin, Barrington Hills, and Carpentersville. These communities along with the Villages of West Dundee, East Dundee, Gilberts, Huntley, Lake in the Hills, Sleepy Hollow, and McHenry County have been involved in the project throughout its duration.

## SECTION V. COMMENTS

Several comments from Section 4(f) and USACE public notices have been received and formal responses are included in Appendix G.

## SECTION VI. FIGURES AND APPENDICES

The following figures and appendices are incorporated as part of this Environmental Assessment Reevaluation:

Section 4(f) *De Minimis* for Fox River Shores Forest Preserve

**Figures**
Figure 1 – Environmental Resource Map
Figure 2 – Range in ADT Values
Figure 3 – Aerial Photographs Comparing Land Use

**Appendices**
Appendix A – Cultural Resources
Appendix B – Noise Analysis
Appendix C – Natural Resources
Appendix D – PESA Review
Appendix E – Section 4(f) Documentation
Appendix F – Significant Milestones and Public Meeting Summary
Appendix G – Public Comments and Reponses

# EXHIBIT

# 6

**Federal Highway Administration**

**FINDING OF NO SIGNIFICANT IMPACT**

**Longmeadow Parkway**
**Huntley Road to IL Route 62**
**Kane County, Illinois**

**PROJECT BACKGROUND**

The Federal Highway Administration (FHWA) issued a Final Environmental Impact Statement (FEIS) in November 2001 and a Record of Decision (ROD) in May 2002 for the Fox River Bridge Crossings in Kane County. In the ROD, three build corridors were identified as build alternatives and each of the corridors were identified as having independent utility, meaning that a decision to build or not build any one of the three corridors would not affect the decision on the other corridors. One of the corridors identified to be built was the "Bolz Road Corridor", which has subsequently been renamed the "Longmeadow Parkway" by the project sponsor, the Kane County Division of Transportation (KDOT). Within this document, the project will be referred to only as the Longmeadow Parkway.

After the issuance of the ROD, KDOT and the Illinois Department of Transportation (IDOT) continued to work to advance the project, including purchasing right-of-way, conducting public meetings, and preparing final design plans. Using local funds, KDOT began construction of a portion of the project, between Huntley Road and Randall Road, in April 2016.

In March 2009, KDOT held a public hearing to seek comments on the KDOT proposal to convert the Longmeadow Parkway Bridge to a tolled bridge to help fund construction. KDOT prepared a document titled "Technical Memorandum for the Fox River Bridge Crossings Final Environmental Impact Statement and Section 4(f) Evaluation" to document the effects of tolling the bridge. In a November 20, 2009 letter from FHWA to IDOT, FHWA concluded that the re-evaluation demonstrated that a supplemental Environmental Impact Statement (EIS) was not required based on the change from a non-tolled bridge to a tolled bridge.

In 2015, as KDOT prepared to begin construction on the project, FHWA determined a re-evaluation was necessary, due to new information and circumstances in the project area. FHWA was uncertain of the significance of the new impacts, and therefore required that an Environmental Assessment (EA) Reevaluation be prepared to assess the impacts of the changes, new information, or new circumstances (23 CFR 771.130(b)(2)). The purpose of the EA Reevaluation was to document the changes in impacts, in comparison to the impacts disclosed in the FEIS/ROD and 2009 Reevaluation, to assist FHWA in assessing the significance of the new impacts.

Per 23 CFR 771.130(a), an EIS must be supplemented, when:

(1) Changes to the proposed action would result in significant environmental impacts that were not evaluated in the EIS; or

(2) New information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS.

This document describes FHWA's decision with regard to the applicability of these two criteria for the Longmeadow Parkway project. The "context and intensity" of the impact was evaluated to determine if the impact was "significant". The criteria in 40 CFR 1508.27 were used to evaluate the context and intensity, and therefore the significance, in the changes to the impacts.

If the change, new information or new circumstance resulted in (1) no new impact to the environment, (2) a lessening of environmental impact, or (3) it resulted in a negligible change in environmental impact (e.g., *de minimis*), then the change was not considered a significant impact.

**PURPOSE AND NEED FOR THE PROJECT**

This section describes and summarizes the needs that were identified for the project in the original NEPA decision, describes changes in conditions that have occurred after the FEIS and ROD were issued, and evaluates if the purpose and need remains valid.

FEIS and ROD

The purpose and need for the Longmeadow Parkway was fully documented in the FEIS and ROD.

The need for the project was driven by the few number of bridge crossings of the Fox River, the existing bridge crossings experiencing congestion, and the existing crossings expected to exceed their capacity by the year 2010 due to increasing population in the area of the proposed project. There are four crossings in the project area, and their capacities were noted in the EIS. The crossings included, from north to south:

- IL Route 62/Algonquin Road Bridge (Village of Algonquin)
  - 30,000 vehicles per day (vpd)
- Huntley Road/Main Street Bridge (Carpentersville)
  - 16,000 vpd
- IL Route 72/Main Street Bridge (villages of East and West Dundee)
  - 24,000 vpd
- Interstate 90 (Northwest Tollway)
  - 99,000 vpd

In the 5.1 mile distance between the IL Route 62/Algonquin Road Bridge (within the Village of Algonquin) and the IL Route 72/Main Street Bridge (within the villages of East and West Dundee), there are no major river crossings. The Huntley Road/Main Street Bridge in Carpentersville within this area is a two-lane bridge that serves local, not regional traffic, and terminates at Lord Avenue, four blocks east of the Fox River.

The three objectives of the project were identified to be:

- Enhance the transportation network by reducing congestion and providing alternate and more direct routes;

- Serve existing land use in the region through efficient access to central business districts, public services, and employment and commercial centers; and

- Serve proposed land use in conformance to local and county land use and resource management plans, which encourage compact, contiguous growth for the eastern portion of the region and preserve the rural qualities of the western portion of the region.

Current conditions in the project area

**Transportation Network.** According to the U.S. Census, the population of Kane County has increased from about 208,000 people in 1960 to 515,269 people in 2010.

Northern Kane County continues to be one of the fastest growing areas in the Chicago region, as evidenced by 2014 projections from the Chicago Metropolitan Agency for Planning (CMAP). Kane County's population is projected to reach 789,295 by 2040, an increase of 53.2% over the 2010 population. CMAP expects a population increase of about 146,000 additional residents by the year 2040, within the four townships that are part of the Longmeadow Parkway corridor area. This population increase will add demand for an improved transportation network in the area.

There have been several roadway improvements in the project area after the completion of the EIS, including the following:

- Algonquin Bypass – this project includes a new roadway on new alignment to direct through traffic around downtown Algonquin on IL Route 31. The intent of the project was to alleviate congestion at the IL Route 31 and IL Route 62 intersection.
- I-90 Add Lanes – this project included reconstructing and expanding to six lanes from Randall Road to I-39 and reconstructing and expanding to eight lanes from I-294 to Randall Road. This project was intended to add capacity to the roadway and decrease travel times throughout the corridor. I-90 serves long distance and regional travel and is not intended to address local traffic.

- Main Street Bridge in Carpentersville – this bridge was reconstructed to replace the structurally deficient bridge over the Fox River. No capacity was added to the roadway.

The CMAP April 7, 2016 traffic projections below, show the traffic growth on the other crossings in this area, assuming the Longmeadow Parkway project is not built. This average daily traffic (ADT) projection, measured in vehicles per day (vpd), includes the recently completed Algonquin Bypass and I-90 widening in its model. The documentation from CMAP is included in the Errata document.

| Bridge Location | Roadway Capacity (vpd) | Current ADT (vpd) | No Build 2040 ADT (vpd) |
|---|---|---|---|
| IL Route 62/Algonquin Road Bridge | 30,000 | 37,000 | 47,000 |
| Huntley Road/Main Street Bridge | 16,000 | 26,000 | 31,300 |
| IL Route 72/Main Street Bridge | 32,000 | 32,000 | 42,600 |
| Interstate 90 | 132,000* | 110,000 | 146,400 |

* This value is an estimate for the additional lanes based on the capacity of I-90 before the improvements.

With the exception of I-90, additional capacity has not been added to the other three crossings listed above. Both current and projected traffic on these three crossings show that without any additional crossings, the bridges will continue to experience congestion and ADT in excess of the effective available capacity.

IL Route 72/Main Street is congested through East and West Dundee with numerous driveways and businesses fronting the road. The IL Route 62/Algonquin Road Bridge through Algonquin is consistently congested, due to lack of capacity through the intersection of Algonquin Road and IL Route 31 on the west side of the Fox River. Currently, the existing ADT is 37,000 while the capacity of the roadway for a 24-hour period is 30,000. The Huntley Road/Main Street Bridge, in Village of Carpentersville, is a two-lane bridge that primarily serves local traffic and terminates at Lord Avenue, four blocks east of the Fox River.

**Existing Land Use.** The existing bridges across the Fox River pass through the Central Business Districts (CBD) of Algonquin, Carpentersville and West Dundee. These routes are currently congested. Vehicles traveling through the CBD are disruptive to locally-oriented pedestrian and vehicular movement. The provision of an alternate east-west route will better serve the existing land use, reducing congestion by reducing the through traffic on these routes. This will also protect the historic integrity of the downtown areas by providing a more direct alternate route for some trips.

The area along Randall Road from Big Timber Road to IL Route 72 has continued to undergo commercial/warehouse/industrial development. In 2010, Dundee Township had 25,727 jobs. By 2040, this figure is expected to grow to 53,539. Immediately to the west in Rutland Township, employment is expected to grow from 2,707 to 18,681 (*Source: CMAP Population Summary, October 10, 2014).* This projected growth continues to support the original purpose and need for the project.

**Proposed Land Use.** This project continues to support the purpose to provide access to proposed land uses in the northern region of Kane County. Kane County's 2040 Transportation Plan was developed in concert with the ongoing Land Resource Management Plan update and supports local land use plans. The area west of the Fox River, including the Randall Road/I-90 corridor, continues to be a focus of growth in the northern region of Kane County. The communities of Algonquin and Carpentersville are continuing to develop the land in this area.

EA Reevaluation

The conditions and deficiencies in the roadway network that were identified in the 2002 ROD are still relevant today, and thus the essential elements of the purpose and need for this project are still valid. Population is projected to continue to grow, as well as traffic on the local roadway network, supporting the need for improving access across the Fox River.

The 2013 Design Report and EA Reevaluation utilize the 2040 traffic projections for engineering the roadway and assessing impacts.

**PROPOSED ACTION**

The proposed action is to construct a new highway (Longmeadow Parkway) between Huntley Road and IL Route 62, including a new bridge crossing over the Fox River in Kane County, Illinois. The proposed project corridor is located in the Villages of Algonquin, Carpentersville, Barrington Hills, and in unincorporated Kane County. The length of the project is approximately 5.6 miles, with another 3.7 miles of intersecting roadway improvements. In 2009, KDOT determined that the bridge over the Fox River will be tolled to assist in funding the project.

The location of the Longmeadow Parkway, as described in the FEIS and ROD, has not materially changed. During final design and preparation of engineering plans, refinements have been made including development of intersecting roadway improvements necessary for the Longmeadow Parkway project to be built.

The proposed Longmeadow Parkway typical section consists of two 11-foot lanes in each direction separated by an 18-foot landscaped barrier median. Intersection improvements along the Longmeadow Parkway would also be made. Signalized intersection improvements would be provided at Huntley/Boyer Road, Randall Road, Sleepy Hollow Road, IL Route 31, Bolz Road Connector, IL Route 25 and IL Route 62 (Algonquin Road). Sandbloom Road would pass under the new bridge over the Fox River and intersect with Bolz Road. The existing T-intersection of Huntley Road and Boyer Road would be reconstructed as a four-legged intersection. The proposed roadway would transition into Huntley Road on the west terminus into a two-lane cross section.

The construction of the Longmeadow Parkway should result in the following 2040 reduction in congestion on bridge crossings in the project area, and the resulting traffic on the Longmeadow Parkway Bridge.

| Bridge Segment | Current ADT (vpd) | No Build 2040 ADT (vpd) (1) | Toll Build 2040 ADT (vpd) | Build/No Build 2040 %Change |
|---|---|---|---|---|
| IL Route 62/Algonquin Road Bridge | 37,000 | 47,000 | 37,600 | -25% |
| Huntley Road/Main Street Bridge | 26,000 | 31,300 | 28,400 | -10% |
| IL Route 72/Main Street Bridge | 32,000 | 42,600 | 37,500 | -14% |
| Interstate 90 | 110,000 | 146,400 | 144,800 | -1% |
| Longmeadow Parkway over Fox River | - | - | 26,700 | - |

(1)  Updated CMAP projections from April 7, 2016

The following sections, "Changes to the Action" and "New Information and Circumstances", describe and assess the change in impacts that resulted from design changes to the project, implementation of new policies and regulations, listing of new threatened or endangered species, or other new information or circumstances that were discovered after the ROD was issued. The effects of tolling the bridge were previously evaluated and addressed in the 2009 reevaluation and a decision issued by FHWA; therefore, those effects are not evaluated in this document.

**CHANGES TO THE ACTION**

- **PIER IN THE FOX RIVER**

  In the FEIS and ROD, it was decided that there would be no piers in the Fox River for the Longmeadow Parkway (Bolz Road). The original design did not have any piers in the river but did have seven piers in the floodplain.

  During the design and the value engineering process, KDOT determined that placing a pier in the river would result in a more economical bridge structure. The current design includes one pier in the Fox River and four piers located in the floodplain. The impact will be minimized as the proposed pier in the Fox River will be located near the west shore and will leave the majority of the river open for recreational use. Attached are the plans showing the placement of piers in the original design and the placement of piers in the current design, as well as renderings of what the bridge would look like based on the original design and also based on

the current design. A boat launch is located at Fox River Shores Forest Preserve and this launch will be open during construction.

The current design has two less piers than the original design. Impacts to Waters of the US (WOUS) will be mitigated. The total WOUS impact from the pier in the river is 0.06 acres and mitigation required is 0.09 acres. Credits have already been purchased from wetland banks within the Fox River basin to mitigate for Waters of the US (WOUS) impacts. Compensatory storage is being provided in the basins adjacent to the Fox River to mitigate for floodway and floodplain impacts.

This change to the project resulted in a new impact not evaluated in the EIS and was evaluated for context and intensity.

CONTEXT ANALYSIS

There are three roadway crossings of the Fox River within 5 miles upstream and downstream of the proposed Longmeadow Parkway crossing including Algonquin Road to the north and West Main Street in Carpentersville and East Main Street in West Dundee to the south. All three of these crossings have piers in the water, two on Algonquin Road and three each on the Main Street bridges. In addition, there are two multi-use paths crossing over the Fox River which also have between four to five piers in the Fox River.

INTENSITY ANALYSIS

As defined in 40 CFR 1508.27(b), intensity is evaluated by examining the following 10 criteria.

1. *Impacts that may be both beneficial and adverse. A significant impact may exist even if the Federal agency believes that on balance the effect will be beneficial.*

   The beneficial effect of placing a pier in the Fox River is that the project costs are lowered in comparison to not placing one pier in the Fox River. The total permanent WOUS impact from the one pier in the Fox River is 0.06 acres and mitigation required is 0.09 acres. This WOUS impact will be mitigated at a 1.5:1 mitigation ratio based on the USACE's mitigation ratio that states that for non-high quality aquatic resources the minimum mitigation ratio is 1.5:1. The pier is being placed on the shoreline to minimize effects to recreational boating on the Fox River.

2. *The degree to which the action affects public health or safety.*

Including a pier in the river will not affect public health or safety.  During construction a cofferdam will be erected around the pier to prevent sediment from leaving the project site and limit boaters from entering the immediate area where construction is occurring.

3. *Unique characteristics of the geographic area such as proximity to historic or cultural resources, parklands, prime farmlands, wild and scenic rivers or ecologically critical areas.*

There are no historic or cultural resources, parklands, prime farmlands, or ecologically critical areas where the pier will be placed.  The Fox River is not designated as a wild or scenic river.  There is a population of Smallmouth bass within the project area.  The cofferdam and causeway will not be installed between April 1st and June 30th to avoid spawning season. No in stream work will occur in the Fox River between April 1 and June 30th.  The causeway and cofferdam will be constructed outside of this period between April 1 and June 30th but will remain in place during these dates.  To minimize effects to wildlife in the Fox River, the causeway will consist of clean large stone with no fine material.

4. *The degree to which the effects on the quality of the human environment are likely to be highly controversial.*

In NEPA terms, effects are considered to be "controversial" when technical and scientific experts in the field disagree on the effects of the impact on the human environment. Installation of piers in rivers and other waterways are common and the effects on the environment are well understood. The impact of one pier in the river is typical for a new bridge over a river and an impact of 0.06 acre is minimal for a new river crossing. The effects on the human environment of constructing and permanent placement of one pier in the Fox River for the Longmeadow Parkway Bridge are not controversial.  Recreational activities such as boating and fishing may still occur with the pier located in the Fox River.

5. *Degree to which possible effects on the quality of the human environment are highly uncertain or involve unique or unknown risks.*

Possible effects are highly certain and do not involve unique or unknown risks.  It is common for bridges to be built with piers in the river.  The WOUS impact of 0.06 acres from the one pier in the river is a definitive, highly certain, impact with no unknown risks.

6. *The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principal about a future consideration.*

All bridges over the Fox River within a five mile radius have piers in the river, with the majority having three or more piers in the river. Installing one pier in the Fox River is not setting a precedent for any future actions.

7. *Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.*

The construction of the Longmeadow Parkway project will not force improvements on other roadways. The action will not result in cumulatively significant impacts on the Fox River.

8. *The degree to which the action may adversely affect items listed or eligible for listing in the National Register of Historic Places, or other significant scientific, cultural or historic resources.*

The installation of the pier will not adversely impact any sites listed in or eligible for listing in the National Register of Historic Places or cause loss or destruction of significant scientific, cultural or historical resources.

9. *The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.*

Fish and mussel survey were conducted in Summer of 2016 and no threatened or endangered fish or mussels are located in the location of the pier. The pier in the river will not have an adverse effect on federally listed endangered or threatened species or critical habitat.

10. *Whether the action threatens a violation of Federal, State or local law or requirements imposed for the protection of the environment.*

The installation of the pier will not threaten a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

CONCLUSION

Based on the context and intensity of the impact, and considering the mitigation that will be implemented as part of this action, there is no significant impact resulting from the placement or long term inclusion of one pier in the Fox River.

- **ROADWAY CROSS-SECTION**

The ROD approved a typical cross-section of two 12 foot lanes in each direction separated by an 18 foot median.

During final design, the typical cross-section was changed to two eleven foot lanes in each direction separated by an 18 foot landscaped barrier median.

This change in the project resulted in a lessening of the roadway footprint; therefore, there is no significant impact on the environment as a result of this change.

- **CLAY LINED DITCHES**

In the ROD, a commitment was made to provide clay-lined ditches for all of the corridors selected, including Longmeadow Parkway.

During the coordination for the Section 404 permit for the Longmeadow Parkway, the US Army Corps of Engineers (USACE) identified that this commitment in the ROD would not meet their current permit program requirements. In coordination with the resource and regulatory agencies, including the USEPA, USACE, US Fish and Wildlife Service (USFWS), Illinois EPA, Illinois Department of Natural Resources (IDNR), IDOT, KDOT and FHWA, this commitment was changed to providing clay-lined ditches near IL Route 31 to meet the permitting requirements of the USACE. The change in commitment will result in better protection of WOUS. This coordination is documented in a July 9, 2015 e-mail from FHWA to IDOT, KDOT, and the resource and regulatory agencies.

The change in the commitment from the ROD was necessary to meet the USACE permitting requirements to provide the best protection to WOUS. This results in a lessening of the environmental impact and therefore there is no significant impact on the environment.

**NEW INFORMATION OR CIRCUMSTANCES**

- **RESIDENTIAL RELOCATIONS**

The FEIS identified eleven single family residential displacements required by the project. The number of relocations has been reduced to ten single family residential displacements. Seven of the ten single family relocations have already occurred. There are only three remaining single family relocations that will be required and there is sufficient replacement housing in the project area to relocate them.

Because the number of relocations has been reduced, this change is not a significant impact on the environment.

- **BALD EAGLE NEST SURVEY**

A bald eagle nest survey was completed because nesting bald eagles were observed in the project area.  There was one confirmed bald eagle nest approximately 1,330 feet from the nearest project limit. Because there is adequate distance, defined as a minimum distance of 300 feet, between the project and the nest, there is no impact on the nest.

The project will not have an impact on bald eagles and therefore there is not a significant impact.

- **AIR QUALITY DESIGNATION AS A PM$_{2.5}$ NONATTAINMENT AREA**

The project is within a nonattainment area for PM$_{2.5}$ hot spot analysis. Requirements for PM$_{2.5}$ were first established in March 2006 and later modified in November 2013. The Longmeadow Parkway project is not considered a "project of air quality concern" and therefore a quantitative hot spot analysis is not required. The project will accommodate 1,332 diesel trucks on the new roadway, which is much less than 10,000 diesel trucks, the threshold at which a quantitative analysis would be considered. Therefore, this project will not cause or contribute to any new localized PM$_{2.5}$ violations or increase the frequency or severity of any PM$_{2.5}$ violations.

The project will not have new impacts on air quality (PM$_{2.5}$) and therefore there is no significant impact on PM$_{2.5}$ as result of the project.

- **IDOT NOISE POLICY AND PROCEDURES**

On July 13, 2010, FHWA published a final rule updating its noise regulations (23 CFR 772). Subsequently, IDOT revised its noise policy and procedures to be consistent with the updated regulations. A traffic noise impact occurs when the future build noise levels approach, meet,

or exceed the appropriate Noise Abatement Criteria, or when future build noise levels substantially exceed (greater than 14 dB(A)) existing noise levels.

In the FEIS, the analysis for the Longmeadow Parkway corridor demonstrated that noise impacts occurred in four locations. Noise abatement was considered at each of those locations; however, no noise abatement was proposed because either the abatement would not provide substantial noise reduction or it was not economically reasonable based on cost compared to benefit (FEIS page #4-75).

A new noise analysis was completed for the Longmeadow Parkway corridor as part of the current EA Reevaluation using IDOT's updated noise policy and procedures. Several scattered new residences and a new subdivision, located along the north side of the proposed Longmeadow Parkway and west of IL Route 25, have been included in the noise analyses. There were additional receptors chosen for the updated study based upon IDOT's updated noise policy and current land use. There were no noise impacts due to a "substantial increase" of future build noise levels over existing noise levels.

Out of the four receptors impacted by noise in the FEIS, only one of those receptors was identified as impacted in the updated noise analysis. The updated noise analysis identified four additional receptors that would be impacted by noise, for a total of five impacted receptors. Noise walls were found to not be economically reasonable as the actual cost per benefited receptor exceeded the adjusted allowable cost per benefited receptor.

This change to the project resulted in a new impact not evaluated in the FEIS and was evaluated for context and intensity.

<u>CONTEXT ANALYSIS</u>

The noise sensitive receptors located within Kane County are predominantly single family residential. For the Longmeadow Parkway the sensitive receptor locations included predominantly single family residential with a few multi-family residential receptors, a place of worship and soccer field and trail heads. Both the existing and proposed noise levels are evaluated and noise measurements are calculated for locations where outdoor activity is likely to occur. Impacted receptors were all located along the side roads, i.e. Randall Road and IL Route 25, and not directly adjacent to the proposed Longmeadow Parkway. In the proposed condition with increased traffic it would be likely that impacts would occur to these receptor locations with or without the construction of the proposed Longmeadow Parkway.

Per IDOT's noise policy, if the future build noise level approaches or exceeds the noise abatement criteria (NAC), then the project is considered to have a noise impact. For residential properties, the NAC is 67 dB(A). A 3 dB(A) change in noise level is considered barely

perceptible by the human ear, and a 5 dB(A) change in noise level is considered readily perceptible.

INTENSITY ANALYSIS

As defined in 40 CFR 1508.27(b), intensity is evaluated by examining the following 10 criteria.

1. *Impacts that may be both beneficial and adverse. A significant impact may exist even if the Federal agency believes that on balance the effect will be beneficial.*

   There are five sensitive receptors that were determined to have noise impacts because the future build noise level at those locations exceeded the NAC of 67 dB(A)(R4, R5, R25, R26 and R26A).

   Receptor R4 is a single family residence located at the northwest corner of Longmeadow Parkway and Randall Road. The single family residence is immediately adjacent to Randall Road (approximately 40 feet from edge of pavement to the residence), a four-lane roadway with 23,560 ADT in 2015. The existing noise level at R4 is 73 dB(A) and the build noise level in 2040 is 77 dB(A). This results in a 4 dB(A) increase over the 20 year life of the project. Changes from 3 to 5 dB(A) are barely to readily perceptible by the human ear.

   Receptor R5 is a single family residence located at the southeast corner of Longmeadow Parkway and Randall Road. The single family residence is immediately adjacent to Randall Road (approximately 80 feet from edge of pavement to the residence), a four-lane roadway with 23,140 ADT in 2015. The existing noise level at R5 is 73 dB(A) and the build noise level in 2040 is 75 dB(A). This results in a 2 dB(A) increase over the 20 year life of the project. Changes less than 3 dB(A) are considered not perceptible by the human ear.

   Receptor R25 is a single family residence located along the west side of IL Route 25, south of Bolz Road. The single family residence is immediately adjacent to IL Route 25/Kennedy Drive (approximately 70 feet from edge of pavement to the residence), a four-lane roadway with 10,460 ADT in 2015. The existing noise level at R25 is 67 dB(A) and the build noise level in 2040 is 69 dB(A). This results in a 2 dB(A) increase over the 20 year life of the project. Changes less than 3 dB(A) are considered not perceptible by the human ear.

   Receptor R26 is a single family residence located along the east side of IL Route 25, south of Bolz Road. The single family residence is immediately adjacent to IL Route 25/Kennedy Drive (approximately 45 feet from edge of pavement to the residence), a four-lane roadway with 10,460 ADT in 2015. The existing noise level at R26 is 71 dB(A) and the build noise level in 2040 is 73 dB(A). This results in a 2 dB(A) increase over the 20 year life of the project. Changes less than 3 dB(A) are considered not perceptible by the human ear.

Receptor R26A is a place of worship located along the east side of IL Route 25, south of Bolz Road. The place of worship is immediately adjacent to IL Route 25/Kennedy Drive (approximately 70 feet from edge of pavement to the residence), a four-lane roadway with 10,460 ADT in 2015. The existing noise level at R26A is 70 dB(A) and the build noise level in 2040 is 72 dB(A). This results in a 2 dB(A) increase over the 20 year life of the project. Changes less than 3 dB(A) are considered not perceptible by the human ear.

All of these impacted receptors are along the side roads (i.e., Randall Road and IL Route 25) and not directly adjacent to the proposed Longmeadow Parkway.

2. *The degree to which the action affects public health or safety.*

Four of the five receptors impacted would have an increase in noise levels that would not be perceptible to the human ear (< 3 dB(A)). One of the five receptors would have a 4 dB(A) increase over the existing condition which may be perceived by the human ear. The highest noise level at an impacted receptor is 77 dB(A).

Generally, 120 dB(A) is recognized as the threshold of pain and considered a dangerous noise level. Noise levels less than 120 dB(A) can damage hearing if the listener is exposed to the noise for an extended period of time. The Occupational Safety and Health Administration (OSHA) standard for hearing protection is an 8-hour time-weighted average sound level of 85 dB(A). The noise levels for this project do not approach 85 dB(A).

Typically, traffic noise levels in areas of frequent human use do not approach these noise levels. A 90 dB(A) traffic noise level would occur if a person stood 10 to 20 feet from a roadway carrying approximately 1,000 trucks per hour. It is unlikely that residents would be exposed to this level of noise, and therefore it is unlikely that residents experience hearing damage due to traffic noise.

3. *Unique characteristics of the geographic area such as proximity to historic or cultural resources, parklands, prime farmlands, wetlands, wild and scenic rivers or ecologically critical areas.*

There are no historic or cultural resources, parklands, prime farmlands, or ecologically critical areas where noise impacts have been identified. The Fox River is not designated as a wild or scenic river.

4. *The degree to which the effects on the quality of the human environment are likely to be highly controversial*

The noise impacts will not have effects on the human environment that are likely to be controversial. In NEPA terms, effects are considered to be "controversial" when technical and scientific experts in the field disagree on the effects of the impact on the human environment. Increases in noise levels are common for transportation projects especially with new road construction and the effects on the environment are well understood. The effects on the human environment relating to the impacted receptors are not controversial.

5. *Degree to which possible effects on the quality of the human environment are highly uncertain or involve unique or unknown risks.*

Possible effects are highly certain and do not involve unique or unknown risks. It is common for transportation projects that involve new road construction result in increases in noise levels and potential impacts for sensitive receptors that are located adjacent to the project. The noise levels as summarized in the Traffic Noise Technical Report are definitive and demonstrate a highly certain impact with no unknown risks.

6. *The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principal about a future consideration.*

Most transportation projects that involve new road construction result in increases in noise levels and potential impacts for sensitive receptors that are located adjacent to the project. This does not set a precedent for any future actions.

7. *Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.*

The construction of the Longmeadow Parkway project will not force improvements on other roadways. The action will not result in cumulatively significant impacts due to noise.

8. *The degree to which the action may adversely affect items listed or eligible for listing in the National Register of Historic Places, or other significant scientific, cultural or historic resources.*

Noise impacts will not adversely impact any sites listed in or eligible for listing in the National Register of Historic Places or cause loss or destruction of significant scientific, cultural or historical resources.

9. *The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.*

   Noise impacts will not adversely affect an endangered or threatened species or its habitat that has been determined critical under the Endangered Species Act of 1973.

10. *Whether the action threatens a violation of Federal, State or local law or requirements imposed for the protection of the environment.*

    Noise impacts will not threaten a violation of Federal, State, or local law or requirements imposed for the protection of the environment. FHWA Noise Abatement Criteria and impact levels along with IDOT Noise Policy and Procedures have been followed and are documented in the Traffic Noise Technical Report.

CONCLUSION

Based on the context and intensity of the impact there is not significant impact on residences due to noise impacts.

- **STATE LISTED SPECIES**

  Three species have been listed by the State of Illinois after the ROD was issued, including the Blanding's turtle (threatened), Starhead topminnow (threatened), and Slippershell mussel (threatened).

  Blanding's turtle

  The Illinois Natural Heritage Database contains a record from 2006 of the Blanding's turtle approximately 1,000 feet south of the Longmeadow Parkway corridor. The project was coordinated with the IDNR who responded on March 25, 2015 recommending commitments be incorporated into the project in the location of the Blanding's turtle record. Those commitments are included in the EA Reevaluation and will be incorporated into the project plans.

  Starhead topminnow

  A fish survey was conducted in the project area and no state-listed species, including the Starhead topminnow, were found. A record of a Starhead topminnow exists at a location approximately 2,000 feet downstream of the project. Due to the potential presence of the Starhead topminnow, and the River redhorse (a previously state listed species), no in stream

will occur between April 1 and June 30. IDNR concurs with the in-stream work restriction dates per letter dated October 12, 2016. During this time period no work will affect the moving waterway outside of the cofferdam and causeway. Work can still occur within an already constructed cofferdam and causeway.

Slippershell mussel

The Illinois Natural Heritage Database does not have any records of listed mussels in the project vicinity. A mussel survey was conducted in the project area of the Fox River on July 14, 2016. Thirteen species of mussels were collected, no Slippershell mussels were found. A relict shell for Spike (state-listed, threatened) was found in the survey. The commitment in the 2002 ROD states that:

> Prior to the start of construction, a population survey of live, non-invasive mussel species will be conducted in streams to be crossed. In the event that any live specimens of the elktoe mussel or other non-invasive species are found, a mussel relocation program will be developed in consultation with the IDNR.

This commitment was written prior to the understanding of the Incidental Take Authorization process which became effective July 17, 2001. Thus, the commitment was changed in the EA Reevaluation to:

> A mussel survey will be conducted in the summer of 2016 to determine if any live threatened or endangered mussels exist in the project corridor. If a state listed mussel is found an Incidental Take Authorization will be required before any in stream work in the Fox River will occur.

This commitment was met. IDNR accepted the results of the survey per the October 12, 2016 IDNR letter. Thus, there is no longer a need for a commitment regarding mussels.

The project will have no new impact to the state-listed species and will incorporate measures to ensure state-listed species are protected; therefore, there is no significant impact on state-listed species.

- **NORTHERN LONG-EARED BAT**

The Northern Long-Eared Bat (NLEB) was listed as a threatened species by the USFWS on April 2, 2015. IDOT completed the "Northern Long-Eared Bat 4(d) Rule Streamlined Consultation Form" and submitted it to US Fish and Wildlife Service on July 14, 2016. The determination was made that the project may affect the NLEB, but that any resulting incidental take of the NLEB is not prohibited by the final 4(d) rule. The USFWS did not respond within 30-days of the notification and therefore this determination is informed by the best

available information and FHWA's project responsibilities under Section 7(a)(2) with respect to the NLEB are fulfilled through the USFWS January 5, 2016 Programmatic Biological Opinion (BO).

The following conservation measures will be implemented as part of this project:

- o Trees will not be cleared from April 1 through September 30, consistent with tree clearing dates noted on permits;
- o Impacts to trees will be mitigated at a 2:1 mitigation ratio per the tree mitigation plan, providing potential habitat for NLEB.

The project may affect the NLEB, but any resulting incidental take is not prohibited by the final 4(d) rule. Conservation measures will be implemented to minimize the potential for incidental take. Because the conservation measures will be implemented and any incidental take of the NLEB is not prohibited, there is no significant impact on the NLEB as a result of the project.

- **SMALLMOUTH BASS**

The project area has a higher Smallmouth bass population than other areas in the Fox River Basin. No in stream work will occur between April 1 and June 30 to protect state listed species and the in stream work restriction will benefit the Smallmouth bass since no in stream work will occur while the Smallmouth bass is spawning. Once the cofferdam is in place, all work in the Fox River including installation of the causeway, will be contained within the cofferdam.

There is no significant impact on the Smallmouth bass.

- **HISTORIC PROPERTY IMPACTS**

A forty foot strip of right-of-way will be acquired from the Perry-Lathrop property, which is considered eligible for the National Register of Historic Places. The Illinois State Historic Preservation Officer (SHPO) concurred with a conditional "no adverse effect" finding for the impact. The condition is that the landscaping plan near the Perry-Lathrop property will be submitted to the Illinois SHPO for review and approval.

Based on the commitment to submit the landscaping plan to the Illinois SHPO for review and approval, the "no adverse effect" finding, and concurrence by the Illinois SHPO, there is no significant impact to historic properties.

- **SECTION 4(f) PROPERTIES**

After completion of the ROD, there have been changes regarding Section 4(f) properties in the project area. Those properties include the Perry Lathrop house, Brunner Family Forest Preserve, the Fox River Shores Forest Preserve, and the Buffalo Park Forest Preserve.

Perry Lathrop property

The Perry-Lathrop property is located along the east side of IL Route 31 at 19N045. The Perry Lathrop property is considered eligible for the National Register of Historic Places and is therefore protected by Section 4(f) as a historic property. The Official with Jurisdiction (OWJ) for historic properties is the Illinois State Historic Preservation Officer (SHPO).

A forty foot strip of right-of-way (approximately 0.23 acres) will be acquired from the Perry Lathrop House, resulting in a Section 4(f) use. There is not a direct impact to the house. In coordination with the SHPO, a landscape plan will be developed and submitted to the SHPO for review and approval.

In a letter dated July 7, 2016, IDOT notified the SHPO that FHWA intended to make a Section 4(f) *de minimis* determination based on their concurrence with a conditional "no adverse effect" finding. The SHPO concurred with the no adverse effect finding on July 14, 2016 (Appendix E-60, EA Reevaluation).

The FHWA has determined that the Section 4(f) use of the Perry-Lathrop property, including the measures to minimize harm described in the EA Reevaluation, will have a Section 4(f) *de minimis* impact.

There is no significant impact on the Perry Lathrop property.

Buffalo Park Forest Preserve

FHWA considers the Buffalo Park Forest Preserve a resource protected by Section 4(f). The Forest Preserve District of Kane County (FPDKC) is the OWJ. Within the Buffalo Park Forest Preserve is the Raging Buffalo Snowboard Ski Park. The FPDKC is planning to expand the ski park, including additional parking, a new building, and a larger snowboarding hill.

Excavation of material will occur during construction of Longmeadow Parkway, resulting in approximately 524,000 cubic yards of excess material. Working together, KDOT and FPDKC reached agreement to use the excess material to improve the snowboarding hill within the Buffalo Park Forest Preserve. The improved snowboarding hill will use material excavated from the Longmeadow Parkway project to construct the improved snowboarding hill, for

recreational purposes. Approximately 25% of the work on the hill will occur within the Buffalo Park Forest Preserve with the remaining 75% of the work on the hill to occur within the adjacent Brunner Family Forest Preserve. The construction of the ski hill is not a Section 4(f) use because it is being done at the request of the KCFPD. Section 4(f) land is not being converted to a transportation use, it is being improved for recreational purposes planned for by the KCFPD.

To facilitate the transfer of fill material from the Longmeadow Parkway project site to the Forest Preserve snowboarding hill site, a temporary haul road, partially located on the Buffalo Park Forest Preserve, will be constructed.

As documented in the EA Reevaluation, the temporary haul road meets the temporary occupancy exception described in 23 CFR 774.13(d). Additionally, there is written agreement with FPDKC that the temporary occupancy exception criteria have been met (Appendix E-117 through E-119, EA Reevaluation).

Placement of fill on the Buffalo Park Forest Preserve is a benefit to the Section 4(f) resource as it helps the OWJ achieve its plans and objectives for the Section 4(f) property. Because the temporary occupancy exception is applicable for the construction of the haul road on the Buffalo Park Forest Preserve property, there is no section 4(f) use of this resource.

There is no significant impact on the Buffalo Park Forest Preserve.

<u>Brunner Family Forest Preserve</u>

The Brunner Family Forest Preserve was purchased in October 2008 by the FPDKC. FHWA considers the Brunner Family Forest Preserve a resource protected by Section 4(f), with the exception of the transportation corridor within the Brunner Family Forest Preserve, which was jointly planned by FPDKC and KDOT as a transportation corridor for Longmeadow Parkway. The OWJ for Brunner Family Forest Preserve is the FPDKC.

As documented in the EA Reevaluation, property was formally reserved for the Longmeadow Parkway before, or at the same time, the Brunner Family Forest Preserve was established (Appendix E-1 through E-5, EA Reevaluation). Pursuant to 23 CFR 771.11(i), when a property is formally reserved for a future transportation facility before or at the same time a park, recreation area, or wildlife and waterfowl refuge is established and concurrent or joint planning or development of the transportation facility and the Section 4(f) resource occurs, then any resulting impacts of the transportation facility will not be considered a use as defined in 23 CFR 774.17. Per FHWA's Section 4(f) Policy Paper (July 20, 2012), the land that will be used by the transportation project was reserved from and, therefore, has never been

part of the protected Section 4(f) property. Further, it is not possible to have a constructive use of the Section 4(f) property because it was jointly planned with the transportation project.

The only proposed work that will be outside of the reserved corridor within the Brunner Family Forest Preserve is a temporary haul road to be used to move fill material to the site where the snowboarding hill will be improved, per the request of the FPDKC. Approximately 25% of the work on the hill will occur within the Buffalo Park Forest Preserve with the remaining 75% of the work on the hill to occur within the adjacent Brunner Family Forest Preserve. The construction of the ski hill is not a Section 4(f) use because it is being done at the request of the KCFPD. Section 4(f) land is not being converted to a transportation use, it is being improved for recreational purposes planned for by the KCFPD. The temporary haul road will be constructed along the far western boundary and a farmed portion of the Brunner Family Forest Preserve.

As documented in the EA Reevaluation, the temporary haul road meets the temporary occupancy exception described in 23 CFR 774.13(d). Additionally, there is written agreement with FPDKC that the temporary occupancy exception criteria have been met (Appendix E-117 through E-119, EA Reevaluation).

Because the temporary occupancy exception is applicable for the construction of the haul road on the Buffalo Park Forest Preserve property, there is no Section 4(f) use of Brunner Family Forest Preserve caused by the temporary haul road construction and removal.

There is no Section 4(f) use of the Brunner Family Forest Preserve, and therefore there is no significant impact.

Fox River Shores Forest Preserve

FHWA considers the Fox River Shores Forest Preserve a resource protected by Section 4(f). The FPDKC is the OWJ.

In 2006, FPDKC combined the Algonquin Shores Forest Preserve with the Fox River Shores Forest Preserve. After combining the two adjacent resources, FPDKC retained the Fox River Shores Forest Preserve name. In the ROD, it was found that the Algonquin Shores Forest Preserve, owned by FPDKC, would be impacted by the Longmeadow Parkway project and there were no feasible and prudent alternatives to crossing in this location. The ROD states that the Fox River Shores Forest Preserve was directly south of the Algonquin Forest Preserve and that the Longmeadow Parkway (Bolz Road) crossing is in the area where the Algonquin Shores and Fox River Shores Forest Preserves are joined by a common property line. The ROD explains that the roadway will be on a bridge to minimize land used and to maintain access across the property. Two piers (with footings and piles) will be constructed on the Algonquin

Shores Forest Preserve Property. The total area used by the Longmeadow Parkway was identified as 2.12 acres. It was noted that the Fox River Trail would not be impeded by the roadway because it would be on structure.

The location of the Longmeadow Parkway near the Fox River Shores Forest Preserve has not materially changed since the ROD; the impacts identified are now within the Fox River Shores Forest Preserve because the Algonquin Shores Forest Preserve was incorporated into it.

There have been changes in impacts as a result of refined design of the Longmeadow Parkway in this section. The total permanent right-of-way required by the project has been reduced to 2.06 acres for construction of a detention pond, one bridge pier, mechanically stabilized earth walls, and providing additional length to the existing multi-use trail. An additional 0.9 acres of temporary right-of-way will be necessary to re-align the Fox River Trail. A new connection to the Fox River Trail will be provided from Longmeadow Parkway, which will provide a connection across the Fox River, and a connection between Brunner Family and Fox River Shores Forest Preserves.

The changes in impacts, as a result of the refined design, were disclosed to the public on May 3, 2015 and there was a 30-day opportunity to provide comments on the effects the project would have to the protected activities, features, and attributes that qualify the Fox River Shores Forest Preserve for Section 4(f) protection. Most comments received were general objections to advancing the project and expressed disagreement with applying the *de minimis* determination to the Forest Preserves that would be impacted by the project. Response letters were sent explaining the *de minimis* requirements and explaining that the impacts to the Fox River Shores Forest Preserve would not adversely affect the activities, features, or attributes that make the Fox River Shores Forest Preserve eligible for Section 4(f) protection. Subsequently, on May 24, 2016, KDOT sought concurrence with FPDKC that the project would not adversely affect the activities, features, or attributes that make the Fox River Shores Forest Preserve eligible for Section 4(f) protection and noted that FHWA intended to make a *de minimis* finding based on the FPDKC concurrence. The FPDKC concurred that the scope of work on the Longmeadow Parkway project would not adversely affect the activities, features, or attributes that make the Fox River Shores Forest Preserve eligible for Section 4(f) protection.

The FHWA has determined that the Section 4(f) use of the Fox River Shores Forest Preserve, including the measures to minimize harm described in the EA Reevaluation, will have a Section 4(f) *de minimis* impact.

There is a Section 4(f) *de minimis* use of the Fox River Shores Forest Preserve, and therefore there is no significant impact.

- **WETLAND IMPACTS**

The FEIS did not identify any wetland impacts resulting from the Longmeadow Parkway. After the ROD the right-of-way requirements were refined to include detention requirements and the improvements necessary on side roads that would intersect with Longmeadow Parkway. The US Army Corps of Engineers also updated their wetland delineation manual after the ROD was issued, which takes a more inclusive approach for identifying wetlands.

The Longmeadow Parkway corridor was delineated to take into account all of these changes that occurred. There are a total of eleven wetlands impacted, for a total acreage of 4.16 acres. Of the 4.16 acres impacted, 2.37 acres are considered jurisdictional under the USACE and will require an individual Section 404 permit, while the remaining 1.79 acres are considered non jurisdictional and will be permitted under Kane County requirements. A total of 17.13 acres of wetland mitigation is required. Mitigation credits have been purchased from a wetland bank site in Fox River Basin and some impacts to non-jurisdictional wetlands are being provided through a cooperative project between KDOT and FPDKC.

CONTEXT ANALYSIS

The Northeastern Morainal Natural Division, where Longmeadow Parkway is located, contains a landscape of the most recently glaciated portion of Illinois within the counties of Boone, DeKalb, DuPage, Kane Lake, McHenry, Will and Winnebago.  Approximately 72,000 acres of wetlands currently exist in the Northeastern Morainal Natural Division (http://www.dnr.illinois.gov/conservation/IWAP/Documents/NaturalDivisions/Northeastern Morainal.pdf).  About 8,891 acres of wetlands currently exist in Kane County (IDNR – Land Cover Summary Data by Counties – http://www.dnr.state.il.us/orep/ctap/map/counties.htm).

Twenty wetlands were identified within the project limits, (see Table 11 in the EA Reevaluation).   None of the wetlands identified had a Floristic Quality Index (FQI) of 19 or greater.  The FQI is an indication of native vegetative quality for an area.  Generally a value of under 19 indicates low vegetative quality.   Four sites were classified as Advanced Identification (ADID) sites indicating high habitat value or function.

INTENSITY ANALYSIS

As defined in 40 CFR 1508.27(b), intensity is evaluated by examining the following 10 criteria.

1. *Impacts that may be both beneficial and adverse. A significant impact may exist even if the Federal agency believes that on balance the effect will be beneficial.*

   The project will require filling 4.16 acres of wetlands, constituting less than 0.05% of the wetlands in Kane County and all of the wetlands impacted are considered to have low vegetative quality. The 4.16 acres of wetland impact will be mitigated with a total of 17.13 acres of wetlands, resulting in a net increase in wetlands. Approximately 13 acres of additional wetland will be created and could be considered a benefit.

2. *The degree to which the action affects public health or safety.*

   The impact to wetlands will not affect public health or safety.

3. *Unique characteristics of the geographic area such as proximity to historic or cultural resources, parklands, prime farmlands, wetlands, wild and scenic rivers or ecologically critical areas.*

   There are no historic or cultural resources, parklands, prime farmlands, or ecologically critical areas at any locations where wetlands will be impacted. The Fox River is not designated as a wild or scenic river. Wetlands that will be impacted are considered to have low vegetative quality. The average size of wetlands to be impacted is around 1 acre. Typically larger wetlands provide greater function and habitat value.

4. *The degree to which the effects on the quality of the human environment are likely to be highly controversial*

   In NEPA terms, effects are considered to be "controversial" when technical and scientific experts in the field disagree on the effects of the impact on the human environment. Filling of wetlands for highway projects, and other purposes, is common and the effects on the environment are well understood. The effects on the human environment of filling 4.16 acres of wetland are not highly controversial. Wetland impacts will not have effects on the human environment that are likely to be highly controversial. Because of the linear nature of transportation projects, it is common to impact wetlands; however, impacts have been minimized to the extent practicable, and the quality of wetlands to be impacted is considered low. Through the permitting process, mitigation will replace the wetlands impacted.

5. *Degree to which possible effects on the quality of the human environment are highly uncertain or involve unique or unknown risks.*

The wetland impact of 4.16 acres is a definitive, highly certain impact with no unknown risks. It is common for transportation projects, especially of this size, to have these types of wetland impacts. The wetlands impacted are considered to have low vegetative quality and will be replaced with 17.13 acres of wetlands.

6. *The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principal about a future consideration.*

Wetland impacts were minimized to the greatest extent possible in accordance with USACE permit guidance. The 4.16 acres of impacts to wetlands is not setting a precedent for any future actions. Regulatory requirements include avoiding impacts to wetlands. If this is not possible, the requirements include minimizing impacts to the greatest extent practical. On Longmeadow Parkway, construction limits were reduced to minimize impacts to wetlands and other resources.

7. *Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.*

The construction of the Longmeadow Parkway project will not force improvements on other roadways. The action will not result in cumulatively significant impacts on wetlands.

8. *The degree to which the action may adversely affect items listed or eligible for listing in the National Register of Historic Places, or other significant scientific, cultural or historic resources.*

Impacts to wetlands will not adversely impact any sites listed in or eligible for listing in the National Register of Historic Places or cause loss or destruction of significant scientific, cultural or historical resources.

9. *The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.*

Impacts to wetlands will not affect any threatened or endangered species or habitat. NLEB, fish and mussel species will not be affected by wetland impacts.

10. *Whether the action threatens a violation of Federal, State or local law or requirements imposed for the protection of the environment.*

Impacts to wetlands will not threaten a violation of Federal, State, or local law or requirements imposed for the protection of the environment. All required permits from the USACE will be obtained prior to construction and conditions stipulated in the permit will be followed including compliance with the Interagency Wetlands Policy Act.

CONCLUSION

Based on the context and intensity of the impact, and considering the mitigation that will be implemented as part of this action, there is no significant impact on wetlands.

- **TREE IMPACTS**

In the FEIS, there were 2.7 acres of trees that were identified to be impacted by the Longmeadow Parkway. After the ROD was issued, and KDOT completed detailed design, the right-of-way requirements were refined to include detention requirements and the improvements necessary on side roads that would intersect with Longmeadow Parkway.

The tree impacts were reassessed as part of the 2016 EA Reevaluation. The identification and evaluation of trees, in and adjacent to the right-of-way of the proposed Longmeadow Parkway was performed in accordance with the IDOT Design and Environment-18 (D&E-18) Preservation and Replacement Trees policy. A total of approximately 28.7 acres (or 5,765 trees) are anticipated to be impacted within the Longmeadow Parkway corridor.

According to IDOT policy, if balled and burlapped trees are used for replacement plantings, a minimum of 1:1 is recommended for the number of trees removed to the number of trees intended to be established. KDOT has proposed to mitigate the tree impacts at a 2:1 ratio, for a total of 11,530 balled and burlapped replacement trees. This exceeds D&E-18 minimum requirements for tree replacement and demonstrates environmental stewardship. KDOT plans to plant approximately 4,050 trees within the right-of-way of the Longmeadow Parkway and 7,500 trees on the west side of the Fox River within the Brunner Family Forest Preserve. Sizes, types and densities will be coordinated with the Forest Preserve District of Kane County (FPDKC). This mitigation is within the Northeastern Morainal Natural Division and will be held in conservation in perpetuity.

CONTEXT ANALYSIS

The Northeastern Morainal Natural Division, where Longmeadow Parkway is located, contains a landscape of the most recently glaciated portion of Illinois within the counties of Boone,

DeKalb, DuPage, Kane Lake, McHenry, Will and Winnebago. The pre-settlement plant communities within this division would have been comprised of approximately 60 percent prairie, in addition to upland oak forests, mesic sugar maple forests, marshes, sedge meadows, bogs and fens. Approximately 270,000 acres of forested areas currently exist within the Northeastern Morainal Natural Division (http://www.dnr.illinois.gov/conservation/IWAP/Documents/NaturalDivisions/Northeastern Morainal.pdf). About 24,660 acres of forest currently exists in Kane County. (IDNR – Land Cover Summary Data by Counties - http://www.dnr.state.il.us/orep/ctap/map/counties.htm). The Longmeadow tree survey indicates that the health of the trees within the project corridor as : 9% dead, 41.3% poor, 38% fair, 11.5% good and 0.2% excellent (*Tree Survey Report for Longmeadow Parkway*, August 2014).

<u>INTENSITY ANALYSIS</u>

As defined in 40 CFR 1508.27(b), intensity is evaluated by examining the following 10 criteria.

1. *Impacts that may be both beneficial and adverse. A significant impact may exist even if the Federal agency believes that on balance the effect will be beneficial.*

   The project will result in the removal of 28.7 acres of trees, constituting less than 0.5% of the forested area in Kane County. Within the 28.7 acres of forest, there are approximately 5,765 trees which will be replaced at a 2:1 ratio with 11,530 trees. The trees will be planted within the Longmeadow Parkway right-of-way and other public land. Mitigated at a 2:1 mitigation ratio doubles the amount of trees to be planted which can be considered a benefit. The new tree plantings will supplement existing forested resources as the older trees naturally progress, mature and die.

2. *The degree to which the action affects public health or safety.*

   The impact to trees will not affect public health or safety.

3. *Unique characteristics of the geographic area such as proximity to historic or cultural resources, parklands, prime farmlands, wild and scenic rivers or ecologically critical areas.*

   There are no prime farmlands, wetlands or ecologically critical areas at any locations where trees will be impacted. The Fox River is not designated as a wild or scenic river.

   The 28.7 acres that will be removed involves over 50 percent edge habitat but does include some interior forested areas.

   There will be some trees removed adjacent to the Perry Lathrop property which is considered eligible for inclusion in the National Register of Historic Places. A landscape

plan will be developed and submitted for SHPO approval prior to construction. This is included in the commitments and is not a new impact from the EIS. The SHPO concurred with a "no adverse effect" finding on the Perry Lathrop property.

In addition, there will be some trees impacts on FPDKC property in areas adjacent to the Fox River. Approximately 235 trees will be impacted at Raging Buffalo Snowboard Ski Park, a FPDKC property. These impacts result from improvements planned by the FPDKC and in coordination with them.

The majority of trees to be impacted include dead and poor quality trees and a 2:1 mitigation ratio will be applied to replace the impacted trees. The majority of the mitigation, approximately 7,500 trees, will be planted within the Brunner Family Forest Preserve where currently no trees exist. This will provide additional habitat along the Fox River and enhance the riparian buffer in this area. It will take some time for the balled and burlapped trees to grow and reach maturity and to provide the same function as the trees to be removed.

4. *The degree to which the effects on the quality of the human environment are likely to be highly controversial.*

In NEPA terms, effects are considered to be "controversial" when technical and scientific experts in the field disagree on the effects of the impact on the human environment. The removal of trees in the project area will not have effects on the human environment that are likely to be highly controversial. Tree removal for new transportation projects is common and the effects on the environment are well understood.

The effects on the human environment of removing 28.7 acres of trees are not highly controversial. The tree removal will not occur from April 1 through September 30 to minimize potential impacts to the Northern Long Eared Bat, a federally listed threatened species. Additionally, the trees will be replaced at a 2:1 ratio as a conservation measure.

5. *Degree to which possible effects on the quality of the human environment are highly uncertain or involve unique or unknown risks.*

Possible effects to the human environment as a result of the tree removal are highly certain and do not involve unique or unknown risks. It is common for transportation projects on new location to have impacts on trees and therefore these impacts are well understood.

6. *The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principal about a future consideration.*

The 28.7 acres of impacts to trees is not setting a precedent for any future actions. It is common for transportation projects, especially new bridge projects, to have these types of tree impacts.

7. *Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.*

When considered with other reasonably foreseeable past, present and future projects, cumulative impacts are expected to be minor. No cumulatively significant impacts are anticipated from impacting trees.

8. *The degree to which the action may adversely affect items listed or eligible for listing in the National Register of Historic Places, or other significant scientific, cultural or historic resources.*

Impacts to trees will not adversely impact any sites listed in or eligible for listing in the National Register of Historic Places or cause loss or destruction of significant scientific, cultural or historical resources. There will be some trees removed adjacent to the Perry Lathrop property which is considered eligible for inclusion on the National Register of Historic Places. A landscape plan will be developed and submitted for SHPO approval prior to construction. This is included in the commitments and is not a new impact from the EIS. The SHPO concurred with a "no adverse effect" determination on the Perry Lathrop property.

9. *The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.*

Impacts to trees will not affect any threatened or endangered species or habitat. The NLEB is a threatened species. Trees will not be cleared from April 1st through September 30 to avoid impacting the NLEB and impacts to trees will be mitigated at a 2:1 mitigation ratio providing potential additional habitat for the NLEB. Any incidental take of the NLEB is not prohibited.

10. *Whether the action threatens a violation of Federal, State or local law or requirements imposed for the protection of the environment.*

Impacts to trees will not threaten a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

<u>CONCLUSION</u>

Based on the context and intensity of the impact, and considering the mitigation that will be implemented as part of this action, there is no significant impact on trees.

**ENVIRONMENTAL COMMITMENTS**

Below is a list of all commitments. These commitments are specific to Longmeadow Parkway. The commitments in the FEIS applied to all corridors evaluated and were not necessarily specific to Longmeadow Parkway. This document supersedes any previous commitments made, and if there is a conflict with other documentation, then this FONSI takes precedence.

1. As part of the Congestion Management Study, Pace (the suburban bus division of the Regional Transportation Authority) requested the right to review any proposed plans to ensure compatibility with existing or proposed bus service.

2. As plans for the corridor are developed, ongoing coordination will take place with Pace to ensure the maximum practical inclusion of Travel Demand Reduction (TDR), Operational Management Strategies (OMS), and mass transit extensions and improvements in the project.

3. Clay lined ditches will only be provided near IL Route 31 to reduce the amount of chlorides reaching the shallow groundwater associated with seeps and wetlands west of the Fox River. In all other locations, stormwater runoff will be directed to permeable vegetative swales to continue to allow infiltration to groundwater.

4. Ponds in the area of IL Route 31 will be constructed in a clay/loam formation, similar to the ditches near IL Route 31, which provides protection for shallow ground water resources in this area.

5. Although the cofferdam and causeway may remain in the stream for as long as 2 years, no in stream work in the Fox River outside of the cofferdam and causeway shall occur between April 1 and June 30 due to the potential presence of River redhorse and the Starhead topminnow. The in stream work restriction will benefit the high concentration of Smallmouth bass since no in stream work will occur while the Smallmouth bass is spawning.

6. Of the 4.16 acres of wetlands impacted, 2.37 acres are considered jurisdictional under the USACE and will require an individual Section 404 permit, while the remaining 1.79 acres are considered non jurisdictional and will be permitted under Kane County requirements. A total of 17.13 acres of wetland mitigation is required. Mitigation credits have been purchased from a wetland bank site in Fox River Basin and some impacts to non-jurisdictional wetlands are being provided through a cooperative project between KDOT and FPDKC. Wetland mitigation for direct impacts will be provided in accordance with the more stringent of the USACE, IDNR and Kane County requirements and policies. Wetland mitigation credits from a wetland bank site from the same watershed basin.

7. Erosion and sediment control during construction shall comply with the requirements of the Kane County Stormwater Ordinance. The construction plans for each phase shall have the erosion and sediment control plans reviewed by KDOT.

8. Compensatory storage for fill within the regulatory floodplain will be provided in accordance with the more stringent requirements of the Kane County Countywide Stormwater Ordinance or IDNR-Office of Water Resource (OWR) policies.

9. All archaeological sites will be avoided, no further coordination is necessary.

10. Coordination, regarding review of landscaping plans, will be carried out with SHPO as plans for the Longmeadow Parkway are developed.

11. Blanding's turtle commitments:

    a. In order to assist in ease of movement for the Blanding's turtle, and decrease the likelihood of entrapment in the roadway, the proposed plan has been revised to demonstrate mountable curb and gutter in the area of Sleepy Hollow Road.

    b. KDOT will educate and inform construction crews and all on-site personnel about Blanding's turtle before work begins. The local agency will distribute photos (adult and juvenile) of the species and discuss the site management plan for responding to encounters in a training session and at the preconstruction site meeting. If a turtle is encountered on site, inform crews to immediately stop construction in the surrounding area and contact the appropriate staff at IDNR as listed in the contractor's documents, keeping in mind it is a criminal act to handle a listed species. Personnel on site should watch the turtle until the proper authority arrives to alleviate the situation, keeping at a respectable distance. If the turtle moves, crews should mark the spot where it was seen.

    c. The project area at Sleepy Hollow Road and Highmeadow Lane (south of Longmeadow Parkway) may contain the route to a nesting site. Therefore, potential harm to

transiting turtles is a concern. Work will be limited at Sleepy Hollow Road and Highmeadow Lane to between late October and late March, when this species is hibernating, to prevent construction activities from crushing or injuring juvenile or adult turtles.

d. If construction cannot be limited to between late October and late March, exclusionary fencing should be installed along the construction limits at the intersection of Sleepy Hollow Road and Highmeadow Lane. The fencing should be in place from the end of March through October to prevent turtles from entering the construction areas. Daily inspections should occur for the first two weeks and then be maintained weekly throughout the construction period to ensure the exclusionary fencing has been properly installed (dug into the ground) and to check if any turtles are present on either side of the fence.

e. Trenches along the construction limits at the intersection of Sleepy Hollow Road and Highmeadow Lane shall be covered at the end of each work day. Before starting each work day, trenches and excavations shall be routinely inspected to ensure no turtles (or other amphibians and reptiles) have become trapped within.

12. Trees shall not be cleared from April 1 through September 30 to protect the NLEB.

Within the 28.7 acres of forest, there are approximately 5,765 trees which will be replaced at a 2:1 ratio with 11,530 trees. The trees will be planted within the Longmeadow Parkway right-of-way and other public land.

13. Water wells that are within 200-feet of the project will be properly capped and abandoned unless they can be demonstrated that the well is deep, properly cased, and not hydraulically connected to the surface. If the dwelling associated with the water well will remain after construction is completed, the water well will be replaced or another suitable alternative will be provided. The water well will be constructed such that susceptibility to surficial contamination is minimized, for example, by constructing the well in a deeper aquifer.

14. A Preliminary Site Inspection (PSI) shall be completed before the project is included on a letting to determine if any of the sites or ROW adjacent to the sites will be impacted with the proposed work and/or if any ROW will be required at any of the locations identified in the Preliminary Environmental Site Assessment (PESA).

15. Great horned owls were documented using the nest that is located approximately 800 feet southwest of Karen Drive and Forest Drive. Since the Great horned owl is protected by the Migratory Bird Treaty Act, the tree with the nest shall not be cleared until the young have fledged and the nest is not being used. Per the Illinois Natural History Survey (INHS), the

Great horned owl nests between January 1 and May 31. The tree will be marked on the construction plans and it will not be cleared between January 1 and May 31.

16. Existing natural wetlands or forested tracts will not be used as a pollution prevention device. Natural wetlands will not to be used as primary detention facilities and any treated stormwater discharged to natural wetlands are not anticipated to change the existing use of wetlands.

## AGENCY FINDINGS

The following findings establish the project's adherence to applicable laws intended to protect sensitive environmental and socioeconomic resources.

### Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations

The project does not result in disproportionately high or adverse human health or environmental effects on minority or low-income populations (Executive Order 12898). The number of relocations is ten single family residential displacements, none are considered low income or minority populations.

### Section 106 of the National Historic Preservation Act of 1966 (NHPA)

The FHWA issued a conditional "no adverse effect" finding for this project related to the effects on the Perry Lathrop property. The SHPO concurred with this finding.

### Executive Order 11988, Floodplain Management

The Fox River has an identified floodplain at the crossing location. The streambanks are undeveloped and include a floodplain forest on the western bank. Floodplain fill is estimated at 0.57 acre-feet from fill generated from piers and walls. There is one floodplain within the project study area.

There will be no significant encroachment within any of the 100-year floodplains and regulatory floodways as part of the proposed improvements.

### Section 176(c) of the Clean Air Amendments of 1990

The project's design concept and scope are consistent with the project information used for the TIP conformity analysis. Therefore, this project conforms to the existing State Implementation Plan and the transportation-related requirements of the 1990 Clean Air Act Amendments.

This project is within a portion of a Nonattainment or Maintenance Area where CMAP is the MPO.

This project is included in the FY 2014-2019 Transportation Improvement Program (TIP) endorsed by the Metropolitan Planning Organization Policy Committee of the Chicago Metropolitan Agency for Planning

(CMAP) for the region in which the project is located. Projects in the TIP are considered to be consistent with the regional transportation plan endorsed by CMAP. The project is within the fiscally constrained portion of the plan.

On June 5, 2015, the Federal Highway Administration (FHWA) and the Federal Transit Administration (FTA) determined that the GO TO 2040 Comprehensive Regional Plan and the Transportation Improvement Plan conforms to the State Implementation Plan (SIP) and the transportation-related requirements of the 1990 Clean Air Act Amendments. These findings were in accordance with 40 CFR Part 93, "Determining Conformity of Federal Actions to State or Federal Implementation Plans."

**Executive Order 11990, Protection of Wetlands**

It is anticipated that the proposed action will result in 4.16 acres of wetland impacts. Executive Order (EO) 11990 requires federal agencies to avoid (to the extent practical) long- and short-term adverse impacts associated with the destruction or modification of wetlands. More specifically, EO 11990 directs federal agencies to avoid new construction in wetlands (if practicable avoidance alternatives exist). Where wetlands cannot be avoided, the proposed action must include all practicable measures to minimize harm to wetlands.

Wetland impacts have been avoided where practicable. Wetland impacts result from constructing the new road and bridge on new alignment, widening the existing Longmeadow Parkway and associated side streets to meet current safety and capacity requirements, ditch re-grading and detention requirements.

The determination is that there is no practicable alternative to the proposed construction and impact to wetlands and that the proposed action includes all practicable measures to minimize harm to wetlands that may result from such use.

**Section 7 of the Endangered Species Act**

FHWA determined that the project may affect the NLEB, but that any resulting incidental take of the NLEB is not prohibited by the final 4(d) rule. This determination is informed by the best available information and FHWA's project responsibilities under Section 7(a)(2) with respect to the NLEB are fulfilled through the USFWS January 5, 2016 Programmatic BO.

**Section 4(f) of the U.S. DOT Act of 1966**

FHWA has made the following determinations with respect to Section 4(f) properties:

Perry Lathrop property – Section 4(f) *de minimis* determination.

Buffalo Park Forest Preserve – No Section 4(f) use, temporary occupancy exception is applicable (23 CFR 774.13(d)).

Brunner Family Forest Preserve – Longmeadow Parkway corridor was jointly planned and thus the transportation corridor does not have a Section 4(f) use of this property (23 CFR 774.11(i)). The construction of temporary haul road outside of the reserve transportation corridor is not a Section 4(f) use because the temporary occupancy exception is applicable (23 CFR 774.13(d)).

Fox River Shores Forest Preserve – Section 4(f) *de minimis* determination.

## PUBLIC INVOLVEMENT

The EA Reevaluation was made available to the public on July 29, 2016 for public review and comment through September 6, 2016 at www.co.kane.il.us/dot/foxBridges/longmeadowPkwy.aspx as well as at select local libraries, Villages located within the study area, and the KDOT office. A complete listing of these locations was posted on the project website. Comments received through September 6, 2016 were made part of the official public hearing record.

An invitation postcard was sent to approximately 548 stakeholders on August 9, 2016. Advertisements for the public hearing were published in local newspapers, including the Northwest Herald (July 29 and August 23), Daily Herald (July 29 and August 23), and Reflejos (July 31 and August 21). An email with a web advertisement attached was sent to local municipalities and chambers of commerce the week of August 15th requesting that they distribute information about the public hearing to residents and businesses. Stacks of postcards and posters were also sent to the local municipalities.

 A public hearing was held on Tuesday, August 30, 2016, at the Holiday Inn – Chicago Northwest /Elgin at 495 Airport Road, Elgin, Illinois from 4:00 p.m. to 8:00 p.m. Representatives from the KDOT, IDOT, and consultant team were available to discuss the project and answer questions. Representatives from IDOT's Bureau of Land Acquisition were also present to answer questions regarding the land acquisition process.

The public hearing was in an open house format and also offered a public forum where participants were offered an opportunity to give public comment. There was also a continuous audio-visual presentation, exhibit boards for review, large scale aerials of the project area, and a comment area for attendees to provide comments, questions, and concerns. Two court reporters were available to take comments verbally. Two Spanish speaking interpreters were present throughout the hearing.

The meeting was attended by over 323 people and five media representatives. Forty-five (45) comments via comment form or letter were submitted by attendees. Thirty-six (36) people provided statements during the public forum. The comments submitted via comment form or letter indicated both opposition and support for the project, and covered a variety of topics, including benefits, capacity, environmental impacts, funding, impacts on wildlife and need for project.

All comments received through the end of the public comment period have been addressed and are attached to the Errata.

## CONCLUSION

The FHWA has determined that the changes to the proposed action will not result in significant environmental impacts that were not evaluated in the EIS. Additionally, the new information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts will not result in a significant environmental impact that was not evaluated in the EIS. There are therefore no new significant impacts on the human environment.

This finding of no new significant impacts is based on the attached EA Reevaluation, Errata, and response to public comments on the EA Reevaluation, which has been independently evaluated by the FHWA and determined to adequately and accurately assess the need, environmental issues, and impacts of the proposed project and appropriate mitigation measures.  It provides sufficient evidence and analysis for determining that a Supplemental EIS is not required.  The FHWA takes full responsibility for the accuracy, scope and content of the attached EA Reevaluation and Errata.


_November 22, 2016_

Date                                    Catherine A. Batey, Division Administrator

# EXHIBIT

# 7



**Midwest Region**

👍 **Like** 2.2K     Tweet     Share     **97**

January 10, 2017

Contacts:
Georgia Parham **Georgia_Parham@fws.gov** 812-334-4261 x 1203
Tamara Smith **Tamara_Smith@fws.gov** 952-252-0092 ext. 219

### In a race against extinction, rusty patched bumble bee is listed as endangered

#### First bumble bee protected under the Endangered Species Act



*Rusty patched bumble bee. Photo courtesy of Christy Stewart.*

Just 20 years ago, the rusty patched bumble bee was a common sight, so ordinary that it went almost unnoticed as it moved from flower to flower, collecting nectar and pollen. But the species, now balancing precariously on the brink of extinction, has become the first-ever bumble bee in the United States -- and the first bee of any kind in the contiguous 48 states -- to be declared endangered.

The endangered designation is made by the U.S. Fish and Wildlife Service under the Endangered Species Act for species that are in danger of becoming extinct throughout all or a portion of their range. Service Midwest Regional Director Tom Melius said, "Our top priority is to act quickly to prevent extinction of the rusty patched bumble bee. Listing the bee as endangered will help us mobilize partners and focus resources on finding ways right now to stop the decline."

Once common and abundant across 28 states from Connecticut to South Dakota, the District of Columbia and two Canadian provinces, the rusty patched bumble bee has experienced a swift and dramatic decline since the late 1990s. Abundance of the rusty patched bumble bee has plummeted by 87 percent, leaving small, scattered populations in 13 states and one province.

"The rusty patched bumble bee is among a group of pollinators – including the monarch butterfly – experiencing serious declines across the country," Melius said. "Why is this important? Pollinators are small but mighty parts of the natural mechanism that sustains us and our world. Without them, our forests, parks, meadows and shrublands, and the abundant, vibrant life they support, cannot survive, and our crops require laborious, costly pollination by hand."

Like other bees, rusty patched bumble bees pollinate many plants, including economically important crops such as tomatoes, cranberries and peppers. Bumble bees are especially good pollinators; even plants that can self-pollinate produce more and bigger fruit when pollinated by bumble bees. Each year, insects, mostly bees, provide pollination services valued at an estimated $3 billion in the United States.

Since 2000, rusty patched bumble bees have been reported in Illinois, Indiana, Iowa, Maine, Maryland, Massachusetts, Minnesota, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia and Wisconsin, and Ontario, Canada. Some populations are so small that it is unclear whether they still exist.

Causes of the decline in rusty patched bumble bee populations are believed to be loss of habitat; disease and parasites; use of pesticides that directly or indirectly kill the bees; climate change, which can affect the availability of the flowers they depend on; and extremely small population size. Most likely, a combination of these factors has caused the decline in rusty patched bumble bees.

Melius says there are steps the public can now take to help pollinators like the rusty patched bumble bee. Plant native flowers, even in small plots in urban areas, using a variety that will bloom from spring through fall. Limit or avoid use of pesticides if possible, and always follow label instructions carefully. Foster natural landscapes and leave grass and garden plants uncut after summer to provide habitat for overwintering bees.

The rusty patched bumble bee once lived in grasslands and prairies of the Upper Midwest and Northeast, but many of those areas are gone. The bee gathers pollen and nectar from a variety of flowering plants. It emerges in early spring and is one of the last bumble bee species to go into hibernation in the fall. Because it is active so long, it needs a constant supply of flowers blooming from April through September.

Rusty patched bumble bee colonies rely on survival of their queen bee, the only member of the colony that survives the winter. In spring, a solitary queen emerges from hibernation, finds a suitable nest site and lays eggs fertilized the previous fall. Worker bees hatch, and the colony grows. New queens replace the old, all workers die and the cycle repeats.

More information about the rusty patched bumble bee, the rule listing it as endangered, and ways to help this species and other pollinators is available at **https://www.fws.gov/midwest/endangered/insects/rpbb/index.html**

The final rule listing the rusty patched bumble bee as endangered appears in the January 11, 2017, Federal Register and takes effect on February 10, 2017.

*The mission of the U.S. Fish and Wildlife Service is working with others to conserve, protect and enhance fish, wildlife, plants and their habitats for the continuing benefit of the American people. We are both a leader and trusted partner in fish and wildlife conservation, known for our scientific excellence, stewardship of lands and natural resources, dedicated professionals and commitment to public service. For more information on our work and the people who make it happen, visit **www.fws.gov**.*

*Connect with our Facebook page at **facebook.com/usfwsmidwest**, follow our tweets at **twitter.com/usfwsmidwest**, watch our YouTube Channel at **youtube.com/usfws** and download photos from our Flickr page at **flickr.com/photos/usfwsmidwest**.*